**PEARSON LAW GROUP**
**By: Briana Lynn Pearson, Esquire**
**Identification No. 327007**
**1500 Chestnut St. Suite 2 #2898**
**Philadelphia, PA 19102**
**Phone: 484-469-0322**
**Fax: 856-229-9991**
**Email:**
**bpearson@pearsonlawgroup.org**

**Attorneys for Plaintiffs,**
*Seth Floyd and Erica Hadley*

### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FLOYD et al. | : |
| | : |
| v. | : No. 2:26-cv-02403 |
| | : |
| CITY COUNCIL FOR THE CITY OF PHILADELPHIA, et al. | : |

### PLAINTIFFS SETH FLOYD'S AND ERICA HADLEY'S SECOND AMENDED COMPLAINT

### INTRODUCTION

1.      This action challenges the validity and constitutionality of recently enacted Philadelphia legislation that fundamentally alters the legal and economic conditions under which residential landlords may own, maintain, manage, and lease rental property within the City. Plaintiffs allege that Defendants enacted the challenged ordinances through a legislative process that violated the Pennsylvania Sunshine Act and the Philadelphia Home Rule Charter and that Defendants' enactment and enforcement of those ordinances violate the Takings Clause, the Due Process Clause, the Equal

1

Protection Clause, the Contracts Clause, and Article I, Sections 1 and 26 of the Pennsylvania Constitution.

2. Plaintiffs do not seek exemption from reasonable regulation. Plaintiffs acknowledge that the City possesses legitimate authority to protect tenant health, safety, and housing stability.

3. However, Plaintiffs aver that the challenged legislation exceeds constitutional limits because it imposes cumulative burdens upon a discrete class of small housing providers that the legislative record itself identified as essential to preserving Philadelphia's affordable housing supply.

**PARTIES**

4. Plaintiff Seth Floyd ("Mr. Floyd") is an African American, adult individual, a resident and taxpayer of the City of Philadelphia, and the owner and operator of residential rental properties within the City. As a Philadelphia resident, taxpayer, and landlord, Mr. Floyd is directly and adversely affected by ordinances enacted by the Philadelphia City Council regulating residential rental housing, including Bills No. 250329-AA (attached hereto as Exhibit "A") and 250330-AA (attached hereto as Exhibit "B").

5. Plaintiff Erica Hadley ("Ms. Hadley") is an African American, adult individual and the owner and operator of residential rental properties within the City of Philadelphia. She owns and manages rental properties that are subject to the City's regulatory authority and is directly and adversely affected by Bills No. 250329-AA and 250330-AA, which govern the licensing, operation, management, and legal obligations of residential landlords in the City.

6.      Defendant City Council for the City of Philadelphia ("City Council") is the legislative body of the City of Philadelphia, organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal offices located at Philadelphia City Hall, Philadelphia, Pennsylvania. City Council enacted Bill No. 250329-AA, amending Chapter 9-3900 of The Philadelphia Code ("Property Licenses and Owner Accountability"), and Bill No. 250330-AA, amending Chapter 9-800 of The Philadelphia Code ("Landlord and Tenant"), both of which are challenged in this action.

7.      Defendant Philadelphia City Council Committee on Housing, Neighborhood Development and the Homeless ("Housing Committee") is a standing committee of the Philadelphia City Council responsible for conducting hearings, receiving testimony, considering, and making recommendations regarding legislation concerning housing, neighborhood development, homelessness, and landlord-tenant regulation. The Housing Committee considered and advanced Bill No. 250329-AA and Bill No. 250330-AA before their passage by City Council.

## JURISDICTION AND VENUE

8.      This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiffs seek redress for the deprivation, under color of state law, of rights secured by the Constitution and laws of the United States.

9.      To the extent Plaintiffs assert related claims arising under the laws of the Commonwealth of Pennsylvania, this Court has supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as Plaintiffs' federal claims.

3

10.    This Court has personal jurisdiction over Defendants because they are governmental entities of the City of Philadelphia and, at all relevant times, acted under color of state law within the Eastern District of Pennsylvania.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside in this judicial district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within the Eastern District of Pennsylvania, including the consideration, enactment, and implementation of the challenged ordinances.

**FACTUAL BACKGROUND**

**A.    Plaintiffs and Their Role in Philadelphia's Housing Ecosystem**

12.    Plaintiffs Seth Floyd and Erica Hadley are African American owners and operators of residential rental properties located within the City of Philadelphia.

13.    Plaintiffs are independent housing providers who own, maintain, manage, rehabilitate, and lease residential rental housing without the institutional infrastructure, economies of scale, or financial resources available to large corporate landlords.

14.    Plaintiffs are among the class of small, neighborhood-based housing providers that collectively supply a substantial portion of Philadelphia's naturally occurring affordable housing ("NOAH").

15.    Plaintiffs acquired their properties through years of personal labor, financial sacrifice, private investment, and financing.

16. They assumed financial obligations, invested substantial personal capital in rehabilitating aging housing stock, and devoted significant time and labor toward restoring and maintaining safe, habitable, and code-compliant housing for Philadelphia residents.

17. Plaintiffs did not acquire their properties through institutional investment funds or speculative real estate portfolios. Rather, their rental businesses were built incrementally through individual effort and long-term investment.

18. Unlike institutional housing providers, Plaintiffs personally oversee virtually every aspect of property ownership and management.

19. They perform or directly supervise maintenance, repairs, code compliance, licensing, tenant communications, leasing, financial management, contractor coordination, inspections, and regulatory compliance.

20. Every dollar invested in their properties represents their own capital or borrowed funds for which they remain personally responsible.

21. Rental income generated by Plaintiffs' properties is not passive investment income.

22. Rather, it constitutes the operating revenue necessary to satisfy mortgage obligations, pay real estate taxes, insurance premiums, utilities, maintenance expenses, licensing fees, repairs, and capital improvements while permitting continued reinvestment in Philadelphia neighborhoods.

23. The continued viability of Plaintiffs' rental businesses depends upon maintaining sufficient cash flow to preserve their properties, comply with applicable law, and continue providing quality housing to Philadelphia residents.

24. Plaintiffs acquired, rehabilitated, and continue to operate their properties in reliance upon the legal framework governing residential rental housing existing at the time of acquisition.

25. In making substantial financial commitments to purchase and improve their properties, Plaintiffs reasonably relied upon Pennsylvania law recognizing the traditional incidents of private property ownership, including the rights to possess, manage, lease, maintain, improve, economically benefit from, and lawfully recover possession of residential property.

26. Plaintiffs further relied upon a regulatory framework that permitted them to operate financially sustainable rental businesses while continuing to reinvest in their properties and neighborhoods.

27. Plaintiffs' rental properties constitute naturally occurring affordable housing because they provide affordable rental units without continuing governmental subsidy.

28. These properties remain affordable not because they receive ongoing public funding, but because they are owned and managed by Plaintiffs who are small local housing providers whose business models differ fundamentally from institutional investment firms seeking large portfolio-level returns.

29.     Plaintiffs' ability to continue providing affordable housing depends upon reasonably predictable regulatory requirements, timely collection of rent, prompt resolution of landlord-tenant disputes, the lawful ability to recover possession of rental property when authorized by law, and the continued economic viability of operating small residential rental businesses.

30.     Because Plaintiffs own and personally manage a limited number of rental properties, increases in operating expenses, compliance costs, litigation exposure, or interruptions in rental income cannot be distributed across extensive real estate portfolios or absorbed through institutional financing.

31.     Plaintiffs' properties are not speculative investment vehicles. They are long-term community assets that provide housing to working families, senior citizens, individuals receiving fixed incomes, and other Philadelphia residents who rely upon naturally occurring affordable housing because market-rate alternatives frequently exceed their financial means.

32.     Plaintiffs' continued ability to maintain those properties therefore directly affects both their own economic stability and the continued availability of affordable housing within the neighborhoods they serve.

### B.     Historical Barriers to African American Property Ownership and Wealth Preservation

33.     The ownership of real property has long been recognized as one of the principal means through which American families accumulate wealth, preserve financial stability, and create opportunities for future generations.

34.   For much of the Nation's history, however, African Americans were systematically denied equal access to those opportunities through governmental policies and private practices that restricted the acquisition, financing, development, and transfer of real property.[1]

35.   Historic practices including racially restrictive covenants, redlining, discriminatory mortgage lending, exclusion from conventional credit markets, unequal access to commercial financing, urban renewal policies, discriminatory property valuation practices, and barriers to intergenerational wealth accumulation substantially limited opportunities for African American families to acquire and preserve income-producing real estate.

36.   Although many of those practices have since been prohibited by law, scholars, economists, and housing researchers continue to recognize that their economic effects persist through significant disparities in accumulated wealth, borrowing costs, access to investment capital, commercial credit, and rates of property ownership.

37.   As a consequence of those historical barriers, African American housing providers frequently operate with less accumulated capital, fewer financial reserves,

---

[1] Economists Ellora Derenoncourt, Chi Hyun Kim, Moritz Kuhn, and Moritz Schularick conclude that the Black-white wealth gap is the cumulative product of slavery, unequal initial wealth, and more than a century of discriminatory barriers to wealth accumulation. Their research demonstrates that even under equal wealth-building conditions after Emancipation, the initial disparity would have persisted for generations. In reality, however, unequal access to savings opportunities, capital markets, and appreciating assets caused convergence to proceed even more slowly, with the racial wealth gap widening again since the 1980s. These findings demonstrate that government action which further restricts wealth creation or destroys accumulated assets in historically disadvantaged communities compounds entrenched racial disparities rather than alleviating them. At its core, this is not merely an economic issue,it is a constitutional one. Government policies that intentionally or foreseeably exacerbate longstanding racial inequities implicate the Equal Protection Clause's promise that all persons receive the equal protection of the laws, particularly where state action perpetuates or deepens historically rooted racial disparities. *See* Ellora Derenoncourt, Chi Hyun Kim, Moritz Kuhn & Moritz Schularick, *Wealth of Two Nations: The U.S. Racial Wealth Gap, 1860–2020*, ECONtribute Discussion Paper No. 168 (May 24, 2022).

reduced access to institutional financing, narrower operating margins, and fewer opportunities to absorb significant regulatory costs than larger institutional real estate companies.

38.    Plaintiffs belong to that historically disadvantaged class of property owners.

39.    Their ownership of residential rental housing represents years of personal investment, disciplined financial planning, rehabilitation of aging housing stock, and wealth creation achieved despite longstanding structural barriers to property ownership and capital formation.

40.    For many African American families, ownership of small residential rental properties represents one of the few remaining pathways for building intergenerational wealth, preserving financial independence, financing retirement, supporting family members, and maintaining long-term economic stability.

41.    Preservation of those opportunities is particularly significant in communities that historically experienced systematic exclusion from conventional opportunities for property ownership and wealth accumulation.

42.    Plaintiffs therefore allege that governmental action which substantially increases the economic barriers to owning and operating small residential rental properties foreseeably threatens not only individual businesses, but also one of the principal mechanisms through which historically marginalized communities continue to build, preserve, and transfer wealth through lawful property ownership.

### C.    Philadelphia's Affordable Housing Ecosystem and Naturally Occurring Affordable Housing

43.    Philadelphia's housing market functions as an interconnected economic ecosystem in which tenants, landlords, lenders, neighborhoods, contractors, nonprofit organizations, local government, and the judicial system each perform interdependent roles. The continued availability of affordable housing depends upon maintaining the long-term economic health of every component of that ecosystem rather than shifting disproportionate economic burdens onto any single participant.[2]

44.    Sustainable housing policy therefore requires protecting both tenants and the independent housing providers who supply affordable housing.

45.    Legislation that renders independent housing providers economically unable to continue operating ultimately reduces housing availability, discourages neighborhood investment, accelerates market consolidation, and harms the very tenants such legislation seeks to protect.

46.    Research funded by the Philadelphia Research and Policy Initiative of The Pew Charitable Trusts, and informed by Philadelphia's Department of Licenses and Inspections, concluded that naturally occurring affordable housing, constitutes one of Philadelphia's largest sources of affordable rental housing because it is supplied

---

[2] The Urban Institute characterizes Philadelphia's rental housing market as an interconnected regulatory and support ecosystem in which government agencies, landlords, tenants, nonprofit organizations, health institutions, and community stakeholders each play essential and interdependent roles in maintaining safe, affordable housing. The report concludes that effective housing policy requires coordinated investment, regulatory efficiency, landlord support, and tenant protections rather than imposing disproportionate burdens on any single participant, recognizing that preserving affordable housing depends upon maintaining the long-term health and stability of the housing ecosystem as a whole. *See* Joseph Schilling, Fay Walker, Tanay Nunna & Christina Stacy, *Improving Philadelphia's Rental Regulatory and Housing Support Systems: A Strategic Policy & Health Impact Assessment* (Urban Inst., Sept. 2022).

without continuing governmental subsidy and is owned predominantly by small independent housing providers, like Plaintiffs, rather than institutional investors. *See* Joseph Schilling, Fay Walker, Tanay Nunna & Christina Stacy, *Improving Philadelphia's Rental Regulatory and Housing Support Systems: A Strategic Policy & Health Impact Assessment* (Urban Inst., Sept. 2022).

47. The same research further recognizes that many landlords owning only one or two rental properties lack sufficient access to capital needed to maintain and improve their properties.

48. Rather than recommending increased cumulative regulatory complexity, the research recommends preservation strategies centered upon streamlined regulatory compliance, technical assistance, expanded access to financing, and policies designed to preserve the continued participation of small housing providers in Philadelphia's rental market.

49. Plaintiffs fall squarely within the class of housing providers identified by this research. As independent landlords operating limited numbers of residential rental properties, Plaintiffs rely upon the economic viability of each individual property they own. They do not possess dedicated legal departments, compliance personnel, institutional financing, large diversified investment portfolios, or the ability to spread increasing regulatory costs across hundreds or thousands of rental units.

50. Accordingly, preserving naturally occurring affordable housing necessarily requires preserving the continued economic viability of the small independent landlords who own, maintain, rehabilitate, and reinvest in those properties. Affordable

housing cannot be preserved if the housing providers responsible for maintaining that housing are rendered economically unable to continue operating. *Id.*

51.    The same research further recognizes that cumulative increases in regulatory complexity, compliance costs, litigation exposure, and administrative burdens disproportionately affect small housing providers because those providers generally operate with significantly fewer financial resources than institutional landlords. Those findings were available before enactment of the challenged legislation and were consistent with the testimony presented by Plaintiffs and numerous other housing providers during the legislative process. *Id.*

52.    When independent housing providers become unable to continue operating economically viable rental businesses, the effects extend beyond individual landlords.

53.    Small landlords may defer maintenance, postpone rehabilitation projects, reduce investment in existing housing stock, sell rental properties, or withdraw from the rental housing market entirely.

54.    Those outcomes reduce neighborhood-based ownership, increase market consolidation, diminish opportunities for wealth preservation within historically marginalized communities, and threaten the long-term availability of naturally occurring affordable housing throughout Philadelphia.

55.    Accordingly, preservation of affordable housing and preservation of independent housing providers are inseparable objectives.

56.    Plaintiffs allege that policies which undermine the continued participation of small local landlords necessarily undermine Philadelphia's broader affordable housing ecosystem and ultimately harm landlords, tenants, neighborhoods, and the City alike.

57.    A substantial percentage of Philadelphia residents reside in rental housing rather than owner-occupied homes, making the continued availability of safe, affordable, and financially sustainable rental housing essential to the City's economic stability and public welfare.

58.    Unlike newly constructed affordable housing, privately owned residential properties remain affordable without ongoing governmental subsidy because of their age, location, construction type, or operating costs. These properties provide housing opportunities for working families, senior citizens, individuals living on fixed incomes, and marginalized Philadelphians, and residents whose incomes frequently exceed eligibility thresholds for subsidized housing but remain insufficient to afford newly constructed market-rate housing.

59.    The preservation of Philadelphia's affordable housing supply depends not only upon constructing new housing but also upon maintaining and preserving existing naturally occurring affordable housing. Replacement of existing affordable rental units through new construction requires substantial public and private investment, extended development timelines, land acquisition, financing, zoning approvals, and ongoing governmental subsidies. Consequently, preservation of existing affordable housing is widely recognized as a more economically efficient means of maintaining housing affordability than replacing affordable units after they have been lost.

60.    Much of Philadelphia's naturally occurring affordable housing is owned and operated by small independent landlords rather than institutional real estate companies. Unlike large corporate housing providers, independent landlords frequently own only one or a small number of residential rental properties, personally manage their properties, and rely upon rental income to satisfy mortgages, taxes, insurance, maintenance expenses, and ongoing rehabilitation costs.

61.    Because these housing providers generally operate with limited financial reserves and narrower operating margins than institutional landlords, increases in fixed compliance costs, administrative obligations, litigation expenses, licensing requirements, or interruptions in rental income consume a proportionally greater share of their available operating revenue. The economic viability of many small housing providers therefore depends upon a reasonably predictable legal and regulatory environment that permits continued investment in the maintenance and preservation of existing housing stock.

62.    Accordingly, the long-term preservation of Philadelphia's affordable rental housing market depends not only upon protecting tenants but also upon maintaining the continued financial viability of the independent housing providers responsible for owning, maintaining, rehabilitating, and preserving much of the City's naturally occurring affordable housing. Plaintiffs allege that legislation materially affecting the economic viability of those housing providers necessarily affects the availability, quality, and long-term preservation of affordable housing throughout Philadelphia.

63.    These properties provide housing opportunities for working families, senior citizens, individuals living on fixed incomes, and other residents whose incomes frequently exceed eligibility thresholds for subsidized housing but remain insufficient to afford newly constructed market-rate housing.

64.    The preservation of Philadelphia's affordable housing supply depends not only upon constructing new housing but also upon maintaining and preserving existing naturally occurring affordable housing. Replacement of existing affordable rental units through new construction requires substantial public and private investment, extended development timelines, land acquisition, financing, zoning approvals, and ongoing governmental subsidies. Consequently, preservation of existing affordable housing is widely recognized as a more economically efficient means of maintaining housing affordability than replacing affordable units after they have been lost.

65.    Much of Philadelphia's naturally occurring affordable housing is owned and operated by small independent landlords rather than institutional real estate companies. Unlike large corporate housing providers, independent landlords frequently own only one or a small number of residential rental properties, personally manage their properties, and rely upon rental income to satisfy mortgages, taxes, insurance, maintenance expenses, and ongoing rehabilitation costs. Because these housing providers generally operate with limited financial reserves and narrower operating margins than institutional landlords, increases in fixed compliance costs, administrative obligations, litigation expenses, licensing requirements, or interruptions in rental income consume a proportionally greater share of their available operating revenue. The economic viability of many small housing providers therefore depends

upon a reasonably predictable legal and regulatory environment that permits continued investment in the maintenance and preservation of existing housing stock.

66.    Accordingly, the long-term preservation of Philadelphia's affordable rental housing market depends not only upon protecting tenants but also upon maintaining the continued financial viability of the independent housing providers responsible for owning, maintaining, rehabilitating, and preserving much of the City's naturally occurring affordable housing. Plaintiffs allege that legislation materially affecting the economic viability of those housing providers necessarily affects the availability, quality, and long-term preservation of affordable housing throughout Philadelphia.

**D. The Legislative Process and Defendants' Actual Notice**

67.    During consideration of Bill No. 250329-AA (Phila. Apr. 23, 2026) and Bill No. 250330-AA (Phila. Apr. 23, 2026), Defendant Philadelphia City Council and its Committee on Housing, Neighborhood Development and the Homeless conducted multiple public hearings concerning the proposed legislation.

68.    Plaintiffs personally attended those hearings and actively participated in the legislative process.

69.    Plaintiffs appeared before City Council and its Committee to provide testimony concerning the anticipated legal, economic, and practical effects of the proposed legislation upon small independent housing providers, affordable housing, and Philadelphia neighborhoods.

70.    Numerous additional small landlords, including African American landlords and other minority-owned housing providers, likewise appeared before Council to express similar concerns. Collectively, these speakers represented neighborhood-based housing providers responsible for maintaining substantial portions of Philadelphia's naturally occurring affordable housing.

71.    Plaintiffs and other speakers consistently advised Defendants that the proposed legislation would substantially increase cumulative regulatory burdens through expanded compliance requirements, increased licensing consequences, additional administrative obligations, greater litigation exposure, expanded procedural barriers to recovering possession of residential property, increased operational costs, and prolonged interruptions in rental income.

72.    Plaintiffs further advised Defendants that the cumulative effect of those additional obligations would fall disproportionately upon small independent landlords who lacked institutional economies of scale, dedicated compliance personnel, diversified investment portfolios, or access to substantial commercial financing.

73.    Plaintiffs further advised Defendants that African American and other minority-owned, and marginalized, rental businesses would be especially affected because many continue to operate with fewer accumulated financial resources and more limited access to institutional capital as a consequence of longstanding historical barriers to property ownership and commercial lending.

74.    Plaintiffs further presented evidence that weakening the financial viability of neighborhood-based housing providers would discourage continued investment in

17

naturally occurring affordable housing, increase pressure upon independent landlords to reduce investment or dispose of rental properties, accelerate consolidation of Philadelphia's rental housing market among larger institutional owners, diminish neighborhood-based ownership, and ultimately reduce affordable housing opportunities available to Philadelphia residents.

75.    The testimony presented by Plaintiffs and other housing providers was consistent with the independent housing research referred to herein.

76.    That research had identified the economic importance of preserving small independent housing providers, recommended reducing unnecessary regulatory complexity, and warned that preservation of naturally occurring affordable housing depends upon maintaining the continued participation of neighborhood-based landlords in Philadelphia's housing market.

77.    Several speakers, including minority housing providers, were interrupted, prevented from completing prepared testimony, or afforded materially less opportunity to present their concerns than other participants in the legislative proceedings. Plaintiffs allege that testimony concerning the disproportionate effects upon small housing providers and minority-owned rental businesses received little meaningful consideration despite its consistency with the independent research before Defendants.

78.    Accordingly, before enacting the challenged ordinances, Defendants possessed actual notice that the proposed legislation would foreseeably impose disproportionate economic burdens upon small independent landlords, particularly minority-owned

rental businesses, while simultaneously threatening the long-term preservation of naturally occurring affordable housing throughout Philadelphia.

79.    Notwithstanding those warnings, Defendants proceeded to enact the challenged legislation substantially without adopting meaningful measures designed to preserve the continued economic viability of small housing providers or mitigate the foreseeable consequences identified through both public testimony and independent housing research.

### E. Procedural Irregularities During the Legislative Process

80.    Plaintiffs further allege that portions of the legislative process failed to comply with the procedural requirements imposed by the Pennsylvania Sunshine Act, 65 Pa. Cons. Stat. §§ 701-716, and the Philadelphia Home Rule Charter.

81.    Plaintiffs personally attended multiple relevant hearings related to the legislation at issue.

82.    Based upon their personal observations, Plaintiffs observed that only approximately two (2) to three (3) Committee members were present during substantial portions of the hearings while official proceedings continued.

83.    Plaintiffs further observed Committee members repeatedly entering and leaving the hearing room throughout the proceedings, resulting in extended periods during which fewer than four (4) Councilmembers were present while testimony, discussion, and other official business continued.

84.    Plaintiffs personally observed official proceedings continue during multiple portions of the hearings despite what Plaintiffs understood to be the absence of a continuous quorum.

85.    Plaintiffs further allege that material amendments affecting the challenged legislation were not made publicly available in sufficient time to permit meaningful public review before legislative action occurred.

86.    Plaintiffs further allege that members of the public were not afforded a meaningful opportunity to review and comment upon the operative legislative language before Defendants proceeded toward enactment.

87.    Photographs attached hereto as Exhibit "C" fairly and accurately depict portions of the hearings and corroborate Plaintiffs' observations regarding the absence of a continuous quorum.

88.    Plaintiffs allege that these procedural deficiencies deprived both Plaintiffs and the public of the transparent legislative process required by Pennsylvania law and the Philadelphia Home Rule Charter.

### F.    Enactment of the Challenged Ordinances

89.    Following the legislative proceedings described above, Defendants enacted Bill No. 250329-AA (Phila. Apr. 23, 2026) and Bill No. 250330-AA (Phila. Apr. 23, 2026).

90.     Collectively, the challenged ordinances substantially expand the legal and regulatory obligations governing the ownership, licensing, maintenance, management, leasing, and operation of residential rental property within the City of Philadelphia.

91.     Among other things, the legislation imposes additional procedural requirements affecting landlord-tenant relationships, increases administrative obligations, expands licensing consequences, enlarges potential civil liability, broadens enforcement mechanisms, and materially alters the legal framework under which residential rental housing must be owned and operated.

92.     Although many individual provisions appear limited when viewed in isolation, Plaintiffs are subject to the cumulative operation of the statutory scheme as enacted. Acting together, the challenged ordinances materially increase the financial, operational, legal, and administrative burdens associated with owning and operating small residential rental properties.

93.     Those cumulative burdens include increased compliance costs, expanded administrative requirements, greater litigation exposure, increased licensing risks, prolonged delays affecting the recovery of possession, interruption of rental income, increased legal expenses, additional operational uncertainty, and greater costs associated with maintaining continued compliance.

94.     Unlike institutional housing providers, Plaintiffs cannot distribute these additional costs across extensive real estate portfolios or absorb temporary operating losses through diversified investment capital or institutional financing. Every additional regulatory expense directly reduces the financial resources available to

21

maintain Plaintiffs' properties, satisfy mortgage obligations, preserve affordable housing, and continue reinvesting in Philadelphia neighborhoods.

### G.    Plaintiffs' Present and Ongoing Injuries

95.    Plaintiffs are presently subject to the challenged statutory scheme.

96.    As owners and operators of residential rental property within Philadelphia, Plaintiffs must immediately alter the manner in which they own, manage, maintain, license, lease, and operate their properties in order to comply with the challenged legislation.

97.    Plaintiffs have already incurred and continue to incur increased compliance costs, expanded administrative obligations, increased legal expenses, greater operational uncertainty, additional regulatory burdens, and increased exposure to administrative and judicial proceedings directly attributable to the challenged ordinances.

98.    The challenged legislation further interferes with Plaintiffs' reasonable investment-backed expectations concerning the ownership and operation of their properties by substantially increasing the costs and burdens associated with exercising traditional incidents of private property ownership.

99.    Because Plaintiffs personally own and manage only a limited number of residential rental properties, each additional regulatory burden consumes financial resources that otherwise would have been invested in maintenance, rehabilitation,

capital improvements, neighborhood reinvestment, and preservation of affordable housing.

100. The foreseeable consequences extend beyond Plaintiffs' individual businesses.

101. The challenged legislation increases financial pressure upon neighborhood-based housing providers to defer maintenance, postpone rehabilitation, reduce investment, dispose of rental properties, or withdraw from Philadelphia's rental housing market altogether.

102. As independent housing providers leave the market, Philadelphia's stock of naturally occurring affordable housing becomes increasingly vulnerable to deterioration, redevelopment, institutional acquisition, and permanent loss. Neighborhoods lose locally invested property owners. Opportunities for wealth preservation within historically marginalized communities diminish. Affordable housing options available to working families, seniors, and residents of modest means correspondingly decline.

103. Plaintiffs do not allege that protecting tenants is inconsistent with protecting landlords. Rather, Plaintiffs allege that sustainable affordable housing requires legislation that protects both tenants and the independent housing providers who supply that housing. Policies that render neighborhood-based housing providers economically unable to continue operating ultimately reduce housing availability and harm the very tenants such legislation seeks to protect.

104. Plaintiffs further allege that the challenged legislation threatens more than their individual economic interests. It threatens one of the principal mechanisms through

which historically marginalized communities, particularly African Americans, have been able to acquire, preserve, and transfer wealth through lawful ownership of income-producing real property. Simultaneously, it places at risk one of Philadelphia's largest sources of naturally occurring affordable housing. Rather than strengthening Philadelphia's housing ecosystem, Plaintiffs allege that the challenged legislation foreseeably weakens one of its essential components by undermining the continued participation of the independent housing providers upon whom much of the City's affordable housing supply depends.

105. As a direct and proximate result of Defendants' enactment and enforcement of the challenged ordinances, Plaintiffs have suffered and continue to suffer concrete, particularized, ongoing, and irreparable injuries that are fairly traceable to Defendants' conduct and redressable by the relief requested in this action.

### H.   Defendants Enacted the Challenged Ordinances Despite Contrary Evidence in the Legislative Record

106. Before enacting Bills No. 250329-AA (Phila. Apr. 23, 2026) and Bill No. 250330-AA (Phila. Apr. 23, 2026), Defendants possessed substantial information concerning the foreseeable economic and housing-market consequences of the proposed legislation.

107. That information included testimony presented by Plaintiffs and numerous other independent housing providers during multiple public hearings, as well as the independent housing research referenced herein.

24

108.    Research, clearly, accessible to Defendants, recognized that naturally occurring affordable housing constitutes one of Philadelphia's largest sources of affordable rental housing and that preservation of this housing depends substantially upon the continued economic viability of small, neighborhood-based housing providers.

109.    The same research concluded that many owners of one or two rental properties operate with limited capital reserves, experience difficulty obtaining financing for repairs and improvements, and face significant challenges complying with increasingly complex regulatory requirements. Rather than recommending additional cumulative regulatory obligations, the research emphasized streamlined compliance procedures, technical assistance, expanded access to capital, and preservation strategies designed to maintain the continued participation of small housing providers in Philadelphia's housing market.

110.    Plaintiffs and other speakers presented substantially similar information directly to Defendants during the legislative process. Plaintiffs advised Defendants that the proposed legislation would materially increase compliance costs, administrative burdens, litigation exposure, licensing risks, operational uncertainty, and delays associated with recovering possession of residential rental property. Plaintiffs further advised Defendants that these cumulative burdens would disproportionately affect small independent landlords and minority-owned rental businesses that lacked the institutional resources available to larger corporate housing providers.

111.    Plaintiffs further explained that affordable housing and small housing providers are economically inseparable. They advised Defendants that Philadelphia's housing

market functions as an interconnected economic ecosystem in which the continued availability of naturally occurring affordable housing depends upon preserving the financial viability of the independent landlords who own, maintain, rehabilitate, and operate that housing.

112. Plaintiffs further advised Defendants that increasing cumulative regulatory burdens without corresponding preservation measures would discourage neighborhood-based investment, reduce maintenance and rehabilitation of aging housing stock, increase financial pressure upon small landlords to sell or withdraw from the rental housing market, accelerate market consolidation among institutional owners, and ultimately reduce the long-term supply of affordable housing available to Philadelphia residents.

113. Plaintiffs additionally advised Defendants that these foreseeable consequences would disproportionately affect African American landlords and other historically marginalized property owners because those communities continue to experience the lasting economic effects of historic discrimination in housing, mortgage lending, commercial credit, and wealth accumulation. Plaintiffs explained that ownership of small residential rental properties represents one of the principal means through which many African American families are able to preserve wealth, build equity, finance retirement, and create opportunities for future generations.

114. Accordingly, Defendants possessed actual notice that the challenged legislation would foreseeably impose disproportionate burdens upon small housing providers,

threaten neighborhood-based ownership, reduce preservation of naturally occurring affordable housing, and adversely affect both landlords and tenants.

115. Despite possessing this information, Defendants enacted the challenged ordinances without incorporating meaningful measures designed to preserve the continued economic viability of small housing providers or otherwise address the concerns repeatedly presented during the legislative process.

116. Plaintiffs contend that Defendants did not meaningfully address the testimony presented by Plaintiffs and other neighborhood-based housing providers concerning the foreseeable consequences of the challenged legislation.

117. As enacted, the challenged ordinances impose cumulative regulatory obligations upon the very class of housing providers identified by the independent research as essential to preserving Philadelphia's stock of naturally occurring affordable housing. Plaintiffs allege that Defendants proceeded with enactment despite substantial evidence demonstrating that the legislation would foreseeably weaken the economic foundation upon which much of Philadelphia's affordable housing ecosystem depends.

118. Accordingly, Plaintiffs allege that Defendants enacted the challenged ordinances with actual notice of the foreseeable consequences identified in the legislative record, including increased economic pressure upon small independent housing providers, diminished neighborhood-based ownership, reduced opportunities for wealth preservation within historically marginalized communities, and the long-term erosion of Philadelphia's naturally occurring affordable housing supply.

27

## CAUSES OF ACTION

### COUNT I
### DECLARATORY AND INJUNCTIVE RELIEF
### VIOLATION OF THE PENNSYLVANIA SUNSHINE ACT
### 65 Pa.C.S. §§ 701–716

119.    Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

120.    The Pennsylvania Sunshine Act embodies the Commonwealth's fundamental public policy that governmental deliberations, policy formulation, and official action occur openly so that citizens may observe, evaluate, and participate in governmental decision making before official action is taken.

121.    Defendant Philadelphia City Council Committee on Housing, Neighborhood Development and the Homeless is an "agency" within the meaning of the Pennsylvania Sunshine Act and is therefore required to conduct its deliberations and official actions in meetings open to the public except as expressly authorized by statute.

122.    The Sunshine Act requires that official action and deliberations by a quorum of an agency occur during public meetings and further requires that residents and taxpayers be afforded a reasonable opportunity to comment on matters before official action is taken.

123.    As alleged herein, Defendants engaged in substantive deliberations concerning the challenged legislation outside publicly noticed meetings, formulated and revised amendments outside public view, failed to disclose the operative legislative language before Committee action, and denied Plaintiffs and other residents a meaningful opportunity to comment before official action was taken.

124.    Plaintiffs further allege that substantive amendments to the challenged legislation were prepared, revised, and presented for official action without first being disclosed to

the public in sufficient time to permit meaningful review or participation, thereby frustrating the central purposes of the Sunshine Act.

125. Public comment provided only after official legislative action has already occurred does not satisfy the Sunshine Act's requirement that citizens have a reasonable opportunity to comment before official action is taken.

126. Plaintiffs were therefore deprived of their statutory right to observe governmental deliberations, evaluate the legislation actually under consideration, and meaningfully participate before official action occurred.

127. The procedural violations alleged herein were not harmless.

128. The challenged legislation directly regulates Plaintiffs' property rights, contractual relationships, business operations, and continued ability to own and operate affordable residential rental housing within the City of Philadelphia.

129. Compliance with the Sunshine Act was therefore especially important because the legislation substantially affects identifiable property owners whose legal and economic interests were directly implicated by the proposed ordinances.

130. Upon information and belief, the violations alleged herein were not isolated procedural irregularities but reflected an established course of conduct through which substantive legislative deliberations occurred outside public view before official action was subsequently ratified during publicly noticed proceedings.

131. Defendants thereafter proceeded to enact the challenged ordinances through a legislative process that Plaintiffs allege failed to comply with the mandatory requirements of the Pennsylvania Sunshine Act.

132.   Plaintiffs are Philadelphia taxpayers, residents, and persons directly regulated by the challenged ordinances and therefore possess standing to seek declaratory and equitable relief under 65 Pa.C.S. § 713.

133.   An actual and justiciable controversy exists concerning the validity of the legislative process through which the challenged ordinances were enacted and concerning Defendants' continuing enforcement of legislation that Plaintiffs allege was adopted in violation of mandatory statutory requirements.

134.   Unless restrained by this Court, Defendants will continue enforcing ordinances enacted through proceedings that Plaintiffs allege violated the Pennsylvania Sunshine Act, thereby causing continuing injury to Plaintiffs and depriving them of rights guaranteed by Pennsylvania law.

135.   Pursuant to 65 Pa.C.S. § 713, this Court possesses authority to declare invalid official action taken in violation of the Sunshine Act and to grant appropriate declaratory and injunctive relief where necessary to enforce the Act's requirements.

WHEREFORE, Plaintiffs respectfully request that this Court:

    a.   Declare that Defendants violated the Pennsylvania Sunshine Act during the consideration and enactment of the challenged ordinances.

    b.   Declare that the official legislative actions taken in violation of the Pennsylvania Sunshine Act are invalid and without legal effect to the extent authorized by 65 Pa.C.S. § 713.

    c.   Enjoin Defendants from enforcing the challenged ordinances unless and until they are lawfully reenacted through proceedings conducted in compliance with the Pennsylvania Sunshine Act.

d.  Award Plaintiffs their reasonable attorney's fees, litigation costs, and expenses as authorized by law.

e.  Award such additional legal and equitable relief as this Court deems just and proper.

## COUNT II
### DECLARATORY AND INJUNCTIVE RELIEF
### VIOLATION OF THE PHILADELPHIA HOME RULE CHARTER

136.  Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

137.  The Philadelphia Home Rule Charter is the organic law of the City of Philadelphia and constitutes the exclusive source of legislative authority exercised by the Philadelphia City Council.

138.  The legislative powers delegated to the City Council by the Home Rule Charter may be exercised only in the manner prescribed by the Charter.

139.  Compliance with the Charter's mandatory enactment procedures is therefore a condition precedent to the valid exercise of municipal legislative authority and is not merely directory or advisory.

140.  Section 2-201 of the Home Rule Charter requires that proposed legislation be referred to committee, considered at a public hearing, reported by the committee, printed as reported, distributed to members of Council, and made available to the public before further legislative action may occur.

141.  The Charter further requires that legislation materially amended during the legislative process be printed as amended and made available for the information of both Council members and the public before legislative action is taken.

31

142. These requirements are substantive limitations on the exercise of legislative authority and exist to ensure that elected officials, affected citizens, and the public are considering the same legislative text before official action is taken.

143. As alleged herein, Defendants materially amended the challenged legislation without first printing and making the operative amendments available to Council members, Plaintiffs, and the public as required by Section 2-201 of the Home Rule Charter.

144. Defendants further proceeded to Committee action on legislative language that had not been disclosed in the manner required by the Charter, thereby depriving Plaintiffs and the public of the opportunity to evaluate and respond to the legislation actually under consideration.

145. The ordinances ultimately enacted therefore were advanced through procedures that did not satisfy the mandatory conditions established by the Home Rule Charter for the lawful exercise of legislative authority.

146. These violations were substantive rather than technical because they affected the integrity of the legislative process itself and deprived Plaintiffs of the protections the Charter guarantees before municipal legislation may become law.

147. The challenged ordinances directly regulate Plaintiffs' ownership, leasing, management, and economic use of residential rental property and therefore substantially affect Plaintiffs' vested property interests and ongoing business operations.

148. Defendants' failure to comply with the mandatory procedural safeguards imposed by the Home Rule Charter exceeded the scope of the legislative authority delegated to City Council.

149.  Legislative action taken without compliance with mandatory Charter requirements is ultra vires and cannot serve as a lawful basis for the continuing enforcement of municipal ordinances.

150.  Despite these defects, Defendants enacted the challenged ordinances and continue to enforce them against Plaintiffs and similarly situated property owners.

151.  Plaintiffs have suffered and continue to suffer concrete, particularized, and ongoing injuries as a direct result of Defendants' ultra vires legislative action, including increased regulatory burdens, interference with vested property rights, increased compliance costs, and continuing uncertainty regarding the ownership and operation of their rental properties.

152.  An actual and justiciable controversy therefore exists concerning the validity of the challenged ordinances and Defendants' continuing authority to enforce legislation enacted in violation of the Philadelphia Home Rule Charter.

153.  Unless restrained by this Court, Defendants will continue enforcing ordinances enacted in excess of the authority delegated to them under the Philadelphia Home Rule Charter, thereby causing continuing and irreparable injury to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that this Court:

    a.  Declare that Defendants violated the mandatory requirements of Section 2-201 of the Philadelphia Home Rule Charter during the enactment of the challenged ordinances.

    b.  Declare that the challenged ordinances were enacted in excess of the legislative authority delegated by the Philadelphia Home Rule Charter and are therefore ultra vires, invalid, and unenforceable.

c.  Permanently enjoin Defendants from enforcing the challenged ordinances unless and until they are lawfully reenacted in compliance with the Philadelphia Home Rule Charter.

d.  Award Plaintiffs all costs and attorney's fees authorized by law.

e.  Grant such other legal and equitable relief as this Court deems just and proper.

**COUNT III**
**REGULATORY TAKING WITHOUT JUST COMPENSATION**
**42 U.S.C. § 1983**

154.  Fifth and Fourteenth Amendments to the United States Constitution

155.  Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

156.  The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment, provides that private property shall not be taken for public use without just compensation.

157.  Plaintiffs possess constitutionally protected property interests, including the rights to acquire, possess, lease, manage, exclude others from, control, and derive economically beneficial use from their residential rental properties.

158.  Defendants, acting under color of state law, enacted and continue to enforce the challenged ordinances, which substantially interfere with those protected property interests.

159.  Plaintiffs challenge the cumulative operation of the enacted statutory scheme rather than any isolated provision viewed in isolation.

160.  Collectively, the challenged ordinances impose mandatory restrictions on lease termination and nonrenewal, substantially expand regulatory compliance obligations,

increase litigation exposure, enlarge administrative burdens, interfere with Plaintiffs' ability to recover possession of their property, and materially restrict Plaintiffs' practical ability to control, manage, and economically benefit from their residential rental properties.

## Economic Impact

161.    The challenged ordinances impose substantial economic burdens upon Plaintiffs by increasing compliance costs, delaying the recovery of possession, expanding litigation expenses, increasing administrative obligations, and requiring Plaintiffs to continue paying mortgages, property taxes, insurance premiums, utilities, maintenance expenses, and repair costs during periods in which rental income may be interrupted or materially delayed.

162.    Those economic burdens are particularly significant because Plaintiffs are small, independently owned housing providers whose rental properties operate on limited margins and whose businesses depend upon the timely receipt of rental income and predictable enforcement of lease agreements.

163.    Unlike institutional landlords, Plaintiffs cannot distribute increased regulatory costs across extensive portfolios, absorb prolonged operating losses through diversified sources of capital, or rely upon dedicated legal and compliance departments.

164.    Consequently, regulatory burdens that may constitute ordinary operating expenses for institutional housing providers consume a materially greater percentage of Plaintiffs' operating revenue and directly impair their ability to continue owning, maintaining, and operating affordable residential rental housing.

## Reasonable Investment Backed Expectations

35

165. Plaintiffs acquired, financed, rehabilitated, licensed, and maintained their properties in reliance upon the legal framework governing residential rental housing existing at the time of acquisition.

166. Plaintiffs reasonably expected that they would retain the fundamental incidents of property ownership historically recognized under Pennsylvania law, including the ability to determine whether to enter future lease agreements, recover possession of property upon lawful termination of tenancies, negotiate lease terms, maintain economically viable rental operations, and manage their properties subject to reasonable governmental regulation.

167. The challenged ordinances substantially interfere with those reasonable investment backed expectations by materially altering the legal framework governing residential leasing after Plaintiffs made substantial financial investments in their properties.

168. Plaintiffs have devoted significant personal labor, financial resources, and capital toward acquiring, rehabilitating, maintaining, and preserving residential rental housing in Philadelphia in reliance upon those settled expectations.

### Character of the Government Action

169. Plaintiffs acknowledge that the City possesses broad authority to regulate residential housing in furtherance of legitimate public health, safety, and welfare objectives.

170. That authority, however, remains subject to the limitations imposed by the Takings Clause, which prohibits government from requiring individual property owners to bear burdens that, in fairness and justice, should be borne by the public as a whole.

171. As applied to Plaintiffs, the challenged ordinances substantially alter the legal relationship between landlord and tenant by restricting Plaintiffs' ability to determine whether and under what circumstances possession of their property may be recovered, materially increasing the costs of operating residential rental property, expanding regulatory obligations, and reallocating significant economic burdens to a discrete class of small local housing providers.

172. Those burdens do not operate independently. Rather, each additional restriction compounds the effect of every other restriction, increasing the overall economic impact of the statutory scheme, further interfering with Plaintiffs' reasonable investment backed expectations, and diminishing the practical rights traditionally associated with ownership of residential rental property.

173. The cumulative effect of the challenged ordinances is especially severe for Plaintiffs because they are small African American landlords who lack the economies of scale, institutional financing, compliance infrastructure, and diversified portfolios available to large institutional housing providers.

174. The cumulative operation of the challenged ordinances, as applied to these Plaintiffs and their properties, exceeds the constitutional limits identified in Penn Central by imposing extraordinary economic burdens upon a small class of property owners without providing compensation.

### Penn Central Factors

175. Considering the substantial economic impact of the challenged ordinances upon Plaintiffs, their significant interference with Plaintiffs' reasonable investment backed expectations, and the character of the governmental action, Plaintiffs have plausibly

37

alleged a compensable regulatory taking under the framework articulated in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).

176.    The challenged ordinances substantially interfere with fundamental incidents of ownership, including possession, exclusion, leasing, management, and economically beneficial use, while imposing cumulative burdens that are disproportionately borne by Plaintiffs without the payment of just compensation. Plaintiffs do not seek exemption from reasonable regulation. Plaintiffs acknowledge that the City possesses legitimate authority to protect tenant health, safety, and housing stability. Plaintiffs instead allege that the challenged legislation exceeds constitutional limits because it imposes cumulative burdens upon a discrete class of small housing providers that the legislative record itself identified as essential to preserving Philadelphia's affordable housing supply.

177.    Defendants have neither provided nor offered just compensation for these substantial interferences with Plaintiffs' constitutionally protected property interests.

178.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer substantial economic injury, interference with constitutionally protected property rights, diminished property value, impairment of reasonable investment backed expectations, and continuing irreparable harm.

179.    Defendants' continued enforcement of the challenged ordinances therefore effects an unconstitutional regulatory taking of Plaintiffs' property without just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution and is actionable pursuant to 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that this Court:

38

a. Declare that the challenged ordinances, as applied to Plaintiffs and in their cumulative operation, effect an unconstitutional regulatory taking without just compensation in violation of the Fifth and Fourteenth Amendments.

b. Permanently enjoin Defendants from enforcing the challenged ordinances against Plaintiffs unless and until they are enforced in a manner consistent with the United States Constitution.

c. Award Plaintiffs just compensation to the extent required by the Fifth Amendment and applicable law.

d. Award Plaintiffs their reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

e. Grant such other legal and equitable relief as this Court deems just and proper.

**COUNT IV**
**VIOLATION OF SUBSTANTIVE DUE PROCESS**
**42 U.S.C. § 1983**

180. Fourteenth Amendment to the United States Constitution

181. Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

182. The Fourteenth Amendment prohibits state and local governments from depriving any person of property without due process of law.

183. Plaintiffs possess constitutionally protected property interests in the ownership, possession, leasing, management, operation, and economically beneficial use of their residential rental properties.

39

184.   Defendants, acting under color of state law, enacted and continue to enforce the challenged ordinances, which substantially burden those protected property interests.

185.   Plaintiffs acknowledge that the City possesses broad authority to regulate residential housing in furtherance of legitimate public health, safety, and welfare objectives.

186.   The exercise of that authority, however, remains subject to constitutional limitations. Government regulation affecting protected property interests must bear a real and substantial relationship to the governmental interests asserted and may not impose arbitrary or unreasonable burdens upon a discrete class of property owners.

187.   Plaintiffs do not challenge the City's stated objective of improving housing conditions or promoting housing stability.

188.   Rather, Plaintiffs allege that, as applied to them and in its cumulative operation, the challenged statutory scheme employs regulatory mechanisms that predictably undermine those objectives by imposing disproportionate burdens upon the very class of housing providers responsible for maintaining a substantial portion of Philadelphia's naturally occurring affordable housing.

189.   The challenged ordinances operate cumulatively rather than independently.

190.   Together, they substantially increase compliance costs, expand administrative obligations, increase litigation exposure, delay the recovery of possession, restrict Plaintiffs' ability to determine whether and under what conditions their properties may continue to be leased, and materially increase the cost of operating residential rental housing.

191. Each additional obligation compounds every other obligation, producing cumulative burdens substantially greater than the effect of any individual provision considered in isolation.

192. Independent research available before enactment recognized that Philadelphia's supply of naturally occurring affordable housing depends heavily upon small local landlords operating with limited capital reserves and further concluded that preservation of affordable housing requires reducing unnecessary administrative complexity, streamlining compliance, and expanding technical and financial assistance for those property owners.

193. The challenged ordinances instead substantially increase fixed compliance costs and operational burdens imposed upon that same class of housing providers.

194. Plaintiffs are small African American landlords who personally own, manage, maintain, and rehabilitate residential rental housing.

195. Unlike institutional housing providers, Plaintiffs lack access to institutional financing, diversified real estate portfolios, dedicated compliance personnel, and in-house legal departments capable of absorbing cumulative regulatory burdens.

196. Consequently, identical regulatory requirements impose materially greater economic burdens upon Plaintiffs than upon institutional landlords.

197. Those disproportionate burdens foreseeably reduce Plaintiffs' ability to continue investing in, maintaining, and operating naturally occurring affordable housing.

198. The challenged ordinances therefore operate in a manner that predictably reduces the long-term availability of naturally occurring affordable housing, increases pressure upon small landlords to reduce investment or exit the market, and undermines the City's stated objective of promoting housing stability.

199.   As applied to Plaintiffs, the cumulative operation of the challenged ordinances therefore bears no real or substantial relationship to preserving affordable housing because the regulatory means selected predictably impair the continued viability of the very housing providers upon whom that objective substantially depends.

200.   Plaintiffs further allege that the challenged ordinances arbitrarily allocate a disproportionate share of the economic burden associated with the City's housing policies to a discrete class of small local property owners while institutional housing providers remain materially better positioned to absorb identical regulatory obligations.

201.   The cumulative burdens imposed upon Plaintiffs are excessive in relation to the governmental interests asserted and substantially interfere with Plaintiffs' protected property interests in a manner that is arbitrary as applied to these Plaintiffs.

202.   As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer deprivation of constitutionally protected property interests, substantial economic injury, interference with their ability to continue providing affordable housing, and continuing irreparable harm.

203.   Defendants' continued enforcement of the challenged ordinances therefore deprives Plaintiffs of substantive due process in violation of the Fourteenth Amendment and is actionable pursuant to 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that this Court:

a.   Declare that the challenged ordinances, as applied to Plaintiffs and in their cumulative operation, violate the Due Process Clause of the Fourteenth Amendment.

b.   Permanently enjoin Defendants from enforcing the challenged ordinances against Plaintiffs.

42

    c.   Award Plaintiffs reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

    d.   Grant such other legal and equitable relief as this Court deems just and proper.

**COUNT V**
**VIOLATION OF THE EQUAL PROTECTION CLAUSE**
**42 U.S.C. § 1983**

204. Fourteenth Amendment to the United States Constitution

205. Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

206. The Equal Protection Clause of the Fourteenth Amendment guarantees that no State shall deny any person within its jurisdiction the equal protection of the laws.

207. Plaintiffs Seth Floyd and Erica Hadley are African American citizens of the United States, residents of the City of Philadelphia, taxpayers, and small residential housing providers subject to the challenged ordinances.

208. Plaintiffs do not allege that the challenged ordinances expressly classify persons on the basis of race.

209. Rather, Plaintiffs allege that Defendants enacted and continue to enforce a facially neutral statutory scheme whose cumulative operation imposes foreseeable and disproportionate burdens upon African American small landlords, including Plaintiffs.

210. Prior to enactment of the challenged ordinances, publicly available research documented that Philadelphia's naturally occurring affordable housing is supplied primarily by small local landlords operating with limited capital, modest operating margins, and limited administrative resources.

211.    Publicly available research further documented that African American landlords disproportionately face barriers to commercial lending, access to capital, wealth accumulation, and financial reserves, rendering them materially less able than institutional housing providers to absorb significant fixed regulatory costs and cumulative compliance burdens.

212.    Those economic realities were directly relevant to legislation imposing increased compliance obligations, expanded litigation exposure, additional licensing consequences, restrictions upon the recovery of possession, and increased operational costs for residential landlords.

213.    During multiple public hearings preceding enactment of the challenged ordinances, Plaintiffs and numerous other small residential landlords, including African American landlords and other landlords of color, personally advised Defendants that the proposed legislation would disproportionately burden minority owned rental businesses because fixed compliance costs, expanded litigation exposure, licensing risks, and cumulative regulatory obligations fall materially more heavily upon small property owners than upon institutional housing providers.

214.    These speakers further warned that the proposed legislation would discourage continued investment in naturally occurring affordable housing, increase pressure upon minority landlords to sell locally owned rental properties or withdraw from the rental housing market, and accelerate consolidation of residential housing ownership among larger institutional investors.

215.    Several of these speakers were interrupted before completing their testimony, prevented from presenting all of their prepared remarks, or afforded materially less

44

opportunity to address the legislative body than other participants during the legislative process.

216. Defendants nevertheless possessed actual notice, through repeated public testimony, written submissions, publicly available housing research, and the legislative record itself, that the challenged ordinances would foreseeably impose materially greater burdens upon African American small landlords than upon institutional housing providers.

217. Despite that actual notice, Defendants enacted the challenged ordinances substantially without reducing the cumulative regulatory burdens identified during the legislative process or adopting measures reasonably designed to mitigate their foreseeable disproportionate impact upon minority owned rental businesses.

218. Defendants likewise declined to adopt alternative approaches presented during the legislative process that would have advanced legitimate tenant protections while reducing the cumulative burdens imposed upon small locally owned housing providers and preserving naturally occurring affordable housing.

219. Plaintiffs are African American small landlords who personally own, manage, rehabilitate, and maintain residential rental properties within the City of Philadelphia.

220. Unlike institutional housing providers, Plaintiffs lack dedicated compliance personnel, in house legal departments, institutional financing, diversified real estate portfolios, and the economies of scale necessary to absorb cumulative regulatory costs without materially impairing the viability of their rental businesses.

221. Consequently, identical regulatory obligations consume a materially greater percentage of Plaintiffs' operating revenue, substantially impair Plaintiffs' ability to

45

continue providing affordable housing, and place Plaintiffs at a competitive disadvantage relative to institutional housing providers.

222.   The sequence of events preceding enactment, Defendants' repeated notice that the challenged ordinances would disproportionately burden African American small landlords, the procedural irregularities alleged elsewhere in this Complaint, and Defendants' decision to proceed without materially addressing those concerns provide circumstantial evidence relevant to whether the challenged ordinances, as applied to Plaintiffs, deny Plaintiffs the equal protection of the laws.

223.   As applied to Plaintiffs, the challenged ordinances impose cumulative burdens that deny Plaintiffs the equal protection of the laws guaranteed by the Fourteenth Amendment.

224.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and continue to suffer increased compliance costs, expanded regulatory burdens, interference with constitutionally protected property interests, diminished economic opportunities, competitive disadvantage within the residential rental housing market, and continuing irreparable harm.

225.   Defendants' continued enforcement of the challenged ordinances therefore violates Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment and is actionable pursuant to 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that this Court:

    a.   Declare that the challenged ordinances, as applied to Plaintiffs, violate the Equal Protection Clause of the Fourteenth Amendment.

    b.   Permanently enjoin Defendants from enforcing the challenged ordinances against Plaintiffs.

    c.  Award Plaintiffs their reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

    d.  Grant such other legal and equitable relief as this Court deems just and proper.

**COUNT VI**
**VIOLATION OF THE CONTRACTS CLAUSE**
**U.S. CONSTITUTION ARTICLE I, SECTION 10**
**42 U.S.C. § 1983**

226.   Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

227.   Article I, Section 10 of the United States Constitution provides that no State shall pass any law impairing the obligation of contracts.

228.   Plaintiffs own residential rental properties that are subject to existing written lease agreements executed before the enactment of the challenged ordinances.

229.   Those lease agreements contain negotiated provisions governing lease duration, renewal, termination, possession, and the rights and obligations of landlords and tenants upon expiration of the lease term.

230.   At the time those agreements were executed, Pennsylvania law recognized the parties' ability to negotiate and enforce those contractual provisions.

231.   The challenged ordinances materially impair those existing contractual relationships by rendering negotiated lease provisions governing termination and nonrenewal unenforceable, compelling continuation of landlord tenant relationships beyond the terms agreed upon by the parties, and substituting mandatory statutory provisions for privately negotiated contractual rights.

47

232. The challenged ordinances therefore substantially impair Plaintiffs' contractual rights and materially alter the legal and economic expectations upon which Plaintiffs acquired, financed, maintained, and leased their properties.

233. Plaintiffs acknowledge that the City possesses legitimate interests in promoting housing stability and protecting tenants.

234. As applied to Plaintiffs, however, the substantial impairment of existing contractual relationships is neither reasonable nor appropriately tailored because the challenged ordinances impose sweeping mandatory restrictions regardless of the individual circumstances of the tenancy, the property, or the parties' negotiated agreements.

235. The challenged ordinances alter existing contractual obligations after execution of the lease agreements, deprive Plaintiffs of contractual remedies previously available under Pennsylvania law, and fundamentally alter the parties' allocation of contractual rights and risks.

236. Less restrictive alternatives were identified during the legislative process, including targeted tenant protections and measures supporting naturally occurring affordable housing without substantially impairing existing contractual rights.

237. Defendants nevertheless enacted the challenged ordinances substantially without adopting those alternatives.

238. As a direct and proximate result, Plaintiffs have suffered substantial impairment of existing contractual rights, economic injury, diminished property interests, and continuing irreparable harm.

239. Defendants have therefore violated the Contracts Clause of Article I, Section 10 of the United States Constitution.

48

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Declare that the challenged ordinances, as applied to Plaintiffs, violate the 42 U.S.C. § 1983.

b. Permanently enjoin Defendants from enforcing the challenged ordinances against Plaintiffs.

c. Award Plaintiffs their reasonable attorney's fees and costs.

d. Grant such other legal and equitable relief as this Court deems just and proper.

## COUNT VII
## VIOLATION OF ARTICLE I, SECTION 1 OF THE PENNSYLVANIA CONSTITUTION
## DECLARATORY AND INJUNCTIVE RELIEF

240. Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

241. Article I, Section 1 of the Pennsylvania Constitution declares that all persons possess inherent and indefeasible rights, including the rights of acquiring, possessing, and protecting property.

242. These constitutional protections safeguard the fundamental rights of property ownership, including the right to acquire, possess, lease, manage, maintain, improve, protect, and economically benefit from privately owned property, subject only to lawful and reasonable governmental regulation.

243. Plaintiffs own residential rental properties within the City of Philadelphia and therefore possess constitutionally protected property interests under Article I, Section 1 of the Pennsylvania Constitution.

244. Defendants enacted and continue to enforce the challenged ordinances under color of municipal authority.

49

245.   The challenged ordinances, considered collectively and as applied to Plaintiffs, substantially interfere with Plaintiffs' ability to possess, manage, lease, control, and derive economically beneficial use from their residential rental properties.

246.   Collectively, the challenged ordinances impose expanded compliance obligations, increased administrative burdens, increased litigation exposure, restrictions upon lease termination and nonrenewal, increased delays in recovering possession of residential property, and additional operating costs that materially impair Plaintiffs' ability to continue operating affordable rental housing.

247.   Those cumulative burdens fall with particular force upon Plaintiffs because they are small African American landlords who personally own, maintain, rehabilitate, and manage their rental properties without the institutional resources available to large corporate housing providers.

248.   Unlike institutional landlords, Plaintiffs lack diversified real estate portfolios, institutional financing, dedicated compliance departments, and in-house legal resources capable of absorbing substantial cumulative regulatory burdens.

249.   Consequently, identical regulatory obligations consume a materially greater percentage of Plaintiffs' operating revenue, impair Plaintiffs' ability to reinvest in their properties, and threaten Plaintiffs' continued ownership and operation of naturally occurring affordable housing.

250.   Prior to enactment of the challenged ordinances, Defendants received repeated public testimony from Plaintiffs and numerous other small landlords, including African American landlords and other landlords of color, warning that the cumulative effect of the proposed legislation would disproportionately burden minority-owned rental

businesses, discourage continued investment in affordable housing, and increase pressure upon small landlords to sell their properties or exit the market.

251. Defendants nevertheless enacted the challenged ordinances substantially without reducing the cumulative burdens identified during the legislative process or adopting reasonable alternatives designed to preserve naturally occurring affordable housing while protecting tenants.

252. As applied to Plaintiffs, the cumulative operation of the challenged ordinances unreasonably interferes with Plaintiffs' inherent constitutional rights to acquire, possess, protect, manage, and enjoy their private property as guaranteed by Article I, Section 1 of the Pennsylvania Constitution.

253. Plaintiffs have suffered and continue to suffer substantial economic injury, impairment of fundamental property rights, diminished investment-backed expectations, reduced economic opportunities, and continuing irreparable harm.

254. An actual and justiciable controversy exists concerning Defendants' continued enforcement of the challenged ordinances in violation of Article I, Section 1 of the Pennsylvania Constitution.

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Declare that the challenged ordinances, as applied to Plaintiffs and in their cumulative operation, violate Article I, Section 1 of the Pennsylvania Constitution.

b. Permanently enjoin Defendants from enforcing the challenged ordinances against Plaintiffs.

c. Award Plaintiffs such costs and attorney's fees as authorized by law.

d.  Grant such other legal and equitable relief as this Court deems just and proper.

## COUNT VIII
### VIOLATION OF ARTICLE I, SECTION 26 OF THE PENNSYLVANIA CONSTITUTION
### DECLARATORY AND INJUNCTIVE RELIEF

255.  Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

256.  Article I, Section 26 of the Pennsylvania Constitution provides that neither the Commonwealth nor any political subdivision shall deny to any person the enjoyment of any civil right or discriminate against any person in the exercise of any civil right.

257.  Plaintiffs Seth Floyd and Erica Hadley are African American citizens, Philadelphia taxpayers, and small residential housing providers who own and operate residential rental property within the City of Philadelphia.

258.  Plaintiffs possess constitutionally protected rights to acquire, possess, manage, lease, protect, and enjoy their private property as guaranteed by the Pennsylvania Constitution.

259.  The challenged ordinances apply facially to all residential landlords.

260.  As applied to Plaintiffs, however, the cumulative operation of the challenged ordinances imposes materially greater burdens upon African American small landlords than upon institutional housing providers because fixed compliance costs, expanded administrative obligations, increased litigation exposure, licensing consequences, and restrictions affecting possession consume a substantially greater percentage of Plaintiffs' available financial resources.

52

261. Prior to enactment of the challenged ordinances, Defendants received repeated testimony from Plaintiffs and numerous other African American landlords and other landlords of color advising that the proposed legislation would disproportionately burden minority-owned rental businesses, discourage continued investment in naturally occurring affordable housing, increase pressure upon minority landlords to sell their properties or leave the rental market, and accelerate consolidation of residential housing ownership among larger institutional investors.

262. Those concerns were further supported by publicly available housing research documenting the importance of small landlords to Philadelphia's supply of naturally occurring affordable housing and the financial constraints disproportionately affecting minority housing providers.

263. Defendants therefore possessed actual notice before enactment that the challenged ordinances would foreseeably impose substantially greater burdens upon African American small landlords than upon institutional housing providers.

264. Despite that notice, Defendants enacted the challenged ordinances substantially without modifying the cumulative burdens identified during the legislative process or adopting reasonable alternatives designed to mitigate their foreseeable disproportionate impact upon minority-owned rental businesses.

265. Several African American landlords and other landlords of color who appeared during the legislative process were interrupted, prevented from completing prepared testimony, or afforded materially less opportunity to address the legislative body than other participants, notwithstanding that they were presenting information directly relevant to the foreseeable operation of the proposed legislation.

266. Plaintiffs allege that the sequence of events preceding enactment, the repeated warnings presented during the legislative process, Defendants' actual notice of the foreseeable disproportionate burdens upon minority housing providers, the procedural irregularities alleged elsewhere in this Complaint, and Defendants' decision to proceed substantially without addressing those concerns demonstrate that the challenged ordinances operate in a manner that denies Plaintiffs the equal enjoyment of rights secured by Article I, Section 26 of the Pennsylvania Constitution.

267. As African American small landlords, Plaintiffs have suffered and continue to suffer increased compliance costs, expanded regulatory burdens, diminished economic opportunities, impairment of their ability to continue providing naturally occurring affordable housing, competitive disadvantage relative to institutional housing providers, and continuing irreparable harm.

268. An actual and justiciable controversy exists concerning Defendants' continued enforcement of the challenged ordinances in violation of Article I, Section 26 of the Pennsylvania Constitution.

WHEREFORE, Plaintiffs respectfully request that this Court:

    a. Declare that the challenged ordinances, as applied to Plaintiffs, violate Article I, Section 26 of the Pennsylvania Constitution.

    b. Permanently enjoin Defendants from enforcing the challenged ordinances against Plaintiffs.

    c. Award Plaintiffs all costs and attorney's fees as authorized by law.

    d. Grant such further legal and equitable relief as this Court deems just and proper.

## COUNT IX MUNICIPAL LIABILITY
### 42 U.S.C. § 1983
### MONELL CLAIM

269.   Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

270.   Defendant City of Philadelphia is a municipal corporation organized under the laws of the Commonwealth of Pennsylvania and is a "person" within the meaning of 42 U.S.C. § 1983.

271.   At all relevant times, the actions challenged in this Complaint were undertaken under color of state law.

272.   The challenged ordinances were enacted by the Philadelphia City Council and approved by the Mayor pursuant to the City's final legislative authority.

273.   The enactment of municipal ordinances by City Council constitutes official municipal policy attributable to the City of Philadelphia.

274.   The constitutional deprivations alleged in this Complaint were not isolated acts of individual employees or subordinate officials.

275.   Rather, they arose directly from the City's officially adopted legislative enactments and the deliberate decision of the City's final policymakers to enact and continue enforcing the challenged ordinances.

276.   The City continues to enforce the challenged ordinances against Plaintiffs through its departments, agencies, officers, employees, and agents acting pursuant to official municipal policy.

277.   As alleged throughout this Complaint, the challenged ordinances, individually and in their cumulative operation, violate Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution.

278.    Those constitutional violations include, but are not limited to:

    i.  The taking of protected property interests without just compensation.

    ii.  The deprivation of substantive due process.

    iii.  The denial of equal protection of the laws.

    iv.  The impairment of contractual rights protected by Article I, Section 10 of the United States Constitution.

279.    Because the challenged conduct arises from official legislative enactments adopted by the City's final policymakers, municipal liability attaches pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

280.    As a direct and proximate result of the City's official policies, Plaintiffs have suffered and continue to suffer constitutional injury, economic loss, impairment of protected property rights, increased compliance costs, diminished investment-backed expectations, interference with existing contractual relationships, and continuing irreparable harm.

WHEREFORE, Plaintiffs respectfully request that this Court:

    a.  Enter judgment in favor of Plaintiffs and against Defendant City of Philadelphia on Plaintiffs' federal constitutional claims.

    b.  Declare that the City's official policies embodied in the challenged ordinances violate the United States Constitution.

    c.  Permanently enjoin enforcement of the challenged ordinances.

    d.  Award Plaintiffs all relief authorized under 42 U.S.C. §§ 1983 and 1988, including reasonable attorney's fees and costs.

57

e.  Award such further legal and equitable relief as this Court deems just and

proper.

Respectfully submitted

PEARSON LAW GROUP LLC

_____
Briana Lynn Pearson, Esquire
*Attorneys for PlaintiffS*

Dated:    July 21, 2026

57

58

## **JURY DEMAND**

Please take notice that Plaintiffs hereby demand a trial by jury as to all issues.

Respectfully requested

PEARSON LAW GROUP LLC

_____
Briana Lynn Pearson, Esquire
*Attorneys for Plaintiffs*

Dated:    July 21, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of July, 2026, a true and correct copy of the foregoing **Second Amended Complaint** was electronically filed with the Clerk of Court using the Court's CM/ECF system, which will automatically send notification of such filing to all counsel of record who are registered CM/ECF users.

Respectfully submitted

PEARSON LAW GROUP LLC

_____

Briana Lynn Pearson, Esquire
*Attorneys for PlaintiffS*

Dated:    July 21, 2026

# Exhibit A

# City of Philadelphia



(Bill No. 250329-AA)

AN ORDINANCE

Amending Chapter 9-3900 of The Philadelphia Code, entitled "Property Licenses and Owner Accountability," to clarify licensing requirements, authorize the Department to create a Proactive Inspection program, require public reporting related to Code compliance, and establish remedies, damages, and protections for tenants, all under certain terms and conditions.

*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*

SECTION 1. Legislative Findings. Council finds that:

(1) A safe, habitable, and well-maintained home is a fundamental necessity for health, stability, and economic mobility. Yet, too many rental properties in Philadelphia fail to meet basic standards of habitability. Approximately 40% of Philadelphia rental homes need repairs and 30-45% of rental units operate without proper licensing, exposing tenants to unsafe, unfit, and imminently dangerous conditions.

(2) Philadelphia is trending toward a majority-renter city, with approximately half of all households currently renting their homes. More than half of these renters are cost-burdened, paying more than 30% of their income toward rent, limiting their ability to absorb additional housing instability or pursue legal remedies when conditions deteriorate.

(3) Existing enforcement mechanisms rely heavily on tenant complaints, placing the burden on tenants to identify, report, and pursue remedies for violations, often at personal risk. This reactive system allows serious code violations to persist undetected and unaddressed for extended periods. Furthermore, tenants consistently face retaliation for speaking out about unsafe conditions.

(4) A majority of tenants lack access to legal representation or the financial means to enforce their rights, resulting in widespread under-enforcement of existing housing standards and allowing non-compliant landlords to continue collecting rent despite failing to maintain habitable properties. In eviction court, 80-85% of landlords have legal representation while only 5-8% of tenants do.

(5) The current rental licensing system does not adequately ensure ongoing compliance with housing standards, nor does it provide sufficient transparency to tenants regarding the condition and legal status of their housing.

(6) Strengthening licensing requirements, establishing proactive inspections, improving transparency, and creating meaningful enforcement mechanisms, including a private right of

---

# City of Philadelphia

action, are necessary to ensure that all rental housing meets basic standards of safety and habitability.

(7)  Tenant advocates report a myriad of eviction filings in Philadelphia Municipal Court, and in many cases, eviction judgments entered against tenants, for properties where there are open code violations and deficiencies in rental licenses and certificates of rental suitability.

(8) It is the intent of Council to shift from a reactive, complaint-driven system to a proactive and accountable framework that ensures compliance before harm occurs, empowers tenants to enforce their rights, and aligns economic incentives so that bad actor landlords cannot continue to profit from unsafe or unlawful conditions.

(9) These reforms are necessary to protect public health, reduce displacement, and promote housing stability in Philadelphia's housing system.

SECTION 2. Title 9 of The Philadelphia Code is hereby amended to read as follows:

TITLE 9. REGULATION OF BUSINESSES, TRADES AND PROFESSIONS

\*          \*          \*

CHAPTER 9-3900. PROPERTY LICENSES AND OWNER ACCOUNTABILITY

\*          \*          \*

§ 9-3901. General Provisions.

\*          \*          \*

(2)  Application and Issuance. In addition to the provisions set forth in Subcode A of Title 4, the following provisions shall also apply to licenses required by this Chapter:

(a)        An applicant for a new license or the renewal of a license shall complete an application provided by the Department. *The license shall be considered effective from the date specified on the license.* The application shall contain the following information, and such other information as the Department may require:

\*          \*          \*

(b)        *An applicant shall not be eligible for a new rental license or renewal, nor shall* [T]*t*he Department [shall] issue or renew a license [if] *unless* it finds:

\*          \*          \*

# City of Philadelphia

*BILL NO.* 250329-AA *continued*                                              Certified Copy

*(d)          If a license is issued while an appeal of a violation is pending, the relevant violation is affirmed on appeal, and all relevant appeals have been exhausted, the Department may suspend the license.*

*(e)          The owner shall, within 7 days of receipt, either post the results of any appeal covered by this Section in a conspicuous place clearly visible to all impacted tenants or deliver it to all impacted tenants either personally or by first class mail.*

\*          \*          \*

(4)          Non-compliance, Private Right of Action and Suspension. In addition to the provisions for license suspension set forth in Subcode A of Title 4, the following provisions shall also apply to licenses required by this Chapter:

(a)          The Department is authorized to immediately suspend a license if a property is deemed unfit or unsafe or imminently dangerous.

*(b)          Any owner who is required to obtain or renew a rental license shall, within 7 days of receipt, provide a copy of that rental license, together with a restatement of subsection 9-3901(4)(h), to all tenants in the following manner. The owner shall either (i) post the rental license and restatement of subsection 9-3901(4)(h) in a conspicuous place clearly visible to all tenants or (ii) deliver a copy of the rental license, together with a restatement of subsection 9-3901(4)(h), to each tenant either personally or by certified mail. For properties containing one (1) or two (2) dwelling units, the owner may also provide the rental license and restatement of subsection 9-3901(4)(h) by e-mail, provided that the tenant has affirmatively consented in writing to receive such notices by e-mail, has provided an e-mail address for that purpose, and has not revoked such consent. A tenant may revoke consent to receive notices by e-mail at any time by written notice to the owner, and upon such revocation, the owner shall provide notice by another method authorized under this Section.*

*(c)          Any owner who receives a notice of violation from the Department stating that (i) a property or unit is unsafe, unfit, or imminently dangerous as defined in Sections PM-108, PM-109, or PM-110, or (ii) a property or unit violates the Philadelphia Fire Code, shall provide notice to all impacted tenants by posting a copy of the notice of violation, and any subsequent inspection reports or appeals, in a conspicuous location on the premises clearly visible to impacted tenants, or by delivering such notice personally or by first class mail.*

*Such notice shall be provided no later than twenty-four (24) hours prior to the deadline for correction stated in the notice of violation. If the violation is fully corrected within the time permitted by the Department, no tenant notice shall be required under this subsection.*

# City of Philadelphia

*(d)        Any owner who receives a notice of license suspension shall, within 7 days of receipt, either post a copy of that notice in a conspicuous place clearly visible to all impacted tenants or deliver it to all impacted tenants either personally or by first class mail.*

[(b)] *(e)*      The Department is authorized to suspend a license at the request of the District Attorney with respect to any property subject to forfeiture to the Commonwealth under the provisions of 42 Pa. C.S. § 6801 or other applicable law.

[(c)] *(f)*        A license issued may be suspended by the Department for failure to comply with the requirements of this Code after a re-inspection has been made to determine compliance pursuant to Section A-503.1 of Subcode A, *provided an appeal is not in the process of being reviewed,* or for failure to pay any fine and/or cost imposed under this Chapter or Subcode A, and such suspension shall continue until there has been compliance and until any unpaid fines and costs have been paid.

[(d)] *(g)*      The Department shall provide written notice and an opportunity for a hearing prior to any suspension of a license under this Section.

[(e)] *(h)*      Non-compliance. Any owner who fails to obtain a *valid* rental license as required by Section 9-3902, *who fails to obtain a valid* [to comply with Section 9-3903 regarding a] Certificate of Rental Suitability *as required by Section 9-3903*, *who fails to correct code violations as described in Section 9-3903(2)(d)*, or whose rental license has been suspended shall be denied the right to recover possession of the premises or to collect rent during or for the period of noncompliance or during or for the period of license suspension. In any action for eviction or collection of rent, the owner shall attach a copy of the license*, copies of all Certificates of Rental Suitability required by Section 9-3903 and copies of all code violations issued with respect to the rental unit and/or property during the relevant tenancy.*

[(f)] *(i)*      Private Right of Action. Any [tenant of any property] *person* subject to the provisions of this Chapter shall have the right to bring an action against the owner of such property to compel compliance with this Chapter *and to seek relief as provided in this Section.* [Such private right of action neither limits nor expands the rights of private parties to pursue any legal rights and claims they may possess under a written agreement or at Common Law.] *A prevailing tenant shall be entitled to the following remedies:*

*(.1) Compensatory damages for any harm caused by any non-compliance or liquidated damages in the amount of $1,000 per violation, whichever is greater. Liquidated damages under this subsection are intended to make the tenant whole and to compensate the tenant for collateral harms suffered as a result of the violation and for the tenant's time and effort enforcing the rights afforded to the tenant under this Chapter. Each separate occurrence or instance of a prohibited action shall constitute a separate violation; A continuing violation arising from the same underlying condition shall constitute a single violation and shall not be deemed a separate violation for each day it continues.*

# City of Philadelphia

BILL NO. 250329-AA *continued*                                        Certified Copy

(.2) *For violations of Section 9-3901(4)(h), abatement and refund of rent for any period during which rent was collected and the owner was noncompliant as defined in that Section;*

(.3) *Such other relief, including injunctive relief, as the court may deem appropriate; and*

(.4) *Reasonable attorney's fees and costs.*

(j) *Safe Harbor. In a private action pursuant to this Section, an owner shall not be deemed non-compliant for any period in which the owner can demonstrate, by a preponderance of the evidence, that the safe harbor provisions set below apply.*

(.1) *Delayed re-inspection of premises. An owner shall not be deemed non-compliant for purposes of this Section for any period during which the owner's inability to obtain or maintain a rental license or Certificate of Rental Suitability results primarily from a delayed re-inspection by the Department. An owner shall be deemed compliant as of the date the owner completed the required corrective action and took all reasonable steps to obtain or maintain the required license or Certificate of Rental Suitability, provided that the owner demonstrates by a preponderance of the evidence that:*

(.a) *The owner timely corrected the underlying condition or deficiency;*

(.b) *The owner timely applied for, renewed, or sought reinstatement of the rental license or Certificate of Rental Suitability and requested in writing any required inspections;*

(.c) *Any failure to obtain or maintain the license or Certificate during the relevant period was due primarily to the delayed re-inspection by the City;*

(.d) *The owner provided notice of the completed repair to the tenant(s); and*

(.e) *A subsequent inspection confirms the condition was corrected.*

(.2) *Pending appeal of certain taxes, liens, fines, and fees resulting in outstanding balances. An owner shall not be deemed non-compliant for purposes of this Section for any period during which a timely appeal is pending and not yet adjudicated regarding taxes, liens, fines, and fees unrelated to a Title 4 violation that form an outstanding balance on the owner's business tax account that would otherwise prevent license issuance, provided that the owner demonstrates by a preponderance of the evidence that:*

---

# City of Philadelphia

*(.a)   In the case of a violation that leads to a tax, lien, fine or fee, the underlying violation was not issued under Title 4 and does not involve conditions classified as Unsafe, Unfit, or Imminently Dangerous;*

*(.b)   The outstanding balance is the sole reason preventing the license from being issued or renewed;*

*(.c)   The owner filed a timely administrative or judicial appeal of the violation or tax clearance determination, as applicable, in accordance with governing procedures;*

*(.d)   The owner has not failed to take any required interim corrective actions within the owner's control; and*

*(.e)   The underlying violation or condition is subsequently dismissed or withdrawn upon adjudication, such that the outstanding balance would not have prevented license issuance; and*

*(.f)   Within five (5) days of filing such appeal, the owner provides written notice to all impacted tenants stating that an appeal has been filed, identifying the nature of any outstanding balance, and explaining that the basis for any alleged non-compliance is subject to adjudication; such notice shall be provided in accordance with this Section's notice requirements.*

*(.g) In any action for eviction, recovery of possession, or collection of rent or other charges relating to a property subject to this Section, the owner shall attach to the initial filing a copy of any pending appeal described in this subsection and shall affirmatively disclose the existence and status of such appeal. Failure to attach and disclose as required by this paragraph shall render the filing defective for purposes of this Section until cured.*

*For purposes of this subsection, if the appeal is denied in full, the period of non-compliance shall be deemed to run from the original cure date.*

*(.3)       Renewal of Rental License. An owner shall not be deemed noncompliant for purposes of this Section solely for failure to timely renew a rental license during the fifteen (15) days immediately following the expiration of such license, provided that the owner obtains a valid renewal within such period.*

*(.4)       No provision of this Section shall limit an owner's ability to bring a claim for property damage or breach of contract.*

§ 9-3902. Rental Licenses.

# City of Philadelphia

BILL NO. 250329-AA *continued*                                      Certified Copy

 (1)   Required.

   (a)                        The owner of any dwelling unit, multiple family dwelling, rooming house, dormitory, hotel, one-family dwelling, two-family dwelling, or rooming unit let for occupancy must obtain a rental license. No person shall collect rent with respect to any property that is required to be licensed pursuant to this Section unless a valid rental license has been issued for the property *and has not expired or been suspended.*

§ 9-3903. Certificate of Rental Suitability; Required Tenant Documents.

 (1)   Required.

   (a)                        The owner of any property for which a rental license is required shall, at the inception of each tenancy, provide to the tenant a Certificate of Rental Suitability that was issued by the Department no more than sixty days prior to the inception of the tenancy. The owner shall at the same time provide the tenant a copy of the owner's attestation to the suitability of the dwelling unit as received by the Department pursuant to subsection 9-3903(2)(b)(.3), and a copy of the "City of Philadelphia Partners for Good Housing Handbook" issued by the Department, or such other document as the Department shall require. The Certificate of Rental Suitability may be for either an individual dwelling unit, or for the entire building in which the unit is located.

   (b)                        Exception. The provisions of subsection 9-3903(1)(a) shall not apply with respect to any rental to a tenant who is a member of the owner's family.

   *(c)        The owner of any property for which a rental license is required shall, at the time of filing an eviction action, provide a Certificate of Rental Suitability to the tenant and to the court that was issued by the Department no more than thirty days prior to the date of enrollment. Any owner who fails to comply with this subsection shall be denied the right to file for eviction or obtain possession of the property.*

   *(d)        At any point during a tenancy, a tenant may request a Certificate of Rental Suitability from the owner, provided that a tenant may not request more than one such Certificate within any ninety (90) day period. Within ten (10) days of receiving a tenant request, an owner shall provide to the tenant a Certificate of Rental Suitability issued by the Department no more than thirty days prior to the request. Any owner who fails to comply with this subsection shall be denied the right to collect rent until a Certificate of Rental Suitability is provided to the tenant. The Safe Harbor Provision in Section 3-901(4)(j) shall also apply to this subsection.*

 (2)   Application and Issuance.

# City of Philadelphia

(a)          Applications for a Certificate of Rental Suitability shall be made on forms provided by the Department.

(b)          The Department shall issue a Certificate of Rental Suitability only after it determines that:

(.1)   The owner of the property has obtained all required licenses with respect to the property, including a rental license.

(.2)   There are no outstanding violation notices under this Code with respect to the property, except with respect to violations for which there is a pending appeal of which the owner has notified the Department in a manner prescribed by the Department.

Exception: The Department of Licenses and Inspections may promulgate regulations regarding conditions under which Certificates of Rental Suitability may be issued, despite violations of Section PM-108.1.3 (Unsafe shared retaining walls).

(.3)   The owner of the premises to be leased acknowledges the obligation to provide a fit and habitable property and states that (1) all fire protection and smoke detection equipment for the premises are present and in proper operating order in accordance with all applicable requirements of The Philadelphia Code and regulations and standards adopted thereunder; (2) the operating systems are working properly to provide a fit and habitable condition; and (3) *that the premises are free of unfit, unsafe, or imminently dangerous conditions, as defined by Sections PM-108, PM-109, and PM-110; and (4)* the owner will continue to maintain all fire protection and smoke detection equipment for the premises in accordance with all applicable requirements of The Philadelphia Code and regulations and standards adopted thereunder, will continue to maintain the operating systems in proper working order, *will continue to ensure that the property is free of any unfit, unsafe, and imminently dangerous conditions as defined by Sections PM-108, PM-109, and PM-110,* and will continue to maintain the property in a fit and habitable condition.

(c)          The Certificate shall set forth the applicable rental license number for the property, the date of the last inspection conducted by the Department (where applicable) and the applicable zoning designation, and shall set out the process by which a tenant may request a further inspection of the property by the Department.

(d)          Failure by the owner to correct *unsafe, unfit, or imminently dangerous* code violations *as defined by Sections PM-108, PM-109, and PM-110* [covered by subsection (2)(b)(.3)] within thirty (30) days of receiving a notice of violation, or sooner as indicated by the Department, shall be considered to be noncompliance with this Section*, so long as the owner has not timely appealed the notice of violation.*

# City of Philadelphia

(.1)    *In an action for eviction or collection of rent, the owner shall have the burden of demonstrating compliance with the requirements for issuance of a Certificate of Rental Suitability during the relevant tenancy.*

(.2)    *Where a notice of violation is timely appealed and subsequently affirmed, the owner shall be deemed in noncompliance with this Section as of the cure date specified on the notice of violation.*

(e)    *Proactive Inspection Program. The Department is authorized to establish a Proactive Inspection Program in order to inspect all residential rental properties and units registered to a rental license pursuant to Section 9-3902 ("Rental Licenses"), identified as Residential Dwellings or Rooming Houses / Boarding Houses, on a regular cycle by July 2030, provided that such inspections are feasible in the interests of health and safety.*

(f)    *Reporting Requirements.*

(.1)    *The Department shall prepare an annual report, and shall provide Council with, and make publicly available, such reports pursuant to the schedule set forth in paragraph (.2) Such reports shall include, but are not limited to, the following:*

(.a)    *The current status of the Proactive Inspection Program, an assessment of progress toward the goal of routine proactive inspections for all units registered to a rental license pursuant to Section 9-3902 ("Rental Licenses"), identified as Residential Dwellings or Rooming Houses / Boarding Houses, and a plan for developing the program over the next calendar year.*

(.b)    *The total number of rental inspections performed during the past calendar year per zip code, and whether each inspection was in response to a complaint or a result of the Proactive Inspection Program.*

(.c)    *An overview of inspections performed in response to complaints, including the number and type of complaints received per zip code, number and type of complaints responded to per zip code, the number and type of violations found as a result of complaints per zip code, and the average response time for each type of complaint.*

(.d)    *The total number of all notices of intent to cease operations and cease operations orders for residential rental properties.*

(.e)    *A list of all residential rental property owners and addresses with an open Unfit, Unsafe, or Imminently Dangerous violation or a Cease Operations order, as defined by Sections PM-108, PM-109, PM-110, and A-505.*

# City of Philadelphia

(.2)      *The first report shall be provided to Council no later than December 31, 2027. Thereafter, an annual report shall be provided to Council no later than June 30 each year.*

SECTION 3. This Ordinance shall become effective November 1, 2026.

_____

**Explanation:**

[Brackets] indicate matter deleted.
*Italics* indicate new matter added.

# City of Philadelphia

CERTIFICATION:  This is a true and correct copy of the original Bill, Passed by the City Council on April 23, 2026.  The Bill was Signed by the Mayor on May 7, 2026.

Elizabeth McCollum
Chief Clerk of the City Council

# Exhibit B

# City of Philadelphia



(Bill No. 250330-AA)

AN ORDINANCE

Amending Chapter 9-800 of The Philadelphia Code, entitled "Landlord and Tenant," to modify the requirements related to good cause for ending a tenancy, add protections against retaliation and harassment for tenants and tenant organizations, specify tenants' rights related to the implied warranty of habitability and provide a legal presumption related to breaches of the implied warranty of habitability, create a tenant right to organize, specify deadlines for asserting claims, and establish and enhance enforcement mechanisms, remedies, damages, and protections, all under certain terms and conditions.

*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*

SECTION 1. Legislative Findings. Council finds that:

(1)  A safe, habitable, and well-maintained home is a fundamental necessity for health, stability, and economic mobility. Yet, too many rental properties in Philadelphia fail to meet basic standards of habitability. Approximately 40% of Philadelphia rental homes need repairs and 30-45% of rental units operate without proper licensing, exposing tenants to unsafe, unfit, and imminently dangerous conditions.

(2)  Philadelphia is trending toward a majority-renter city, with approximately half of all households currently renting their homes. More than half of these renters are cost-burdened, paying more than 30% of their income toward rent, which limits their ability to relocate when faced with unsafe or unstable housing conditions and increasing their vulnerability to exploitation.

(3)  Existing enforcement mechanisms rely heavily on tenant complaints, placing the burden on tenants to identify, report, and pursue remedies for violations, often at personal risk. This reactive system allows serious code violations to persist undetected and unaddressed for extended periods. Furthermore, tenants consistently face retaliation for speaking out about unsafe conditions.

(4)  Retaliation against tenants who assert their legal rights severely undermines recourse for tenants experiencing unsafe conditions. Tenants who report violations, request repairs, or organize collectively frequently face eviction, non-renewal, rent increases, or harassment, discouraging the exercise of lawful rights and undermining enforcement of housing standards.

(5)  The absence of clear, enforceable standards governing retaliation, harassment, and interference with tenant rights allows harmful practices to persist and creates uncertainty for both tenants and landlords.

---

# City of Philadelphia

BILL NO. 250330-AA *continued*                                                    Certified Copy

(6) Tenant organizing and collective action are critical tools for addressing unsafe conditions and power imbalances in the rental market. However, tenants and tenant organizers often face barriers to organizing, including restricted access to buildings, non-renewal of leases, eviction, and harassment.

(7) Establishing a clear right to organize, strengthening protections against retaliation and harassment, clarifying and reinforcing the implied warranty of habitability, and creating strong enforcement mechanisms are necessary to ensure that tenants can safely assert their rights without fear of reprisal.

(8) Requiring good cause for lease termination is essential to prevent arbitrary displacement, promote housing stability, and ensure that tenants are not forced from their homes without a legitimate and lawful basis.

(9) These reforms are necessary to protect public health, reduce displacement, and promote housing stability in Philadelphia's housing system.

SECTION 2. Title 9 of The Philadelphia Code is hereby amended to read as follows:

TITLE 9. REGULATION OF BUSINESSES, TRADES AND PROFESSIONS

\*          \*          \*

CHAPTER 9-800. LANDLORD AND TENANT

\*          \*          \*

§ 9-804. Unfair Rental Practices.

\*          \*          \*

(2) It shall be unlawful for any owner, landlord, agent or other person operating or managing premises to *refuse to lease to any person,* terminate a lease with a tenant or make, alter, amend or modify any term or condition of any existing lease or arrangement of tenancy with a tenant*, or restrict access to common areas or amenities* in retaliation for:

    (a)   any violation having been found against the premises;

    (b)   *Initiating or participating in the investigation of or enforcement against a violation, including but not limited to* the filing of a complaint alleging a violation *and/or  related to the investigation of or enforcement against a violation*;

# City of Philadelphia

     (c)   *any lawful communication made by a tenant in good faith with a government official or in a judicial proceeding regarding violations or other conditions of the premises, provided that any allegations concerning retaliatory conduct during a consecutive thirty (30) day period shall be treated as the subject of a single complaint.*

    [(c)] *(d)* the joining of*, or participation in,* any lawful organization*, including a tenant organization, association, or union*[*,* or any other exercise of a legal right]. [It shall be unlawful for any owner, landlord, agent or other person operating or managing premises to refuse to lease any premises to a prospective tenant because he believes the prospective tenant has exercised any such right];

    [(d)] *(e)* an incident of domestic violence or sexual assault in which a tenant was the victim, or a tenant's status as a victim of domestic violence or sexual assault. For purposes of this subsection (2)(d) the meaning of the terms "victim", "domestic violence" and "sexual assault" are as defined in Section 9-3201 of this Code[.]*;*

    *(f)   any other exercise of a legal right.*

In any civil proceeding involving this provision in which the notice of termination or alteration of a term or condition of the lease was given within one year after a violation was found, a right of the tenant against the landlord, agent or other person operating or managing premises was exercised, or a correction made, whichever is the latest, it shall be the burden of the owner, landlord, agent or other person operating or managing such premises to prove that the notice was not given in retaliation for the exercise by the tenant of his legal rights.

    (3)  [The provisions of this Section shall not apply to:

    (a)]   [Any bona fide] *The* transfer of title [incident to a sale] of the [premises, but] *premises shall not alter the obligation of* any subsequent owner, landlord, agent or other person operating or managing such premises *to comply with* [shall be subject to] the provisions of this Chapter.

    *(a)*   [(b)] *It shall not be a violation of this Section 9-804 for* [Any] *an* owner, landlord or agent or other person operating or managing any premises against which a notice of violation has been issued *to* [who desires to] terminate an existing occupancy in order that the premises may be rehabilitated and the violation cured, *provided that* [and] the Department of Licenses and Inspections issues a certification that such work requires that the premises be vacated.

                *      \*      \**

(12)  Good cause required.

# City of Philadelphia

(a)    No owner, landlord, agent or other person operating or managing any residential premises, upon expiration of [a] *any* lease [of less than one year], shall *take any action to terminate a tenancy* [issue a notice to vacate, notice of non-renewal, or notice to terminate the lease], unless (1) the landlord has good cause to *take that action* [not renew the lease]; and (2) the landlord provides the tenant with notice pursuant to subsection (c), below. For purposes of this subsection (12)(a), good cause shall include, but is not limited to, any of the following:

*        *        *

(.10)    *The landlord has cause for eviction under 68 Pa. Stat. § 250.501(a)(2) or (3), or successor statute.*

(.11)    *The owner has entered into a bona fide agreement of sale to transfer the premises to a purchaser who will occupy the unit as their principal residence, provided that:*

(.a)    *The owner provides the tenant with a copy of a fully executed, arm's-length agreement of sale identifying the purchaser.*

(.b)    *The purchaser provides a signed statement that the purchaser intends to occupy the unit as their principal residence within ninety (90) days of closing and does not intend to rent the unit.*

(.c)    *The owner provides at least sixty (60) days' notice of non-renewal to the tenant, attaching all documentation requested in paragraphs (.a)-(.b), above.*

*        *        *

(b) [Reserved] *For purposes of subsection 12(a), above, an action to terminate a tenancy shall include, but is not limited to, any of the following:*

(.1)    *Issuing, serving, or otherwise providing a tenant with a notice to vacate, notice of non-renewal, notice to terminate the lease, notice of Diversion Rights pursuant to Section 9-811; or*

(.2)    *Initiating, filing, commencing, or otherwise pursuing an eviction action or any other legal action seeking to obtain a judgment for possession of the premises, excepting ejectment actions.*

(c)    A landlord who has good cause to *take an action to terminate a tenancy* [issue a notice to vacate or notice to terminate a lease] under subsection (a), above, shall notify the tenant in writing *with reasonable specificity* of the basis for such good cause in the same manner and on the same schedule as set forth in subsection (11)(a) ("Landlord Notice to Tenant of Rent

---

# City of Philadelphia

BILL NO. 250330-AA *continued*                                                    Certified Copy

Increase"). In the event the owner, landlord, agent or other person operating or managing the premises fails to issue the notice as required by this subsection (12), the lease shall renew on a month-to-month basis, unless the tenant elects otherwise.

*        *        *

   (f)      *This section (12) shall not apply if a landlord sufficiently alleges in an eviction complaint, and a court of competent jurisdiction finds, that the tenant resides in an individual rental unit that is also occupied by the landlord as a primary residence and has been since the start of the tenancy.*

*        *        *

   (13)      Self-Help Eviction.

*        *        *

   (14)      Any person aggrieved under the provisions of this Section may file a complaint with the Fair Housing Commission or may allege any violations in an initial pleading or, where appropriate, in a responsive pleading in a court of competent jurisdiction. *Claims for violations of this Chapter shall be governed by the contractual statute of limitations applicable under the laws of the Commonwealth of Pennsylvania. Tenants shall retain the right to file claims beyond the expiration of their lease period and after vacating the premises, provided such claims are filed within the applicable contractual statute of limitations period. There is no requirement that a complaint be filed with an agency before asserting a claim in court. Each separate occurrence or instance of a prohibited action shall constitute a separate violation. A continuing violation arising from the same underlying condition shall constitute a single violation and shall not be deemed a separate violation for each day it continues.*

   (a)      *In an administrative proceeding before the Fair Housing Commission violations of this Section shall be punishable pursuant to Section 9-807.*

   (b)      *In a judicial proceeding, a court may order the following, upon a finding that a violation of this Section has occurred:*

      (.1) *Injunctive relief and such other equitable relief, as appropriate.*

      (.2) *Compensatory damages and restitution, including economic damages inclusive of overpaid rent and emotional distress damages, or, in the alternative, if the plaintiff elects before judgment is rendered, statutory damages of $1,000 per violation.*

      (.3) *Upon a finding of a willful or wanton violation of this Section, punitive damages up to three times the value of actual damages sustained inclusive of overpaid rent or, if statutory damages are elected, three times the value of statutory damages.*

# City of Philadelphia

*BILL NO.* 250330-AA *continued*                                     Certified Copy

*(.4) Reasonable attorney's fees and costs.*

*(.5) Suspension or revocation of the owner or agent's rental license, during which period the rent for any rental unit in the housing accommodation shall not be collected or increased.*

*(c)      A tenant may use the protections afforded in this Section as an affirmative defense in a court of competent jurisdiction.*

*(15)      No provision of this Section can be waived or made subject to a contract between the parties depriving a tenant of the benefits of this Section.*

*\* \* \**

*§ 9-816. Rights to Safe and Healthy Homes.*

*(1)  Right to Organize.*

*(a)      Tenants shall have the right to:*

*(.1)      Organize and advocate related to the terms and conditions of their residency;*

*(.2)      Form, join, meet with, and participate in tenant organizations;*

*(.3)      Meet and confer through representatives of their own choosing with owners and management; and*

*(.4)      Engage in lawful concerted activities with other tenants;*

*(b)      Any tenant organizer who is not a tenant shall have the same rights to visit tenants and access residential rental accommodations and shall follow the same building access and security protocols as all other non-tenants. Furthermore:*

*(.1)      If a multifamily residential property has a consistently enforced, written policy against canvassing, then a non-tenant tenant organizer must be accompanied by a tenant while on the property of the multifamily housing project.*

*(.2)      If a multifamily residential property has a written policy favoring canvassing, any non-tenant tenant organizer must be afforded the same privileges and rights of access as other uninvited outside parties in the normal course of operations. If the*

# City of Philadelphia

*project does not have a consistently enforced, written policy against canvassing, the project shall be treated as if it has a policy favoring canvassing;*

   *(c)  Any owner or agent of an owner of a residential rental accommodation has a duty to confer in good faith with tenants and tenant organizers regarding lease terms and property conditions to which those tenants are party. "Confer in good faith" means that the parties shall have the mutual obligation, personally or through their authorized representatives, to meet and confer and continue for a reasonable period of time, in order to exchange freely information, opinions, and proposals, and to endeavor to reach agreement. Examples of conferring in good faith include, but are not limited to, maintaining a designated point of contact, engaging in regular communications, responding to reasonable requests for information, allowing participation by non-resident advocates, providing adequate time for limited-English speakers to obtain translation services, providing and adhering to timelines for addressing habitability concerns, and negotiating and putting agreements into writing;*

   *(d)  No owner or agent of an owner of a residential rental accommodation shall interfere with the right of a tenant or tenant organizer invited by a tenant onto the premises to conduct the following activities related to the establishment or operation of a tenant organization, if performed in a lawful manner consistent with subsection § 9-816(1)(b):*

     *(.1)  Distributing literature in common areas, including lobby areas;*

     *(.2)  Knocking on tenants' doors, speaking with tenants, and placing literature at or under tenants' doors;*

     *(.3)  Posting information on all building bulletin boards;*

     *(.4)  Assisting tenants in participating in tenant organization activities; and*

     *(.5)  Convening tenant or tenant organization meetings at any reasonable time and in any appropriate space that would reasonably be interpreted as areas that the tenant had access to under the terms of their lease, including any tenant's unit, a community room, a common area including lobbies, or other available space.*

     *(.6)  Formulating responses to owner actions or building and unit conditions, including:*

      *(.a) Rent increases or requests for rent increases;*

      *(.b) Proposed changes in the housing accommodation's facilities and services;*

# City of Philadelphia

BILL NO. 250330-AA *continued*                                                    Certified Copy

(.c)    Conversion of residential units to nonresidential use, cooperative housing, or condominiums;

(.7)    Proposing that the owner or management modify the housing accommodation's facilities and services; and

(.8)    Any other activity reasonably related to the establishment or operation of a tenant organization.

(e)    This Section shall not be construed to grant any greater access to a rental residential accommodation than any other non-resident would be provided.

(2)  Right to Habitability.

(a)    Tenants shall have the right to facilities and services vital to their life, health, and safety and to the use of the premises for residential purposes throughout the duration of their tenancy. At a minimum, tenants have a right to safe and sanitary living conditions.

(b)    It shall be unlawful for any owner, landlord, agent, or other person operating or managing premises to threaten to or engage in any act or omission which materially interferes with the tenant's right to habitability, including but not limited to the following:

(.1)    Failing to perform or complete repairs and maintenance in a reasonably timely manner or failing to follow applicable industry standards, including but not limited to the Philadelphia Property Maintenance Code, Philadelphia Building Construction and Occupancy Code, Philadelphia Fire Code, and Philadelphia Health Code, to minimize exposure to mold, lead paint and dust, asbestos, or other building materials with potentially harmful health impacts. A reasonably timely manner is defined as the landlord has had reasonable time after being put on notice, taking into account the emergency nature of the repair as well as the impact or potential impact to the tenants' and occupants' health, safety, and well-being.

(.2)    Engaging in an act or omission which results in a material breach of the implied warranty of habitability, as defined in this Section.

(c)    Abatement under this provision

(.1)    In a court action alleging unpaid rent, a tenant shall be entitled to an abatement of rent during and for any periods when the implied warranty of habitability has been materially breached by a landlord, including, but not limited to, where a landlord fails to rebut the presumption of a breach pursuant to this subsection. A material breach of the implied warranty of habitability occurs when (1) a defect in the property is of a nature and kind which will prevent the use of the dwelling for its intended purpose to provide premises fit for habitation by its dwellers; (2) the landlord had notice of the defect of the

# City of Philadelphia

*condition; and (3) the landlord failed to make the necessary repairs in a reasonably timely manner.*

*(.2)        In a proceeding pursuant to this Section before a court of competent jurisdiction, there shall be a rebuttable presumption that an owner, landlord, agent or other person operating or managing any residential premises breached the implied warranty of habitability if (1) the conditions or characteristics of the premises violate the requirements of the Philadelphia Property Maintenance Code or the Philadelphia Fire Code; (2) the Department has issued a notice of violation regarding the defective conditions or characteristics of the premises; (3) the date to cure, specified in an issued notice of violation, has passed; (4) no appeal of that notice of violation is pending; and (5) the defective conditions or characteristics that form the basis of that notice of violation have not all been remedied. When these conditions are met, a court may reasonably conclude that the landlord had notice of the defect from the Department of Licenses and Inspections, had a reasonable opportunity to make the necessary repairs, and failed to make the necessary repairs. (.a)      A notice of violation that includes a determination by the Department that the rental property is unfit, unsafe, or imminently dangerous, which is not complied with pursuant to the timelines of section (b) shall entitle a tenant to full abatement of rent during or for the period of the violation, or until the Department determines that work to repair the violation has started and is actively progressing, and acceptable interim measures have been taken to ensure tenant safety and unit habitability during the interim.*

*(.b)  The Department's notice of violation to the landlord shall relieve the tenant of separately providing the landlord written notice of a defect or condition that gives rise to the presumptive breach of the implied warranty of habitability.*

*(.c)  A landlord may rebut the presumption of a breach of the implied warranty of habitability, in whole or in part, by showing by a preponderance of the evidence:*

*(.i)        The landlord has been unable to correct the violation because the tenant prevented the landlord from accessing the property;*

*(.ii)       To the extent the notice of violation is not related to the structure of the building, that the habitability of the tenant's residence was not fully impacted by the relevant violation, in which case rent shall be abated to the extent that habitability was adversely impacted;*

*(.iii)      The tenant caused the violation that is the basis for the violation; or*

*(.iv)      The defective conditions or characteristics that form the basis of the violation were corrected, in which case the breach shall be deemed to apply to the period from the issuance of the notice of violation to the date the defective condition was*

# City of Philadelphia

*repaired, so long as notice of repair was provided, a request for reinspection by the Department has been made, and the subsequent reinspection confirms the defective condition was repaired.*

*(.d)   Nothing in this Subsection shall be interpreted to preclude a finding that the implied warranty of habitability was breached prior to or despite no violation having been issued by the City.*

*(3)           Protections Against Interference and Retaliation*

*(a)           Tenants shall have the right to the use and quiet enjoyment of their residence and the housing services that are connected with the use or occupancy of a rental unit, including, but not limited to, utilities (including gas, water, and electricity), ordinary repairs or replacement, and maintenance, including painting.*

*(b)           It shall be unlawful for any owner, landlord, agent, or other person operating or managing premises to take any action, or refuse to act in a way that would cause a reasonable tenant to vacate such residential rental unit or to surrender or waive any rights described above in relation to such tenancy. Examples include, but are not limited to, the following:*

*(.1)   Reducing or eliminating, or threatening to reduce or to interfere with a tenant's quiet enjoyment of their residence, including but not limited to, by failing to provide notice of 24 hours for non-emergency repairs to the tenant, or failing to offer a reasonable justification for entry into the unit; or otherwise engaging in unreasonably disruptive behavior when entering or accessing the property or attempting to do so.*

*(.2)   Threatening a tenant or their guests with physical harm.*

*(.3)   Reducing or eliminating, or threatening to reduce or to eliminate, housing services required by a lease, contract or law, including but not limited to the elimination of parking if provided in the tenant's lease or contract.*

*(.4)   Engaging  in abusive use of government process against a tenant, for example by making a report or threatening to make a report about a tenant to a governmental entity, including immigration authorities, when done to retaliate against the tenant for engaging in activity protected under Section 9-804(2), to prevent the tenant from engaging in such activities in the future, or to cause the tenant to vacate the unit or forfeit other legal rights of occupancy.*

*(.5)   Other acts or omissions of such significance as to substantially interfere with or disturb the comfort, repose, peace or quiet of a tenant and that cause, or are likely to cause, a tenant to surrender or waive any rights in relation to such tenancy.*

# City of Philadelphia

*(.6)   Retaliating for engaging in activity protected under Section 9-804(2) by reducing or eliminating, or threatening to reduce or to eliminate any other benefits, privileges, or facilities of the property promised to tenants, in a lease or otherwise, or required by law.*

*(.7)   Disclosing, threatening to disclose, or misusing a tenant's medical or health information, including but not limited to records or information relating to disability, medical treatment, prescriptions, or health conditions, where such disclosure or threat of disclosure is made to co-tenants, neighbors, employers, governmental entities, or any other third party.*

*(4)   Remedies. Any person aggrieved under the provisions of this Section may allege any violations in an initial pleading or, where appropriate, in a responsive pleading in a court of competent jurisdiction. A claim for a violation of this Chapter must be filed in court within two (2) years of the date that an alleged violation occurred. There is no requirement that a complaint be filed with an agency before asserting a claim in court. Each separate occurrence or instance of a prohibited action shall constitute a separate violation. A continuing violation arising from the same underlying condition shall constitute a single violation and shall not be deemed a separate violation for each day it continues.*

*(a)      A court may order the following, upon a finding that a violation of this Section has occurred:*

*(.1)      Injunctive relief and such other equitable relief, as appropriate.*

*(.2)      Compensatory damages and restitution, including overpaid rent and emotional distress damages, or, in the alternative, if the plaintiff elects before judgment is rendered, statutory damages of $1,000 per violation.*

*(.3)      Upon a finding of a willful or wanton violation of this Section, punitive damages of three times the value of actual damages sustained inclusive of overpaid rent or, if statutory damages are elected, three times the value of statutory damages.*

*(.4)      Reasonable attorney's fees and costs.*

*(.5)      Suspension or revocation of the owner or agent's rental license, during which period the rent for any rental unit in the housing accommodation shall not be collected or increased.*

*(b)      A tenant may use the protections afforded in this Section as an affirmative defense in a court of competent jurisdiction.*

SECTION 3. This Ordinance shall become effective November 1, 2026.

# City of Philadelphia

*BILL NO.* 250330-AA *continued*                                                    Certified Copy

_____

**Explanation:**

[Brackets] indicate matter deleted.
*Italics* indicate new matter added.

# City of Philadelphia

*BILL NO.* 250330-AA *continued*                                        Certified Copy

CERTIFICATION:  This is a true and correct copy of the original Bill, Passed by the City Council on April 23, 2026.  The Bill was Signed by the Mayor on May 7, 2026.

Elizabeth McCollum
Chief Clerk of the City Council

---

# Exhibit C





