# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| SETH FLOYD, *et al.*,<br><br>     *Plaintiffs,*<br><br>     v.<br><br>CITY COUNCIL FOR THE CITY OF PHILADELPHIA, *et al.*,<br><br>     *Defendants.* | Case No. 2:26-cv-02403-WB |

**[PROPOSED] BRIEF OF *AMICI CURIAE* IN SUPPORT OF DEFENDANTS' MOTION**
**TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

Daniel Urevick-Ackelsberg (PA No. 307758)
Olivia Mania (PA No. 336161)
PUBLIC INTEREST LAW CENTER
1617 John F. Kennedy Blvd., Suite 1650
Philadelphia, PA 19103
267-546-1316
dackelsberg@pubintlaw.org
omania@pubintlaw.org

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................................... ii

*AMICI CURIAE* AND THEIR INTERESTS ................................................................ 1

ARGUMENT.............................................................................................................. 2

FACTUAL BACKGROUND ...................................................................................... 3

    I.     Philadelphia-based landlords sue to stop amendments to the Philadelphia Code .................................................................................................................3

    II.    Plaintiffs' active participation in the legislative process.............................5

LEGAL ARGUMENT ................................................................................................ 7

    I.     Municipal regulations that ensure housing is safe and stable for tenants do not violate the United States or Pennsylvania Constitutions......................7

        A.    Municipal regulations that ensure housing is safe and stable for tenants do not violate the Takings Clause ......................................7

            1.    Plaintiffs do not allege Safe Healthy Homes causes any concrete harm to their properties, let alone a severe one .... 8

            2.    Safe Healthy Homes does not interfere with Plaintiffs' reasonable expectations ..................................................... 10

            3.    Safe Healthy Homes is a quintessential program to promote the public good ................................................................. 12

        B.    Municipal regulations that ensure housing is safe and stable for tenants do not violate the Contract Clause .................................. 12

            1.    Plaintiffs fail to plead any interference with a contract........ 13

            2.    Plaintiffs' allegation of less restrictive alternatives is irrelevant.............................................................................. 14

        C.    Municipal regulations that ensure housing is safe and healthy for tenants do not violate the guarantee of Due Process.................... 16

        D.    Municipal regulations that ensure housing is safe and stable for tenants do not violate the Equal Protection Clause....................... 17

        E.    Municipal regulations that violate no constitutional provision provide no *Monell* liability......................................................................... 20

CONCLUSION ...................................................................................................... 21

# TABLE OF AUTHORITIES

**Pages(s)**

**Cases**

*Allied Structural Steel Co. v. Spannaus*,
  438 U.S. 234 (1978)................................................................................... 12, 13

*Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*,
  669 F.3d 359 (3d Cir. 2012).................................................................. 13, 14, 17

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................... 7, 19

*Ashley Sveen v. Kaye Melin*,
  584 U.S. 811 (2018)............................................................................................. 13

*Ass'n of Cmty. Orgs. for Reform Now v.SEPTA*,
  789 A.2d 811 (Pa. Commw. Ct. 2002) ........................................................... 21

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................7

*Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
  508 U.S. 602 (1993)............................................................................................ 10

*Conf. of Presidents of Major Italian Am. Orgs., Inc. v. City of Phila.*,
  No. 22-1116, 2023 WL 1069704 (3d Cir. Jan. 27, 2023) ........................................ 20

*Conf. of Presidents of Major Italian Am. Orgs., Inc. v. City of Phila.*,
  No. CV 21-1609, 2022 WL 118118 (E.D. Pa. Jan. 12, 2022)................................. 20

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
  665 F.3d 524 (3d Cir. 2011).............................................................................. 18

*Energy Reserves Group, Inc. v. Kansas Power & Light Co.*,
  459 U.S. 400 (1983)............................................................................................ 15

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009).................................................................................3

*Frempong v. Richardson*,
  209 A.3d 1001 (Pa. Super. Ct. 2019)............................................................... 11

*Grammer v. John J. Kane Reg'l Ctrs.–Glen Hazel*,
  570 F.3d 520 (3d Cir. 2009)............................................................................. 20

*HAPCO v. City of Phila.*,
    482 F. Supp. 3d 337 (E.D. Pa. 2020)................................................................passim

*Hosp. & Healthsystem Ass'n of Pa. v. Commonwealth*,
    77 A.3d 587 (Pa. 2013)............................................................................... 16

*Johnson v. City of Phila.*,
    975 F.3d 394 (3d Cir. 2020) (internal quotation omitted) ........................................ 20

*Johnson v. City of Reading*,
    No. 5:21-CV-04860-JMG, 2025 WL 3565686 (E.D. Pa. Dec. 12, 2025) .................. 20

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
    480 U.S. 470 (1987).............................................................................. 10, 15

*Keystone Bituminous Coal Ass'n v. Duncan*,
    771 F.2d 707 (3d Cir. 1985).................................................................... 10, 15

*Lawrence Cnty. v. Brenner*,
    582 A.2d 79 (Pa. Commw. Ct. 1990) ........................................................21

*Lincoln Union v. Northwestern Co.*,
    335 U.S. 525 (1949)................................................................................ 16

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005).................................................................................. 8

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982).................................................................................. 7

*Lucas v. S.C. Coastal Council*,
    505 U.S. 1003 (1992)................................................................................ 8

*Murr v. Wisconsin*,
    582 U.S. 383 (2017).................................................................................. 8

*Nekrilov v. City of Jersey City*,
    45 F.4th 662 (3d Cir. 2022).................................................................passim

*New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*,
    439 U.S. 96 (1978).................................................................................. 16

*Pace Res., Inc. v. Shrewsbury Twp.*,
    808 F.2d 1023, 1031 (3d Cir. 1987)...................................................... 8, 10, 12, 17

*Penn Centr. Transp. Co. v. City of N.Y.*,
  438 U.S. 104 (1978).................................................................................. 8, 12

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*,
  467 U.S. 717 (1984)..................................................................................... 16

*Pers. Adm'r of Mass. v. Feeney*,
  442 U.S. 256 (1979)..................................................................................... 20

*Pugh v. Holmes*,
  405 A.2d 897 (Pa. 1979)............................................................................... 11

*Rogin v. Bensalem Twp.*,
  616 F.2d 680 (3d Cir.1980)............................................................................. 8

*Sammon v. N.J. Bd. of Med. Exam'rs*,
  66 F.3d 639 (3d Cir. 1995)............................................................................ 17

*Sargent v. Sch. Dist. of Phila.*,
  165 F.4th 727 (3d Cir. 2026)................................................................... 19, 20

*Stradford v. Sec'y Pa. Dep't of Corr.*,
  53 F.4th 67 (3d Cir. 2022)............................................................................. 19

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023)..................................................................................... 18

*Transp. Workers Union of Am., Loc. 290 v. SEPTA*,
  145 F.3d 619 (3d Cir. 1998)........................................................................... 15

*Troy Ltd. v. Renna*,
  727 F.2d 287 (3d Cir. 1984)........................................................................... 14

*United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of V.I.*,
  842 F.3d 201 (3d Cir. 2016)..................................................................... 13, 14

*Yee v. City of Escondido, Cal.*,
  503 U.S. 519 (1992)................................................................................ 10, 12

**Statutes**
42 U.S.C. § 1983............................................................................................. 20

Phila. Code § 9-3902(1)(a)................................................................................ 11

Phila. Code § PM-101...................................................................................... 11

**Rules**

*Housing Justice*, One PA, https://www.onepa.org/housing-justice/ (last visited Aug. 4, 2026)........................................................................................................... 1, 2

Ira Goldstein et al., *Evictions in Philadelphia: Race (and Place) Matters*, Reinvestment Fund (Feb. 2021), https://bit.ly/456YjIc ..................................................... 18

Joseph Schilling et al., *Improving Philadelphia's Rental Regulatory and Housing Support Systems*, Urb. Inst. (Sept. 2022), https://bit.ly/3Ue8IPR............................. 18

Lauren Andreoli, *Case Update — The Court Sets the Road to Resolution***,** HAPCO (July 2026), https://hapcophiladelphia.com/free-content/hapco-philadelphia-case-update-the-court-sets-the-road-to-resolution/................................................................... 3, 21

*Newsletter*, HAPCO (July 2026), https://hapcophiladelphia.com/wp-content/uploads/2026/07/Newsletter_V2.pdf ............................................................ 3

*Newsletter*, HAPCO (Sept. 2025), https://hapcophiladelphia.com/wp-content/uploads/2025/09/SEPTEMBER-NEWSLETTER-FINAL.pdf.........................5

*One PA*, https://www.onepa.org/ (last visited Aug. 4, 2026)........................................... 1

*Tenant Union Representative Network*, https://rturn.net/ (last visited Aug. 4, 2026) ....... 1

Transcript, Council for the City of Phila. (Apr. 23, 2026), https://www.transcriptroom.org/tr/CAF/DownloadFile/4695606?docType=30&FileName=STATED_MEETING_042326.pdf ..................................................................... 7

Transcript, Council of the City of Phila., Comm. on Hous., Cmty. Dev., & the Homeless (Mar. 30, 2026), https://www.transcriptroom.org/tr/CAF/DownloadFile/4120756?docType=30&FileName=COMMITTEE_ON_HOUSING_NEIGHHOOD_DEV_%26_THE_HOMELESS_033026.pdf.................................................................................................. 3, 6

**Constitutional Provisions**

U.S. Const. amend. V...................................................................................................... 7

U.S. Const. art. I, § 10, cl. 1 ......................................................................................... 12

### *AMICI CURIAE* AND THEIR INTERESTS

For more than fifty years, the Tenant Union Representative Network ("TURN") has served as "a tenant service and advocacy organization that promotes the human right to housing."[1] Based in Philadelphia, TURN helps renters advocate for themselves, upholds their rights to safe, healthy housing, protects tenant organizers, and advocates for the right of tenants "to a safe and decent place to live."[2] TURN holds eviction defense clinics that prepare tenants to represent themselves in landlord-tenant court, holds repair clinics to help tenants demand adequate maintenance in their homes, and inspects rental properties to ensure they meet Housing Quality Standards.[3] TURN supports the Safe Healthy Homes legislation, as well as the broader power of the City of Philadelphia to enact proactive legislation that increases the quality of housing for Philadelphia renters. *See, e.g.*, *HAPCO v. City of Phila.*, 482 F. Supp. 3d 337 (E.D. Pa. 2020) (TURN serving as intervenor to defend city-enacted eviction protections).

One Pennsylvania Activists United ("One PA") "is a grassroots movement for racial, economic, and social justice in Pennsylvania."[4] One PA is committed to addressing an ongoing, multifaceted housing crisis.[5] Founded in 2019 and made part of One PA in 2023, Renters United Philadelphia is a One PA project dedicated to "build[ing] people power to protect renters from landlords who choose profit over maintaining dignified

---

[1] *Tenant Union Representative Network*, https://rturn.net/ (last visited Aug. 4, 2026).

[2] *Id.*

[3] *Id.*

[4] *One PA*, https://www.onepa.org/ (last visited Aug. 4, 2026).

[5] *Housing Justice*, One PA, https://www.onepa.org/housing-justice/ (last visited Aug. 4, 2026).

housing, and to preserve and increase the amount of affordable housing in Pennsylvania."[6] Both on its behalf, and on behalf of members, One PA advocates for Philadelphia housing policies that protect the rights of renters, including advocating for the passage of the Safe Healthy Homes legislation. One PA has a vested interest in the ability of the City of Philadelphia to enact and implement Safe Healthy Homes and other efforts to cure the housing crisis that Philadelphia renters face.

## ARGUMENT

In this litigation sponsored by the Homeowners Association of Philadelphia (HAPCO), a landlord lobbying organization, it's Board President, along with another landlord, seeks to enjoin Philadelphia's Safe Healthy Homes legislation, a series of amendments to the Philadelphia Code intended to promote renter safety, health, and stability. Yet after 57 pages of averments in their Second Amended Complaint, Plaintiffs' contentions regarding Safe Healthy Homes remains vague and undeveloped. In fact, despite making an as-applied constitutional challenge to the entirety of two ordinances, Plaintiffs do not so much as cite a single specific provision of the legislation anywhere in their complaint, let alone explain how it applies to them or how that application violates the Constitution.

Plaintiffs' pleading failures cross every claim they make. Their Takings Clause claim fails to concretely identify any loss in value to their property, let alone the drastic value they must allege. Their Contract Clause claim fails to identify any material interference to any contract. Their Due Process claim effectively concedes the reason the legislation was enacted in the first instance. And despite their invocation of this nation's

---

[6] *Id.*

2

deplorable history of housing discrimination, their Equal Protection claim fails to allege a single piece of discriminatory impact at all. All these failures are merely cover for Plaintiffs' real complaint, which they state elsewhere: that Philadelphia's City Councilmembers "don't listen to us."[7]

Enough is enough. Tenants across Philadelphia worked tirelessly for the passage of this important legislation. The landlord lobby's continuing efforts to undermine these hard-fought reforms remain woefully insufficient. After three bites at the apple to describe the infirmities of Safe Healthy Homes, they should not have a fourth. Their complaint should be dismissed with prejudice.

## FACTUAL BACKGROUND[8]

### I. Philadelphia-based landlords sue to stop amendments to the Philadelphia Code

Plaintiffs Seth Floyd[9] and Erica Hadley are Philadelphia-based, African American landlords, who challenge Philadelphia's recent enactment of the Safe Healthy Homes

---

[7] Transcript at 81:19–20, Council of the City of Phila., Comm. on Hous., Cmty. Dev., & the Homeless (Mar. 30, 2026), https://www.transcriptroom.org/tr/CAF/DownloadFile/4120756?docType=30&FileName= COMMITTEE_ON_HOUSING_NEIGHHOOD_DEV_%26_THE_HOMELESS_033026.p df.

[8] A "District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009).

[9] Mr. Floyd is the Board President of the Homeowners Association of Philadelphia ("HAPCO"). *Newsletter*, HAPCO (July 2026), https://hapcophiladelphia.com/wp-content/uploads/2026/07/Newsletter_V2.pdf. HAPCO refers to this litigation as "our lawsuit," and states that this "litigation runs entirely on [its] Legal Action Fund." *See* Lauren Andreoli, *Case Update — The Court Sets the Road to Resolution*, HAPCO (July 2026), https://hapcophiladelphia.com/free-content/hapco-philadelphia-case-update-the-court-sets-the-road-to-resolution/.

legislation. Second Amended Complaint ("SAC") ¶¶ 4–5, Dkt. No. 21. Among other things, across ordinances that make up Safe Healthy Homes, Philadelphia clarified its rental license requirements, authorized the creation of a proactive rental inspection program, increased transparency, modified its requirements related to good cause for ending a tenancy, strengthened protections for tenant organizing, and codified the common law protections of the implied warranty of habitability. SAC Ex. A, Bill No. 250329-AA at 1; SAC Ex. B, Bill No. 250330-AA at 1. Philadelphia enacted these amendments because City Council thought them "necessary to protect public health, reduce displacement, and promote housing stability in Philadelphia's housing system." SAC Ex. A, Bill No. 250329-AA § 1(9).

Plaintiffs do not cite *any* specific provision of Safe Healthy Homes, while conceding that "many individual provisions" of the bill "appear limited when viewed in isolation," SAC ¶ 92.[10] Despite this absence and this concession, Plaintiffs allege that Safe Healthy Homes illegally burdens "a discrete class of small housing providers," even though "the legislative record itself" identifies those small housing providers "as essential to preserving Philadelphia's affordable housing supply." SAC ¶ 3. Plaintiffs also aver that "research . . . recognizes that many landlords owning only one or two rental properties lack sufficient access to capital," and that Plaintiffs themselves "fall squarely within the class of housing providers identified by this research."[11] SAC ¶¶ 47, 49; *see also, e.g.*, SAC ¶¶ 14, 28.

---

[10] While unclear and uncited, it is possible that Plaintiffs attempt to reference Safe Healthy Homes' good cause renewal protections. *See, e.g.*, ¶ 160.

[11] There are serious questions about whether Mr. Floyd "fall[s] squarely within" this class of housing providers. In a recent HAPCO newsletter, it reported that Mr. Floyd

4

Plaintiffs also repeatedly assert that Safe Healthy Homes causes them "cumulative burdens[,] includ[ing] increased compliance costs, expanded administrative requirements, greater litigation exposure, increased licensing risks, prolonged delays affecting the recovery of possession, interruption of rental income, increased legal expenses, additional operational uncertainty, and greater costs associated with maintaining continued compliance." SAC ¶¶ 93, 97, 105. Plaintiffs do not explain what costs, requirements, exposure, delays, expenses or uncertainty they are referring to, nor how those burdens have increased as a result of Safe Healthy Homes.

Similarly, Plaintiffs allege that when they purchased and improved their Philadelphia properties, they relied upon both the "legal framework governing residential rental housing existing at the time of acquisition" and "a regulatory framework that permitted them to operate financially sustainable rental businesses while continuing to reinvest in their properties and neighborhoods." SAC ¶¶ 24, 26. Plaintiffs do not, however, explain when they purchased their properties, or the framework they refer to.

## II.    Plaintiffs' active participation in the legislative process

Key to Plaintiffs' allegations is that their extensive participation in the process put City Council on notice about what is, in their view, the impact of the legislation. Specifically, Plaintiffs allege that they "actively participated in the legislative process" that led to the passage of Safe Healthy Homes, providing testimony to City Council along with "[n]umerous additional small landlords," where they "consistently advised" City Council

---

"owns 30 properties across North and West Philadelphia, including single-family rentals and small apartment buildings. He also owns a real estate brokerage, Opulant Realty Group, and a title company." *Newsletter* at 7, HAPCO (Sept. 2025), https://hapcophiladelphia.com/wp-content/uploads/2025/09/SEPTEMBER-NEWSLETTER-FINAL.pdf.

about potential results of the legislation. SAC ¶¶ 68, 70–71.[12] These cautions included their beliefs regarding the "cumulative regulatory burdens" Safe Healthy Homes imposes on small landlords, and their belief that "African American and other minority-owned, and marginalized, rental businesses would be especially affected because many continue to operate with fewer accumulated financial resources and more limited access to institutional capital as a consequence of longstanding historical barriers to property ownership and commercial lending. " SAC ¶¶ 71, 73.

While Plaintiffs allege that "several speakers" "were interrupted, prevented from completing prepared testimony, or afforded materially less opportunity to present their concerns than other participants in the legislative proceedings," SAC ¶ 77, Plaintiffs believe their participation in the legislative process was extensive enough that City Council had "actual notice" that Safe Healthy Homes "would foreseeably impose disproportionate economic burdens upon small independent landlords, particularly minority-owned rental businesses." SAC ¶ 78; *see also* SAC ¶¶ 106–18 (describing extensive record Plaintiffs allege they created during the legislative process).[13]

---

[12] Mr. Floyd was so involved that he spent portions of his own public testimony covering his deep involvement, stating that he "met with" the Councilmember who sponsored the legislation "more times than [he] can count," while ruing that this same Councilmember "do[esn't] listen to us." Transcript at 80:16–17; 81:19–20, Council of the City of Phila., Comm. on Hous., Cmty. Dev., & the Homeless (Mar. 30, 2026), https://www.transcriptroom.org/tr/CAF/DownloadFile/4120756?docType=30&FileName=COMMITTEE_ON_HOUSING_NEIGHHOOD_DEV_%26_THE_HOMELESS_033026.pdf.

[13] Plaintiffs were not the only property owners deeply involved. Multiple housing providers publicly testified that the legislative process produced amendments significant enough that the entire legislation was worth supporting. For example, the President of the Building Industry Association of Philadelphia ("BIA") testified in Council that his organization "changed its position from a strong opposition to supporting the bills when they got amended with much of the BIA and other concerns." Transcript at 64:20–24, Council for the City of Phila. (Apr. 23, 2026),

6

Somewhat paradoxically, however, Plaintiffs also allege that despite the extensive record Plaintiffs and other landlords created, the public was deprived the "meaningful opportunity to review and comment upon the operative legislative language [of Safe Healthy Homes] before Defendants proceeded toward enactment." SAC ¶ 86. Plaintiffs do not provide the amendments they allege they were deprived from reviewing.

## LEGAL ARGUMENT

I.  **Municipal regulations that ensure housing is safe and stable for tenants do not violate the United States or Pennsylvania Constitutions**

A. **Municipal regulations that ensure housing is safe and stable for tenants do not violate the Takings Clause**

The Takings Clause states that "private property [shall not] be taken for public use without just compensation." U.S. Const. amend. V.[14] The Supreme Court's Takings Clause jurisprudence recognizes three forms of regulatory actions that constitute a taking. Two of these are considered *per se* or categorical takings and involve the "relatively narrow" circumstances in which a regulation either results in a "permanent physical occupation" under *Loretto v. Teleprompter Manhattan CATV Corporation*, 458 U.S. 419, 426 (1982), or denies a landowner "*all* economically beneficial uses" of their property

---

https://www.transcriptroom.org/tr/CAF/DownloadFile/4695606?docType=30&FileName=STATED_MEETING_042326.pdf; *see also id.* at 73:9–22 (testimony of a "housing provider for the last 15 years" who spoke "in support of the Safe Healthy Homes Act" and thanked sponsor of legislation "for the conversations and for amending this legislation").

[14] The standard for evaluating Plaintiffs' claims is a familiar one: "To survive a motion to dismiss [pursuant to Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992). *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005).

Because neither of these "relatively narrow" circumstances apply here, the Court must decide whether the legislation constitutes a taking using the "principle guidelines" set forth in *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978). *See Lingle*, 544 U.S. at 538. Such an inquiry requires courts to consider "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr v. Wisconsin*, 582 U.S. 383, 384 (2017). "Although the test is flexible, the *Penn Central* 'inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests.'" *Nekrilov v. City of Jersey City*, 45 F.4th 662, 672 (3d Cir. 2022) (quoting *Lingle*, 544 U.S. at 540). Each factor weighs decisively against Plaintiffs.

### 1. *Plaintiffs do not allege Safe Healthy Homes causes any concrete harm to their properties, let alone a severe one*

To begin, Plaintiffs fail to plead that Safe Healthy Homes causes a sufficiently large economic impact on their property. To meet this standard, Plaintiffs must demonstrate that the legislation "destroys or severely diminishes the value of [their] property." *Rogin v. Bensalem Twp.*, 616 F.2d 680, 690 (3d Cir. 1980). That loss in value must be drastic: Even a 90 percent diminution in value will not suffice. *See Pace Res., Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1031 (3d Cir. 1987). Neither will a loss of more than half an owner's rental revenue. *Nekrilov*, 45 F.4th at 673–74.

Plaintiffs allege none of this. They fail to describe with any particularity how the legislation has diminished their property value just as they fail to plead any scope of that

8

harm. Instead, they allege that they "challenge the cumulative operation of the enacted statutory scheme rather than any isolated provision viewed in isolation," SAC ¶ 159, and that

> The challenged ordinances impose substantial economic burdens upon Plaintiffs by increasing compliance costs, delaying the recovery of possession, expanding litigation expenses, increasing administrative obligations, and requiring Plaintiffs to continue paying mortgages, property taxes, insurance premiums, utilities, maintenance expenses, and repair costs during periods in which rental income may be interrupted or materially delayed.

SAC ¶ 161. These sorts of unexplained conclusory allegations do not suffice to sustain a Takings Clause claim. *See Nekrilov*, 45 F.4th at 673.[15]

Even had Plaintiffs been more specific, they repeatedly make another concession which dooms their claim: that Safe Healthy Homes does not harm "institutional housing providers" and so would lead to the sale of properties to those property owners, thereby "accelera[ing] consolidation of residential housing ownership among larger institutional investors." SAC ¶ 261. Yet this concession—that Plaintiffs could sell their buildings to other landlords—only concretizes that they have failed the Third Circuit's standard. *See Nekrilov*, 45 F.4th at 673 (rejecting lost-profit claims which "fail to account for other potentially profitable uses of the properties, the most obvious of which is to sell the properties.").

---

[15] As explained *supra*, note 10, it is conceivable that Plaintiffs obliquely reference Safe Healthy Homes' amendments to Philadelphia's protections regarding good cause lease terminations. *See* SAC ¶ 160. But if so, Plaintiffs do not explain the state of good cause protections that already existed, or the ways Safe Healthy Homes both expanded and narrowed those protections. *See* SAC Ex. B, Bill No. 250330-AA, § 9-804(12) (expanding good cause to leases of one year or more, while adding additional causes for termination).

### 2. *Safe Healthy Homes does not interfere with Plaintiffs' reasonable expectations*

Plaintiffs have similarly failed to adequately allege that the legislation interferes with their "reasonable, distinct, investment-backed expectations." *Keystone Bituminous Coal Ass'n v. Duncan*, 771 F.2d 707, 713 (3d Cir. 1985), *aff'd sub nom. Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987). Those expectations are subject to two limiting principles: (1) a plaintiff must show the regulation has "nearly the same effect as the complete destruction of the property rights of the owner," with (2) the understanding that "expectations are reasonable only if they take into account the power of the state to regulate in the public interest." *Pace Res. Inc.*, 808 F.2d at 1033 (internal quotation omitted). The interference alleged here fails on both counts.

As to the first requirement, and as explained above, Plaintiffs fail to adequately plead virtually any destruction of their property right at all. As to the second, a municipality's passage of an ordinance to regulate the residential rental housing market is a paradigmatic example of allowable government action that typically does not violate the Takings Clause. *See, e.g.*, *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 528–29 (1992); *Nekrilov*, 45 F.4th at 678. There is therefore no surprise to Plaintiffs that their expected return on investments may be tempered by a government's action. *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993) ("[T]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.") (internal quotation and citation omitted).

This is particularly true in Philadelphia and Pennsylvania where, as one court already noted in rejecting a different HAPCO attempt to enjoin a Philadelphia housing

10

law: "residential leases have been heavily regulated for many years," from rules regarding lease terminations and non-renewals, eviction procedures, and tenant disclosures, to the protection of tenant organizing, good cause lease renewals, and more. *HAPCO*, 482 F. Supp. 3d at 351.

This *ex ante* state of the rental market makes Plaintiffs' failure to identify which parts of this legislation they believe to harm them especially perplexing. For example, while Safe Healthy Homes codifies the implied warranty of habitability, *see* SAC Ex. B, Bill No. 250330-AA, § 9-816(2), an implied warranty of habitability has been part of every residential lease in Pennsylvania for 47 years. *See Pugh v. Holmes*, 405 A.2d 897 (Pa. 1979). Similarly, while Safe Healthy Homes strengthens penalties for unlicensed landlords, *see* SAC Ex. A, Bill No. 250329-AA § 9-3901(f)(i), Philadelphia has long required landlords to have licenses in order to have the right to collect rent. *See, e.g.*, *Frempong v. Richardson*, 209 A.3d 1001, 1004 (Pa. Super. Ct. 2019) (quoting Phila. Code § 9-3902(1)(a) for the Philadelphia requirement that "[n]o person shall collect rent with respect to any property that is required to be licensed . . . unless a valid rental license has been issued for the property."). And while Safe Healthy Homes establishes a proactive housing code inspection program, *see* SAC Ex. A, Bill No. 250329-AA § 9-3903(2)(e), Philadelphia has long had a property maintenance code that landlords are required to follow. *See* Phila. Code § PM-101. "Against this heavily-regulated backdrop," *HAPCO*, 482 F. Supp. 3d at 352, Plaintiffs allege no facts that credibly show their reasonable expectations were violated.

### 3. *Safe Healthy Homes is a quintessential program to promote the public good*

Plaintiffs fare no better with the third factor, where a court must decide whether challenged regulations are akin to a "physical invasion" or instead "a public program adjusting the benefits and burdens of economic life to promote the public good," with the presumption that the latter is true. *Penn Cent.*, 438 U.S. at 124; *see Pace Res. Inc.*, 808 F.2d at 1030 (instructing that in assessing character, the government is "entitled to a presumption that it does advance the public interest"). Here, the law is clearly the latter.

To start, the Supreme Court "has consistently affirmed that States have broad power to regulate housing conditions" without running afoul of the Takings Clause even when the regulation produces economic injuries to a landowner. *Yee*, 503 U.S. at 528–29. Moreover, the purpose of Safe Healthy Homes is self-evident. On its face, the City determined the legislation was "necessary to ensure that all rental housing meets basic standards of safety and habitability." SAC Ex. A, Bill No. 250329-AA § 1(6). Plaintiffs largely admit this point, conceding that they "do not challenge the City's stated objective of improving housing conditions or promoting housing stability." SAC ¶ 187.

Because Plaintiffs fail to plead facts sufficient to plausibly allege any *Penn Central* factor, let alone all three, the Court should dismiss their Takings Clause claim.

### B. Municipal regulations that ensure housing is safe and stable for tenants do not violate the Contract Clause

Plaintiffs' Contract Clause claim fares no better. The Contract Clause provides that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. "The Clause is not, however, the Draconian provision that its words might seem to imply." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 240 (1978). The

12

Clause "'does not prevent the State from exercising such powers as are vested in it for the promotion of the common weal, or are necessary for the general good of the public,' even though contracts previously entered into may be affected." *United Steel Paper & Forestry Rubber Mfg. Allied Indus. & Serv. Workers Int'l Union AFL-CIO-CLC v. Gov't of V.I.*, 842 F.3d 201, 210 (3d Cir. 2016) (quoting *Allied Structural Steel*, 438 U.S. at 241). Again, a court considers a three-part test. Again, Plaintiffs fail all three.

### 1. *Plaintiffs fail to adequately plead any interference with a contract*

The first step in determining "whether legislation violates the Contract Clause" is to "analyze whether the law has operated as a substantial impairment of a contractual relationship." *United Steel Paper,* 842 F.3d at 210. If there is no impairment, the inquiry ends. *Ashley Sveen v. Kaye Melin*, 584 U.S. 811, 819–20 (2018). If there is an impairment, a court next considers "whether the government entity, in justification, had a significant and legitimate public purpose behind the regulation; and whether the impairment is reasonable and necessary to serve this important public purpose." *United Steel Paper*, 842 F.3d at 210.

Plaintiffs flounder at step one. "To determine whether a regulation has substantially impaired an existing contract," courts "consider[] the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Nekrilov*, 45 F.4th at 679 (citing *Sveen*, 584 U.S. at 812). Moreover, "[a]n important factor in determining the substantiality of any contractual impairment is whether the parties were operating in a regulated industry." *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 369 (3d Cir. 2012). This is because "[w]hen a party enters an industry that is regulated in a

13

particular manner, it is entering subject to further legislation in the area, and changes in the regulation that may affect its contractual relationships are foreseeable." *Id*.

Yet as explained above, the Philadelphia rental market has long been "heavily-regulated." *HAPCO*, 482 F. Supp. 3d at 352. Because Plaintiffs have failed to identify their "contractual bargain" or their burdens from before or after Safe Healthy Homes was enacted (let alone whether such change was foreseeable), they "have not articulated how [the legislation] has substantially impaired the contractual relationships between the lessors and the plaintiffs," *Nekrilov*, 45 F.4th at 679, and they therefore fail to plead a Contract Clause claim. *See Am. Exp. Travel*, 669 F.3d at 370 ("Given such consistent regulation," amendments to regulations could not disturb "legitimate expectations as the contracting party or impose an unexpected change in its contractual obligations."); *see also Troy Ltd. v. Renna*, 727 F.2d 287, 297 (3d Cir. 1984) ("[A]n enlargement of an already-regulated statutory tenancy is probably not an impairment at all.").

### 2. *Plaintiffs' allegation of less restrictive alternatives is irrelevant*

To the extent the Court inquires further, Plaintiffs concede the second step,[16] and fare no better on the third: "whether the impairment is reasonable and necessary to serve this important public purpose." *United Steel Paper*, 842 F.3d at 210. Here Plaintiffs argue that "[l]ess restrictive alternatives were identified during the legislative process" to accomplish the City's goals. SAC ¶ 236.

Plaintiffs do not identify these alternatives, but the conclusion is no different than if they had, because Plaintiffs do not allege Philadelphia is a party to their leases. And

---

[16] *See* SAC ¶ 233 ("Plaintiffs acknowledge that the City possesses legitimate interests in promoting housing stability and protecting tenants.").

where the government is not a party to the contract at issue, less restrictive alternatives are irrelevant: "If the impaired contractual relationship is between private parties, the court will defer to the legislative judgment concerning the importance of the public purpose and the manner in which that purpose is being pursued." *Transp. Workers Union of Am., Loc. 290 v. SEPTA*, 145 F.3d 619, 621 (3d Cir. 1998) (citing *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 412–13 (1983)); *Duncan*, 771 F.2d 707 at 717 ("Unless the state itself is a contracting party the courts should defer to the legislative judgment as to the reasonableness of the particular measure, as is customary in reviewing economic and social regulations in other contexts.").

In other words, when a city has made legislative findings that aspects of the rental market "have deleterious affects" on city residents, courts will "refuse to second-guess [the City's] determinations" as to "the most appropriate ways of dealing with the problem." *Nekrilov*, 45 F.4th at 680 (quoting *DeBenedictis*, 480 U.S. at 505); *see also HAPCO*, 482 F. Supp. 3d at 355 n.93 (rejecting claim that legislation did not appropriately "consider the financial burden experienced by landlords" because it is not a "Court's role to strike down legislation merely because certain parties dislike the results of the legislation."). Plaintiffs may have a better alternative. But even had they articulated it—which they have not— they still fail to plead their claim.

15

### C. Municipal regulations that ensure housing is safe and healthy for tenants do not violate the guarantee of due process

Plaintiffs also allege Safe Healthy Homes violates their rights to due process under both the state and federal constitutions.[17] As explained above, Plaintiffs' fail to adequately plead their Contracts Clause claim. That matters here, because "Due Process Clause claims are assessed using a less exacting standard than Contracts Clause claims." *HAPCO*, 482 F. Supp. 3d at 356; *accord Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984) (recognizing the contrast between "the limitations imposed on States by the Contract Clause . . . with the less searching standards imposed on economic legislation by the Due Process Clauses."). So where a Contracts Clause claim fails, the failure of a Due Process Clause claim generally follows. *See HAPCO*, 482 F. Supp. 3d at 356.

Regardless, Plaintiffs' Due Process claim is a non-starter, because the Due Process Clause "is [not] to be so broadly construed that the Congress and state legislatures are put in a strait jacket when they attempt to suppress business and industrial conditions which they regard as offensive to the public welfare." *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 439 U.S. 96, 107 (1978) (quoting *Lincoln Union v. Northwestern Co.*, 335 U.S. 525, 536–537(1949)). For this reason, the Supreme Court

> has explained that the day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought. For protection against abuses by legislatures the people must resort to the polls,

---

[17] "The state and federal due process provisions are substantially equivalent in their protective scope." *Hosp. & Healthsystem Ass'n of Pa. v. Commonwealth*, 77 A.3d 587, 600 n.15 (Pa. 2013) (cleaned up).

not to the courts. Therefore, the Due Process Clause of the Fourteenth Amendment generally does not prohibit retrospective civil legislation, unless the consequences are particularly harsh and oppressive. Generally speaking, state laws need only be rational and non-arbitrary in order to satisfy the right to substantive due process.

*HAPCO*, 482 F. Supp. 3d at 356 (cleaned up).

Rational basis review presents Plaintiffs with a hurdle they cannot meet: the "burden of rebutting every conceivable rational basis" for the legislation. *Am. Exp. Travel Related Servs.*, 669 F.3d at 367. In fact, Plaintiffs concede the objective of the legislation, *e.g.*, SAC ¶ 187, instead alleging that as applied to them, the legislation "undermine[s] those objectives," SAC ¶ 188. But that argument fares no better in a Due Process claim than it does in a Contracts Clause claim: "a court engaging in rational basis review" does not "second guess the legislature on the factual assumptions or policy considerations underlying the statute." *Sammon v. N.J. Bd. of Med. Exam'rs*, 66 F.3d 639, 645 (3d Cir. 1995). Neither will a "difference of opinion on how" the goals of legislation "should be achieved" suffice. *Pace Res., Inc. v. Shrewsbury Twp.*, 808 F.2d at 1035. Challenged legislation need not "be in every respect consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Id.* at 645 (cleaned up). Plaintiffs' fail to plead a Due Process claim.

### D.  Municipal regulations that ensure housing is safe and stable for tenants do not violate the Equal Protection Clause

Plaintiffs' most cynical claim, that Safe Healthy Homes violates Plaintiffs' rights to equal protection under the Fourteenth Amendment, fares no better. Drafted after the 13th Amendment "failed to equalize society," the 14th Amendment is the totem of this nation's efforts during Reconstruction, intended to "enshrine[] a broad guarantee of equality in [its]

17

Equal Protection Clause." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 321–22 (2023) (Sotomayor, J., dissenting). But the Clause's promise has been attacked for the entirety of its existence, and as a result, "[g]ulf-sized race-based gaps exist with respect to the health, wealth, and well-being of American citizens. They were created in the distant past, but have indisputably been passed down to the present day through the generations." *Id.* at 384 (Jackson, J., dissenting). Plaintiffs aptly describe this history. Yet they also fail to allege anything remotely sufficient to state a claim for a violation of the Equal Protection Clause.

To start, the Equal Protection Clause considers whether "similarly situated individuals of a different race were treated differently." *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 550 (3d Cir. 2011). Yet Plaintiffs do not compare themselves to white landlords or landlords of any other race at all. Instead, they allege they are at a disadvantage to "*institutional housing providers*." SAC ¶ 216 (emphasis added); *see also* SAC ¶ 213 (burdens will "fall materially more heavily upon small property owners than upon institutional providers"); SAC ¶ 221 (legislation will "place Plaintiffs at a competitive disadvantage relative to institutional housing providers"). In doing so, Plaintiffs fail to describe the racial make-up of small or "institutional" landlords, fail to suggest these categories are proxies for race, and fail to allege they are making comparators between similarly situated people.[18]

---

[18] There is a group disproportionately harmed by the *ex ante* state of the Philadelphia housing market: Black *renters*. *See* Ira Goldstein et al., *Evictions in Philadelphia: Race (and Place) Matters* at 3, Reinvestment Fund (Feb. 2021), https://bit.ly/456YjIc ("The analysis found that Black tenants were substantially over-represented among households facing an eviction filing."); Joseph Schilling et al., *Improving Philadelphia's Rental Regulatory and Housing Support Systems* at 14, Urb. Inst. (Sept. 2022),

18

"At bottom, the Equal Protection Clause requires equal treatment of all persons similarly situated." *Stradford v. Sec'y Pa. Dep't of Corr.*, 53 F.4th 67, 73 (3d Cir. 2022) (internal quotation omitted). Putting aside questions about whether Mr. Floyd could possibly be defined as a small landlord,[19] or the lack of any cohesive description of what is causing the disadvantage Plaintiffs reference, the Equal Protection Clause stands as a bulwark against discrimination on the basis of race, not the size of one's real estate portfolio, so Plaintiffs' claim fails before it begins.[20]

This is not Plaintiffs' only foundational failure. For a facially neutral law such as Safe Healthy Homes, Plaintiffs must allege, among other things, a discriminatory impact based on race. *See Sargent v. Sch. Dist. of Phila.*, 165 F.4th 727, 739–40 (3d Cir. 2026). But Plaintiffs' provide no cohesive allegations of *any impact,* failing to explain what the law was before Safe Healthy Homes was enacted or what the law will be once it takes effect, let alone how this actually impacts them. Instead, they retreat to difficult-to-parse allegations that the legislation's "cumulative operation imposes foreseeable and disproportionate burdens upon African American small landlords, including Plaintiffs." SAC ¶ 209. These conclusory statements will not do. *Iqbal*, 556 U.S. at 678.

---

https://bit.ly/3Ue8IPR ("In Philadelphia, neighborhoods that are low-income and majority Black have higher instances of code enforcement violations.").

[19] *See supra* note 10.

[20] To the extent the Court examines the legislation under rational basis review, Plaintiffs have conceded the point. *See, e.g.*, SAC ¶ 57 ("A substantial percentage of Philadelphia residents reside in rental housing rather than owner-occupied homes, making the continued availability of safe, affordable, and financially sustainable rental housing essential to the City's economic stability and public welfare.").

"Put simply, Plaintiffs do not provide this Court with any details as to how their lives have changed because of" the Safe Healthy Homes legislation. *Conf. of Presidents of Major Italian Am. Orgs., Inc. v. City of Phila.*, No. CV 21-1609, 2022 WL 118118, at *8 (E.D. Pa. Jan. 12, 2022), *aff'd*, No. 22-1116, 2023 WL 1069704 (3d Cir. Jan. 27, 2023). With no impact cohesively pleaded—let alone a *discriminatory* one—Plaintiffs' claim fails here, too.[21]

### E.  Municipal regulations that violate no constitutional provision provide no *Monell* liability

Finally, Plaintiffs allege what they describe as a "*Monell* claim" under 42 U.S.C. § 1983. It is certainly accurate that "42 U.S.C. § 1983 is a vehicle for imposing liability against anyone who, under color of state law, deprives a person of rights, privileges, or immunities secured by the Constitution and laws." *Grammer v. John J. Kane Reg'l Ctrs.–Glen Hazel*, 570 F.3d 520, 525 (3d Cir. 2009) (internal quotation omitted). But § 1983 is not an independent cause of action. Rather, "for *Monell* liability to attach, there must still be a violation of the plaintiff's constitutional rights." *Johnson v. City of Phila.*, 975 F.3d 394, 403 n.13 (3d Cir. 2020) (internal quotation omitted); *see also Johnson v. City of Reading*, No. 5:21-CV-04860-JMG, 2025 WL 3565686, at *6 (E.D. Pa. Dec. 12, 2025) ("Plaintiff has failed to establish that there was an underlying constitutional violation,

---

[21] Should the Court go further and examine whether Plaintiffs demonstrate a discriminatory intent, *see Sargent*, 165 F.4th at 739–40, they flounder there, too, failing to allege Safe Healthy Homes was enacted "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

which is a necessary predicate element to any *Monell* claim."). And because each of Plaintiffs' constitutional claims fail, so does any claim under § 1983.[22]

## CONCLUSION

In light of the foregoing, this Court should grant Defendants' Motion to Dismiss with prejudice.

Date: August 4, 2026

Respectfully submitted,

*/s/ Daniel Urevick-Ackelsberg*
Daniel Urevick-Ackelsberg (PA No. 307758)
Olivia Mania (PA No. 336161)
PUBLIC INTEREST LAW CENTER
1617 John F. Kennedy Blvd., Suite 1650
Philadelphia, PA 19103
267-546-1316
dackelsberg@pubintlaw.org
omania@pubintlaw.org

*Counsel for Amici Curiae*

---

[22] While *Amici* decline to address Plaintiffs' procedural claims in depth, they note that, in contrast to Plaintiffs' original complaint, the Second Amended Complaint retreats to broad generalities. This includes Plaintiffs' failure to plead subsequent City Council hearings where Mr. Floyd testified and which produced, in HAPCO's words, "real, concrete revisions to the bills." *See* Lauren Andreoli, *Case Update — The Court Sets the Road to Resolution*, HAPCO (July 2026), https://hapcophiladelphia.com/free-content/hapco-philadelphia-case-update-the-court-sets-the-road-to-resolution/. This silence is instructive since "most any Sunshine Act infraction could have been cured by subsequent ratification at a public meeting." *Lawrence Cnty. v. Brenner*, 582 A.2d 79, 84 (Pa. Commw. Ct. 1990); *Ass'n of Cmty. Orgs. for Reform Now v.SEPTA*, 789 A.2d 811, 813 (Pa. Commw. Ct. 2002). In fact, in its communications to its members, HAPCO implicitly acknowledges that the procedural claims are moot. Lauren Andreoli, *Case Update — The Court Sets the Road to Resolution*, HAPCO (July 2026), https://hapcophiladelphia.com/free-content/hapco-philadelphia-case-update-the-court-sets-the-road-to-resolution/ ("[T]the expansion of [this] case into constitutional and property-rights claims . . . kept it alive after the bills passed.").