**PEARSON LAW GROUP**
**By: Briana Lynn Pearson, Esquire Identification No. 327007**
**1500 Chestnut St. Suite 2 #2898**
**Philadelphia, PA 19102**
**Phone: 484-469-0322**
**Fax: 856-229-9991**
**Email: bpearson@pearsonlawgroup.org**

**Attorneys for Plaintiffs, *Seth Floyd and Erica Hadley***

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FLOYD et al. | : | |
| | : | |
| v. | : | No. 2:26-cv-02403 |
| CITY COUNCIL FOR THE CITY OF | : | |
| PHILADELPHIA, et al. | : | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO PROPOSED AMICI CURIAE'S MOTION FOR LEAVE TO PARTICIPATE**

Plaintiffs Seth Floyd and Erica Hadley respectfully oppose the Motion for Leave to Participate as Amici Curiae filed by the Tenant Union Representative Network and One Pennsylvania Activists United. For the reasons set forth in the accompanying Memorandum of Law, Plaintiffs respectfully request that the Court deny the Motion and decline to docket the proposed amicus brief.

Respectfully submitted,

PEARSON LAW GROUP LLC

______________________________
Briana Lynn Pearson, Esquire
*Attorneys for Plaintiffs*

Dated: August 18, 2026

**PEARSON LAW GROUP**
**By: Briana Lynn Pearson, Esquire Identification No. 327007**
**1500 Chestnut St. Suite 2 #2898**
**Philadelphia, PA 19102**
**Phone: 484-469-0322**
**Fax: 856-229-9991**
**Email: bpearson@pearsonlawgroup.org**

**Attorneys for Plaintiffs,**
***Seth Floyd and***
***Erica Hadley***

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FLOYD et al. | : | |
| | : | |
| v. | : | No. 2:26-cv-02403 |
| CITY COUNCIL FOR THE CITY OF | : | |
| PHILADELPHIA, et al. | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO PROPOSED AMICI CURIAE'S MOTION FOR LEAVE TO PARTICIPATE**

## I. INTRODUCTION

Plaintiffs Seth Floyd ("Mr. Floyd") and Erica Hadley ("Ms. Hadley") oppose the Motion for Leave to Participate as Amici Curiae filed by the Tenant Union Representative Network ("TURN") and One Pennsylvania Activists United ("One PA") (collectively, "Proposed Amici"). Amicus participation is discretionary, not automatic. At the trial level, "where issues of fact as well as law predominate," such participation is less appropriate, particularly where the existing parties are competently represented and the proposed filing merely supplies additional advocacy for one side. *Goldberg v. City of Philadelphia*, No. 91-7575, 1994 U.S. Dist. LEXIS 9392, at *1–2 (E.D. Pa. July 12, 1994). That is precisely the circumstance here. Proposed Amici identify no legal issue neglected by Defendants, specialized information unavailable to the parties, or materially distinct perspective necessary to assist the Court. Their proposed brief instead supports

Defendants' Motion to Dismiss and substantially repeats and expands Defendants' arguments concerning Plaintiffs' constitutional claims.

The sequence preceding the filing makes the duplicative nature of the proposed participation particularly apparent. Counsel for One PA first advised Counsel for Plaintiffs that One PA intended to intervene as a party because its interests allegedly were not adequately represented by the City and could diverge from the City's interests. Days later, Counsel for Proposed Amici abandoned intervention and announced that TURN and One PA would instead seek amicus status. On August 4, 2026, Defendants filed their Motion to Dismiss, and Proposed Amici filed that same day a proposed amicus brief expressly supporting Defendants' Motion and seeking the same dismissal with prejudice. Indeed, Counsel for Proposed Amici informed Counsel for Plaintiffs that morning that the organizations would seek amicus status and that their brief would be filed that day.

Whatever prompted that procedural shift, its effect is clear. Proposed Amici do not supply a distinct amicus perspective. They supply supplemental merits briefing for Defendants. Amicus status should not be used to enlarge one side's Rule 12(b)(6) briefing through allied organizations where competent counsel already presents substantially the same arguments. The Motion should be denied.

## II. STATEMENT OF FACTS AND PROCEDURAL HISTORY

Plaintiffs challenge Philadelphia legislation affecting the ownership and operation of residential rental housing. Plaintiffs allege, among other things, that the challenged legislation imposes cumulative burdens on small housing providers, threatens Philadelphia's supply of naturally occurring affordable housing, and will disproportionately affect minority and marginalized housing providers and tenants.

On July 29, 2026, Counsel for One PA advised Counsel for Plaintiffs that One PA intended to move to intervene to defend the validity and legality of the Safe Healthy Homes legislation. See Emails Between Counsel, attached as Exhibit "A." When Counsel for Plaintiffs questioned why intervention was necessary and how One PA's asserted interest differed from the interests already represented by Defendants, Counsel for One PA responded that there were multiple ways One PA's interests and the City's interests could diverge. *Id.*

Counsel for Plaintiffs also raised the apparent tension between the allegations of the Second Amended Complaint ("SAC") and the missions invoked by the organizations seeking participation. Counsel for Plaintiffs explained that the SAC alleges that the legislation disproportionately harms minority and marginalized tenants and housing providers, accelerates displacement, burdens small housing providers, and reduces the supply of naturally occurring affordable housing. *Id.* Counsel for Plaintiffs asked how advocating for legislation alleged to cause those consequences aligned with an organizational commitment to renters and affordable housing.

On August 4, 2026, Counsel for Proposed Amici changed course. Counsel advised the parties that the organizations would no longer seek intervention and instead intended to seek leave for TURN and One PA to participate as amici, with the proposed brief to be filed that same day. Counsel for Plaintiffs responded that the purpose of such an amicus filing was unclear, particularly because One PA had only days earlier maintained that its interests were not adequately represented by the City because those interests could diverge. Counsel for Plaintiffs further observed that One PA now proposed to participate solely as an amicus supporting defense of the challenged legislation and questioned how that position differed from the City's litigation posture.

The timing is significant. On that same date, August 4, 2026, Defendants filed their Motion to Dismiss and supporting memorandum seeking dismissal of the SAC. See Defendants'

Memorandum of Law in Support of Motion to Dismiss, attached as Exhibit "B." Proposed Amici likewise filed their Motion for Leave and proposed brief expressly in support of Defendants' Rule 12(b)(6) motion. The two merits presentations substantially overlap. Defendants challenge the sufficiency of Plaintiffs' Takings Clause, Contracts Clause, Due Process, Equal Protection, and related claims. Proposed Amici proceed through materially the same constitutional claims and seek the same ultimate relief. Their proposed brief argues that Plaintiffs have not sufficiently alleged concrete economic harm under the Takings Clause, reasonable investment backed expectations, substantial impairment of contracts, a substantive due process violation, or an Equal Protection violation. Proposed Amici ultimately request dismissal with prejudice.

Proposed Amici also expressly identify their institutional alignment with the challenged legislation. TURN states that it supports the Safe Healthy Homes legislation and the City's authority to enact legislation increasing housing quality for renters. One PA states that it advocated for passage of the legislation and has a vested interest in the City's ability to implement it. The allegations actually before the Court are contained in Plaintiffs' SAC, attached as Exhibit "C."

## III. QUESTION PRESENTED

Whether the Court should exercise its discretion to permit TURN and One PA to participate as amici curiae where issues of fact as well as law predominate at the trial level, Defendants are competently represented, Proposed Amici admittedly share overlapping interests with Defendants, and their proposed brief, filed the same day as Defendants' Motion to Dismiss, substantially duplicates and expands Defendants' arguments for dismissal.

**Suggested Answer: No.**

## IV. ARGUMENT

### A. Amicus Participation Is Particularly Inappropriate at the Trial Level Where Issues of Fact as Well as Law Predominate.

Whether to permit amicus participation rests within the Court's discretion. The function of an amicus, however, is to assist the Court, not merely to add another advocate to one side of an adversarial dispute. The Eastern District of Pennsylvania addressed that distinction directly in *Goldberg*. There, the Court recognized that "at the trial level, where issues of fact as well as law predominate, the aid of amicus curiae may be less appropriate than at the appellate level where such participation has become standard procedure." *Goldberg*, 1994 U.S. Dist. LEXIS 9392, at *1. The Court denied leave where the parties were adequately represented and the additional participation was neither necessary nor helpful. *Id.* at *1–2.

That reasoning applies with particular force here. Plaintiffs' claims and Defendants' Rule 12(b)(6) arguments repeatedly concern the sufficiency and characterization of factual allegations involving the legislative process, economic burdens, investment backed expectations, existing leases, practical effects of the legislation, and alleged disparate consequences. Proposed Amici themselves characterize Plaintiffs' claims as deficient because of supposedly missing or insufficient factual allegations. Their brief, for example, attacks Plaintiffs' allegations concerning economic impact, compliance costs, litigation expenses, and investment expectations.

This is therefore not an appellate proceeding presenting an abstract legal question for which an additional institutional perspective is necessary. It is trial level litigation in which the Court must evaluate the allegations actually pleaded and the parties' competing arguments concerning those allegations. *Feesers, Inc. v. Michael Foods, Inc.*, No. 1:CV-04-0576, 2006 U.S. Dist. LEXIS 103917, at *4–6 (M.D. Pa. Mar. 21, 2006), is instructive. There, the court denied leave where the proposed amicus did not materially broaden the interests already represented and its asserted

perspective did not substantively assist the court. The court likewise recognized the reduced utility of amicus participation at the trial level where factual as well as legal issues predominate. *Id.* The same conclusion follows here.

**B. Defendants Are Competently Represented, and Proposed Amici Offer No Materially Distinct Assistance.**

Proposed Amici do not contend that Defendants are incapable of defending the challenged legislation. To the contrary, their filing acknowledges the overlap between their interests and the City's. Their proposed brief demonstrates how extensive that overlap is. Defendants argue that Plaintiffs fail to plead sufficient economic impact to sustain their Takings Clause claim. Proposed Amici argue the same. Defendants challenge Plaintiffs' claimed reasonable investment backed expectations. Proposed Amici do the same. Defendants contend that Plaintiffs fail to establish substantial impairment of contractual relationships. Proposed Amici again advance that position. Defendants argue that the challenged legislation serves legitimate public purposes and survives substantive due process review. Proposed Amici likewise defend the legislation on those grounds. Defendants challenge Plaintiffs' Equal Protection claim. Proposed Amici do the same.

The similarity is not incidental. Both merits briefs were filed on August 4, 2026. Proposed Amici expressly filed in support of Defendants' Motion to Dismiss, and their brief seeks dismissal with prejudice. It is not directed toward an overlooked legal question or a subject outside Defendants' presentation. It functions as another merits brief seeking the same disposition through substantially the same arguments. *Dwelling Place Network v. Murphy*, No. 20-6281, 2020 U.S. Dist. LEXIS 100605, at *5–7 (D.N.J. June 9, 2020), rejected amicus participation under comparable circumstances. The governmental defendants were competently represented, and the proposed amicus offered arguments and information that could be provided by the defendants

themselves. The court recognized the concern that an allied amicus brief duplicating a litigant's arguments effectively extends that litigant's briefing. *Id.* at *6–7.

That concern is particularly pronounced here. Defendants have already filed a comprehensive memorandum attacking the SAC. Proposed Amici seek to supplement that presentation with another substantial attack upon the same pleading. Permitting that procedure would effectively enlarge Defendants' briefing while requiring Plaintiffs to respond to two aligned presentations seeking the identical disposition. That does not meaningfully assist the Court. It creates an inequitable briefing advantage.

### C. Counsel for Proposed Amici's Abrupt Shift From Intervention to Amicus Participation Underscores That the Filing Functions as Supplemental Defense Briefing.

The correspondence between counsel further demonstrates why separate participation is unnecessary. Counsel for One PA initially represented that One PA intended to intervene as a party. When Counsel for Plaintiffs questioned the necessity of intervention, Counsel for One PA maintained that One PA's interests and the City's interests could diverge. See Ex. "A." Days later, Counsel for Proposed Amici abandoned intervention. On August 4, 2026, Counsel advised that TURN and One PA would instead seek leave to file an amicus brief and that the brief would be filed that day. Counsel for Plaintiffs immediately identified the inconsistency: One PA had just asserted that its interests were not adequately represented because they could diverge from the City, yet now proposed to participate solely as an amicus supporting defense of the legislation. Ex. "A." Then, that same day, Proposed Amici submitted a merits brief supporting Defendants' Motion to Dismiss and seeking the same dismissal with prejudice (both briefs filed on August 4, 2026).

Plaintiffs do not contend that counsel may never reconsider a procedural vehicle. The point is narrower. This sequence undermines the contention that Proposed Amici are needed to fill an

unrepresented legal or institutional gap. Counsel first asserted that One PA required separate participation because its interests could diverge from Defendants. Counsel then abandoned that request and submitted a brief whose present litigation objective is indistinguishable from Defendants' objective.

The proposed brief confirms that this is more than an appearance created by the correspondence. Proposed Amici proceed through the same principal constitutional claims and seek the same ultimate disposition. Their brief expressly attacks Plaintiffs' Takings, Contracts, Due Process, and Equal Protection claims and asks that the SAC be dismissed with prejudice. At minimum, the sequence creates the appearance of *procedural gamesmanship*. Amicus procedure should not become a substitute for the additional party participation initially contemplated, allowing allied organizations to avoid the burdens attendant to intervention while retaining the benefit of an additional merits submission supporting one side.

The Court need not facilitate that procedural maneuvering where the proposed filing supplies no materially distinct assistance. *Feesers* denied amicus participation where the proposed organization's interests did not significantly distinguish or broaden the interests already represented and its participation made no significant additional contribution. 2006 U.S. Dist. LEXIS 103917, at *4–6. Likewise, *Dwelling Place Network* denied participation where competent governmental defendants could themselves provide the proposed arguments. 2020 U.S. Dist. LEXIS 100605, at *5–7. The same reasoning applies here.

### D. Proposed Amici's Asserted Missions Demonstrate a Policy Stake, Not a Need for Separate Merits Briefing.

Proposed Amici's own description of their missions further demonstrates the distinction between possessing an interest in a controversy and providing assistance that warrants amicus participation. TURN describes itself as a tenant service and advocacy organization promoting a

human right to housing, helping renters secure safe and healthy housing, and protecting tenants. One PA describes itself as a movement for racial, economic, and social justice. Its Renters United Philadelphia project is expressly dedicated to protecting renters and preserving and increasing affordable housing. Those missions explain why Proposed Amici care about Philadelphia housing policy. They do not establish that separate amicus participation is necessary to resolve a Rule 12(b)(6) motion.

The distinction is particularly important because the SAC alleges consequences directly implicating those stated missions. Plaintiffs allege that the challenged legislation burdens small housing providers, disproportionately affects minority owned and marginalized rental businesses, threatens continued housing availability, and risks consolidation of residential housing ownership among larger institutional investors. Proposed Amici themselves acknowledge and attack those allegations in their proposed brief. Counsel for Plaintiffs raised this tension before the filing. See Ex. "A." The point is not that Proposed Amici must agree with Plaintiffs about the legislation's consequences. They plainly do not. The point is that their disagreement reflects a substantive policy position regarding disputed factual consequences of the legislation. It does not establish that Defendants inadequately represent the legal defense of that legislation.

Indeed, Proposed Amici expressly state that TURN supports the Safe Healthy Homes legislation and that One PA advocated for its passage and has a vested interest in its implementation. That is a policy stake. It does not itself create an unrepresented legal issue requiring another merits brief. There may ultimately be factual disagreement concerning the legislation's effects upon affordable housing, displacement, tenants, small housing providers, and institutional consolidation. But that illustrates why the principle articulated in *Goldberg* is important here: this is trial level litigation "where issues of fact as well as law predominate."

*Goldberg*, 1994 U.S. Dist. LEXIS 9392, at *1. Proposed Amici's preferred characterization of those disputed consequences does not transform an aligned policy position into independent assistance necessary to the Court.

### E. Allowing the Proposed Brief Would Inequitably Expand Defendants' Merits Briefing Without Corresponding Assistance to the Court.

The practical effect of granting leave should not be overlooked. Defendants seek dismissal of the SAC. Proposed Amici seek the same result. Their proposed brief expands the defense of the challenged legislation through additional factual characterizations, policy arguments, authorities, and attacks upon Plaintiffs' allegations. The August 4, 2026 filings make the point unusually clear. Defendants filed their Rule 12(b)(6) Motion and supporting memorandum. On the same day, Proposed Amici filed their request to add another substantial merits brief supporting that very Motion. That is precisely the concern identified in *Dwelling Place Network*: an allied amicus brief that duplicates a litigant's arguments may simply extend the length and force of one party's briefing without providing assistance the Court otherwise lacks. 2020 U.S. Dist. LEXIS 100605, at *6–7.

Amicus participation should serve the Court. It should not function as a procedural device through which one side effectively receives supplemental merits briefing because organizations aligned with its litigation position wish to reinforce arguments competent counsel has already made. Nor should amicus procedure permit what is functionally a second defense brief simply because it arrives under a different name. Proposed Amici are entitled to favor the legislation and advocate for its policy objectives outside this litigation. But the relevant question here is not whether TURN and One PA have an interest in the subject matter. It is whether their proposed participation assists this Court in a manner not already supplied by the parties. It does not.

Where Defendants are competently represented, Proposed Amici's interests presently align with Defendants' litigation objective, the proposed arguments substantially overlap, both merits presentations were filed on the same day, and factual issues remain central to the parties' dispute, the proposed filing is neither necessary nor sufficiently useful to justify the resulting imbalance.

**V. CONCLUSION**

For these reasons, Plaintiffs Seth Floyd and Erica Hadley respectfully request that the Court deny the Motion for Leave to Participate as Amici Curiae filed by the Tenant Union Representative Network and One Pennsylvania Activists United and decline to docket the proposed amicus brief.

Respectfully submitted,

PEARSON LAW GROUP LLC

Briana Lynn Pearson, Esquire
*Attorneys for Plaintiffs*

Dated: August 18, 2026

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of August 2026, a true and correct copy of the foregoing **RESPONSE IN OPPOSITION TO PROPOSED AMICI CURIAE'S MOTION FOR LEAVE TO PARTICIPATE** was electronically filed with the Clerk of Court using the Court's CM/ECF system, which will automatically send notification of such filing to all counsel of record who are registered CM/ECF users.

Respectfully submitted,

PEARSON LAW GROUP LLC

______________________________
Briana Lynn Pearson, Esquire
*Attorneys for Plaintiffs*

Dated: August 18, 2026

# Ex. A

PEARSON LAW

**Briana Pearson <bpearson@pearsonlawgroup.org>**

## Re: Floyd v. City Council, No. 2:26-cv-02403

1 message

**Briana Pearson** <bpearson@pearsonlawgroup.org> Wed, Jul 29, 2026 at 6:47 PM
To: Dan Urevick-Ackelsberg <dackelsberg@pubintlaw.org>
Cc: Olivia Mania <omania@pubintlaw.org>, Madison Gray <mgray@pubintlaw.org>

Mr. Urevick-Ackelsberg,
I appreciate your explanation regarding Rule 24. I would note, however, that my prior email did not ask you to debate the litigation's merits. Rather, I asked how your client's decision to intervene is consistent with its publicly stated mission in light of the allegations set forth in the Complaint. I understand that you have elected not to address that question. Accordingly, my clients are unable to consent to One Pennsylvania's proposed motion to intervene and will reserve all rights to respond after reviewing the motion and supporting papers once filed.
Regards,
Briana

On Wed, Jul 29, 2026 at 6:05 PM Dan Urevick-Ackelsberg <dackelsberg@pubintlaw.org> wrote:

> Ms. Pearson,
>
> We are not the client, and I doubt we will get far debating the merits of your case over email. So I will respectfully decline to delve into the first part of your email.
>
> With regards to Rule 24: First, my client will explain that it has a deep history of fighting for reforms to protect Philadelphia renters. Second, there are multiple ways my client's interest and the City's interest could diverge. Recent history provides one: When HAPCO previously sued to enjoin one of these very sections of the Philadelphia code, HAPCO and the City reached an agreement that left the law unenforced for multiple years.
>
> Regardless, I look forward to working with you. Feel free to reach out with any questions.
>
> Dan
>
> **Dan Urevick-Ackelsberg**
> Senior Attorney (he/him)
> THE PUBLIC INTEREST LAW CENTER
> Action. Access. Progress.
> 1617 John F. Kennedy Blvd., Suite 1650
> Philadelphia, PA 19103
> P: 267.546.1316
> F: 215.627.3183
> dackelsberg@pubintlaw.org

www.pubintlaw.org

---

**From:** Briana Pearson <bpearson@pearsonlawgroup.org>
**Sent:** Wednesday, July 29, 2026 4:58 PM
**To:** Dan Urevick-Ackelsberg <dackelsberg@pubintlaw.org>
**Cc:** Olivia Mania <omania@pubintlaw.org>; Madison Gray <mgray@pubintlaw.org>
**Subject:** Re: Floyd v. City Council, No. 2:26-cv-02403

Dear Mr. Urevick-Ackelsberg,

Before I can respond to your request regarding your proposed motion to intervene, I have several questions.

Your email states that One Pennsylvania seeks to intervene "to defend the validity and legality of the Safe Healthy Homes legislation." As I understand it, the Public Interest Law Center's stated mission includes "stopping housing discrimination against low-income people and promoting healthy, affordable housing for people in the neighborhoods of their choice."

Have you carefully reviewed the allegations in the Complaint? The Complaint alleges that the challenged ordinance disproportionately harms minority and other marginalized tenants, accelerates displacement, burdens small housing providers, and reduces the supply of naturally occurring affordable housing. Those alleged consequences appear difficult to reconcile with your organization's publicly stated mission.

Can you explain how advocating in support of legislation alleged to produce those effects is consistent with your organization's stated commitment to protecting affordable housing and preventing housing discrimination? If your organization disputes those allegations, I would appreciate understanding the basis for its position.

Additionally, because One Pennsylvania is not a named party to this litigation, could you identify the specific legal interest that One Pennsylvania contends warrants intervention under Federal Rule of Civil Procedure 24 and explain why that interest is not adequately represented by the existing defendants?

Your responses will help inform my client's position regarding your proposed motion.

--

Very truly yours,
Briana Lynn Pearson, JD, MBA, Esq.

Pearson Law Group, LLC
1500 Chestnut St. Suite 2 #2898
Philadelphia, PA 19102

Phone: 484-469-0322

Fax: 856-229-9991

Email: bpearson@pearsonlawgroup.org

Website: pearsonlegal.org

CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure.

On Wed, Jul 29, 2026 at 4:25 PM Dan Urevick-Ackelsberg <dackelsberg@pubintlaw.org> wrote:

> Ms. Pearson,

I hope you are well.

On behalf of One Pennsylvania, our office intends to file a motion to intervene in *Floyd v. City Council*, No. 2:26-cv-02403. We will do so to defend the validity and legality of the Safe Healthy Homes legislation.

By 5:00 p.m. on Friday, July 31, could you let me know whether your client is opposed or unopposed to this motion?

Thanks so much,

Dan

**Dan Urevick-Ackelsberg**
Senior Attorney (he/him)
THE PUBLIC INTEREST LAW CENTER
Action. Access. Progress.
1617 John F. Kennedy Blvd., Suite 1650
Philadelphia, PA 19103
P: 267.546.1316
F: 215.627.3183
dackelsberg@pubintlaw.org

www.pubintlaw.org

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

--

Very truly yours,
Briana Lynn Pearson, JD, MBA, Esq.
Pearson Law Group, LLC
1500 Chestnut St. Suite 2 #2898
Philadelphia, PA 19102Phone: 484-469-0322
Fax: 856-229-9991
Email: bpearson@pearsonlawgroup.org
Website: pearsonlegal.org

**CONFIDENTIALITY NOTICE:** The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure.

PEARSON LAW

**Briana Pearson <bpearson@pearsonlawgroup.org>**

---

## RE: Floyd v. City Council / Motion for Leave to File Amicus Brief

1 message

---

**Dan Urevick-Ackelsberg** <dackelsberg@pubintlaw.org> Tue, Aug 4, 2026 at 2:54 PM
To: Briana Pearson <bpearson@pearsonlawgroup.org>
Cc: William Shuey <william.shuey@phila.gov>, Michael Pfautz <michael.pfautz@phila.gov>

Briana,

Thanks. We will not have time to send you the brief beforehand, so will not mark you as unopposed. You will of course respond as you see fit once it is filed.

My best,

Dan

**Dan Urevick-Ackelsberg**
Senior Attorney (he/him)

THE PUBLIC INTEREST LAW CENTER

Action. Access. Progress.

1617 John F. Kennedy Blvd., Suite 1650
Philadelphia, PA 19103
P: 267.546.1316
F: 215.627.3183
dackelsberg@pubintlaw.org

www.pubintlaw.org

---

**From:** Briana Pearson <bpearson@pearsonlawgroup.org>
**Sent:** Tuesday, August 4, 2026 2:40 PM
**To:** Dan Urevick-Ackelsberg <dackelsberg@pubintlaw.org>
**Cc:** William Shuey <william.shuey@phila.gov>; Michael Pfautz <michael.pfautz@phila.gov>
**Subject:** Re: Floyd v. City Council / Motion for Leave to File Amicus Brief

Dan,

At this point, I'd need to review the proposed motion and amicus brief before taking a position.

At the moment, I have difficulty understanding the purpose of an amicus filing. There are no pending dispositive motions or other substantive issues before the Court. The pleadings remain open, no legal issue has been presented for the Court's

determination beyond the allegations of the Complaint, and the parties have not yet fully engaged in discovery. Under those circumstances, I'm not sure what issue the proposed amicus brief is intended to address or how it would assist the Court at this stage.

I also note that, last week, you represented that One Pennsylvania's interests were not adequately represented by the City because the organizations' interests could diverge, citing prior litigation as an example. Your latest email indicates that One Pennsylvania now intends to participate solely as an amicus in support of defending the challenged legislation. It is not entirely clear to me how that position differs from the City's litigation posture or why an amicus brief is necessary if the City is already advancing the same objective.

Once I've had an opportunity to review the motion and proposed brief, I'll let you know whether my clients intend to oppose the request.

Best,
Briana

On Tue, Aug 4, 2026 at 2:21 PM Dan Urevick-Ackelsberg <dackelsberg@pubintlaw.org> wrote:

Counsel,

I told each of you that my office intended to file a motion to intervene in this matter. Instead, on behalf of both the Tenant Union Representation Network and One Pennsylvania, we intend to seek leave to file an amicus brief, with such brief to be filed today.

If you can, kindly let me know by 5:00 p.m. whether you are opposed or unopposed to this motion.

My best,

Dan

**Dan Urevick-Ackelsberg**
Senior Attorney (he/him)
THE PUBLIC INTEREST LAW CENTER
Action. Access. Progress.
1617 John F. Kennedy Blvd., Suite 1650
Philadelphia, PA 19103
P: 267.546.1316
F: 215.627.3183
dackelsberg@pubintlaw.org

www.pubintlaw.org

--

Very truly yours,

Briana Lynn Pearson, JD, MBA, Esq.

Pearson Law Group, LLC

1500 Chestnut St. Suite 2 #2898

Philadelphia, PA 19102Phone: 484-469-0322
Fax: 856-229-9991
Email: bpearson@pearsonlawgroup.org

Website: pearsonlegal.org

**CONFIDENTIALITY NOTICE:** The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure.

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

# Ex. B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SETH FLOYD, et al.,** | : | |
| **Plaintiffs,** | : | |
| **v.** | : | **Civil Action No. 26-cv-02403** |
| **CITY COUNCIL FOR THE CITY OF PHILADELPHIA, et al.,** | : | |
| **Defendants.** | : | |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

I. INTRODUCTION ........ 1

II. BACKGROUND ........ 1

A. Procedural and Factual History ........ 1

B. Provisions of the Bills ........ 5

III. LEGAL STANDARD ........ 6

IV. ARGUMENT ........ 7

A. No Sunshine Act Violation Occurred (Count 1) ........ 7

B. No Home Rule Charter Violation Occurred (Count 2) ........ 12

C. The Bills Do Not Constitute a Regulatory Taking (Count 3) ........ 15

1. Plaintiffs Fail to Allege Any Concrete Economic Impact ........ 16

2. Plaintiffs Have No Reasonable, Distinct Investment-Backed Expectations ........ 17

3. The Character of the Government Action Weighs Against Finding a Regulatory Taking ........ 18

D. The Bills Do Not Violate the Contracts Clause (Count 6) ........ 19

1. Plaintiffs Have Not Alleged a Substantial Impairment of Existing Contracts ........ 20

2. The Ordinance Serves a Significant and Legitimate Public Purpose ........ 21

3. The Ordinance Is a Reasonable and Appropriate Means of Advancing That Purpose ........ 22

E. The Bills Have a Rational Basis and So Satisfy Substantive Due Process (Counts 4 and 7) ........ 23

F. The Bills Do Not Violate the Equal Protections Clause (Counts 5 and 8) ........ 24

G. Plaintiffs Fail to State a *Monell* Claim (Count 9) ........ 26

H. Further Amendment Would Be Futile ........ 26

V. CONCLUSION ........ 27

Case 2:26-cv-02403-WB Document 30 Filed 08/04/26 Page 3 of 32

**TABLE OF AUTHORITIES**

Page(s)

Cases

*ACRA Turf Club, LLC v. Zanzuccki*,
724 Fed. App'x 102 (3d Cir. 2018) .......... 23
*Alekseev v. City Council of City of Philadelphia*,
8 A.3d 311 (Pa. 2010) .......... 9
*Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*,
669 F.3d 359 (3d Cir. 2012) .......... 20, 23
*Andrus v. Allard*,
444 U.S. 51 (1979) .......... 16, 17
*Anspach v. City of Phila.*,
503 F.3d 256 (3d Cir. 2007) .......... 13
*Antonelli v. New Jersey*,
419 F.3d 267 (3d Cir. 2005) .......... 24
*Arthur v. Maersk, Inc.*,
434 F.3d 196 (3d Cir. 2006) .......... 27
*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 6, 13
*Ass'n of Cmty. Orgs. for Reform Now v. Se. Pa. Transp. Auth.*,
789 A.2d 811 (Pa. Cmwlth. 2002) .......... 10
*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 6
*Budhun v. Reading Hops. & Med. Ctr.*,
765 F.3d 245 (3d Cir. 2014) .......... 26, 27
*City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*,
538 U.S. 188 (2003) .......... 24
*City of New Orleans v. Dukes*,
427 U.S. 297 (1976) .......... 25
*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
665 F.3d 524 (3d Cir. 2011) .......... 25
*Euclid v. Ambler Realty Co.*,
272 U.S. 365, (1926) .......... 16
*Flemming v. Nestor*,
363 U.S. 603 (1960) .......... 23
*Fowler v. UPMC Shadyside*,
578 F.3d 203 (3d Cir. 2009) .......... 6
*Hadacheck v. Sebastian*,
239 U.S. 394 (1915) .......... 16
*HAPCO v. City of Philadelphia*, Pennsylvania law regulates security deposits, eviction procedures, notice requirements, retaliatory eviction, rent withholding, fair housing practices, and numerous other aspects of the landlord-tenant,
relationship. 482 F. Supp. 3d 337 (E.D. Pa. 2020) .......... 20, 21

*Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*,
452 U.S. 264 (1981) .......... 16
*In re Schering,*
*Plow*, 678 F.3d .......... 6
*Ituah v. City of Philadelphia*,
No. CV 19-05088, 2020 WL 1470808 (E.D. Pa. Mar. 26, 2020) .......... 26
*Keystone Bituminous Coal Ass'n v. Duncan*,
771 F.2d 707 (3d Cir.1985) .......... 22
*Kramer v. W.C.A.B. (Rite Aid Corp.)*,
883 A.2d 518 (Pa. 2005) .......... 25
*League of Women Voters of Pa. v. Com.*,
683 A.2d 685 (Pa. Cmwlth. 1996) .......... 10
*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) .......... 15
*Monell v. Department of Social Services*,
436 U.S. 658 (1978) .......... 26
*Muncy Creek Twp. Citizens Comm. v. Shipman*,
573 A.2d 662 (Pa. Cmwlth. 1990) .......... 8
*Nekrilov v. City of Jersey City*,
45 F.4th 662 (3d Cir. 2022) .......... Passim
*Neu v. Millcreek Twp. Bd. of Sch. Directors*,
349 A.3d 1070 (Pa. Cmwlth. 2025) .......... 26
*Nicholas v. Pa. State Univ.*,
227 F.3d 133 (3d Cir. 2000) .......... 23
*Nieves v. Hess Oil Virgin Islands Corp.*,
819 F.2d 1237 (3d Cir. 1987) .......... 22
*Pace Res., Inc. v. Shrewsbury Twp.*,
808 F.2d 1023 (3d Cir. 1987) .......... 17
*Penn Central Transportation Co. v. New York City*,
438 U.S. 104 (1978) .......... 15, 18
*Pennsylvania Game Comm'n v. Marich*,
666 A.2d 253 (Pa. 1995) .......... 23
*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*,
998 F.2d 1192 (3d Cir. 1993) .......... 6
*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*,
467 U.S. 717 (1984) .......... 23
*Personnel Adm'r of Mass. v. Feeney*,
442 U.S. 256 (1979) .......... 24
*Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*,
908 F. Supp. 2d 597 (M.D. Pa. 2012) .......... 25
*R. v. Com., Dept. of Public Welfare*,
636 A.2d 142 (Pa. 1993) .......... 23
*Rogin v. Bensalem Twp.*,
616 F.2d 680 (3d Cir. 1980) .......... 16, 18
*Sammon v. N.J. Bd. of Med. Exam'rs*,
66 F.3d 639 (3d Cir. 1995) .......... 23

*Santiago v. Warminster Twp.*,
629 F.3d 121 (3d Cir. 2010) ........ 6
*Shelley v. Wilson*,
339 F. App'x 136 (3d Cir. 2009) ........ 2
*Sveen v. Melin*,
584 U.S. 811 (2018) ........ 19
*Transp. Workers Union of Am., Local 290 v. SEPTA*,
145 F.3d 619 (3d Cir. 1998) ........ 20
*Travelers Indem. Co. v. Dammann & Co.*,
594 F.3d 238 (3d Cir. 2010) ........ 27
*Troy Ltd. v. Renna*,
727 F.2d 287 ........ 17, 18, 21, 22
*Twp. of Exeter v. Zoning Hearing Bd. of Exeter Twp.*,
962 A.2d 653 (Pa. 2009) ........ 23
*United States Trust Co. v. New Jersey*,
431 U.S. 1 (1977) ........ 19, 21
*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ........ 24
*Wimbush v. City of Philadelphia*,
No. CV 16-05783, 2017 WL 1355174 (E.D. Pa. Apr. 13, 2017) ........ 26

Statutes

3 Pa. C.S. § 16257 ........ 26
65 Pa. C.S. 703 ........ 8
65 Pa. C.S. 704 ........ 8, 10
65 Pa. C.S. § 710.1(a) ........ 8, 9, 10
Article 1, Section 1 of the Pennsylvania Constitution ........ 23
Article I, Section 26 of the Pennsylvania Constitution ........ 24, 25
Article I, Section I of the Pennsylvania Constitution ........ 23
Section 710.1 ........ 9

Rules

Fed. R. Civ. P. 8(a)(2) ........ 13
Fed. R. Civ. P. 12(b)(6) ........ 6, 7, 12, 13
Federal Rule of Civil Procedure 15(a)(1) ........ 27

Other Authorities

*Tr.* at 181 ........ 4

## I. INTRODUCTION

Plaintiffs are two individuals who claim to be small landlords and oppose two recent Bills passed by Philadelphia's City Council and signed into law by the Mayor. These Bills provide greater protections for all of Philadelphia's residential tenants and are meant to help protect tenants from unsafe and unhealthful housing. Plaintiffs bring two procedural challenges to the enactment of the Bills and a long list of substantive challenges. For the reasons stated below, Plaintiffs fail to state claims on any grounds. Their Second Amended Complaint lacks the necessary factual allegations and fails to identify any law that would invalidate the new protections. The Bills will become effective November 1, 2026, a time when the residents of Philadelphia can look forward to a more fair and equitable rental landscape in Philadelphia.

## II. BACKGROUND[1]

### A. Procedural and Factual History

Plaintiffs Seth Floyd and Erica Hadley are African American owners and operators of residential rental properties within the City of Philadelphia. 2d Am. Compl. ("SAC") (ECF No. 21) ¶¶ 4, 5. Plaintiffs assert that they are adversely impacted by two ordinances passed by City Council that are the subject of this case—Bill Nos. 250329-AA and 250330-AA (the "Bills"). *Id.* ¶¶ 4, 5, Exs. A, B.

Under Philadelphia's Home Rule Charter, before City Council can vote on potential legislation, that legislation must be "referred to a committee, considered at a public hearing, reported by the committee, printed as reported, and distributed to the members of the Council and made available to the public." Phila. Charter § 2-201.

[1] For purposes of this Motion to Dismiss only, Defendants take the facts as pled to be true.

In accordance with this provision, on April 10, 2025, Councilmember Nicolas O'Rourke introduced the Bills—which proposed expanded protections for residential tenants in Philadelphia—into Philadelphia City Council.[2] The Bills were then referred to Council's Committee on Housing, Neighborhood Development and the Homeless (the "Committee") for a hearing. *See supra* note 2*; see also* SAC ¶ 7. The Committee is composed of six members: Chair Jamie Gauthier, Vice Chair Rue Landau, and Councilmembers Cindy Bass, Mark Squilla, Michael Driscoll, and Curtis Jones, Jr. *See Standing Committees - Philadelphia City Council* (Nov. 24, 2025 2:26 PM), https://phlcouncil.com/standing-committees/ .

As the Bills worked their way through the legislative process, City Council and the Committee held multiple public hearings on the Bills. SAC ¶ 67. The Second Amended Complaint contains virtually no detail regarding these multiple hearings and the various steps in the legislative process. *See* SAC ¶¶ 67—89 (conclusory allegations regarding alleged irregularities at unspecified public hearings). Nonetheless, the extensive legislative history of the Bills, including public notices, transcripts, video recordings, and agendas, is a matter of public record and is appropriate for the Court to consider at the Motion to Dismiss stage. *See e.g.*, *Shelley v. Wilson*, 339 F. App'x 136, 137 n.2 (3d Cir. 2009). A brief summary of that legislative history is provided below, along with citations to the public record. As appropriate, reference will be made to City Exhibits A and B attached hereto, which are publicly available "Legislation

[2] The legislative history of the Bills is available on City Council's website ("Legistar") at the following publicly available addresses:

Bill 250329: https://phila.legistar.com/LegislationDetail.aspx?ID=7300048&GUID=5FA005B6-47E9-4FED-8F94-4661BD604D22&Options=ID|Text|&Search=250329.

Bill 250330: https://phila.legistar.com/LegislationDetail.aspx?ID=7300049&GUID=52D840F2-9545-44B8-9C3F-6A985532E5FC&Options=ID|Text|&Search=250330.

Details" reports for Bill 250329 (City Ex. A) and Bill 250330 (City Ex. B).[3] As is evident from reviewing City Exhibits A and B, the Bills moved through the legislative process simultaneously.

On March 4, 2026, the Committee held the first hearing on the Bills.City Exs. A and B. During the hearing, amended versions of the Bills were introduced for votes and were favorably reported out to the full Council for consideration. *Id.*. The Committee also received public comment.[4]

On March 18, 2026, Plaintiffs Seth Floyd and Erica Hadley filed a complaint and emergency petition for preliminary injunction against Defendants City Council and the Committee in the Philadelphia Court of Common Pleas, alleging violations of Pennsylvania's Sunshine Act and Philadelphia's Home Rule Charter stemming from the March 4, 2026 hearing. ECF 8-1 at 7 ¶23.[5] That day, the parties resolved Plaintiffs' injunction petition via a stipulation, which provided that City Council would refer the Bills back to the Committee for a new hearing, which would comply with the Sunshine Act and Charter. ECF No. 8-1 at 23 (Mar. 18, 2026 Stipulated Order).

---

[3] These documents are available through Legistar, or at the following addresses:

Bill 250329:
https://phila.legistar.com/ViewReport.ashx?M=R&N=Master&GID=30&ID=7300048&GUID=5FA005B6-47E9-4FED-8F94-4661BD604D22&Extra=WithText&Title=Legislation+Details+(With+Text)

Bill 250330:
https://phila.legistar.com/ViewReport.ashx?M=R&N=Master&GID=30&ID=7300049&GUID=52D840F2-9545-44B8-9C3F-6A985532E5FC&Extra=WithText&Title=Legislation+Details+(With+Text)

[4] *See Hearing on Bills 250329, 250330 Before the Council of the City of Philadelphia Committee on Housing, Neighborhood Development and the Homeless* at 1-226 (Mar. 4, 2026), *available at* https://www.transcriptroom.org/tr/CAF/DownloadFile/1768650?docType=30&FileName=COMMITTEE_ON_HOUSING_NEIGHBORHOOD_DEVELOPMENT_AND_THE_HOMELESS_030426_Full_Pdf%20(002).pdf

[5] Pinpoint citations to ECF documents are to the ECF system pagination.

Consistent with the Stipulated Order, on March 19, 2026, City Council voted to refer the Bills back to the Committee. *See* note 1, *supra*. On March 30, 2026, the Committee held its second public hearing on the Bills. *See* Committee, *Public Hearing Notice.*[6] On that date, the Committee received public comment on the Bills, including from both Plaintiffs, after which it voted to favorably report the Bills to the full Council.[7] All six members of the Committee were present at the beginning of the hearing and for the vote to favorably report the Bills back to the full Council at the end of the hearing.[8] Less than a quorum of the Committee (*i.e.*, fewer than 4 members) was present during portions of the public comment period held prior to the vote. SAC ¶¶ 82, 83, Ex. C. The Bills were not amended during the March 30 hearing. *See March 30 Tr.* at 181.

On April 16, 2026, the full City Council held a meeting where it considered the Bills as reported from the Committee along with additional amendments and public comment.[9] A quorum of Council was present throughout the entirety of the meeting, including public

---

[6] *Available at* https://phila.legistar.com/View.ashx?M=A&ID=1402609&GUID=51CC5F54-1764-401F-B4FD-D6A325CC0645

[7] *See Hearing on Bills 250329, 250330 Before the Council of the City of Philadelphia Committee on Housing, Neighborhood Development and the Homeless* at 78-81, 87-90, 180-83 (Mar. 30, 2026), *available at* https://www.transcriptroom.org/tr/CAF/DownloadFile/4120756?docType=30&FileName=COMMITTEE_ON_HOUSING_NEIGHHOOD_DEV_%26_THE_HOMELESS_033026.pdf.

[8] *See Hearing on Bills 250329, 250330 Before the Council of the City of Philadelphia Committee on Housing, Neighborhood Development and the Homeless* at 179-185 (Mar. 30, 2026) [hereinafter *March 30 Tr.*], *available at* https://www.transcriptroom.org/tr/CAF/DownloadFile/4120756?docType=30&FileName=COMMITTEE_ON_HOUSING_NEIGHHOOD_DEV_%26_THE_HOMELESS_033026.pdf.

[9] *Stated Meeting of the Council of the City of Philadelphia* at 61-142, 161-66 (Apr. 16, 2026), *available at* https://www.transcriptroom.org/tr/CAF/DownloadFile/5184948?docType=30&FileName=STATED_MEETING_041626.pdf

comment.[10] On April 23, 2026, Council again considered the Bills, accepted more public comment, and ultimately voted to approve the Bills.[11] A quorum of Council was present throughout the entirety of the meeting, including public comment.[12] The Mayor signed the Bills into law on May 7, 2026, and they will become effective November 1, 2026. *See supra* note 2.

**B. Provisions of the Bills**

The Bills provide greater protection for residential tenants. First, Bill 250329 amended Title 9 of the Philadelphia Code to require that landlords alert their tenants to certain provisions of the law. Additionally, landlords are required to notify their tenants of certain building code violations. The Bill also expands the remedies available to a tenant who prevails in certain legal actions, while providing new "safe harbor" protections against certain private lawsuits brought against landlords. Other changes to the law are also provided in the text of the Bill. SAC Ex. A.

Bill 250330 also amended Title 9 of the Philadelphia Code. The Bill provides protections for tenants who join a tenants' rights organization, and extends the "good cause" requirements for terminating a tenancy for residential leases of less than a year to all residential leases. Additionally, the Bill includes detailed language on the Right to Habitability and protection from retaliation. Other changes to the law are also provided in the text of the Bill. SAC Ex. B.

Both Bills become effective November 1, 2026. *See* SAC, Ex. A at 10 Section 3, Ex. B at 11 Section 3.

---

[10] In addition to the transcript, video of the meeting is available at *https://www.youtube.com/watch?v=jHVTEDwCBhE*

[11] *Stated Meeting of the Council of the City of Philadelphia* at 59-148, 163-71(Apr. 23, 2026), *available at* https://www.transcriptroom.org/tr/CAF/DownloadFile/4695606?docType=30&FileName=STATED_MEETING_042326.pdf

[12] In addition to the transcript, video is available at https://www.youtube.com/watch?v=ZW9ROvBWwSM

## III. LEGAL STANDARD

Under Rule 12(b)(6), the Court should dismiss an action on a motion made before a responsive pleading is filed when a complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Courts undertake a three-step analysis in ruling on a motion to dismiss pursuant to Rule 12(b)(6):

> **First**, the court must tak[e] note of the elements a plaintiff must plead to state a claim. **Second**, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. **Finally**, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*In re Schering Plow*, 678 F.3d at 243 (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010)) (emphasis added) (internal quotation marks omitted).

A complaint must "show" its "entitlement" to relief "with its facts." *Id.* at 244 (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009)). The Court may also consider matters of public record such as legislative history, judicial documents, "letter decisions of government agencies, . . . and published reports of administrative bodies," where "the public ha[s] unqualified access to all of the documents at issue." *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993) (internal quotation marks and citations omitted).

"[A] plaintiff's obligation to provide the 'grounds' of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (stating that a Complaint must contain something more than "naked assertion[s]" devoid of "further factual enhancement.").

## IV. ARGUMENT

All nine of Plaintiffs' Counts fail to plead sufficient facts to state a claim under the law, and should be dismissed pursuant to FRCP 12 (b)(6). Plaintiffs do not identify any procedural deficiencies in the passage of the bills to sustain their first two counts. Indeed, Plaintiffs barely identify any specific legislative acts at all in their Complaint, let alone procedurally improper ones. Counts three through nine purport to attack the substantive aspects of the Bills, but fail to support their allegations or plead sufficient facts to support their claims. Moreover, the text of the Bills demonstrates that there are no proper legal challenges to bring. This is the third complaint brought by Plaintiffs in this lawsuit and any further amendment would be futile. Therefore, the Complaint should be dismissed in full with prejudice.

### A. No Sunshine Act Violation Occurred (Count 1)

Plaintiffs' allegations regarding procedural irregularity are conclusory and are insufficient to establish a violation of the Sunshine Act. While difficult to parse, Plaintiffs' pleadings regarding the Sunshine Act seem to boil down to two allegations: (1) members of City Council and/or the Committee had private substantive discussions regarding the Bills; and (2) Plaintiffs were deprived of a meaningful opportunity to provide public comment because they were given inadequate notice of proposed amendments and because less than a quorum of the Committee was present for public comment at the March 30 Committee hearing. These allegations fail to state a claim for violation of the Sunshine Act.

With respect to the alleged private substantive discussions regarding the Bills, the Second Amended Complaint states that "Defendants engaged in substantive deliberations concerning the challenged legislation outside publicly noticed meetings" and "formulated and revised amendments outside public view." SAC ¶ 123. But the Sunshine Act does not require that all substantive discussion or deliberations happen at a public meeting. Rather, the Sunshine Act

expressly requires that "deliberations *by a quorum* of the members of an agency shall take place at a meeting open to the public." 65 Pa. C.S. 704 (emphasis added).[13] Plaintiffs do not allege that a *quorum*[14] of the Committee's or City Council's members privately gathered, much less that they deliberated agency business in private. And the Sunshine Act does not prohibit individual legislators or groups of less than a quorum from meeting with interested parties and discussing pending legislation with them. *See Muncy Creek Twp. Citizens Comm. v. Shipman*, 573 A.2d 662, 664 (Pa. Cmwlth. 1990) ("[t]here was not a quorum of the three [township] supervisors present [at purported private meeting], thus, no requirement that their discussions take place at a meeting open to the public"). As a result, Plaintiffs' claims regarding deliberation and private meetings are insufficient to establish a Sunshine Act violation.

Plaintiffs' other Sunshine Act allegations appear to be premised on the Sunshine Act's requirement that "the board or council of a political subdivision . . . shall provide a reasonable opportunity at each advertised regular meeting and advertised special meeting for residents . . . to comment on matters of concern, official action or deliberation which are or may be before the board or council prior to taking official action." 65 Pa. C.S. § 710.1(a). The Second Amended Complaint asserts that less than a quorum of the Committee was present during portions of public comment at the March 30 Committee meeting and that "Defendants . . . failed to disclose the operative legislative language before Committee action, and denied Plaintiffs and other

[13] The Sunshine Act defines deliberation as "[t]he discussion of agency business held for the purpose of making a decision." 65 Pa. C.S. 703.

[14] A quorum is a majority of the agency—here, the Committee has six members, so a quorum is four. *See* Phila. City Council Res. No. 200001-A ("Rules of City Council) at 12 § IV, ¶ 4, *available at* https://phlcouncil.com/wp-content/uploads/2020/07/Rules-of-Council.pdf ("4. A quorum for a committee hearing or meeting shall consist of a majority of all the members of the committee and a quorum must be present at any meeting at the time a vote is taken."). City Council has 17 members, Phila. Charter § 2-100; therefore a quorum of City Council is 9 members.

residents a meaningful opportunity to comment before official action was taken." SAC ¶¶ 81, 123.

The breaking of quorum during public comment at the March 30 Committee hearing is not a Sunshine Act violation for four reasons. First, the Sunshine Act's requirement to allow for public comment *only* applies to the governing board or council of the political subdivision, *i.e.,* City Council; it does not apply to other bodies considered as "agencies" under the Sunshine Act, such as the Committee. *See* 65 Pa. C.S. § 710.1(a) ("*[T]he board or council of a political subdivision* . . . shall provide a reasonable opportunity at each advertised regular meeting and advertised special meeting for residents . . . to comment on matters of concern, official action or deliberation which are or may be before the board or council prior to taking official action." (emphasis added)). This is in marked contrast to the other provisions of the Act, which apply to all agencies (which includes committees). *See, e.g.*, *id.* § 705 (requiring public voting "[i]n all meetings of agencies"); *id.* § 706 (requiring that "[a]n agency shall give public notice of its first regular meeting"). And use of the word "the" before "board or council" suggests it applies to a singular entity of the City and, indeed, the Pennsylvania Supreme Court has confirmed this provision requires "public participation before a board or council proper." *Alekseev v. City Council of City of Philadelphia*, 8 A.3d 311, 314 (Pa. 2010). There is only one governing "board or council of" the City of Philadelphia: Philadelphia City Council. By its plain text, in Philadelphia the public comment requirement only applies to City Council meetings, not meetings of its committees. Thus, even if the Committee had not provided for a period of public comment on March 30, 2026 at all, it would not have violated the Sunshine Act.

Second, Section 710.1 does not require a quorum. Section 710.1 makes no reference to a quorum at all—instead, it only requires that the board or council offer a "reasonable opportunity"

for residents to make comments prior to taking official action. 65 Pa. C.S. 710.1(a). The fact that no quorum is required for public comment is reinforced by Section 704, which in contrast specifically says that a quorum is required for "official action and deliberations." 65 Pa. C.S. § 704. Thus, failure to maintain quorum throughout public comment does not violate the Sunshine Act.

Third, even though not required by the Sunshine Act, the Committee *did* provide a reasonable opportunity for public comment at the hearing. In addition to accepting written comments, the Committee received live verbal comment for nearly three hours—including from both Plaintiffs. *See* note 7, *supra, cf. SAC* ¶ *83*. And those comments were memorialized in the transcript of the hearing, which is publicly available. *See id.*

Fourth, Defendants provided additional public comment sessions without breaking quorum at two subsequent meetings of the full Council that not only satisfied the Sunshine Act but cured any earlier alleged violation. *See Ass'n of Cmty. Orgs. for Reform Now v. Se. Pa. Transp. Auth.*, 789 A.2d 811, 813 (Pa. Cmwlth. 2002) (holding any potential violation due to SEPTA board members' meeting to discuss proposed fare increase was cured by later public meeting, after which fare increase was formally adopted); *League of Women Voters of Pa. v. Com.*, 683 A.2d 685, 690 (Pa. Cmwlth. 1996) (holding any violation arising out of General Assembly conference committee's closed-door meeting(s) that resulted in "extensive report" on proposed legislation was cured at subsequent open meeting where committee took official action). On April 16, 2026, the full City Council held a meeting where it considered the Bills as reported from the Committee. Council accepted public comment and also subsequently approved

amendments to the Bills.[15] Second, on April 23, 2026, Council again considered the Bills as now amended, accepted more public comment, and ultimately voted to approve the Bills.[16] A quorum was maintained throughout the public comment period at both of these meetings.[17]

Finally, Plaintiffs' vague allegation that they received inadequate notice of potential amendments is insufficient to state a violation of the Sunshine Act and is belied by the public legislative record of the Bills. Nothing in the Sunshine Act prohibits proposed legislation from being amended during public meetings. Moreover, the legislative record shows that Plaintiffs and other members of the public had ample notice and opportunity to comment regarding each version of the Bills as they made their way through the legislative process: At the March 30 Committee hearing, the Bills were not amended and the public had an opportunity to comment on the text of the Bills as noticed. *See City Exs. A and B*. At the April 16 City Council meeting, the Bills were amended and the public had another opportunity to comment on the Bills. *Id.* At the April 23 City Council meeting, the Bills were not further amended, the public had an opportunity to comment on the text of the Bills as noticed, and Council voted to pass the Bills. *Id.*

[15] *Stated Meeting of the Council of the City of Philadelphia* at 62-142 (Apr. 16, 2026) (Transcript), *available at* https://www.transcriptroom.org/tr/CAF/DownloadFile/5184948?docType=30&FileName=STATED_MEETING_041626.pdf

[16] *Stated Meeting of the Council of the City of Philadelphia* at (Apr. 23, 2026) (Transcript), *available at* https://www.transcriptroom.org/tr/CAF/DownloadFile/4695606?docType=30&FileName=STATED_MEETING_042326.pdf

[17] *See Stated Meeting of the Council of the City of Philadelphia* (Apr. 16, 2026) (Video), https://www.youtube.com/watch?v=jHVTEDwCBhE&t=8197s; *Stated Meeting of the Council of the City of Philadelphia* (Apr. 23, 2026) (Video), www.youtube.com/watch?v=ZW9ROvBWwSM.

For all of these reasons, Count I of the Second Amended Complaint should be dismissed with prejudice for failure to state a claim under Rule 12(b)(6).

**B. No Home Rule Charter Violation Occurred (Count 2)**

Plaintiffs assert a violation of the Philadelphia Home Rule Charter, specifically, Section 2-201, by City Council. SAC ¶¶ 136-153. Here again, Plaintiffs fail to state a claim, in this instance because their claim lacks sufficient specificity and because the public record demonstrates compliance with the Home Rule Charter in all respects.

*Plaintiffs' allegations are impermissibly vague*

To begin with, Plaintiffs assert a violation of the Home Rule Charter, but never describe with specificity what action they challenge, or on what grounds. As described *supra* in Section II(A), the Bills passed through both the full City Council and the Committee twice each, being acted upon on a total of 10 different dates. Likewise, there were 7 amendments of each bill before final passage. Plaintiffs do not specify which action, specific amendment, procedural vote, or passage, whether by the Committee or by the full City Council, they claim violated the Home Rule Charter. The only allegations provided are merely conclusory statements that do not allow Defendants to know the claims against them. For example, in paragraph 143 of their Second Amended Complaint, Plaintiffs state that "Defendants materially amended the challenged legislation without first printing and making the operative amendments available to Council members, Plaintiffs, and the public . . . ." But which amendment is addressed in the paragraph is never specified. They further allege that Defendants "proceeded to Committee action on legislative language that had not been disclosed in the manner required by the Charter." SAC ¶ 144. But as Plaintiffs know, the Committee considered the legislation twice, and which action is complained of is unknown to Defendants.

Plaintiffs' allegations in the body of the Complaint offer no more information. Despite the assertion in paragraph 143 of facts "alleged herein," the only two paragraphs addressing amendment state that "Plaintiffs further allege that material amendments affecting the challenged legislation were not made publicly available in sufficient time to permit meaningful public review before legislative action occurred." SAC ¶ 85. And the following paragraph states "Plaintiffs further allege that members of the public were not afforded a meaningful opportunity to review and comment upon the operative legislative language before Defendants proceeded toward enactment." SAC ¶ 86.

A review of Plaintiffs legal allegations does little to illuminate the matter. Plaintiffs only cite Section 2-201, without specifying which of its 7 subsections are implicated. SAC ¶¶ 140, 143, and Wherefore clause (a).

Therefore, Defendants can only guess at the factual and legal allegations being asserted by Plaintiffs in Count 2. This falls short of the legal requirement for stating a claim because under the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Where a complaint fails to state a claim upon which relief may be granted, Fed. R. Civ. P. 12(b)(6) permits dismissal of the complaint. When considering such a motion, the Court examines whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face[.]'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It is insufficient to allege "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* Put differently, the Court should not credit a plaintiff's "bald assertions" or "legal conclusions." *Anspach v. City of Phila.*, 503 F.3d 256, 260 (3d Cir. 2007).

Here, although Plaintiffs have access to the extensive and authoritative public record, they have failed to identify precisely which action or amendment they allege violates any particular requirement of the Home Rule Charter. Despite this being the third Complaint in this matter, filed about 4 months after the original complaint, Plaintiffs have included nothing other than bald assertions of "deficiencies" and legal conclusions of "failures." For that reason, Count 2 should be dismissed.

*The Defendants Complied With the Home Rule Charter*

Without legally sufficient and particular allegations, Defendants are left to guess what the allegations are against them. With that said, Plaintiffs make reference to amendments without "first printing" notice. ECF filing 21 at ¶ 143. This is as close to a particular allegation as is included in the Second Amended Complaint, and so will be addressed herein.

Home Rule Charter section 2-201(2) says in full that (2) "Before a bill shall be considered by the Council it shall be referred to a committee, considered at a public hearing, reported by the committee, printed as reported, and distributed to the members of the Council and made available to the public." Section 2-201(3) says in relevant part that (3) "Bills amended shall be printed as amended for the use of the members of the Council and for the information of the public."

There is no allegation in the Plaintiffs' Second Amended Complaint that these required "printings" did not occur. At all times, Plaintiffs had access to Legistar, described *supra* in Section II(A). There is no allegation that either of the Bills was amended, but not published and available to the public through the Legistar website that is equally available to everyone. As the publicly-available transcript shows, the Bills were amended at public meetings and then those amendments were provided to the public as required by the Home Rule Charter.

It is particularly important to focus on the bill as it was finally amended. As the public record shows, the Bills were passed out of Committee on March 30, 2026, read at the April 9, 2026 meeting of the full City Council, then amended by City Council on April 16, 2026, and finally passed on April 23, 2026. Per the Philadelphia Home Rule Charter, the Bills could not be passed (and were not passed) on the same day that an amendment occurred, meaning that the Public would always have an opportunity to come to Council and give comment on the final version of the Bills before they were passed. Phila. Charter § 2-201(4). There is no allegation in the Second Amended Complaint of a particular fault or deficiency that violated the Home Rule Charter in this legislative sequence.

Thus, no violation of the Home Rule Charter is pleaded, because the publicly-available documents demonstrate that none occurred. For this reason as well, Count 2 should be dismissed.

**C. The Bills Do Not Constitute a Regulatory Taking (Count 3)**

Plaintiffs assert that the Bills "[c]ollectively" constitute a regulatory taking under the Fifth and Fourteenth Amendments, but every factor of the legal test for such a taking weighs against them. "[R]egulatory takings challenges are governed by the standards set forth in *Penn Central Transportation Co. v. New York City,* 438 U.S. 104 (1978)." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005). These include "'[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations[,]" and "the 'character of the governmental action'—for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'" *Lingle*, 544 U.S. at 538-39 (quoting *Penn Central*, 438 U.S. at 124). While the complaint alleges the Bills will impose increased costs, it fails to identify any nonspeculative negative economic impact or the violation of any reasonable, distinct investment-backed

expectation, and the Bills are classic public policy regulations adjusting the benefits and burdens of property ownership citywide.[18]

**1. Plaintiffs Fail to Allege Any Concrete Economic Impact**

The economic impact of a regulation "is usually measured in terms of its effect on the value of the property." *Nekrilov v. City of Jersey City*, 45 F.4th 662, 673 (3d Cir. 2022); *see also Rogin v. Bensalem Twp.*, 616 F.2d 680, 690 (3d Cir. 1980) ("[U]nless application of the law destroys or severely diminishes the value of the property, the Court will uphold the application."). The bar for diminution in property value is high; the Supreme Court has held that decreases up to 87% may not be sufficient for a takings claim. *See Euclid v. Ambler Realty Co.*, 272 U.S. 365, (1926) (75% diminution); *Hadacheck v. Sebastian*, 239 U.S. 394, 36 (1915) (87% diminution in value). Speculative projections of future profitability are insufficient as "loss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim." *Andrus v. Allard*, 444 U.S. 51, 66 (1979); *see also Nekrilov*, 45 F.4th at 674 (holding specific allegations of reduced rental revenue of approximately 50% and 66% based on specific revenue estimates were insufficient to plausibly allege the economic impact required for a regulatory taking)

Here, beyond a conclusory allegation of "diminished property value," plaintiffs identify no appraisal, market analysis, or other factual allegations suggesting that the Bills have significantly reduced the market value of their properties. *See* SAC ¶ 178. They provide no

---

[18] At the outset, we note that Plaintiffs have not even alleged what properties they own, how many are rented or affected by the Bills, or other specific factual information necessary to support a takings claim. *See, e.g.*, *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 295 (1981) (noting *Penn Central*'s "'ad hoc, factual inquir[y]' must be conducted with respect to specific property" because of the need to examine "the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances")

estimate of lost income, diminution in property value, or effect on the viability of their properties as investments. Nor do they allege that the properties can no longer be leased, occupied, or sold. *See id.* ¶¶ 161-164. Instead, the Complaint mainly alleges that compliance with the Bills may increase the costs of operating rental housing and delay the realization of rental income. *See id.* Those conclusory claims of increased compliance costs are entirely contingent upon future events that may never occur, including tenant disputes, housing-code violations, and future eviction proceedings. Those allegations, even if true, do not plausibly establish the type of concrete economic impact contemplated by *Penn Central*. *See Nekrilov*, 45 F.4th at 674.

Plaintiffs' allegations also fail to account for the continued economic uses and value of their properties. *See Nekrilov*, 45 F.4th at 673. (noting takings claim must consider "other potentially profitable uses of the properties, the most obvious of which is to sell the properties." Here, the Bills do not prevent Plaintiffs from retaining ownership of their properties, living in them, selling them, or continuing to use them as rental housing or other purposes. At most, Plaintiffs allege that the Bills affects one aspect of the economic benefits associated with ownership. Such an allegation is insufficient to establish a regulatory taking. *See Andrus v. Allard*, 444 U.S. 51, 65 (1979) (noting destruction of one "strand" of the bundle of property rights cannot be considered a taking).

**2. Plaintiffs Have No Reasonable, Distinct Investment-Backed Expectations**

The second *Penn Central* factor considers the extent to which a regulation interferes with a property owner's reasonable, distinct investment-backed expectations. Such expectations are reasonable only insofar as they "take into account the power of the state to regulate in the public interest." *Pace Res., Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1033 (3d Cir. 1987). As the Third Circuit noted in *Troy Ltd. v. Renna*, 727 F.2d 287, the Supreme Court has upheld housing regulations limiting a landlord right to recover against holdover tenants and a regulation giving

tenants a right of continued occupation after expiry of the lease. *Troy Ltd. v. Renna*, 727 F.2d 287, 302 (3d Cir. 1984) (collecting cases). Though they involved "cost to the owner", these regulations were not deemed takings. *Id*.

Plaintiffs do not allege they have any distinct investment backed expectations that are violated by the Bills—no mortgages contingent on any-cause eviction or the ability to retaliate against tenants. And they certainly could not have any reasonable expectations that the City would not continue to regulate the landlord-tenant relationship, as many of the rent-withholding provisions depend on existing legal rules and the City added the good-cause eviction requirement for short-term tenancies in 2019. *See* Phila. Code § 9-804(12) (codifying Bill No. 170854-A enacted January 2019). As such, Plaintiffs' taking claim also fails to plausibly allege any sufficient investment-backed expectations.

#### 3. The Character of the Government Action Weighs Against Finding a Regulatory Taking

The final *Penn Central* factor examines the character of the governmental action. Physical intrusions raises more concern than "public program[s] adjusting the benefits and burdens of economic life to promote the common good." *Nekrilov*, 45 F.4th at 677 (quoting Penn. Cent., 438 U.S. at 124). Regulations of general applicability are less likely to constitute compensable takings than those singling out particular property owners. *Rogin v. Bensalem Twp.*, 616 F.2d 680, 690 (3d Cir. 1980).

The Bills here bear all the hallmarks of the type of generally applicable economic regulation contemplated by *Penn Central.* They establish generally applicable rules governing the landlord-tenant relationship throughout the City's residential rental market. Plaintiffs themselves recognize their broad scope by comparing how "institutional landlords" might absorb the resulting costs, thus conceding that the Bills do not only operate on some "small class." SAC

¶¶ 163, 174. And Plaintiffs acknowledge the City's legitimate goal of promoting affordable housing and protecting "tenant health, safety, and housing stability." *Id.* ¶ 176. Because the Bills are generally applicable regulations that do not physically intrude, the character of the government action here also does not support a takings claim.

* * *

Count Three fails to plausibly allege any facts necessary to find any of the *Penn Central* factors support a takings claim, let alone all three. Thus, Plaintiffs' Takings claim must be dismissed as a matter of law.

**D. The Bills Do Not Violate the Contracts Clause (Count 6)**

Plaintiffs' Contracts Clause claim fails to state a claim for several reasons. First, Plaintiffs have not alleged facts to a cognizable impairment of any of their contracts. Second, even if the Bills could significantly impair some contract, they serve significant and legitimate public purposes sufficient to satisfy Contracts Clause review, particularly because the City is not a party to any affected contract.

To determine if a law violates the Contracts Clause, courts perform a three-step inquiry. First, the Court asks whether the challenged law "has operated as a substantial impairment of a contractual relationship." *Sveen v. Melin*, 584 U.S. 811, 819 (2018). If so, the Court considers whether the law serves a significant and legitimate public purpose and is drawn in an "appropriate" and "reasonable" manner. *Id*. Where, as here, the government is not itself a party to the affected contracts, and the regulation is an "economic and social" one, courts will defer to the legislature's judgment concerning the necessity and reasonableness of the regulation. *United States Trust Co. v. New Jersey*, 431 U.S. 1, 22–23 (1977).

### 1. Plaintiffs Have Not Alleged a Substantial Impairment of Existing Contracts

Under the first prong, the Court must determine "(1) whether there is a contractual relationship; (2) whether a change in a law has impaired that contractual relationship; and (3) whether the impairment is substantial." *Transp. Workers Union of Am., Local 290 v. SEPTA*, 145 F.3d 619, 621 (3d Cir. 1998). If there has been an impairment, courts then determine where it is substantial by looking to the party's "legitimate expectations that arise from such contractual relationships" and whether they "have been substantially thwarted." *Id.* at 622. In weighing reasonable expectation, the Third Circuit has recognized that when a party enters an industry that is regulated in a particular manner, it is entering subject to further legislation in the area, and changes in the regulation that may affect its contractual relationships are foreseeable. *Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 369 (3d Cir. 2012) (holding that a retroactive change to presumptive abandonment for travelers checks did not violate the contracts clause).

Plaintiffs could not reasonably expect that the statutory framework governing residential landlord-tenant relationships would remain unchanged. Residential leasing has long been the subject of extensive state and local regulation. As the court explained in *HAPCO v. City of Philadelphia*, Pennsylvania law regulates security deposits, eviction procedures, notice requirements, retaliatory eviction, rent withholding, fair housing practices, and numerous other aspects of the landlord-tenant relationship. 482 F. Supp. 3d 337, 352 (E.D. Pa. 2020).

Indeed, in this case, the challenged legislation extends good cause protections that already exist for all leases for a term of less than one year.[19] Phila. Code § 9-804(12)(a). As to

---

[19] It is not clear Plaintiffs have even alleged any contractual impairment at all. Although they claim they have leases with terms that will be altered by the Bills, they do not attach the leases or cite any specific provisions of the Bills or those contracts. SAC ¶¶ 229-231. While the complaint

provisions allowing for the refund or withholding of rent, these prove substantially similar to provisions of the Pennsylvania's Rent Withholding Act, which "authorizes rent withholding where a local health department certifies a dwelling as unfit for human habitation." *HAPCO*, 482 F. Supp. 3d at 352. And it is already illegal under the Philadelphia code to collect rent without a rental license. Phila. Code § 9-302(1)(a). As in the Takings context, Plaintiffs' reasonable expectations are not frustrated by the City's additional regulations in already regulated market.

**2. The Ordinance Serves a Significant and Legitimate Public Purpose**

Even assuming Plaintiffs had adequately alleged a substantial impairment, their claim would still fail because the Bills serve a significant and legitimate public purpose. Legislatures must possess "broad power to adopt general regulatory measures without being concerned that private contracts will be impaired" as a result. *U.S. Tr. Co.*, 431 U.S. at 22. This latitude is required when addressing a legitimate public purpose, one that is "aimed at remedying a broad and general social or economic problem." *Nekrilov*, 45 F.4th at 679 (citation omitted).

The Bills address precisely those kinds of public concerns. In *Troy*, in upholding an expansion to statutory tenancy protections, the Third Circuit noted that there was "no question" as to the "broad remedial purpose in protecting the mental and physical health of citizens who could suffer greatly by evictions." *Troy Ltd.*, 727 F.2d at 298. Here, the City identifies the interests of protecting tenants from "unsafe, unfit, and imminently dangerous conditions" as well as retaliation and arbitrary displacement. SAC, Ex. A at 1-2, Ex. B at 1-2. Plaintiffs do not

---

generally objects to the Bills' provisions regarding good-cause eviction and bases for withholding rent where the landlord commits other legal violations, it is purely speculative that those provisions will be invoked during the remaining duration of any lease after the Bills become effective in November, six months after their passage.

contest the city's "legitimate interests in promoting housing stability and protecting tenants." SAC ¶ 233.

### 3. The Ordinance Is a Reasonable and Appropriate Means of Advancing That Purpose

Finally, the Bills are reasonably tailored to advance those legitimate objectives. When the government is not itself a contracting party, courts "the courts should defer to the legislative judgment as to the reasonableness of the particular measure." *Keystone Bituminous Coal Ass'n v. Duncan*, 771 F.2d 707, 717 (3d Cir.1985); *see also Nieves v. Hess Oil Virgin Islands Corp*., 819 F.2d 1237, 1249 (3d Cir. 1987) ("Courts are required to defer to the legislature's judgment concerning the necessity and reasonableness of economic and social legislation.").

Here, the City is not a party to Plaintiffs' lease agreements. Consequently, its legislative judgment is entitled to substantial deference. As the Third Circuit explained in *Nekrilov*, courts should not second-guess legislative determinations concerning the appropriate means of addressing housing-related concerns where the government has identified a legitimate public purpose and selected reasonable regulatory measures to accomplish it. 45 F.4th at 680. Likewise, *Troy* emphasized that courts may not substitute their own policy judgments for those of the legislature when reviewing economic and social legislation regulating private contractual relationships. 727 F.2d at 298. While Plaintiffs may differ as to the wisdom of the Bills and their likely effects on the housing market, those policy disagreements are legally insufficient to invalidate the Bills.

* * *

Because Plaintiffs have failed to allege a substantial impairment of existing contracts, and because the Bills serve a significant public purpose through reasonable means entitled to judicial deference, Plaintiffs fail to state a claim under the Contracts Clause.

### E. The Bills Have a Rational Basis and So Satisfy Substantive Due Process (Counts 4 and 7)

Plaintiffs' federal and state substantive due process claims in Counts Four and Seven[20] also fail to state a claim for relief because they do not claim the violation of a fundamental right and, as discussed above, the Bills have a rational basis. "In a case challenging a legislative act, as here, the act must withstand rational basis review." *Am. Express*, 669 F.3d at 366 (citing *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000). Under rational basis review, courts "cannot second-guess the Legislature's factual assumptions or policy considerations that underlie the statute." *ACRA Turf Club, LLC v. Zanzuccki*, 724 Fed. App'x 102, 111 (3d Cir. 2018) (citing *Sammon v. N.J. Bd. of Med. Exam'rs*, 66 F.3d 639, 645 (3d Cir. 1995). "It is enough that the State offers a conceivable rational basis for its action, and '[t]he court may even hypothesize the motivations of the state legislature to find a legitimate objective promoted by the provision under attack.'" *Am. Express*, 669 F.3d at 367 (citation omitted). "It is 'constitutionally irrelevant whether this reasoning in fact underlay the legislative decision . . . .'" *Id.* (quoting *Flemming v. Nestor*, 363 U.S. 603, 612 (1960)). The Supreme Court has recognized that review under the Contracts Clause is "more exacting than the rational basis standard applied in the due process analysis." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984).

---

[20] Claims under Article 1, Section 1 of the Pennsylvania Constitution follow the federal substantive due process analysis. *See Twp. of Exeter v. Zoning Hearing Bd. of Exeter Twp.*, 962 A.2d 653, 659 (Pa. 2009) ("In reviewing the constitutionality of an ordinance under Article 1, Section I of the Pennsylvania Constitution and the Fifth and Fourteenth Amendments to the United States Constitution, we employ 'a substantive due process inquiry, involving a balancing of landowners' rights against the public interest sought to be protected by an exercise of the police power[.]'" (citation omitted)); *Pennsylvania Game Comm'n v. Marich*, 666 A.2d 253, 255 n.6 (Pa. 1995) ("As we have held that the requirements of Article I, Section I of the Pennsylvania Constitution are not distinguishable from those of the 14th Amendment, *R. v. Com., Dept. of Public Welfare,* 636 A.2d 142, 152–153 (Pa. 1993), we may apply the same analysis to both claims.").

For the reasons discussed above, the Bills serve legitimate public purposes and represent a reasonable means of advancing those objectives. Accordingly, Plaintiffs cannot plausibly allege that the Ordinance is arbitrary or irrational, and their substantive due process claim should be dismissed.

### F. The Bills Do Not Violate the Equal Protections Clause (Counts 5 and 8)

Plaintiffs allege that the Bills deny them equal protection and enjoyment of rights under the Fourteenth Amendment and Article I, Section 26 of the Pennsylvania Constitution ("Section 26") in Counts V and VIII, respectively. But as Plaintiffs concede, the Bills are facially neutral and do not distinguish on the basis of race. SAC ¶ 208. And Plaintiffs allegations of disparate racial impact are not cognizable under either constitutional provision, which only impose liability where there is also discriminatory motive. Because Plaintiffs do not and could not allege that the Bills were passed to discriminate on the basis of race, and because the Bills satisfy rational basis review, Plaintiffs' discrimination claims fail.

To invoke strict scrutiny for a race discrimination claim, plausible factual allegations of "'racially discriminatory intent or purpose [are] required'" *Antonelli v. New Jersey*, 419 F.3d 267, 274 (3d Cir. 2005) (quoting *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.,* 538 U.S. 188, 194 (2003)); *see also id.* ("Intentional discrimination can be shown when[] . . . a facially neutral law or policy that is applied evenhandedly is motivated by discriminatory intent and has a racially discriminatory impact[.]" (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 97 (1977)). "Discriminatory intent 'implies that the decision-maker . . . selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.'" *Id.* (quoting *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 279 (1979)) (alteration in *Antonelli*). If heightened scrutiny does not apply, "[u]nder rational basis review, the challenged classification must be

upheld if it is 'rationally related to a legitimate state interest.'" *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 556 (3d Cir. 2011) (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)). A Section 26 claim under the Pennsylvania Constitution utilizes the same standards as federal equal protection claims. *Kramer v. W.C.A.B. (Rite Aid Corp.)*, 883 A.2d 518, 532 (Pa. 2005) ( "In evaluating equal protection claims under the Pennsylvania Constitution, this Court has employed the same standards applicable to federal equal protection claims . . . ."); *see also Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, 908 F. Supp. 2d 597, 618 (M.D. Pa. 2012). Therefore, our analysis of Section 26 in Count Eight is subsumed in our discussion of Count Five and the federal equal protection clause.

As noted above, Plaintiffs concede the Bills are facially race neutral. SAC ¶¶ 208-209. Plaintiffs also do not allege that the Bills intentionally treat different groups differently. Instead, they claim that the Bills have a disparate impact because their "cumulative operation imposes foreseeable and disproportionate burdens upon African American small landlords, including Plaintiffs." *Id.* ¶ 209, *cf.* ¶ 264. But both the Equal Protection Clause and Section 26 require allegations that the laws were motivated by discriminatory intent—that they were passed "because of, not merely in spite of" race to invoke strict scrutiny. But the operative complaint does not contain any such allegations of racial motivation or even to treat different types of residential landlords differently. And as discussed above, Plaintiffs do not allege the Bills intentionally distinguish between groups on any other basis, and the Bills have a rational basis for imposing the costs Plaintiffs allege. *See supra* Parts IV.D-E. As a result, Plaintiffs' discrimination claims fail as a matter of law.[21]

---

[21] Plaintiffs discrimination claims also suffer from a fatal logical flaw. While they allege that the Bills disproportionately burden "small property owners" as compared to "institutional housing providers," they do not allege that that Bills impose greater burdens on small African American

### G. Plaintiffs Fail to State a *Monell* Claim (Count 9)

Plaintiffs have sued Philadelphia City Council and the Committee. SAC ¶¶ 6, 7. Plaintiffs have not named "the City of Philadelphia" as a defendant, but refer to the city as a Defendant in Count Nine, *see id.* ¶ 270, which seeks to impose liability under Section 1983 pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).[22] But *Monell* liability requires some underlying violation of federal law, and since Count Nine contains no independent allegations of federal law violations, and Plaintiffs other federal claims fail as a matter of law, Count Nine does as well.

### H. Further Amendment Would Be Futile

Because Plaintiffs have already amended their complaint twice with no improvement of their deficient claims, further amendment would be futile and the Court should dismiss the Second Amended Complaint with prejudice. The determination to deny leave to amend is within the discretion of the trial court. *Budhun v. Reading Hops. & Med. Ctr.*, 765 F.3d 245, 259 (3d Cir. 2014) (citation omitted). The Court may deny leave to amend when amendment "would be

---

landlords than other small landlords, or even that the majority of such "small" landlords to whom the Bills apply are African American like Plaintiffs. (SAC ¶¶ 209-213, 260-268).

[22] As a general rule, claims against City officials and bodies are properly brought against the City itself. *See, e.g., Wimbush v. City of Philadelphia*, No. CV 16-05783, 2017 WL 1355174, at *4 n.2 (E.D. Pa. Apr. 13, 2017) ("[T]he police department . . . cannot be sued apart from the City of Philadelphia itself."); *Ituah v. City of Philadelphia*, No. CV 19-05088, 2020 WL 1470808, at *3 n.3 (E.D. Pa. Mar. 26, 2020); *see also* 3 Pa. C.S. § 16257 (providing that municipal departments will no longer have "separate corporate existence[s], and hereafter all suits growing out of their transactions ... shall be in the name of the city of Philadelphia"). However, under Pennsylvania law, Sunshine Act claims are properly brought against the specific "entity" alleged to have committed the violation. *See Neu v. Millcreek Twp. Bd. of Sch. Directors*, 349 A.3d 1070, 1078-79 (Pa. Cmwlth. 2025).

In their amended complaints, Plaintiffs have added other types of claims that are only properly brought against the City itself without adding the City as a defendant. However, since non-Sunshine Act claims against a City body or department are tantamount to claims against the City, in the interest of judicial efficiency Defendants respond to Plaintiffs' claims on the merits as though they had properly named the City itself.

futile," *id.* (citing *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006)), including "if the [further] amended complaint would not survive a motion to dismiss for failure to state a claim," *id.* (citing *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 243 (3d Cir. 2010)).

Here, Plaintiffs have already used their amendment as of right pursuant to Federal Rule of Civil Procedure 15(a)(1). Plaintiffs have now had ample opportunity to plead their claims, yet the Second Amended Complaint only adds legally flawed claims, not relevant factual allegations. As argued *supra*, Plaintiffs fail to state claim. Thus, the Second Amended Complaint should be dismissed without further opportunity to amend.

## V. CONCLUSION

For all the reasons set forth above, Defendants respectfully request that this Court dismiss the Second Amended Complaint with prejudice.

Respectfully submitted,

CITY OF PHILADELPHIA LAW DEPARTMENT
Renee Garcia, City Solicitor

Date: August 4, 2026

By: */s/ William B. Shuey*

WILLIAM B. SHUEY (PA ID No. 208792)
Senior Attorney
MICHAEL PFAUTZ (PA ID No. 325323)
Deputy City Solicitor
Affirmative & Special Litigation
CITY OF PHILADELPHIA LAW DEPARTMENT
1515 Arch Street, 15th Floor
Philadelphia, PA 19102
Phone: (215) 683-5233
*Counsel for Defendants*

Ex. C

**PEARSON LAW GROUP**
**By: Briana Lynn Pearson, Esquire**
**Identification No. 327007**
**1500 Chestnut St. Suite 2 #2898**
**Philadelphia, PA 19102**
**Phone: 484-469-0322**
**Fax: 856-229-9991**
**Email:**
**bpearson@pearsonlawgroup.org**

**Attorneys for Plaintiffs,**
***Seth Floyd and Erica Hadley***

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FLOYD et al. | : | |
| | : | |
| v. | : | No. 2:26-cv-02403 |
| | : | |
| CITY COUNCIL FOR THE CITY OF PHILADELPHIA, et al. | : | |

# PLAINTIFFS SETH FLOYD'S AND ERICA HADLEY'S SECOND AMENDED COMPLAINT

## INTRODUCTION

1. This action challenges the validity and constitutionality of recently enacted Philadelphia legislation that fundamentally alters the legal and economic conditions under which residential landlords may own, maintain, manage, and lease rental property within the City. Plaintiffs allege that Defendants enacted the challenged ordinances through a legislative process that violated the Pennsylvania Sunshine Act and the Philadelphia Home Rule Charter and that Defendants' enactment and enforcement of those ordinances violate the Takings Clause, the Due Process Clause, the Equal

Protection Clause, the Contracts Clause, and Article I, Sections 1 and 26 of the Pennsylvania Constitution.

2. Plaintiffs do not seek exemption from reasonable regulation. Plaintiffs acknowledge that the City possesses legitimate authority to protect tenant health, safety, and housing stability.

3. However, Plaintiffs aver that the challenged legislation exceeds constitutional limits because it imposes cumulative burdens upon a discrete class of small housing providers that the legislative record itself identified as essential to preserving Philadelphia's affordable housing supply.

**PARTIES**

4. Plaintiff Seth Floyd ("Mr. Floyd") is an African American, adult individual, a resident and taxpayer of the City of Philadelphia, and the owner and operator of residential rental properties within the City. As a Philadelphia resident, taxpayer, and landlord, Mr. Floyd is directly and adversely affected by ordinances enacted by the Philadelphia City Council regulating residential rental housing, including Bills No. 250329-AA (attached hereto as Exhibit "A") and 250330-AA (attached hereto as Exhibit "B").

5. Plaintiff Erica Hadley ("Ms. Hadley") is an African American, adult individual and the owner and operator of residential rental properties within the City of Philadelphia. She owns and manages rental properties that are subject to the City's regulatory authority and is directly and adversely affected by Bills No. 250329-AA and 250330-AA, which govern the licensing, operation, management, and legal obligations of residential landlords in the City.

6. Defendant City Council for the City of Philadelphia ("City Council") is the legislative body of the City of Philadelphia, organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal offices located at Philadelphia City Hall, Philadelphia, Pennsylvania. City Council enacted Bill No. 250329-AA, amending Chapter 9-3900 of The Philadelphia Code ("Property Licenses and Owner Accountability"), and Bill No. 250330-AA, amending Chapter 9-800 of The Philadelphia Code ("Landlord and Tenant"), both of which are challenged in this action.

7. Defendant Philadelphia City Council Committee on Housing, Neighborhood Development and the Homeless ("Housing Committee") is a standing committee of the Philadelphia City Council responsible for conducting hearings, receiving testimony, considering, and making recommendations regarding legislation concerning housing, neighborhood development, homelessness, and landlord-tenant regulation. The Housing Committee considered and advanced Bill No. 250329-AA and Bill No. 250330-AA before their passage by City Council.

**JURISDICTION AND VENUE**

8. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiffs seek redress for the deprivation, under color of state law, of rights secured by the Constitution and laws of the United States.

9. To the extent Plaintiffs assert related claims arising under the laws of the Commonwealth of Pennsylvania, this Court has supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as Plaintiffs' federal claims.

10. This Court has personal jurisdiction over Defendants because they are governmental entities of the City of Philadelphia and, at all relevant times, acted under color of state law within the Eastern District of Pennsylvania.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside in this judicial district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within the Eastern District of Pennsylvania, including the consideration, enactment, and implementation of the challenged ordinances.

## FACTUAL BACKGROUND

### A. Plaintiffs and Their Role in Philadelphia's Housing Ecosystem

12. Plaintiffs Seth Floyd and Erica Hadley are African American owners and operators of residential rental properties located within the City of Philadelphia.

13. Plaintiffs are independent housing providers who own, maintain, manage, rehabilitate, and lease residential rental housing without the institutional infrastructure, economies of scale, or financial resources available to large corporate landlords.

14. Plaintiffs are among the class of small, neighborhood-based housing providers that collectively supply a substantial portion of Philadelphia's naturally occurring affordable housing ("NOAH").

15. Plaintiffs acquired their properties through years of personal labor, financial sacrifice, private investment, and financing.

16. They assumed financial obligations, invested substantial personal capital in rehabilitating aging housing stock, and devoted significant time and labor toward restoring and maintaining safe, habitable, and code-compliant housing for Philadelphia residents.

17. Plaintiffs did not acquire their properties through institutional investment funds or speculative real estate portfolios. Rather, their rental businesses were built incrementally through individual effort and long-term investment.

18. Unlike institutional housing providers, Plaintiffs personally oversee virtually every aspect of property ownership and management.

19. They perform or directly supervise maintenance, repairs, code compliance, licensing, tenant communications, leasing, financial management, contractor coordination, inspections, and regulatory compliance.

20. Every dollar invested in their properties represents their own capital or borrowed funds for which they remain personally responsible.

21. Rental income generated by Plaintiffs' properties is not passive investment income.

22. Rather, it constitutes the operating revenue necessary to satisfy mortgage obligations, pay real estate taxes, insurance premiums, utilities, maintenance expenses, licensing fees, repairs, and capital improvements while permitting continued reinvestment in Philadelphia neighborhoods.

23. The continued viability of Plaintiffs' rental businesses depends upon maintaining sufficient cash flow to preserve their properties, comply with applicable law, and continue providing quality housing to Philadelphia residents.

24. Plaintiffs acquired, rehabilitated, and continue to operate their properties in reliance upon the legal framework governing residential rental housing existing at the time of acquisition.

25. In making substantial financial commitments to purchase and improve their properties, Plaintiffs reasonably relied upon Pennsylvania law recognizing the traditional incidents of private property ownership, including the rights to possess, manage, lease, maintain, improve, economically benefit from, and lawfully recover possession of residential property.

26. Plaintiffs further relied upon a regulatory framework that permitted them to operate financially sustainable rental businesses while continuing to reinvest in their properties and neighborhoods.

27. Plaintiffs' rental properties constitute naturally occurring affordable housing because they provide affordable rental units without continuing governmental subsidy.

28. These properties remain affordable not because they receive ongoing public funding, but because they are owned and managed by Plaintiffs who are small local housing providers whose business models differ fundamentally from institutional investment firms seeking large portfolio-level returns.

29. Plaintiffs' ability to continue providing affordable housing depends upon reasonably predictable regulatory requirements, timely collection of rent, prompt resolution of landlord-tenant disputes, the lawful ability to recover possession of rental property when authorized by law, and the continued economic viability of operating small residential rental businesses.

30. Because Plaintiffs own and personally manage a limited number of rental properties, increases in operating expenses, compliance costs, litigation exposure, or interruptions in rental income cannot be distributed across extensive real estate portfolios or absorbed through institutional financing.

31. Plaintiffs' properties are not speculative investment vehicles. They are long-term community assets that provide housing to working families, senior citizens, individuals receiving fixed incomes, and other Philadelphia residents who rely upon naturally occurring affordable housing because market-rate alternatives frequently exceed their financial means.

32. Plaintiffs' continued ability to maintain those properties therefore directly affects both their own economic stability and the continued availability of affordable housing within the neighborhoods they serve.

### B. Historical Barriers to African American Property Ownership and Wealth Preservation

33. The ownership of real property has long been recognized as one of the principal means through which American families accumulate wealth, preserve financial stability, and create opportunities for future generations.

34. For much of the Nation's history, however, African Americans were systematically denied equal access to those opportunities through governmental policies and private practices that restricted the acquisition, financing, development, and transfer of real property.[1]

35. Historic practices including racially restrictive covenants, redlining, discriminatory mortgage lending, exclusion from conventional credit markets, unequal access to commercial financing, urban renewal policies, discriminatory property valuation practices, and barriers to intergenerational wealth accumulation substantially limited opportunities for African American families to acquire and preserve income-producing real estate.

36. Although many of those practices have since been prohibited by law, scholars, economists, and housing researchers continue to recognize that their economic effects persist through significant disparities in accumulated wealth, borrowing costs, access to investment capital, commercial credit, and rates of property ownership.

37. As a consequence of those historical barriers, African American housing providers frequently operate with less accumulated capital, fewer financial reserves,

[1] Economists Ellora Derenoncourt, Chi Hyun Kim, Moritz Kuhn, and Moritz Schularick conclude that the Black-white wealth gap is the cumulative product of slavery, unequal initial wealth, and more than a century of discriminatory barriers to wealth accumulation. Their research demonstrates that even under equal wealth-building conditions after Emancipation, the initial disparity would have persisted for generations. In reality, however, unequal access to savings opportunities, capital markets, and appreciating assets caused convergence to proceed even more slowly, with the racial wealth gap widening again since the 1980s. These findings demonstrate that government action which further restricts wealth creation or destroys accumulated assets in historically disadvantaged communities compounds entrenched racial disparities rather than alleviating them. At its core, this is not merely an economic issue,it is a constitutional one. Government policies that intentionally or foreseeably exacerbate longstanding racial inequities implicate the Equal Protection Clause's promise that all persons receive the equal protection of the laws, particularly where state action perpetuates or deepens historically rooted racial disparities. *See* Ellora Derenoncourt, Chi Hyun Kim, Moritz Kuhn & Moritz Schularick, *Wealth of Two Nations: The U.S. Racial Wealth Gap, 1860–2020*, ECONtribute Discussion Paper No. 168 (May 24, 2022).

reduced access to institutional financing, narrower operating margins, and fewer opportunities to absorb significant regulatory costs than larger institutional real estate companies.

38. Plaintiffs belong to that historically disadvantaged class of property owners.

39. Their ownership of residential rental housing represents years of personal investment, disciplined financial planning, rehabilitation of aging housing stock, and wealth creation achieved despite longstanding structural barriers to property ownership and capital formation.

40. For many African American families, ownership of small residential rental properties represents one of the few remaining pathways for building intergenerational wealth, preserving financial independence, financing retirement, supporting family members, and maintaining long-term economic stability.

41. Preservation of those opportunities is particularly significant in communities that historically experienced systematic exclusion from conventional opportunities for property ownership and wealth accumulation.

42. Plaintiffs therefore allege that governmental action which substantially increases the economic barriers to owning and operating small residential rental properties foreseeably threatens not only individual businesses, but also one of the principal mechanisms through which historically marginalized communities continue to build, preserve, and transfer wealth through lawful property ownership.

### C. Philadelphia's Affordable Housing Ecosystem and Naturally Occurring Affordable Housing

43. Philadelphia's housing market functions as an interconnected economic ecosystem in which tenants, landlords, lenders, neighborhoods, contractors, nonprofit organizations, local government, and the judicial system each perform interdependent roles. The continued availability of affordable housing depends upon maintaining the long-term economic health of every component of that ecosystem rather than shifting disproportionate economic burdens onto any single participant.[2]

44. Sustainable housing policy therefore requires protecting both tenants and the independent housing providers who supply affordable housing.

45. Legislation that renders independent housing providers economically unable to continue operating ultimately reduces housing availability, discourages neighborhood investment, accelerates market consolidation, and harms the very tenants such legislation seeks to protect.

46. Research funded by the Philadelphia Research and Policy Initiative of The Pew Charitable Trusts, and informed by Philadelphia's Department of Licenses and Inspections, concluded that naturally occurring affordable housing, constitutes one of Philadelphia's largest sources of affordable rental housing because it is supplied

---

[2] The Urban Institute characterizes Philadelphia's rental housing market as an interconnected regulatory and support ecosystem in which government agencies, landlords, tenants, nonprofit organizations, health institutions, and community stakeholders each play essential and interdependent roles in maintaining safe, affordable housing. The report concludes that effective housing policy requires coordinated investment, regulatory efficiency, landlord support, and tenant protections rather than imposing disproportionate burdens on any single participant, recognizing that preserving affordable housing depends upon maintaining the long-term health and stability of the housing ecosystem as a whole. *See* Joseph Schilling, Fay Walker, Tanay Nunna & Christina Stacy, *Improving Philadelphia's Rental Regulatory and Housing Support Systems: A Strategic Policy & Health Impact Assessment* (Urban Inst., Sept. 2022).

without continuing governmental subsidy and is owned predominantly by small independent housing providers, like Plaintiffs, rather than institutional investors. *See* Joseph Schilling, Fay Walker, Tanay Nunna & Christina Stacy, *Improving Philadelphia's Rental Regulatory and Housing Support Systems: A Strategic Policy & Health Impact Assessment* (Urban Inst., Sept. 2022).

47. The same research further recognizes that many landlords owning only one or two rental properties lack sufficient access to capital needed to maintain and improve their properties.

48. Rather than recommending increased cumulative regulatory complexity, the research recommends preservation strategies centered upon streamlined regulatory compliance, technical assistance, expanded access to financing, and policies designed to preserve the continued participation of small housing providers in Philadelphia's rental market.

49. Plaintiffs fall squarely within the class of housing providers identified by this research. As independent landlords operating limited numbers of residential rental properties, Plaintiffs rely upon the economic viability of each individual property they own. They do not possess dedicated legal departments, compliance personnel, institutional financing, large diversified investment portfolios, or the ability to spread increasing regulatory costs across hundreds or thousands of rental units.

50. Accordingly, preserving naturally occurring affordable housing necessarily requires preserving the continued economic viability of the small independent landlords who own, maintain, rehabilitate, and reinvest in those properties. Affordable

housing cannot be preserved if the housing providers responsible for maintaining that housing are rendered economically unable to continue operating. *Id.*

51. The same research further recognizes that cumulative increases in regulatory complexity, compliance costs, litigation exposure, and administrative burdens disproportionately affect small housing providers because those providers generally operate with significantly fewer financial resources than institutional landlords. Those findings were available before enactment of the challenged legislation and were consistent with the testimony presented by Plaintiffs and numerous other housing providers during the legislative process. *Id.*

52. When independent housing providers become unable to continue operating economically viable rental businesses, the effects extend beyond individual landlords.

53. Small landlords may defer maintenance, postpone rehabilitation projects, reduce investment in existing housing stock, sell rental properties, or withdraw from the rental housing market entirely.

54. Those outcomes reduce neighborhood-based ownership, increase market consolidation, diminish opportunities for wealth preservation within historically marginalized communities, and threaten the long-term availability of naturally occurring affordable housing throughout Philadelphia.

55. Accordingly, preservation of affordable housing and preservation of independent housing providers are inseparable objectives.

56. Plaintiffs allege that policies which undermine the continued participation of small local landlords necessarily undermine Philadelphia's broader affordable housing ecosystem and ultimately harm landlords, tenants, neighborhoods, and the City alike.

57. A substantial percentage of Philadelphia residents reside in rental housing rather than owner-occupied homes, making the continued availability of safe, affordable, and financially sustainable rental housing essential to the City's economic stability and public welfare.

58. Unlike newly constructed affordable housing, privately owned residential properties remain affordable without ongoing governmental subsidy because of their age, location, construction type, or operating costs. These properties provide housing opportunities for working families, senior citizens, individuals living on fixed incomes, and marginalized Philadelphians, and residents whose incomes frequently exceed eligibility thresholds for subsidized housing but remain insufficient to afford newly constructed market-rate housing.

59. The preservation of Philadelphia's affordable housing supply depends not only upon constructing new housing but also upon maintaining and preserving existing naturally occurring affordable housing. Replacement of existing affordable rental units through new construction requires substantial public and private investment, extended development timelines, land acquisition, financing, zoning approvals, and ongoing governmental subsidies. Consequently, preservation of existing affordable housing is widely recognized as a more economically efficient means of maintaining housing affordability than replacing affordable units after they have been lost.

60. Much of Philadelphia's naturally occurring affordable housing is owned and operated by small independent landlords rather than institutional real estate companies. Unlike large corporate housing providers, independent landlords frequently own only one or a small number of residential rental properties, personally manage their properties, and rely upon rental income to satisfy mortgages, taxes, insurance, maintenance expenses, and ongoing rehabilitation costs.

61. Because these housing providers generally operate with limited financial reserves and narrower operating margins than institutional landlords, increases in fixed compliance costs, administrative obligations, litigation expenses, licensing requirements, or interruptions in rental income consume a proportionally greater share of their available operating revenue. The economic viability of many small housing providers therefore depends upon a reasonably predictable legal and regulatory environment that permits continued investment in the maintenance and preservation of existing housing stock.

62. Accordingly, the long-term preservation of Philadelphia's affordable rental housing market depends not only upon protecting tenants but also upon maintaining the continued financial viability of the independent housing providers responsible for owning, maintaining, rehabilitating, and preserving much of the City's naturally occurring affordable housing. Plaintiffs allege that legislation materially affecting the economic viability of those housing providers necessarily affects the availability, quality, and long-term preservation of affordable housing throughout Philadelphia.

63. These properties provide housing opportunities for working families, senior citizens, individuals living on fixed incomes, and other residents whose incomes frequently exceed eligibility thresholds for subsidized housing but remain insufficient to afford newly constructed market-rate housing.

64. The preservation of Philadelphia's affordable housing supply depends not only upon constructing new housing but also upon maintaining and preserving existing naturally occurring affordable housing. Replacement of existing affordable rental units through new construction requires substantial public and private investment, extended development timelines, land acquisition, financing, zoning approvals, and ongoing governmental subsidies. Consequently, preservation of existing affordable housing is widely recognized as a more economically efficient means of maintaining housing affordability than replacing affordable units after they have been lost.

65. Much of Philadelphia's naturally occurring affordable housing is owned and operated by small independent landlords rather than institutional real estate companies. Unlike large corporate housing providers, independent landlords frequently own only one or a small number of residential rental properties, personally manage their properties, and rely upon rental income to satisfy mortgages, taxes, insurance, maintenance expenses, and ongoing rehabilitation costs. Because these housing providers generally operate with limited financial reserves and narrower operating margins than institutional landlords, increases in fixed compliance costs, administrative obligations, litigation expenses, licensing requirements, or interruptions in rental income consume a proportionally greater share of their available operating revenue. The economic viability of many small housing providers therefore depends

upon a reasonably predictable legal and regulatory environment that permits continued investment in the maintenance and preservation of existing housing stock.

66. Accordingly, the long-term preservation of Philadelphia's affordable rental housing market depends not only upon protecting tenants but also upon maintaining the continued financial viability of the independent housing providers responsible for owning, maintaining, rehabilitating, and preserving much of the City's naturally occurring affordable housing. Plaintiffs allege that legislation materially affecting the economic viability of those housing providers necessarily affects the availability, quality, and long-term preservation of affordable housing throughout Philadelphia.

**D. The Legislative Process and Defendants' Actual Notice**

67. During consideration of Bill No. 250329-AA (Phila. Apr. 23, 2026) and Bill No. 250330-AA (Phila. Apr. 23, 2026), Defendant Philadelphia City Council and its Committee on Housing, Neighborhood Development and the Homeless conducted multiple public hearings concerning the proposed legislation.

68. Plaintiffs personally attended those hearings and actively participated in the legislative process.

69. Plaintiffs appeared before City Council and its Committee to provide testimony concerning the anticipated legal, economic, and practical effects of the proposed legislation upon small independent housing providers, affordable housing, and Philadelphia neighborhoods.

70. Numerous additional small landlords, including African American landlords and other minority-owned housing providers, likewise appeared before Council to express similar concerns. Collectively, these speakers represented neighborhood-based housing providers responsible for maintaining substantial portions of Philadelphia's naturally occurring affordable housing.

71. Plaintiffs and other speakers consistently advised Defendants that the proposed legislation would substantially increase cumulative regulatory burdens through expanded compliance requirements, increased licensing consequences, additional administrative obligations, greater litigation exposure, expanded procedural barriers to recovering possession of residential property, increased operational costs, and prolonged interruptions in rental income.

72. Plaintiffs further advised Defendants that the cumulative effect of those additional obligations would fall disproportionately upon small independent landlords who lacked institutional economies of scale, dedicated compliance personnel, diversified investment portfolios, or access to substantial commercial financing.

73. Plaintiffs further advised Defendants that African American and other minority-owned, and marginalized, rental businesses would be especially affected because many continue to operate with fewer accumulated financial resources and more limited access to institutional capital as a consequence of longstanding historical barriers to property ownership and commercial lending.

74. Plaintiffs further presented evidence that weakening the financial viability of neighborhood-based housing providers would discourage continued investment in

naturally occurring affordable housing, increase pressure upon independent landlords to reduce investment or dispose of rental properties, accelerate consolidation of Philadelphia's rental housing market among larger institutional owners, diminish neighborhood-based ownership, and ultimately reduce affordable housing opportunities available to Philadelphia residents.

75. The testimony presented by Plaintiffs and other housing providers was consistent with the independent housing research referred to herein.

76. That research had identified the economic importance of preserving small independent housing providers, recommended reducing unnecessary regulatory complexity, and warned that preservation of naturally occurring affordable housing depends upon maintaining the continued participation of neighborhood-based landlords in Philadelphia's housing market.

77. Several speakers, including minority housing providers, were interrupted, prevented from completing prepared testimony, or afforded materially less opportunity to present their concerns than other participants in the legislative proceedings. Plaintiffs allege that testimony concerning the disproportionate effects upon small housing providers and minority-owned rental businesses received little meaningful consideration despite its consistency with the independent research before Defendants.

78. Accordingly, before enacting the challenged ordinances, Defendants possessed actual notice that the proposed legislation would foreseeably impose disproportionate economic burdens upon small independent landlords, particularly minority-owned

rental businesses, while simultaneously threatening the long-term preservation of naturally occurring affordable housing throughout Philadelphia.

79. Notwithstanding those warnings, Defendants proceeded to enact the challenged legislation substantially without adopting meaningful measures designed to preserve the continued economic viability of small housing providers or mitigate the foreseeable consequences identified through both public testimony and independent housing research.

### E. Procedural Irregularities During the Legislative Process

80. Plaintiffs further allege that portions of the legislative process failed to comply with the procedural requirements imposed by the Pennsylvania Sunshine Act, 65 Pa. Cons. Stat. §§ 701-716, and the Philadelphia Home Rule Charter.

81. Plaintiffs personally attended multiple relevant hearings related to the legislation at issue.

82. Based upon their personal observations, Plaintiffs observed that only approximately two (2) to three (3) Committee members were present during substantial portions of the hearings while official proceedings continued.

83. Plaintiffs further observed Committee members repeatedly entering and leaving the hearing room throughout the proceedings, resulting in extended periods during which fewer than four (4) Councilmembers were present while testimony, discussion, and other official business continued.

84. Plaintiffs personally observed official proceedings continue during multiple portions of the hearings despite what Plaintiffs understood to be the absence of a continuous quorum.

85. Plaintiffs further allege that material amendments affecting the challenged legislation were not made publicly available in sufficient time to permit meaningful public review before legislative action occurred.

86. Plaintiffs further allege that members of the public were not afforded a meaningful opportunity to review and comment upon the operative legislative language before Defendants proceeded toward enactment.

87. Photographs attached hereto as Exhibit "C" fairly and accurately depict portions of the hearings and corroborate Plaintiffs' observations regarding the absence of a continuous quorum.

88. Plaintiffs allege that these procedural deficiencies deprived both Plaintiffs and the public of the transparent legislative process required by Pennsylvania law and the Philadelphia Home Rule Charter.

### F. Enactment of the Challenged Ordinances

89. Following the legislative proceedings described above, Defendants enacted Bill No. 250329-AA (Phila. Apr. 23, 2026) and Bill No. 250330-AA (Phila. Apr. 23, 2026).

90. Collectively, the challenged ordinances substantially expand the legal and regulatory obligations governing the ownership, licensing, maintenance, management, leasing, and operation of residential rental property within the City of Philadelphia.

91. Among other things, the legislation imposes additional procedural requirements affecting landlord-tenant relationships, increases administrative obligations, expands licensing consequences, enlarges potential civil liability, broadens enforcement mechanisms, and materially alters the legal framework under which residential rental housing must be owned and operated.

92. Although many individual provisions appear limited when viewed in isolation, Plaintiffs are subject to the cumulative operation of the statutory scheme as enacted. Acting together, the challenged ordinances materially increase the financial, operational, legal, and administrative burdens associated with owning and operating small residential rental properties.

93. Those cumulative burdens include increased compliance costs, expanded administrative requirements, greater litigation exposure, increased licensing risks, prolonged delays affecting the recovery of possession, interruption of rental income, increased legal expenses, additional operational uncertainty, and greater costs associated with maintaining continued compliance.

94. Unlike institutional housing providers, Plaintiffs cannot distribute these additional costs across extensive real estate portfolios or absorb temporary operating losses through diversified investment capital or institutional financing. Every additional regulatory expense directly reduces the financial resources available to

maintain Plaintiffs' properties, satisfy mortgage obligations, preserve affordable housing, and continue reinvesting in Philadelphia neighborhoods.

### G. Plaintiffs' Present and Ongoing Injuries

95. Plaintiffs are presently subject to the challenged statutory scheme.

96. As owners and operators of residential rental property within Philadelphia, Plaintiffs must immediately alter the manner in which they own, manage, maintain, license, lease, and operate their properties in order to comply with the challenged legislation.

97. Plaintiffs have already incurred and continue to incur increased compliance costs, expanded administrative obligations, increased legal expenses, greater operational uncertainty, additional regulatory burdens, and increased exposure to administrative and judicial proceedings directly attributable to the challenged ordinances.

98. The challenged legislation further interferes with Plaintiffs' reasonable investment-backed expectations concerning the ownership and operation of their properties by substantially increasing the costs and burdens associated with exercising traditional incidents of private property ownership.

99. Because Plaintiffs personally own and manage only a limited number of residential rental properties, each additional regulatory burden consumes financial resources that otherwise would have been invested in maintenance, rehabilitation,

capital improvements, neighborhood reinvestment, and preservation of affordable housing.

100. The foreseeable consequences extend beyond Plaintiffs' individual businesses.

101. The challenged legislation increases financial pressure upon neighborhood-based housing providers to defer maintenance, postpone rehabilitation, reduce investment, dispose of rental properties, or withdraw from Philadelphia's rental housing market altogether.

102. As independent housing providers leave the market, Philadelphia's stock of naturally occurring affordable housing becomes increasingly vulnerable to deterioration, redevelopment, institutional acquisition, and permanent loss. Neighborhoods lose locally invested property owners. Opportunities for wealth preservation within historically marginalized communities diminish. Affordable housing options available to working families, seniors, and residents of modest means correspondingly decline.

103. Plaintiffs do not allege that protecting tenants is inconsistent with protecting landlords. Rather, Plaintiffs allege that sustainable affordable housing requires legislation that protects both tenants and the independent housing providers who supply that housing. Policies that render neighborhood-based housing providers economically unable to continue operating ultimately reduce housing availability and harm the very tenants such legislation seeks to protect.

104. Plaintiffs further allege that the challenged legislation threatens more than their individual economic interests. It threatens one of the principal mechanisms through

which historically marginalized communities, particularly African Americans, have been able to acquire, preserve, and transfer wealth through lawful ownership of income-producing real property. Simultaneously, it places at risk one of Philadelphia's largest sources of naturally occurring affordable housing. Rather than strengthening Philadelphia's housing ecosystem, Plaintiffs allege that the challenged legislation foreseeably weakens one of its essential components by undermining the continued participation of the independent housing providers upon whom much of the City's affordable housing supply depends.

105. As a direct and proximate result of Defendants' enactment and enforcement of the challenged ordinances, Plaintiffs have suffered and continue to suffer concrete, particularized, ongoing, and irreparable injuries that are fairly traceable to Defendants' conduct and redressable by the relief requested in this action.

### H. Defendants Enacted the Challenged Ordinances Despite Contrary Evidence in the Legislative Record

106. Before enacting Bills No. 250329-AA (Phila. Apr. 23, 2026) and Bill No. 250330-AA (Phila. Apr. 23, 2026), Defendants possessed substantial information concerning the foreseeable economic and housing-market consequences of the proposed legislation.

107. That information included testimony presented by Plaintiffs and numerous other independent housing providers during multiple public hearings, as well as the independent housing research referenced herein.

108. Research, clearly, accessible to Defendants, recognized that naturally occurring affordable housing constitutes one of Philadelphia's largest sources of affordable rental housing and that preservation of this housing depends substantially upon the continued economic viability of small, neighborhood-based housing providers.

109. The same research concluded that many owners of one or two rental properties operate with limited capital reserves, experience difficulty obtaining financing for repairs and improvements, and face significant challenges complying with increasingly complex regulatory requirements. Rather than recommending additional cumulative regulatory obligations, the research emphasized streamlined compliance procedures, technical assistance, expanded access to capital, and preservation strategies designed to maintain the continued participation of small housing providers in Philadelphia's housing market.

110. Plaintiffs and other speakers presented substantially similar information directly to Defendants during the legislative process. Plaintiffs advised Defendants that the proposed legislation would materially increase compliance costs, administrative burdens, litigation exposure, licensing risks, operational uncertainty, and delays associated with recovering possession of residential rental property. Plaintiffs further advised Defendants that these cumulative burdens would disproportionately affect small independent landlords and minority-owned rental businesses that lacked the institutional resources available to larger corporate housing providers.

111. Plaintiffs further explained that affordable housing and small housing providers are economically inseparable. They advised Defendants that Philadelphia's housing

market functions as an interconnected economic ecosystem in which the continued availability of naturally occurring affordable housing depends upon preserving the financial viability of the independent landlords who own, maintain, rehabilitate, and operate that housing.

112. Plaintiffs further advised Defendants that increasing cumulative regulatory burdens without corresponding preservation measures would discourage neighborhood-based investment, reduce maintenance and rehabilitation of aging housing stock, increase financial pressure upon small landlords to sell or withdraw from the rental housing market, accelerate market consolidation among institutional owners, and ultimately reduce the long-term supply of affordable housing available to Philadelphia residents.

113. Plaintiffs additionally advised Defendants that these foreseeable consequences would disproportionately affect African American landlords and other historically marginalized property owners because those communities continue to experience the lasting economic effects of historic discrimination in housing, mortgage lending, commercial credit, and wealth accumulation. Plaintiffs explained that ownership of small residential rental properties represents one of the principal means through which many African American families are able to preserve wealth, build equity, finance retirement, and create opportunities for future generations.

114. Accordingly, Defendants possessed actual notice that the challenged legislation would foreseeably impose disproportionate burdens upon small housing providers,

threaten neighborhood-based ownership, reduce preservation of naturally occurring affordable housing, and adversely affect both landlords and tenants.

115. Despite possessing this information, Defendants enacted the challenged ordinances without incorporating meaningful measures designed to preserve the continued economic viability of small housing providers or otherwise address the concerns repeatedly presented during the legislative process.

116. Plaintiffs contend that Defendants did not meaningfully address the testimony presented by Plaintiffs and other neighborhood-based housing providers concerning the foreseeable consequences of the challenged legislation.

117. As enacted, the challenged ordinances impose cumulative regulatory obligations upon the very class of housing providers identified by the independent research as essential to preserving Philadelphia's stock of naturally occurring affordable housing. Plaintiffs allege that Defendants proceeded with enactment despite substantial evidence demonstrating that the legislation would foreseeably weaken the economic foundation upon which much of Philadelphia's affordable housing ecosystem depends.

118. Accordingly, Plaintiffs allege that Defendants enacted the challenged ordinances with actual notice of the foreseeable consequences identified in the legislative record, including increased economic pressure upon small independent housing providers, diminished neighborhood-based ownership, reduced opportunities for wealth preservation within historically marginalized communities, and the long-term erosion of Philadelphia's naturally occurring affordable housing supply.

## CAUSES OF ACTION

### COUNT I
### DECLARATORY AND INJUNCTIVE RELIEF
### VIOLATION OF THE PENNSYLVANIA SUNSHINE ACT
### 65 Pa.C.S. §§ 701–716

119. Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

120. The Pennsylvania Sunshine Act embodies the Commonwealth's fundamental public policy that governmental deliberations, policy formulation, and official action occur openly so that citizens may observe, evaluate, and participate in governmental decision making before official action is taken.

121. Defendant Philadelphia City Council Committee on Housing, Neighborhood Development and the Homeless is an "agency" within the meaning of the Pennsylvania Sunshine Act and is therefore required to conduct its deliberations and official actions in meetings open to the public except as expressly authorized by statute.

122. The Sunshine Act requires that official action and deliberations by a quorum of an agency occur during public meetings and further requires that residents and taxpayers be afforded a reasonable opportunity to comment on matters before official action is taken.

123. As alleged herein, Defendants engaged in substantive deliberations concerning the challenged legislation outside publicly noticed meetings, formulated and revised amendments outside public view, failed to disclose the operative legislative language before Committee action, and denied Plaintiffs and other residents a meaningful opportunity to comment before official action was taken.

124. Plaintiffs further allege that substantive amendments to the challenged legislation were prepared, revised, and presented for official action without first being disclosed to

the public in sufficient time to permit meaningful review or participation, thereby frustrating the central purposes of the Sunshine Act.

125. Public comment provided only after official legislative action has already occurred does not satisfy the Sunshine Act's requirement that citizens have a reasonable opportunity to comment before official action is taken.

126. Plaintiffs were therefore deprived of their statutory right to observe governmental deliberations, evaluate the legislation actually under consideration, and meaningfully participate before official action occurred.

127. The procedural violations alleged herein were not harmless.

128. The challenged legislation directly regulates Plaintiffs' property rights, contractual relationships, business operations, and continued ability to own and operate affordable residential rental housing within the City of Philadelphia.

129. Compliance with the Sunshine Act was therefore especially important because the legislation substantially affects identifiable property owners whose legal and economic interests were directly implicated by the proposed ordinances.

130. Upon information and belief, the violations alleged herein were not isolated procedural irregularities but reflected an established course of conduct through which substantive legislative deliberations occurred outside public view before official action was subsequently ratified during publicly noticed proceedings.

131. Defendants thereafter proceeded to enact the challenged ordinances through a legislative process that Plaintiffs allege failed to comply with the mandatory requirements of the Pennsylvania Sunshine Act.

132. Plaintiffs are Philadelphia taxpayers, residents, and persons directly regulated by the challenged ordinances and therefore possess standing to seek declaratory and equitable relief under 65 Pa.C.S. § 713.

133. An actual and justiciable controversy exists concerning the validity of the legislative process through which the challenged ordinances were enacted and concerning Defendants' continuing enforcement of legislation that Plaintiffs allege was adopted in violation of mandatory statutory requirements.

134. Unless restrained by this Court, Defendants will continue enforcing ordinances enacted through proceedings that Plaintiffs allege violated the Pennsylvania Sunshine Act, thereby causing continuing injury to Plaintiffs and depriving them of rights guaranteed by Pennsylvania law.

135. Pursuant to 65 Pa.C.S. § 713, this Court possesses authority to declare invalid official action taken in violation of the Sunshine Act and to grant appropriate declaratory and injunctive relief where necessary to enforce the Act's requirements.

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Declare that Defendants violated the Pennsylvania Sunshine Act during the consideration and enactment of the challenged ordinances.

b. Declare that the official legislative actions taken in violation of the Pennsylvania Sunshine Act are invalid and without legal effect to the extent authorized by 65 Pa.C.S. § 713.

c. Enjoin Defendants from enforcing the challenged ordinances unless and until they are lawfully reenacted through proceedings conducted in compliance with the Pennsylvania Sunshine Act.

d. Award Plaintiffs their reasonable attorney's fees, litigation costs, and expenses as authorized by law.

e. Award such additional legal and equitable relief as this Court deems just and proper.

**COUNT II**
**DECLARATORY AND INJUNCTIVE RELIEF**
**VIOLATION OF THE PHILADELPHIA HOME RULE CHARTER**

136. Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

137. The Philadelphia Home Rule Charter is the organic law of the City of Philadelphia and constitutes the exclusive source of legislative authority exercised by the Philadelphia City Council.

138. The legislative powers delegated to the City Council by the Home Rule Charter may be exercised only in the manner prescribed by the Charter.

139. Compliance with the Charter's mandatory enactment procedures is therefore a condition precedent to the valid exercise of municipal legislative authority and is not merely directory or advisory.

140. Section 2-201 of the Home Rule Charter requires that proposed legislation be referred to committee, considered at a public hearing, reported by the committee, printed as reported, distributed to members of Council, and made available to the public before further legislative action may occur.

141. The Charter further requires that legislation materially amended during the legislative process be printed as amended and made available for the information of both Council members and the public before legislative action is taken.

142. These requirements are substantive limitations on the exercise of legislative authority and exist to ensure that elected officials, affected citizens, and the public are considering the same legislative text before official action is taken.

143. As alleged herein, Defendants materially amended the challenged legislation without first printing and making the operative amendments available to Council members, Plaintiffs, and the public as required by Section 2-201 of the Home Rule Charter.

144. Defendants further proceeded to Committee action on legislative language that had not been disclosed in the manner required by the Charter, thereby depriving Plaintiffs and the public of the opportunity to evaluate and respond to the legislation actually under consideration.

145. The ordinances ultimately enacted therefore were advanced through procedures that did not satisfy the mandatory conditions established by the Home Rule Charter for the lawful exercise of legislative authority.

146. These violations were substantive rather than technical because they affected the integrity of the legislative process itself and deprived Plaintiffs of the protections the Charter guarantees before municipal legislation may become law.

147. The challenged ordinances directly regulate Plaintiffs' ownership, leasing, management, and economic use of residential rental property and therefore substantially affect Plaintiffs' vested property interests and ongoing business operations.

148. Defendants' failure to comply with the mandatory procedural safeguards imposed by the Home Rule Charter exceeded the scope of the legislative authority delegated to City Council.

149. Legislative action taken without compliance with mandatory Charter requirements is ultra vires and cannot serve as a lawful basis for the continuing enforcement of municipal ordinances.

150. Despite these defects, Defendants enacted the challenged ordinances and continue to enforce them against Plaintiffs and similarly situated property owners.

151. Plaintiffs have suffered and continue to suffer concrete, particularized, and ongoing injuries as a direct result of Defendants' ultra vires legislative action, including increased regulatory burdens, interference with vested property rights, increased compliance costs, and continuing uncertainty regarding the ownership and operation of their rental properties.

152. An actual and justiciable controversy therefore exists concerning the validity of the challenged ordinances and Defendants' continuing authority to enforce legislation enacted in violation of the Philadelphia Home Rule Charter.

153. Unless restrained by this Court, Defendants will continue enforcing ordinances enacted in excess of the authority delegated to them under the Philadelphia Home Rule Charter, thereby causing continuing and irreparable injury to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Declare that Defendants violated the mandatory requirements of Section 2-201 of the Philadelphia Home Rule Charter during the enactment of the challenged ordinances.

b. Declare that the challenged ordinances were enacted in excess of the legislative authority delegated by the Philadelphia Home Rule Charter and are therefore ultra vires, invalid, and unenforceable.

c. Permanently enjoin Defendants from enforcing the challenged ordinances unless and until they are lawfully reenacted in compliance with the Philadelphia Home Rule Charter.

d. Award Plaintiffs all costs and attorney's fees authorized by law.

e. Grant such other legal and equitable relief as this Court deems just and proper.

**COUNT III**
**REGULATORY TAKING WITHOUT JUST COMPENSATION**
**42 U.S.C. § 1983**

154. Fifth and Fourteenth Amendments to the United States Constitution

155. Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

156. The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment, provides that private property shall not be taken for public use without just compensation.

157. Plaintiffs possess constitutionally protected property interests, including the rights to acquire, possess, lease, manage, exclude others from, control, and derive economically beneficial use from their residential rental properties.

158. Defendants, acting under color of state law, enacted and continue to enforce the challenged ordinances, which substantially interfere with those protected property interests.

159. Plaintiffs challenge the cumulative operation of the enacted statutory scheme rather than any isolated provision viewed in isolation.

160. Collectively, the challenged ordinances impose mandatory restrictions on lease termination and nonrenewal, substantially expand regulatory compliance obligations,

increase litigation exposure, enlarge administrative burdens, interfere with Plaintiffs' ability to recover possession of their property, and materially restrict Plaintiffs' practical ability to control, manage, and economically benefit from their residential rental properties.

**Economic Impact**

161. The challenged ordinances impose substantial economic burdens upon Plaintiffs by increasing compliance costs, delaying the recovery of possession, expanding litigation expenses, increasing administrative obligations, and requiring Plaintiffs to continue paying mortgages, property taxes, insurance premiums, utilities, maintenance expenses, and repair costs during periods in which rental income may be interrupted or materially delayed.

162. Those economic burdens are particularly significant because Plaintiffs are small, independently owned housing providers whose rental properties operate on limited margins and whose businesses depend upon the timely receipt of rental income and predictable enforcement of lease agreements.

163. Unlike institutional landlords, Plaintiffs cannot distribute increased regulatory costs across extensive portfolios, absorb prolonged operating losses through diversified sources of capital, or rely upon dedicated legal and compliance departments.

164. Consequently, regulatory burdens that may constitute ordinary operating expenses for institutional housing providers consume a materially greater percentage of Plaintiffs' operating revenue and directly impair their ability to continue owning, maintaining, and operating affordable residential rental housing.

**Reasonable Investment Backed Expectations**

165. Plaintiffs acquired, financed, rehabilitated, licensed, and maintained their properties in reliance upon the legal framework governing residential rental housing existing at the time of acquisition.

166. Plaintiffs reasonably expected that they would retain the fundamental incidents of property ownership historically recognized under Pennsylvania law, including the ability to determine whether to enter future lease agreements, recover possession of property upon lawful termination of tenancies, negotiate lease terms, maintain economically viable rental operations, and manage their properties subject to reasonable governmental regulation.

167. The challenged ordinances substantially interfere with those reasonable investment backed expectations by materially altering the legal framework governing residential leasing after Plaintiffs made substantial financial investments in their properties.

168. Plaintiffs have devoted significant personal labor, financial resources, and capital toward acquiring, rehabilitating, maintaining, and preserving residential rental housing in Philadelphia in reliance upon those settled expectations.

**Character of the Government Action**

169. Plaintiffs acknowledge that the City possesses broad authority to regulate residential housing in furtherance of legitimate public health, safety, and welfare objectives.

170. That authority, however, remains subject to the limitations imposed by the Takings Clause, which prohibits government from requiring individual property owners to bear burdens that, in fairness and justice, should be borne by the public as a whole.

171. As applied to Plaintiffs, the challenged ordinances substantially alter the legal relationship between landlord and tenant by restricting Plaintiffs' ability to determine whether and under what circumstances possession of their property may be recovered, materially increasing the costs of operating residential rental property, expanding regulatory obligations, and reallocating significant economic burdens to a discrete class of small local housing providers.

172. Those burdens do not operate independently. Rather, each additional restriction compounds the effect of every other restriction, increasing the overall economic impact of the statutory scheme, further interfering with Plaintiffs' reasonable investment backed expectations, and diminishing the practical rights traditionally associated with ownership of residential rental property.

173. The cumulative effect of the challenged ordinances is especially severe for Plaintiffs because they are small African American landlords who lack the economies of scale, institutional financing, compliance infrastructure, and diversified portfolios available to large institutional housing providers.

174. The cumulative operation of the challenged ordinances, as applied to these Plaintiffs and their properties, exceeds the constitutional limits identified in Penn Central by imposing extraordinary economic burdens upon a small class of property owners without providing compensation.

**Penn Central Factors**

175. Considering the substantial economic impact of the challenged ordinances upon Plaintiffs, their significant interference with Plaintiffs' reasonable investment backed expectations, and the character of the governmental action, Plaintiffs have plausibly

alleged a compensable regulatory taking under the framework articulated in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).

176. The challenged ordinances substantially interfere with fundamental incidents of ownership, including possession, exclusion, leasing, management, and economically beneficial use, while imposing cumulative burdens that are disproportionately borne by Plaintiffs without the payment of just compensation. Plaintiffs do not seek exemption from reasonable regulation. Plaintiffs acknowledge that the City possesses legitimate authority to protect tenant health, safety, and housing stability. Plaintiffs instead allege that the challenged legislation exceeds constitutional limits because it imposes cumulative burdens upon a discrete class of small housing providers that the legislative record itself identified as essential to preserving Philadelphia's affordable housing supply.

177. Defendants have neither provided nor offered just compensation for these substantial interferences with Plaintiffs' constitutionally protected property interests.

178. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer substantial economic injury, interference with constitutionally protected property rights, diminished property value, impairment of reasonable investment backed expectations, and continuing irreparable harm.

179. Defendants' continued enforcement of the challenged ordinances therefore effects an unconstitutional regulatory taking of Plaintiffs' property without just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution and is actionable pursuant to 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Declare that the challenged ordinances, as applied to Plaintiffs and in their cumulative operation, effect an unconstitutional regulatory taking without just compensation in violation of the Fifth and Fourteenth Amendments.

b. Permanently enjoin Defendants from enforcing the challenged ordinances against Plaintiffs unless and until they are enforced in a manner consistent with the United States Constitution.

c. Award Plaintiffs just compensation to the extent required by the Fifth Amendment and applicable law.

d. Award Plaintiffs their reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

e. Grant such other legal and equitable relief as this Court deems just and proper.

**COUNT IV**
**VIOLATION OF SUBSTANTIVE DUE PROCESS**
**42 U.S.C. § 1983**

180. Fourteenth Amendment to the United States Constitution

181. Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

182. The Fourteenth Amendment prohibits state and local governments from depriving any person of property without due process of law.

183. Plaintiffs possess constitutionally protected property interests in the ownership, possession, leasing, management, operation, and economically beneficial use of their residential rental properties.

184. Defendants, acting under color of state law, enacted and continue to enforce the challenged ordinances, which substantially burden those protected property interests.

185. Plaintiffs acknowledge that the City possesses broad authority to regulate residential housing in furtherance of legitimate public health, safety, and welfare objectives.

186. The exercise of that authority, however, remains subject to constitutional limitations. Government regulation affecting protected property interests must bear a real and substantial relationship to the governmental interests asserted and may not impose arbitrary or unreasonable burdens upon a discrete class of property owners.

187. Plaintiffs do not challenge the City's stated objective of improving housing conditions or promoting housing stability.

188. Rather, Plaintiffs allege that, as applied to them and in its cumulative operation, the challenged statutory scheme employs regulatory mechanisms that predictably undermine those objectives by imposing disproportionate burdens upon the very class of housing providers responsible for maintaining a substantial portion of Philadelphia's naturally occurring affordable housing.

189. The challenged ordinances operate cumulatively rather than independently.

190. Together, they substantially increase compliance costs, expand administrative obligations, increase litigation exposure, delay the recovery of possession, restrict Plaintiffs' ability to determine whether and under what conditions their properties may continue to be leased, and materially increase the cost of operating residential rental housing.

191. Each additional obligation compounds every other obligation, producing cumulative burdens substantially greater than the effect of any individual provision considered in isolation.

192. Independent research available before enactment recognized that Philadelphia's supply of naturally occurring affordable housing depends heavily upon small local landlords operating with limited capital reserves and further concluded that preservation of affordable housing requires reducing unnecessary administrative complexity, streamlining compliance, and expanding technical and financial assistance for those property owners.

193. The challenged ordinances instead substantially increase fixed compliance costs and operational burdens imposed upon that same class of housing providers.

194. Plaintiffs are small African American landlords who personally own, manage, maintain, and rehabilitate residential rental housing.

195. Unlike institutional housing providers, Plaintiffs lack access to institutional financing, diversified real estate portfolios, dedicated compliance personnel, and in-house legal departments capable of absorbing cumulative regulatory burdens.

196. Consequently, identical regulatory requirements impose materially greater economic burdens upon Plaintiffs than upon institutional landlords.

197. Those disproportionate burdens foreseeably reduce Plaintiffs' ability to continue investing in, maintaining, and operating naturally occurring affordable housing.

198. The challenged ordinances therefore operate in a manner that predictably reduces the long-term availability of naturally occurring affordable housing, increases pressure upon small landlords to reduce investment or exit the market, and undermines the City's stated objective of promoting housing stability.

199. As applied to Plaintiffs, the cumulative operation of the challenged ordinances therefore bears no real or substantial relationship to preserving affordable housing because the regulatory means selected predictably impair the continued viability of the very housing providers upon whom that objective substantially depends.

200. Plaintiffs further allege that the challenged ordinances arbitrarily allocate a disproportionate share of the economic burden associated with the City's housing policies to a discrete class of small local property owners while institutional housing providers remain materially better positioned to absorb identical regulatory obligations.

201. The cumulative burdens imposed upon Plaintiffs are excessive in relation to the governmental interests asserted and substantially interfere with Plaintiffs' protected property interests in a manner that is arbitrary as applied to these Plaintiffs.

202. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered and continue to suffer deprivation of constitutionally protected property interests, substantial economic injury, interference with their ability to continue providing affordable housing, and continuing irreparable harm.

203. Defendants' continued enforcement of the challenged ordinances therefore deprives Plaintiffs of substantive due process in violation of the Fourteenth Amendment and is actionable pursuant to 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Declare that the challenged ordinances, as applied to Plaintiffs and in their cumulative operation, violate the Due Process Clause of the Fourteenth Amendment.

b. Permanently enjoin Defendants from enforcing the challenged ordinances against Plaintiffs.

c. Award Plaintiffs reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

d. Grant such other legal and equitable relief as this Court deems just and proper.

**COUNT V**
**VIOLATION OF THE EQUAL PROTECTION CLAUSE**
**42 U.S.C. § 1983**

204. Fourteenth Amendment to the United States Constitution

205. Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

206. The Equal Protection Clause of the Fourteenth Amendment guarantees that no State shall deny any person within its jurisdiction the equal protection of the laws.

207. Plaintiffs Seth Floyd and Erica Hadley are African American citizens of the United States, residents of the City of Philadelphia, taxpayers, and small residential housing providers subject to the challenged ordinances.

208. Plaintiffs do not allege that the challenged ordinances expressly classify persons on the basis of race.

209. Rather, Plaintiffs allege that Defendants enacted and continue to enforce a facially neutral statutory scheme whose cumulative operation imposes foreseeable and disproportionate burdens upon African American small landlords, including Plaintiffs.

210. Prior to enactment of the challenged ordinances, publicly available research documented that Philadelphia's naturally occurring affordable housing is supplied primarily by small local landlords operating with limited capital, modest operating margins, and limited administrative resources.

211. Publicly available research further documented that African American landlords disproportionately face barriers to commercial lending, access to capital, wealth accumulation, and financial reserves, rendering them materially less able than institutional housing providers to absorb significant fixed regulatory costs and cumulative compliance burdens.

212. Those economic realities were directly relevant to legislation imposing increased compliance obligations, expanded litigation exposure, additional licensing consequences, restrictions upon the recovery of possession, and increased operational costs for residential landlords.

213. During multiple public hearings preceding enactment of the challenged ordinances, Plaintiffs and numerous other small residential landlords, including African American landlords and other landlords of color, personally advised Defendants that the proposed legislation would disproportionately burden minority owned rental businesses because fixed compliance costs, expanded litigation exposure, licensing risks, and cumulative regulatory obligations fall materially more heavily upon small property owners than upon institutional housing providers.

214. These speakers further warned that the proposed legislation would discourage continued investment in naturally occurring affordable housing, increase pressure upon minority landlords to sell locally owned rental properties or withdraw from the rental housing market, and accelerate consolidation of residential housing ownership among larger institutional investors.

215. Several of these speakers were interrupted before completing their testimony, prevented from presenting all of their prepared remarks, or afforded materially less

opportunity to address the legislative body than other participants during the legislative process.

216. Defendants nevertheless possessed actual notice, through repeated public testimony, written submissions, publicly available housing research, and the legislative record itself, that the challenged ordinances would foreseeably impose materially greater burdens upon African American small landlords than upon institutional housing providers.

217. Despite that actual notice, Defendants enacted the challenged ordinances substantially without reducing the cumulative regulatory burdens identified during the legislative process or adopting measures reasonably designed to mitigate their foreseeable disproportionate impact upon minority owned rental businesses.

218. Defendants likewise declined to adopt alternative approaches presented during the legislative process that would have advanced legitimate tenant protections while reducing the cumulative burdens imposed upon small locally owned housing providers and preserving naturally occurring affordable housing.

219. Plaintiffs are African American small landlords who personally own, manage, rehabilitate, and maintain residential rental properties within the City of Philadelphia.

220. Unlike institutional housing providers, Plaintiffs lack dedicated compliance personnel, in house legal departments, institutional financing, diversified real estate portfolios, and the economies of scale necessary to absorb cumulative regulatory costs without materially impairing the viability of their rental businesses.

221. Consequently, identical regulatory obligations consume a materially greater percentage of Plaintiffs' operating revenue, substantially impair Plaintiffs' ability to

continue providing affordable housing, and place Plaintiffs at a competitive disadvantage relative to institutional housing providers.

222. The sequence of events preceding enactment, Defendants' repeated notice that the challenged ordinances would disproportionately burden African American small landlords, the procedural irregularities alleged elsewhere in this Complaint, and Defendants' decision to proceed without materially addressing those concerns provide circumstantial evidence relevant to whether the challenged ordinances, as applied to Plaintiffs, deny Plaintiffs the equal protection of the laws.

223. As applied to Plaintiffs, the challenged ordinances impose cumulative burdens that deny Plaintiffs the equal protection of the laws guaranteed by the Fourteenth Amendment.

224. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and continue to suffer increased compliance costs, expanded regulatory burdens, interference with constitutionally protected property interests, diminished economic opportunities, competitive disadvantage within the residential rental housing market, and continuing irreparable harm.

225. Defendants' continued enforcement of the challenged ordinances therefore violates Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment and is actionable pursuant to 42 U.S.C. § 1983.

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Declare that the challenged ordinances, as applied to Plaintiffs, violate the Equal Protection Clause of the Fourteenth Amendment.

b. Permanently enjoin Defendants from enforcing the challenged ordinances against Plaintiffs.

c. Award Plaintiffs their reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988.

d. Grant such other legal and equitable relief as this Court deems just and proper.

**COUNT VI**
**VIOLATION OF THE CONTRACTS CLAUSE**
**U.S. CONSTITUTION ARTICLE I, SECTION 10**
**42 U.S.C. § 1983**

226. Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

227. Article I, Section 10 of the United States Constitution provides that no State shall pass any law impairing the obligation of contracts.

228. Plaintiffs own residential rental properties that are subject to existing written lease agreements executed before the enactment of the challenged ordinances.

229. Those lease agreements contain negotiated provisions governing lease duration, renewal, termination, possession, and the rights and obligations of landlords and tenants upon expiration of the lease term.

230. At the time those agreements were executed, Pennsylvania law recognized the parties' ability to negotiate and enforce those contractual provisions.

231. The challenged ordinances materially impair those existing contractual relationships by rendering negotiated lease provisions governing termination and nonrenewal unenforceable, compelling continuation of landlord tenant relationships beyond the terms agreed upon by the parties, and substituting mandatory statutory provisions for privately negotiated contractual rights.

232. The challenged ordinances therefore substantially impair Plaintiffs' contractual rights and materially alter the legal and economic expectations upon which Plaintiffs acquired, financed, maintained, and leased their properties.

233. Plaintiffs acknowledge that the City possesses legitimate interests in promoting housing stability and protecting tenants.

234. As applied to Plaintiffs, however, the substantial impairment of existing contractual relationships is neither reasonable nor appropriately tailored because the challenged ordinances impose sweeping mandatory restrictions regardless of the individual circumstances of the tenancy, the property, or the parties' negotiated agreements.

235. The challenged ordinances alter existing contractual obligations after execution of the lease agreements, deprive Plaintiffs of contractual remedies previously available under Pennsylvania law, and fundamentally alter the parties' allocation of contractual rights and risks.

236. Less restrictive alternatives were identified during the legislative process, including targeted tenant protections and measures supporting naturally occurring affordable housing without substantially impairing existing contractual rights.

237. Defendants nevertheless enacted the challenged ordinances substantially without adopting those alternatives.

238. As a direct and proximate result, Plaintiffs have suffered substantial impairment of existing contractual rights, economic injury, diminished property interests, and continuing irreparable harm.

239. Defendants have therefore violated the Contracts Clause of Article I, Section 10 of the United States Constitution.

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Declare that the challenged ordinances, as applied to Plaintiffs, violate the 42 U.S.C. § 1983.

b. Permanently enjoin Defendants from enforcing the challenged ordinances against Plaintiffs.

c. Award Plaintiffs their reasonable attorney's fees and costs.

d. Grant such other legal and equitable relief as this Court deems just and proper.

**COUNT VII**
**VIOLATION OF ARTICLE I, SECTION 1 OF THE PENNSYLVANIA CONSTITUTION**
**DECLARATORY AND INJUNCTIVE RELIEF**

240. Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

241. Article I, Section 1 of the Pennsylvania Constitution declares that all persons possess inherent and indefeasible rights, including the rights of acquiring, possessing, and protecting property.

242. These constitutional protections safeguard the fundamental rights of property ownership, including the right to acquire, possess, lease, manage, maintain, improve, protect, and economically benefit from privately owned property, subject only to lawful and reasonable governmental regulation.

243. Plaintiffs own residential rental properties within the City of Philadelphia and therefore possess constitutionally protected property interests under Article I, Section 1 of the Pennsylvania Constitution.

244. Defendants enacted and continue to enforce the challenged ordinances under color of municipal authority.

245. The challenged ordinances, considered collectively and as applied to Plaintiffs, substantially interfere with Plaintiffs' ability to possess, manage, lease, control, and derive economically beneficial use from their residential rental properties.

246. Collectively, the challenged ordinances impose expanded compliance obligations, increased administrative burdens, increased litigation exposure, restrictions upon lease termination and nonrenewal, increased delays in recovering possession of residential property, and additional operating costs that materially impair Plaintiffs' ability to continue operating affordable rental housing.

247. Those cumulative burdens fall with particular force upon Plaintiffs because they are small African American landlords who personally own, maintain, rehabilitate, and manage their rental properties without the institutional resources available to large corporate housing providers.

248. Unlike institutional landlords, Plaintiffs lack diversified real estate portfolios, institutional financing, dedicated compliance departments, and in-house legal resources capable of absorbing substantial cumulative regulatory burdens.

249. Consequently, identical regulatory obligations consume a materially greater percentage of Plaintiffs' operating revenue, impair Plaintiffs' ability to reinvest in their properties, and threaten Plaintiffs' continued ownership and operation of naturally occurring affordable housing.

250. Prior to enactment of the challenged ordinances, Defendants received repeated public testimony from Plaintiffs and numerous other small landlords, including African American landlords and other landlords of color, warning that the cumulative effect of the proposed legislation would disproportionately burden minority-owned rental

businesses, discourage continued investment in affordable housing, and increase pressure upon small landlords to sell their properties or exit the market.

251. Defendants nevertheless enacted the challenged ordinances substantially without reducing the cumulative burdens identified during the legislative process or adopting reasonable alternatives designed to preserve naturally occurring affordable housing while protecting tenants.

252. As applied to Plaintiffs, the cumulative operation of the challenged ordinances unreasonably interferes with Plaintiffs' inherent constitutional rights to acquire, possess, protect, manage, and enjoy their private property as guaranteed by Article I, Section 1 of the Pennsylvania Constitution.

253. Plaintiffs have suffered and continue to suffer substantial economic injury, impairment of fundamental property rights, diminished investment-backed expectations, reduced economic opportunities, and continuing irreparable harm.

254. An actual and justiciable controversy exists concerning Defendants' continued enforcement of the challenged ordinances in violation of Article I, Section 1 of the Pennsylvania Constitution.

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Declare that the challenged ordinances, as applied to Plaintiffs and in their cumulative operation, violate Article I, Section 1 of the Pennsylvania Constitution.

b. Permanently enjoin Defendants from enforcing the challenged ordinances against Plaintiffs.

c. Award Plaintiffs such costs and attorney's fees as authorized by law.

d. Grant such other legal and equitable relief as this Court deems just and proper.

## COUNT VIII
## VIOLATION OF ARTICLE I, SECTION 26 OF THE PENNSYLVANIA CONSTITUTION
## DECLARATORY AND INJUNCTIVE RELIEF

255. Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

256. Article I, Section 26 of the Pennsylvania Constitution provides that neither the Commonwealth nor any political subdivision shall deny to any person the enjoyment of any civil right or discriminate against any person in the exercise of any civil right.

257. Plaintiffs Seth Floyd and Erica Hadley are African American citizens, Philadelphia taxpayers, and small residential housing providers who own and operate residential rental property within the City of Philadelphia.

258. Plaintiffs possess constitutionally protected rights to acquire, possess, manage, lease, protect, and enjoy their private property as guaranteed by the Pennsylvania Constitution.

259. The challenged ordinances apply facially to all residential landlords.

260. As applied to Plaintiffs, however, the cumulative operation of the challenged ordinances imposes materially greater burdens upon African American small landlords than upon institutional housing providers because fixed compliance costs, expanded administrative obligations, increased litigation exposure, licensing consequences, and restrictions affecting possession consume a substantially greater percentage of Plaintiffs' available financial resources.

261. Prior to enactment of the challenged ordinances, Defendants received repeated testimony from Plaintiffs and numerous other African American landlords and other landlords of color advising that the proposed legislation would disproportionately burden minority-owned rental businesses, discourage continued investment in naturally occurring affordable housing, increase pressure upon minority landlords to sell their properties or leave the rental market, and accelerate consolidation of residential housing ownership among larger institutional investors.

262. Those concerns were further supported by publicly available housing research documenting the importance of small landlords to Philadelphia's supply of naturally occurring affordable housing and the financial constraints disproportionately affecting minority housing providers.

263. Defendants therefore possessed actual notice before enactment that the challenged ordinances would foreseeably impose substantially greater burdens upon African American small landlords than upon institutional housing providers.

264. Despite that notice, Defendants enacted the challenged ordinances substantially without modifying the cumulative burdens identified during the legislative process or adopting reasonable alternatives designed to mitigate their foreseeable disproportionate impact upon minority-owned rental businesses.

265. Several African American landlords and other landlords of color who appeared during the legislative process were interrupted, prevented from completing prepared testimony, or afforded materially less opportunity to address the legislative body than other participants, notwithstanding that they were presenting information directly relevant to the foreseeable operation of the proposed legislation.

266. Plaintiffs allege that the sequence of events preceding enactment, the repeated warnings presented during the legislative process, Defendants' actual notice of the foreseeable disproportionate burdens upon minority housing providers, the procedural irregularities alleged elsewhere in this Complaint, and Defendants' decision to proceed substantially without addressing those concerns demonstrate that the challenged ordinances operate in a manner that denies Plaintiffs the equal enjoyment of rights secured by Article I, Section 26 of the Pennsylvania Constitution.

267. As African American small landlords, Plaintiffs have suffered and continue to suffer increased compliance costs, expanded regulatory burdens, diminished economic opportunities, impairment of their ability to continue providing naturally occurring affordable housing, competitive disadvantage relative to institutional housing providers, and continuing irreparable harm.

268. An actual and justiciable controversy exists concerning Defendants' continued enforcement of the challenged ordinances in violation of Article I, Section 26 of the Pennsylvania Constitution.

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Declare that the challenged ordinances, as applied to Plaintiffs, violate Article I, Section 26 of the Pennsylvania Constitution.

b. Permanently enjoin Defendants from enforcing the challenged ordinances against Plaintiffs.

c. Award Plaintiffs all costs and attorney's fees as authorized by law.

d. Grant such further legal and equitable relief as this Court deems just and proper.

Case 2:26-cv-02403-AWB Document 30 Filed 08/12/26 Page 110 of 144

## COUNT IX MUNICIPAL LIABILITY
## 42 U.S.C. § 1983
## MONELL CLAIM

269. Plaintiffs incorporate by reference each preceding paragraph of this Complaint as though fully set forth herein.

270. Defendant City of Philadelphia is a municipal corporation organized under the laws of the Commonwealth of Pennsylvania and is a "person" within the meaning of 42 U.S.C. § 1983.

271. At all relevant times, the actions challenged in this Complaint were undertaken under color of state law.

272. The challenged ordinances were enacted by the Philadelphia City Council and approved by the Mayor pursuant to the City's final legislative authority.

273. The enactment of municipal ordinances by City Council constitutes official municipal policy attributable to the City of Philadelphia.

274. The constitutional deprivations alleged in this Complaint were not isolated acts of individual employees or subordinate officials.

275. Rather, they arose directly from the City's officially adopted legislative enactments and the deliberate decision of the City's final policymakers to enact and continue enforcing the challenged ordinances.

276. The City continues to enforce the challenged ordinances against Plaintiffs through its departments, agencies, officers, employees, and agents acting pursuant to official municipal policy.

277. As alleged throughout this Complaint, the challenged ordinances, individually and in their cumulative operation, violate Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution.

278. Those constitutional violations include, but are not limited to:

i. The taking of protected property interests without just compensation.

ii. The deprivation of substantive due process.

iii. The denial of equal protection of the laws.

iv. The impairment of contractual rights protected by Article I, Section 10 of the United States Constitution.

279. Because the challenged conduct arises from official legislative enactments adopted by the City's final policymakers, municipal liability attaches pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

280. As a direct and proximate result of the City's official policies, Plaintiffs have suffered and continue to suffer constitutional injury, economic loss, impairment of protected property rights, increased compliance costs, diminished investment-backed expectations, interference with existing contractual relationships, and continuing irreparable harm.

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Enter judgment in favor of Plaintiffs and against Defendant City of Philadelphia on Plaintiffs' federal constitutional claims.

b. Declare that the City's official policies embodied in the challenged ordinances violate the United States Constitution.

c. Permanently enjoin enforcement of the challenged ordinances.

d. Award Plaintiffs all relief authorized under 42 U.S.C. §§ 1983 and 1988, including reasonable attorney's fees and costs.

e. Award such further legal and equitable relief as this Court deems just and proper.

Respectfully submitted

PEARSON LAW GROUP LLC



Briana Lynn Pearson, Esquire
*Attorneys for PlaintiffS*

Dated: July 21, 2026

**<u>JURY DEMAND</u>**

Please take notice that Plaintiffs hereby demand a trial by jury as to all issues.

Respectfully requested

PEARSON LAW GROUP LLC

____________________________
Briana Lynn Pearson, Esquire
*Attorneys for Plaintiffs*

Dated: July 21, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of July, 2026, a true and correct copy of the foregoing **Second Amended Complaint** was electronically filed with the Clerk of Court using the Court's CM/ECF system, which will automatically send notification of such filing to all counsel of record who are registered CM/ECF users.

Respectfully submitted

PEARSON LAW GROUP LLC



____________________________

Briana Lynn Pearson, Esquire
*Attorneys for PlaintiffS*

Dated: July 21, 2026

# Exhibit A

# City of Philadelphia

(Bill No. 250329-AA)

AN ORDINANCE

Amending Chapter 9-3900 of The Philadelphia Code, entitled "Property Licenses and Owner Accountability," to clarify licensing requirements, authorize the Department to create a Proactive Inspection program, require public reporting related to Code compliance, and establish remedies, damages, and protections for tenants, all under certain terms and conditions.

*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*

SECTION 1. Legislative Findings. Council finds that:

(1) A safe, habitable, and well-maintained home is a fundamental necessity for health, stability, and economic mobility. Yet, too many rental properties in Philadelphia fail to meet basic standards of habitability. Approximately 40% of Philadelphia rental homes need repairs and 30-45% of rental units operate without proper licensing, exposing tenants to unsafe, unfit, and imminently dangerous conditions.

(2) Philadelphia is trending toward a majority-renter city, with approximately half of all households currently renting their homes. More than half of these renters are cost-burdened, paying more than 30% of their income toward rent, limiting their ability to absorb additional housing instability or pursue legal remedies when conditions deteriorate.

(3) Existing enforcement mechanisms rely heavily on tenant complaints, placing the burden on tenants to identify, report, and pursue remedies for violations, often at personal risk. This reactive system allows serious code violations to persist undetected and unaddressed for extended periods. Furthermore, tenants consistently face retaliation for speaking out about unsafe conditions.

(4) A majority of tenants lack access to legal representation or the financial means to enforce their rights, resulting in widespread under-enforcement of existing housing standards and allowing non-compliant landlords to continue collecting rent despite failing to maintain habitable properties. In eviction court, 80-85% of landlords have legal representation while only 5-8% of tenants do.

(5) The current rental licensing system does not adequately ensure ongoing compliance with housing standards, nor does it provide sufficient transparency to tenants regarding the condition and legal status of their housing.

(6) Strengthening licensing requirements, establishing proactive inspections, improving transparency, and creating meaningful enforcement mechanisms, including a private right of

# City of Philadelphia



action, are necessary to ensure that all rental housing meets basic standards of safety and habitability.

(7) Tenant advocates report a myriad of eviction filings in Philadelphia Municipal Court, and in many cases, eviction judgments entered against tenants, for properties where there are open code violations and deficiencies in rental licenses and certificates of rental suitability.

(8) It is the intent of Council to shift from a reactive, complaint-driven system to a proactive and accountable framework that ensures compliance before harm occurs, empowers tenants to enforce their rights, and aligns economic incentives so that bad actor landlords cannot continue to profit from unsafe or unlawful conditions.

(9) These reforms are necessary to protect public health, reduce displacement, and promote housing stability in Philadelphia's housing system.

SECTION 2. Title 9 of The Philadelphia Code is hereby amended to read as follows:

TITLE 9. REGULATION OF BUSINESSES, TRADES AND PROFESSIONS

* * *

CHAPTER 9-3900. PROPERTY LICENSES AND OWNER ACCOUNTABILITY

* * *

§ 9-3901. General Provisions.

* * *

(2) Application and Issuance. In addition to the provisions set forth in Subcode A of Title 4, the following provisions shall also apply to licenses required by this Chapter:

(a) An applicant for a new license or the renewal of a license shall complete an application provided by the Department. *The license shall be considered effective from the date specified on the license.* The application shall contain the following information, and such other information as the Department may require:

* * *

(b) *An applicant shall not be eligible for a new rental license or renewal, nor shall* [T]*t*he Department [shall] issue or renew a license [if] *unless* it finds:

* * *

# City of Philadelphia



*(d) If a license is issued while an appeal of a violation is pending, the relevant violation is affirmed on appeal, and all relevant appeals have been exhausted, the Department may suspend the license.*

*(e) The owner shall, within 7 days of receipt, either post the results of any appeal covered by this Section in a conspicuous place clearly visible to all impacted tenants or deliver it to all impacted tenants either personally or by first class mail.*

* * *

(4) Non-compliance, Private Right of Action and Suspension. In addition to the provisions for license suspension set forth in Subcode A of Title 4, the following provisions shall also apply to licenses required by this Chapter:

(a) The Department is authorized to immediately suspend a license if a property is deemed unfit or unsafe or imminently dangerous.

*(b) Any owner who is required to obtain or renew a rental license shall, within 7 days of receipt, provide a copy of that rental license, together with a restatement of subsection 9-3901(4)(h), to all tenants in the following manner. The owner shall either (i) post the rental license and restatement of subsection 9-3901(4)(h) in a conspicuous place clearly visible to all tenants or (ii) deliver a copy of the rental license, together with a restatement of subsection 9-3901(4)(h), to each tenant either personally or by certified mail. For properties containing one (1) or two (2) dwelling units, the owner may also provide the rental license and restatement of subsection 9-3901(4)(h) by e-mail, provided that the tenant has affirmatively consented in writing to receive such notices by e-mail, has provided an e-mail address for that purpose, and has not revoked such consent. A tenant may revoke consent to receive notices by e-mail at any time by written notice to the owner, and upon such revocation, the owner shall provide notice by another method authorized under this Section.*

*(c) Any owner who receives a notice of violation from the Department stating that (i) a property or unit is unsafe, unfit, or imminently dangerous as defined in Sections PM-108, PM-109, or PM-110, or (ii) a property or unit violates the Philadelphia Fire Code, shall provide notice to all impacted tenants by posting a copy of the notice of violation, and any subsequent inspection reports or appeals, in a conspicuous location on the premises clearly visible to impacted tenants, or by delivering such notice personally or by first class mail.*

*Such notice shall be provided no later than twenty-four (24) hours prior to the deadline for correction stated in the notice of violation. If the violation is fully corrected within the time permitted by the Department, no tenant notice shall be required under this subsection.*

# City of Philadelphia



*(d) Any owner who receives a notice of license suspension shall, within 7 days of receipt, either post a copy of that notice in a conspicuous place clearly visible to all impacted tenants or deliver it to all impacted tenants either personally or by first class mail.*

[(b)] *(e)* The Department is authorized to suspend a license at the request of the District Attorney with respect to any property subject to forfeiture to the Commonwealth under the provisions of 42 Pa. C.S. § 6801 or other applicable law.

[(c)] *(f)* A license issued may be suspended by the Department for failure to comply with the requirements of this Code after a re-inspection has been made to determine compliance pursuant to Section A-503.1 of Subcode A, *provided an appeal is not in the process of being reviewed,* or for failure to pay any fine and/or cost imposed under this Chapter or Subcode A, and such suspension shall continue until there has been compliance and until any unpaid fines and costs have been paid.

[(d)] *(g)* The Department shall provide written notice and an opportunity for a hearing prior to any suspension of a license under this Section.

[(e)] *(h)* Non-compliance. Any owner who fails to obtain a *valid* rental license as required by Section 9-3902, *who fails to obtain a valid* [to comply with Section 9-3903 regarding a] Certificate of Rental Suitability *as required by Section 9-3903*, *who fails to correct code violations as described in Section 9-3903(2)(d)*, or whose rental license has been suspended shall be denied the right to recover possession of the premises or to collect rent during or for the period of noncompliance or during or for the period of license suspension. In any action for eviction or collection of rent, the owner shall attach a copy of the license*, copies of all Certificates of Rental Suitability required by Section 9-3903 and copies of all code violations issued with respect to the rental unit and/or property during the relevant tenancy.*

[(f)] *(i)* Private Right of Action. Any [tenant of any property] *person* subject to the provisions of this Chapter shall have the right to bring an action against the owner of such property to compel compliance with this Chapter *and to seek relief as provided in this Section*. [Such private right of action neither limits nor expands the rights of private parties to pursue any legal rights and claims they may possess under a written agreement or at Common Law.] *A prevailing tenant shall be entitled to the following remedies:*

*(.1) Compensatory damages for any harm caused by any non-compliance or liquidated damages in the amount of $1,000 per violation, whichever is greater. Liquidated damages under this subsection are intended to make the tenant whole and to compensate the tenant for collateral harms suffered as a result of the violation and for the tenant's time and effort enforcing the rights afforded to the tenant under this Chapter. Each separate occurrence or instance of a prohibited action shall constitute a separate violation; A continuing violation arising from the same underlying condition shall constitute a single violation and shall not be deemed a separate violation for each day it continues.*

# City of Philadelphia



*(.2) For violations of Section 9-3901(4)(h), abatement and refund of rent for any period during which rent was collected and the owner was noncompliant as defined in that Section;*

*(.3) Such other relief, including injunctive relief, as the court may deem appropriate; and*

*(.4) Reasonable attorney's fees and costs.*

*(j) Safe Harbor. In a private action pursuant to this Section, an owner shall not be deemed non-compliant for any period in which the owner can demonstrate, by a preponderance of the evidence, that the safe harbor provisions set below apply.*

*(.1) Delayed re-inspection of premises. An owner shall not be deemed non-compliant for purposes of this Section for any period during which the owner's inability to obtain or maintain a rental license or Certificate of Rental Suitability results primarily from a delayed re-inspection by the Department. An owner shall be deemed compliant as of the date the owner completed the required corrective action and took all reasonable steps to obtain or maintain the required license or Certificate of Rental Suitability, provided that the owner demonstrates by a preponderance of the evidence that:*

*(.a) The owner timely corrected the underlying condition or deficiency;*

*(.b) The owner timely applied for, renewed, or sought reinstatement of the rental license or Certificate of Rental Suitability and requested in writing any required inspections;*

*(.c) Any failure to obtain or maintain the license or Certificate during the relevant period was due primarily to the delayed re-inspection by the City;*

*(.d) The owner provided notice of the completed repair to the tenant(s); and*

*(.e) A subsequent inspection confirms the condition was corrected.*

*(.2) Pending appeal of certain taxes, liens, fines, and fees resulting in outstanding balances. An owner shall not be deemed non-compliant for purposes of this Section for any period during which a timely appeal is pending and not yet adjudicated regarding taxes, liens, fines, and fees unrelated to a Title 4 violation that form an outstanding balance on the owner's business tax account that would otherwise prevent license issuance, provided that the owner demonstrates by a preponderance of the evidence that:*

# City of Philadelphia



*(.a) In the case of a violation that leads to a tax, lien, fine or fee, the underlying violation was not issued under Title 4 and does not involve conditions classified as Unsafe, Unfit, or Imminently Dangerous;*

*(.b) The outstanding balance is the sole reason preventing the license from being issued or renewed;*

*(.c) The owner filed a timely administrative or judicial appeal of the violation or tax clearance determination, as applicable, in accordance with governing procedures;*

*(.d) The owner has not failed to take any required interim corrective actions within the owner's control; and*

*(.e) The underlying violation or condition is subsequently dismissed or withdrawn upon adjudication, such that the outstanding balance would not have prevented license issuance; and*

*(.f) Within five (5) days of filing such appeal, the owner provides written notice to all impacted tenants stating that an appeal has been filed, identifying the nature of any outstanding balance, and explaining that the basis for any alleged non-compliance is subject to adjudication; such notice shall be provided in accordance with this Section's notice requirements.*

*(.g) In any action for eviction, recovery of possession, or collection of rent or other charges relating to a property subject to this Section, the owner shall attach to the initial filing a copy of any pending appeal described in this subsection and shall affirmatively disclose the existence and status of such appeal. Failure to attach and disclose as required by this paragraph shall render the filing defective for purposes of this Section until cured.*

*For purposes of this subsection, if the appeal is denied in full, the period of non-compliance shall be deemed to run from the original cure date.*

*(.3) Renewal of Rental License. An owner shall not be deemed noncompliant for purposes of this Section solely for failure to timely renew a rental license during the fifteen (15) days immediately following the expiration of such license, provided that the owner obtains a valid renewal within such period.*

*(.4) No provision of this Section shall limit an owner's ability to bring a claim for property damage or breach of contract.*

§ 9-3902. Rental Licenses.

# City of Philadelphia



(1) Required.

(a) The owner of any dwelling unit, multiple family dwelling, rooming house, dormitory, hotel, one-family dwelling, two-family dwelling, or rooming unit let for occupancy must obtain a rental license. No person shall collect rent with respect to any property that is required to be licensed pursuant to this Section unless a valid rental license has been issued for the property *and has not expired or been suspended.*

§ 9-3903. Certificate of Rental Suitability; Required Tenant Documents.

(1) Required.

(a) The owner of any property for which a rental license is required shall, at the inception of each tenancy, provide to the tenant a Certificate of Rental Suitability that was issued by the Department no more than sixty days prior to the inception of the tenancy. The owner shall at the same time provide the tenant a copy of the owner's attestation to the suitability of the dwelling unit as received by the Department pursuant to subsection 9-3903(2)(b)(.3), and a copy of the "City of Philadelphia Partners for Good Housing Handbook" issued by the Department, or such other document as the Department shall require. The Certificate of Rental Suitability may be for either an individual dwelling unit, or for the entire building in which the unit is located.

(b) Exception. The provisions of subsection 9-3903(1)(a) shall not apply with respect to any rental to a tenant who is a member of the owner's family.

*(c) The owner of any property for which a rental license is required shall, at the time of filing an eviction action, provide a Certificate of Rental Suitability to the tenant and to the court that was issued by the Department no more than thirty days prior to the date of enrollment. Any owner who fails to comply with this subsection shall be denied the right to file for eviction or obtain possession of the property.*

*(d) At any point during a tenancy, a tenant may request a Certificate of Rental Suitability from the owner, provided that a tenant may not request more than one such Certificate within any ninety (90) day period. Within ten (10) days of receiving a tenant request, an owner shall provide to the tenant a Certificate of Rental Suitability issued by the Department no more than thirty days prior to the request. Any owner who fails to comply with this subsection shall be denied the right to collect rent until a Certificate of Rental Suitability is provided to the tenant. The Safe Harbor Provision in Section 3-901(4)(j) shall also apply to this subsection.*

(2) Application and Issuance.

# City of Philadelphia



(a) Applications for a Certificate of Rental Suitability shall be made on forms provided by the Department.

(b) The Department shall issue a Certificate of Rental Suitability only after it determines that:

(.1) The owner of the property has obtained all required licenses with respect to the property, including a rental license.

(.2) There are no outstanding violation notices under this Code with respect to the property, except with respect to violations for which there is a pending appeal of which the owner has notified the Department in a manner prescribed by the Department.

Exception: The Department of Licenses and Inspections may promulgate regulations regarding conditions under which Certificates of Rental Suitability may be issued, despite violations of Section PM-108.1.3 (Unsafe shared retaining walls).

(.3) The owner of the premises to be leased acknowledges the obligation to provide a fit and habitable property and states that (1) all fire protection and smoke detection equipment for the premises are present and in proper operating order in accordance with all applicable requirements of The Philadelphia Code and regulations and standards adopted thereunder; (2) the operating systems are working properly to provide a fit and habitable condition; and (3) *that the premises are free of unfit, unsafe, or imminently dangerous conditions, as defined by Sections PM-108, PM-109, and PM-110; and (4)* the owner will continue to maintain all fire protection and smoke detection equipment for the premises in accordance with all applicable requirements of The Philadelphia Code and regulations and standards adopted thereunder, will continue to maintain the operating systems in proper working order, *will continue to ensure that the property is free of any unfit, unsafe, and imminently dangerous conditions as defined by Sections PM-108, PM-109, and PM-110,* and will continue to maintain the property in a fit and habitable condition.

(c) The Certificate shall set forth the applicable rental license number for the property, the date of the last inspection conducted by the Department (where applicable) and the applicable zoning designation, and shall set out the process by which a tenant may request a further inspection of the property by the Department.

(d) Failure by the owner to correct *unsafe, unfit, or imminently dangerous* code violations *as defined by Sections PM-108, PM-109, and PM-110* [covered by subsection (2)(b)(.3)] within thirty (30) days of receiving a notice of violation, or sooner as indicated by the Department, shall be considered to be noncompliance with this Section*, so long as the owner has not timely appealed the notice of violation*.

# City of Philadelphia



*(.1) In an action for eviction or collection of rent, the owner shall have the burden of demonstrating compliance with the requirements for issuance of a Certificate of Rental Suitability during the relevant tenancy.*

*(.2) Where a notice of violation is timely appealed and subsequently affirmed, the owner shall be deemed in noncompliance with this Section as of the cure date specified on the notice of violation.*

*(e) Proactive Inspection Program. The Department is authorized to establish a Proactive Inspection Program in order to inspect all residential rental properties and units registered to a rental license pursuant to Section 9-3902 ("Rental Licenses"), identified as Residential Dwellings or Rooming Houses / Boarding Houses, on a regular cycle by July 2030, provided that such inspections are feasible in the interests of health and safety.*

*(f) Reporting Requirements.*

*(.1) The Department shall prepare an annual report, and shall provide Council with, and make publicly available, such reports pursuant to the schedule set forth in paragraph (.2) Such reports shall include, but are not limited to, the following:*

*(.a) The current status of the Proactive Inspection Program, an assessment of progress toward the goal of routine proactive inspections for all units registered to a rental license pursuant to Section 9-3902 ("Rental Licenses"), identified as Residential Dwellings or Rooming Houses / Boarding Houses, and a plan for developing the program over the next calendar year.*

*(.b) The total number of rental inspections performed during the past calendar year per zip code, and whether each inspection was in response to a complaint or a result of the Proactive Inspection Program.*

*(.c) An overview of inspections performed in response to complaints, including the number and type of complaints received per zip code, number and type of complaints responded to per zip code, the number and type of violations found as a result of complaints per zip code, and the average response time for each type of complaint.*

*(.d) The total number of all notices of intent to cease operations and cease operations orders for residential rental properties.*

*(.e) A list of all residential rental property owners and addresses with an open Unfit, Unsafe, or Imminently Dangerous violation or a Cease Operations order, as defined by Sections PM-108, PM-109, PM-110, and A-505.*

# City of Philadelphia



*(.2) The first report shall be provided to Council no later than December 31, 2027. Thereafter, an annual report shall be provided to Council no later than June 30 each year.*

SECTION 3. This Ordinance shall become effective November 1, 2026.

---

**Explanation:**

[Brackets] indicate matter deleted.
*Italics* indicate new matter added.

# City of Philadelphia



CERTIFICATION: This is a true and correct copy of the original Bill, Passed by the City Council on April 23, 2026. The Bill was Signed by the Mayor on May 7, 2026.

Elizabeth McCollum
Chief Clerk of the City Council

# Exhibit B

# City of Philadelphia

(Bill No. 250330-AA)

AN ORDINANCE

Amending Chapter 9-800 of The Philadelphia Code, entitled "Landlord and Tenant," to modify the requirements related to good cause for ending a tenancy, add protections against retaliation and harassment for tenants and tenant organizations, specify tenants' rights related to the implied warranty of habitability and provide a legal presumption related to breaches of the implied warranty of habitability, create a tenant right to organize, specify deadlines for asserting claims, and establish and enhance enforcement mechanisms, remedies, damages, and protections, all under certain terms and conditions.

*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*

SECTION 1. Legislative Findings. Council finds that:

(1) A safe, habitable, and well-maintained home is a fundamental necessity for health, stability, and economic mobility. Yet, too many rental properties in Philadelphia fail to meet basic standards of habitability. Approximately 40% of Philadelphia rental homes need repairs and 30-45% of rental units operate without proper licensing, exposing tenants to unsafe, unfit, and imminently dangerous conditions.

(2) Philadelphia is trending toward a majority-renter city, with approximately half of all households currently renting their homes. More than half of these renters are cost-burdened, paying more than 30% of their income toward rent, which limits their ability to relocate when faced with unsafe or unstable housing conditions and increasing their vulnerability to exploitation.

(3) Existing enforcement mechanisms rely heavily on tenant complaints, placing the burden on tenants to identify, report, and pursue remedies for violations, often at personal risk. This reactive system allows serious code violations to persist undetected and unaddressed for extended periods. Furthermore, tenants consistently face retaliation for speaking out about unsafe conditions.

(4) Retaliation against tenants who assert their legal rights severely undermines recourse for tenants experiencing unsafe conditions. Tenants who report violations, request repairs, or organize collectively frequently face eviction, non-renewal, rent increases, or harassment, discouraging the exercise of lawful rights and undermining enforcement of housing standards.

(5) The absence of clear, enforceable standards governing retaliation, harassment, and interference with tenant rights allows harmful practices to persist and creates uncertainty for both tenants and landlords.

# City of Philadelphia



(6) Tenant organizing and collective action are critical tools for addressing unsafe conditions and power imbalances in the rental market. However, tenants and tenant organizers often face barriers to organizing, including restricted access to buildings, non-renewal of leases, eviction, and harassment.

(7) Establishing a clear right to organize, strengthening protections against retaliation and harassment, clarifying and reinforcing the implied warranty of habitability, and creating strong enforcement mechanisms are necessary to ensure that tenants can safely assert their rights without fear of reprisal.

(8) Requiring good cause for lease termination is essential to prevent arbitrary displacement, promote housing stability, and ensure that tenants are not forced from their homes without a legitimate and lawful basis.

(9) These reforms are necessary to protect public health, reduce displacement, and promote housing stability in Philadelphia's housing system.

SECTION 2. Title 9 of The Philadelphia Code is hereby amended to read as follows:

TITLE 9. REGULATION OF BUSINESSES, TRADES AND PROFESSIONS

* * *

CHAPTER 9-800. LANDLORD AND TENANT

* * *

§ 9-804. Unfair Rental Practices.

* * *

(2) It shall be unlawful for any owner, landlord, agent or other person operating or managing premises to *refuse to lease to any person,* terminate a lease with a tenant or make, alter, amend or modify any term or condition of any existing lease or arrangement of tenancy with a tenant*, or restrict access to common areas or amenities* in retaliation for:

(a) any violation having been found against the premises;

(b) *Initiating or participating in the investigation of or enforcement against a violation, including but not limited to* the filing of a complaint alleging a violation *and/or related to the investigation of or enforcement against a violation*;

# City of Philadelphia



(c) *any lawful communication made by a tenant in good faith with a government official or in a judicial proceeding regarding violations or other conditions of the premises, provided that any allegations concerning retaliatory conduct during a consecutive thirty (30) day period shall be treated as the subject of a single complaint.*

[(c)] *(d)* the joining of*, or participation in,* any lawful organization*, including a tenant organization, association, or union*[, or any other exercise of a legal right]. [It shall be unlawful for any owner, landlord, agent or other person operating or managing premises to refuse to lease any premises to a prospective tenant because he believes the prospective tenant has exercised any such right];

[(d)] *(e)* an incident of domestic violence or sexual assault in which a tenant was the victim, or a tenant's status as a victim of domestic violence or sexual assault. For purposes of this subsection (2)(d) the meaning of the terms "victim", "domestic violence" and "sexual assault" are as defined in Section 9-3201 of this Code[.]*;*

*(f)* *any other exercise of a legal right.*

In any civil proceeding involving this provision in which the notice of termination or alteration of a term or condition of the lease was given within one year after a violation was found, a right of the tenant against the landlord, agent or other person operating or managing premises was exercised, or a correction made, whichever is the latest, it shall be the burden of the owner, landlord, agent or other person operating or managing such premises to prove that the notice was not given in retaliation for the exercise by the tenant of his legal rights.

(3) [The provisions of this Section shall not apply to:

(a)] [Any bona fide] *The* transfer of title [incident to a sale] of the [premises, but] *premises shall not alter the obligation of* any subsequent owner, landlord, agent or other person operating or managing such premises *to comply with* [shall be subject to] the provisions of this Chapter.

*(a)* [(b)] *It shall not be a violation of this Section 9-804 for* [Any] *an* owner, landlord or agent or other person operating or managing any premises against which a notice of violation has been issued *to* [who desires to] terminate an existing occupancy in order that the premises may be rehabilitated and the violation cured, *provided that* [and] the Department of Licenses and Inspections issues a certification that such work requires that the premises be vacated.

* * *

(12) Good cause required.

# City of Philadelphia



(a) No owner, landlord, agent or other person operating or managing any residential premises, upon expiration of [a] *any* lease [of less than one year], shall *take any action to terminate a tenancy* [issue a notice to vacate, notice of non-renewal, or notice to terminate the lease], unless (1) the landlord has good cause to *take that action* [not renew the lease]; and (2) the landlord provides the tenant with notice pursuant to subsection (c), below. For purposes of this subsection (12)(a), good cause shall include, but is not limited to, any of the following:

* * *

*(.10) The landlord has cause for eviction under 68 Pa. Stat. § 250.501(a)(2) or (3), or successor statute.*

*(.11) The owner has entered into a bona fide agreement of sale to transfer the premises to a purchaser who will occupy the unit as their principal residence, provided that:*

*(.a) The owner provides the tenant with a copy of a fully executed, arm's-length agreement of sale identifying the purchaser.*

*(.b) The purchaser provides a signed statement that the purchaser intends to occupy the unit as their principal residence within ninety (90) days of closing and does not intend to rent the unit.*

*(.c) The owner provides at least sixty (60) days' notice of non-renewal to the tenant, attaching all documentation requested in paragraphs (.a)-(.b), above.*

* * *

(b) [Reserved] *For purposes of subsection 12(a), above, an action to terminate a tenancy shall include, but is not limited to, any of the following:*

*(.1) Issuing, serving, or otherwise providing a tenant with a notice to vacate, notice of non-renewal, notice to terminate the lease, notice of Diversion Rights pursuant to Section 9-811; or*

*(.2) Initiating, filing, commencing, or otherwise pursuing an eviction action or any other legal action seeking to obtain a judgment for possession of the premises, excepting ejectment actions.*

(c) A landlord who has good cause to *take an action to terminate a tenancy* [issue a notice to vacate or notice to terminate a lease] under subsection (a), above, shall notify the tenant in writing *with reasonable specificity* of the basis for such good cause in the same manner and on the same schedule as set forth in subsection (11)(a) ("Landlord Notice to Tenant of Rent

# City of Philadelphia



Increase"). In the event the owner, landlord, agent or other person operating or managing the premises fails to issue the notice as required by this subsection (12), the lease shall renew on a month-to-month basis, unless the tenant elects otherwise.

*　　*　　*

*(f) This section (12) shall not apply if a landlord sufficiently alleges in an eviction complaint, and a court of competent jurisdiction finds, that the tenant resides in an individual rental unit that is also occupied by the landlord as a primary residence and has been since the start of the tenancy.*

*　　*　　*

*(13)* Self-Help Eviction.

*　　*　　*

*(14)* Any person aggrieved under the provisions of this Section may file a complaint with the Fair Housing Commission or may allege any violations in an initial pleading or, where appropriate, in a responsive pleading in a court of competent jurisdiction. *Claims for violations of this Chapter shall be governed by the contractual statute of limitations applicable under the laws of the Commonwealth of Pennsylvania. Tenants shall retain the right to file claims beyond the expiration of their lease period and after vacating the premises, provided such claims are filed within the applicable contractual statute of limitations period. There is no requirement that a complaint be filed with an agency before asserting a claim in court. Each separate occurrence or instance of a prohibited action shall constitute a separate violation. A continuing violation arising from the same underlying condition shall constitute a single violation and shall not be deemed a separate violation for each day it continues.*

*(a) In an administrative proceeding before the Fair Housing Commission violations of this Section shall be punishable pursuant to Section 9-807.*

*(b) In a judicial proceeding, a court may order the following, upon a finding that a violation of this Section has occurred:*

*(.1) Injunctive relief and such other equitable relief, as appropriate.*

*(.2) Compensatory damages and restitution, including economic damages inclusive of overpaid rent and emotional distress damages, or, in the alternative, if the plaintiff elects before judgment is rendered, statutory damages of $1,000 per violation.*

*(.3) Upon a finding of a willful or wanton violation of this Section, punitive damages up to three times the value of actual damages sustained inclusive of overpaid rent or, if statutory damages are elected, three times the value of statutory damages.*

# City of Philadelphia



*(.4) Reasonable attorney's fees and costs.*

*(.5) Suspension or revocation of the owner or agent's rental license, during which period the rent for any rental unit in the housing accommodation shall not be collected or increased.*

*(c) A tenant may use the protections afforded in this Section as an affirmative defense in a court of competent jurisdiction.*

*(15)* No provision of this Section can be waived or made subject to a contract between the parties depriving a tenant of the benefits of this Section.

* * *

*§ 9-816. Rights to Safe and Healthy Homes.*

*(1) Right to Organize.*

*(a) Tenants shall have the right to:*

*(.1) Organize and advocate related to the terms and conditions of their residency;*

*(.2) Form, join, meet with, and participate in tenant organizations;*

*(.3) Meet and confer through representatives of their own choosing with owners and management; and*

*(.4) Engage in lawful concerted activities with other tenants;*

*(b) Any tenant organizer who is not a tenant shall have the same rights to visit tenants and access residential rental accommodations and shall follow the same building access and security protocols as all other non-tenants. Furthermore:*

*(.1) If a multifamily residential property has a consistently enforced, written policy against canvassing, then a non-tenant tenant organizer must be accompanied by a tenant while on the property of the multifamily housing project.*

*(.2) If a multifamily residential property has a written policy favoring canvassing, any non-tenant tenant organizer must be afforded the same privileges and rights of access as other uninvited outside parties in the normal course of operations. If the*

# City of Philadelphia



*project does not have a consistently enforced, written policy against canvassing, the project shall be treated as if it has a policy favoring canvassing;*

*(c) Any owner or agent of an owner of a residential rental accommodation has a duty to confer in good faith with tenants and tenant organizers regarding lease terms and property conditions to which those tenants are party. "Confer in good faith" means that the parties shall have the mutual obligation, personally or through their authorized representatives, to meet and confer and continue for a reasonable period of time, in order to exchange freely information, opinions, and proposals, and to endeavor to reach agreement. Examples of conferring in good faith include, but are not limited to, maintaining a designated point of contact, engaging in regular communications, responding to reasonable requests for information, allowing participation by non-resident advocates, providing adequate time for limited-English speakers to obtain translation services, providing and adhering to timelines for addressing habitability concerns, and negotiating and putting agreements into writing;*

*(d) No owner or agent of an owner of a residential rental accommodation shall interfere with the right of a tenant or tenant organizer invited by a tenant onto the premises to conduct the following activities related to the establishment or operation of a tenant organization, if performed in a lawful manner consistent with subsection § 9-816(1)(b):*

*(.1) Distributing literature in common areas, including lobby areas;*

*(.2) Knocking on tenants' doors, speaking with tenants, and placing literature at or under tenants' doors;*

*(.3) Posting information on all building bulletin boards;*

*(.4) Assisting tenants in participating in tenant organization activities; and*

*(.5) Convening tenant or tenant organization meetings at any reasonable time and in any appropriate space that would reasonably be interpreted as areas that the tenant had access to under the terms of their lease, including any tenant's unit, a community room, a common area including lobbies, or other available space.*

*(.6) Formulating responses to owner actions or building and unit conditions, including:*

*(.a) Rent increases or requests for rent increases;*

*(.b) Proposed changes in the housing accommodation's facilities and services;*

# City of Philadelphia



*(.c) Conversion of residential units to nonresidential use, cooperative housing, or condominiums;*

*(.7) Proposing that the owner or management modify the housing accommodation's facilities and services; and*

*(.8) Any other activity reasonably related to the establishment or operation of a tenant organization.*

*(e) This Section shall not be construed to grant any greater access to a rental residential accommodation than any other non-resident would be provided.*

*(2) Right to Habitability.*

*(a) Tenants shall have the right to facilities and services vital to their life, health, and safety and to the use of the premises for residential purposes throughout the duration of their tenancy. At a minimum, tenants have a right to safe and sanitary living conditions.*

*(b) It shall be unlawful for any owner, landlord, agent, or other person operating or managing premises to threaten to or engage in any act or omission which materially interferes with the tenant's right to habitability, including but not limited to the following:*

*(.1) Failing to perform or complete repairs and maintenance in a reasonably timely manner or failing to follow applicable industry standards, including but not limited to the Philadelphia Property Maintenance Code, Philadelphia Building Construction and Occupancy Code, Philadelphia Fire Code, and Philadelphia Health Code, to minimize exposure to mold, lead paint and dust, asbestos, or other building materials with potentially harmful health impacts. A reasonably timely manner is defined as the landlord has had reasonable time after being put on notice, taking into account the emergency nature of the repair as well as the impact or potential impact to the tenants' and occupants' health, safety, and well-being.*

*(.2) Engaging in an act or omission which results in a material breach of the implied warranty of habitability, as defined in this Section.*

*(c) Abatement under this provision*

*(.1) In a court action alleging unpaid rent, a tenant shall be entitled to an abatement of rent during and for any periods when the implied warranty of habitability has been materially breached by a landlord, including, but not limited to, where a landlord fails to rebut the presumption of a breach pursuant to this subsection. A material breach of the implied warranty of habitability occurs when (1) a defect in the property is of a nature and kind which will prevent the use of the dwelling for its intended purpose to provide premises fit for habitation by its dwellers; (2) the landlord had notice of the defect of the*

# City of Philadelphia



*condition; and (3) the landlord failed to make the necessary repairs in a reasonably timely manner.*

*(.2) In a proceeding pursuant to this Section before a court of competent jurisdiction, there shall be a rebuttable presumption that an owner, landlord, agent or other person operating or managing any residential premises breached the implied warranty of habitability if (1) the conditions or characteristics of the premises violate the requirements of the Philadelphia Property Maintenance Code or the Philadelphia Fire Code; (2) the Department has issued a notice of violation regarding the defective conditions or characteristics of the premises; (3) the date to cure, specified in an issued notice of violation, has passed; (4) no appeal of that notice of violation is pending; and (5) the defective conditions or characteristics that form the basis of that notice of violation have not all been remedied. When these conditions are met, a court may reasonably conclude that the landlord had notice of the defect from the Department of Licenses and Inspections, had a reasonable opportunity to make the necessary repairs, and failed to make the necessary repairs. (.a) A notice of violation that includes a determination by the Department that the rental property is unfit, unsafe, or imminently dangerous, which is not complied with pursuant to the timelines of section (b) shall entitle a tenant to full abatement of rent during or for the period of the violation, or until the Department determines that work to repair the violation has started and is actively progressing, and acceptable interim measures have been taken to ensure tenant safety and unit habitability during the interim.*

*(.b) The Department's notice of violation to the landlord shall relieve the tenant of separately providing the landlord written notice of a defect or condition that gives rise to the presumptive breach of the implied warranty of habitability.*

*(.c) A landlord may rebut the presumption of a breach of the implied warranty of habitability, in whole or in part, by showing by a preponderance of the evidence:*

*(.i) The landlord has been unable to correct the violation because the tenant prevented the landlord from accessing the property;*

*(.ii) To the extent the notice of violation is not related to the structure of the building, that the habitability of the tenant's residence was not fully impacted by the relevant violation, in which case rent shall be abated to the extent that habitability was adversely impacted;*

*(.iii) The tenant caused the violation that is the basis for the violation; or*

*(.iv) The defective conditions or characteristics that form the basis of the violation were corrected, in which case the breach shall be deemed to apply to the period from the issuance of the notice of violation to the date the defective condition was*

*repaired, so long as notice of repair was provided, a request for reinspection by the Department has been made, and the subsequent reinspection confirms the defective condition was repaired.*

*(.d) Nothing in this Subsection shall be interpreted to preclude a finding that the implied warranty of habitability was breached prior to or despite no violation having been issued by the City.*

*(3) Protections Against Interference and Retaliation*

*(a) Tenants shall have the right to the use and quiet enjoyment of their residence and the housing services that are connected with the use or occupancy of a rental unit, including, but not limited to, utilities (including gas, water, and electricity), ordinary repairs or replacement, and maintenance, including painting.*

*(b) It shall be unlawful for any owner, landlord, agent, or other person operating or managing premises to take any action, or refuse to act in a way that would cause a reasonable tenant to vacate such residential rental unit or to surrender or waive any rights described above in relation to such tenancy. Examples include, but are not limited to, the following:*

*(.1) Reducing or eliminating, or threatening to reduce or to interfere with a tenant's quiet enjoyment of their residence, including but not limited to, by failing to provide notice of 24 hours for non-emergency repairs to the tenant, or failing to offer a reasonable justification for entry into the unit; or otherwise engaging in unreasonably disruptive behavior when entering or accessing the property or attempting to do so.*

*(.2) Threatening a tenant or their guests with physical harm.*

*(.3) Reducing or eliminating, or threatening to reduce or to eliminate, housing services required by a lease, contract or law, including but not limited to the elimination of parking if provided in the tenant's lease or contract.*

*(.4) Engaging in abusive use of government process against a tenant, for example by making a report or threatening to make a report about a tenant to a governmental entity, including immigration authorities, when done to retaliate against the tenant for engaging in activity protected under Section 9-804(2), to prevent the tenant from engaging in such activities in the future, or to cause the tenant to vacate the unit or forfeit other legal rights of occupancy.*

*(.5) Other acts or omissions of such significance as to substantially interfere with or disturb the comfort, repose, peace or quiet of a tenant and that cause, or are likely to cause, a tenant to surrender or waive any rights in relation to such tenancy.*

# City of Philadelphia



*(.6) Retaliating for engaging in activity protected under Section 9-804(2) by reducing or eliminating, or threatening to reduce or to eliminate any other benefits, privileges, or facilities of the property promised to tenants, in a lease or otherwise, or required by law.*

*(.7) Disclosing, threatening to disclose, or misusing a tenant's medical or health information, including but not limited to records or information relating to disability, medical treatment, prescriptions, or health conditions, where such disclosure or threat of disclosure is made to co-tenants, neighbors, employers, governmental entities, or any other third party.*

*(4) Remedies. Any person aggrieved under the provisions of this Section may allege any violations in an initial pleading or, where appropriate, in a responsive pleading in a court of competent jurisdiction. A claim for a violation of this Chapter must be filed in court within two (2) years of the date that an alleged violation occurred. There is no requirement that a complaint be filed with an agency before asserting a claim in court. Each separate occurrence or instance of a prohibited action shall constitute a separate violation. A continuing violation arising from the same underlying condition shall constitute a single violation and shall not be deemed a separate violation for each day it continues.*

*(a) A court may order the following, upon a finding that a violation of this Section has occurred:*

*(.1) Injunctive relief and such other equitable relief, as appropriate.*

*(.2) Compensatory damages and restitution, including overpaid rent and emotional distress damages, or, in the alternative, if the plaintiff elects before judgment is rendered, statutory damages of $1,000 per violation.*

*(.3) Upon a finding of a willful or wanton violation of this Section, punitive damages of three times the value of actual damages sustained inclusive of overpaid rent or, if statutory damages are elected, three times the value of statutory damages.*

*(.4) Reasonable attorney's fees and costs.*

*(.5) Suspension or revocation of the owner or agent's rental license, during which period the rent for any rental unit in the housing accommodation shall not be collected or increased.*

*(b) A tenant may use the protections afforded in this Section as an affirmative defense in a court of competent jurisdiction.*

SECTION 3. This Ordinance shall become effective November 1, 2026.

# City of Philadelphia



**Explanation:**

[Brackets] indicate matter deleted.
*Italics* indicate new matter added.

# City of Philadelphia



CERTIFICATION: This is a true and correct copy of the original Bill, Passed by the City Council on April 23, 2026. The Bill was Signed by the Mayor on May 7, 2026.

Elizabeth McCollum
Chief Clerk of the City Council

# Exhibit C







