# EXHIBIT INDEX

**Exhibit A:** Richard Moore Declaration, executed October 29, 2026.

**Exhibit B:** Consent Order entered March 19, 2026.

**Exhibit C:** Order entered April 15, 2026, ECF No. 13.

**Exhibit D:** Transcript of April 14, 2026 hearing, ECF No. 14, particularly pages 4–10.

**Exhibit E:** Enacted Bills Nos. 250329-AA (ECF No. 21, at 61–71) and 250330-AA (id. at 73–85), with effective-date provisions.

**Exhibit F:** October 29, 2026 Declaration of Seth Floyd.

**Exhibit G:** Official March 30, 2026 Committee transcript (excerpts from 222-page transcript), particularly pages 18–19, 51, 54–70, 78–81, 87–90, and 143–152.

*Exhibit G contains selected pages, not the entire 222-page transcript.*

*The supplied Exhibit E does not include separate Philadelphia Home Rule Charter text.*

# EXHIBIT A

Declaration of Richard Moore

**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FLOYD et al. | : | |
| | : | |
| v. | : | No. 2:26-cv-02403 |
| CITY COUNCIL FOR THE CITY OF | : | |
| PHILADELPHIA, et al. | : | |

**DECLARATION OF RICHARD MOORE**

I, Richard Moore, declare as follows:

1. I am an adult individual competent to testify concerning the matters set forth herein. The factual statements in this Declaration are based upon my personal knowledge and firsthand observations, except where I expressly identify a statement as my understanding or opinion.

2. I am the owner and operator of a Philadelphia Property Management Firm, and have been a Philadelphia taxpayer and business owner for approximately forty (40) years.

3. My business, Best City Homes, Inc., is located at 2216 South Street, Philadelphia, Pennsylvania 19146. My telephone number is 267-977-8205.

4. During my approximately four decades as a Philadelphia business owner and real estate professional, I have witnessed the effects of City policies and legislation on residential property owners, particularly smaller landlords and independent property owners who do not possess the financial resources available to larger institutional landlords.

5. I have followed the legislative proceedings concerning the housing legislation challenged in this action because of the substantial consequences such legislation may have for Philadelphia's rental housing community, including small landlords, minority property owners, and other historically marginalized property owners.

6. I submit this Declaration to provide my firsthand observations concerning the legislative proceedings, including the manner in which public testimony was received, the participation of Councilmembers, and subsequent communications with a Councilmember's office that raised concerns regarding the fair and equitable consideration of affected stakeholders.
7. I attended the March 30, 2026, hearing before the Philadelphia City Council Committee on Housing, Neighborhood Development and the Homeless.
8. I understood that this hearing followed legal challenges to the manner in which the legislation had previously been considered and was intended to address concerns regarding the legislative process.
9. Given those circumstances, I expected the subsequent hearing to be conducted with particular attention to procedural compliance, meaningful public participation, and the fair consideration of affected stakeholders.
10. Instead, I personally observed conduct that raised serious concerns about whether the procedural problems surrounding the legislation had actually been addressed.
11. Although a quorum was present at the beginning of the hearing, I observed that only approximately two (2) to three (3) Councilmembers were present for the majority of the proceeding, fewer than the required quorum of five (5).
12. Councilmembers repeatedly entered and exited the hearing room, resulting in extended periods during which fewer than five Councilmembers were present.
13. At multiple points, the hearing continued despite my observation that fewer than five Councilmembers were present.

14. These were not isolated or momentary observations. The repeated absence of Councilmembers was sufficiently noticeable that I became concerned about whether the Committee was conducting the proceedings in the manner required of a public legislative body.
15. I also observed that a timer was used to impose an approximately two-minute limit on public testimony.
16. Although the timer appeared to establish a uniform limitation, I personally observed that the restriction was not enforced consistently among speakers.
17. Individuals presenting positions supportive of tenants were permitted to exceed the stated time limitation, including one speaker who spoke for approximately nine (9) minutes and thirty-eight (38) seconds.
18. By contrast, individuals presenting smaller landlord perspectives or proposing changes intended to balance the interests of tenants and property owners were cut off at or near the two-minute limitation.
19. I observed individuals attempting to explain how the proposed legislation would affect landlords and property owners, including those advocating modifications intended to make the legislation more equitable, being prevented from completing their remarks.
20. The unequal application of speaking limitations was particularly troubling because the legislation concerned obligations and potential burdens imposed directly upon the property owners whose perspectives were being curtailed.
21. Based upon what I witnessed, the hearing did not provide the fair, balanced, and consistent opportunity for public participation that I expected, particularly given the prior challenges to the legislative process.

22. What concerned me most was not simply that procedural irregularities occurred, but that they occurred during a hearing that I understood was intended to address concerns about the legality and fairness of the earlier proceedings.

23. In my view, repeating questionable procedures during a hearing intended to address earlier procedural deficiencies only deepened the concerns that had brought the legislative process into dispute.

24. To my knowledge, Councilmember O'Rourke was the sponsor of the bills at issue in this matter.

25. After the initial legislative hearing and before the April 16, 2026, hearing, I personally met with Télyse Masaoay, Chief of Staff to Philadelphia Councilmember O'Rourke.

26. During that meeting, I discussed concerns regarding the challenged housing legislation and efforts by Plaintiffs and affected property owners to communicate their positions to City Council.

27. Ms. Masaoay communicated directly to me that Councilmember O'Rourke's office would not meet with Plaintiffs because they had filed the lawsuit challenging the legislative proceedings.

28. Ms. Masaoay, along with multiple other City Council staff members, also communicated that they would not meet with the Homeowners Association of Philadelphia ("HAPCO"), an organization with which both plaintiffs are affiliated as members.

29. These statements were communicated directly to me. I personally heard them and am not relying upon information provided by another individual.

30. Based upon these communications, I understood that the refusal was not merely a scheduling issue or a general unwillingness to meet with constituents, but was connected to Plaintiffs' legal challenge to the legislative proceedings.

31. I further understood that the refusal extended beyond the individual Plaintiffs to HAPCO, notwithstanding that HAPCO is not a party to this litigation and represents the interests of numerous property owners who are not parties to this action.

32. I was particularly concerned that HAPCO and its members could be denied opportunities to communicate with elected officials simply because two of its members had exercised their right to challenge the City's conduct.

33. This distinction is important because HAPCO represents interests extending well beyond this litigation and the personal interests of either Plaintiff.

34. It is my understanding that HAPCO represents and advocates primarily for small- to mid-sized landlords and independent residential property owners throughout Philadelphia, including a substantial membership of minority landlords and property owners.

35. HAPCO's membership includes numerous minority property owners and small- to mid-sized landlords whose financial circumstances, property ownership interests, and practical experiences differ substantially from those of large corporate or institutional property owners.

36. As a Philadelphia real estate professional and business owner for approximately forty (40) years, I understand that small- to mid-sized landlords, particularly independent and minority property owners, often lack the financial resources to absorb additional

regulatory expenses, prolonged vacancies, litigation costs, and other financial burdens that larger institutional property owners may be better positioned to withstand.

37. The challenged housing legislation directly concerns matters affecting these property owners and the manner in which they operate, maintain, and manage their properties.

38. I believe HAPCO and its members should be afforded a meaningful opportunity to participate in the legislative process, communicate with elected officials, and advocate for their interests without being excluded or treated differently because two of its members are Plaintiffs in litigation challenging the City's legislative proceedings.

39. My concern is not that City Council must agree with the positions advanced by HAPCO or its members. Rather, those positions should receive fair consideration, and disagreement with proposed legislation or association with individuals challenging governmental conduct should not result in unequal treatment.

40. I believe it is particularly important that HAPCO, given its substantial minority landlord membership and its representation of small-to mid-sized property owners, have a meaningful opportunity to communicate its members' concerns when legislation may substantially affect their financial interests and continued ownership of property.

41. My concerns regarding the refusal to meet with Plaintiffs and HAPCO cannot be separated from what I personally witnessed during the March 30, 2026, hearing.

42. At that hearing, I observed repeated periods during which fewer than five Councilmembers were present, notwithstanding the continuation of proceedings.

43. I also observed public-comment restrictions being applied inconsistently, with speakers supporting tenant positions receiving substantially more time than speakers presenting landlord perspectives.

44. Taken together, these circumstances demonstrated to me that the legislative process was not conducted in a manner that afforded all affected stakeholders a fair and meaningful opportunity to be heard, particularly those who expressed opposition to the proposed legislation.

45. I understand that elected officials may disagree with constituents and are not required to adopt every recommendation offered during a public hearing.

46. However, there is a significant difference between disagreeing with a position and conducting proceedings in a manner that affords unequal opportunities to those presenting opposing viewpoints.

47. There is also a significant difference between declining a meeting for ordinary reasons and selectively refusing to engage with Plaintiffs or HAPCO because of their opposition to proposed legislation or their challenge to the legislative proceedings.

48. In my approximately forty years of conducting business in Philadelphia, I have come to appreciate the importance of public confidence in the fairness and integrity of governmental decision-making.

49. I believe these circumstances warrant careful examination, particularly where legislation affecting substantial numbers of Philadelphia property owners, including HAPCO's small- to mid-sized and minority landlord membership, was considered through proceedings in which opportunities for participation and meaningful engagement were not afforded equally to all affected stakeholders.

50. I submit this Declaration so that the Court may consider what I personally observed and heard when evaluating Plaintiffs' request for relief.

51. I am willing to testify concerning the matters set forth herein if requested by the Court.

**VERIFICATION**

I declare that the foregoing statements are true and correct to the best of my personal knowledge, information, and recollection, pursuant to 28 U.S.C. § 1746.

DocuSigned by:

8004474C26764D6...

**Richard Moore**

10/29/2026

Date: __________________

# EXHIBIT B

March 19, 2026 Consent Order

| | | |
|---|---|---|
| SETH FLOYD and ERICA HADLEY<br>Plaintiffs,<br><br>v.<br><br>CITY COUNCIL FOR THE CITY OF PHILADELPHIA and PHILADELPHIA CITY COUNCIL COMMITTEE ON HOUSING, NEIGHBORHOOD DEVELOPMENT AND THE HOMELESS<br>Defendants | : | PHILADELPHIA COUNTY<br>COURT OF COMMON PLEAS<br>TRIAL DIVISION<br><br>MARCH TERM, 2026<br><br>CIVIL CASE 2655 |

FILED 2026 MAR 19 AM 8:54

On this 18th day of March, 2026, it is hereby STIPULATED by and between the parties, Plaintiffs Seth Floyd and Erica Hadley, and Defendants City Council for the City of Philadelphia ("Philadelphia City Council") and the Committee on Housing, Neighborhood Development and the Homeless ("The Committee"), the following:

- Philadelphia City Council Bill numbers 250329 and 250330 (the "Bills") will not be voted upon for final passage in City Council on March 19, 2026;
- Instead, the sponsor of Bill Numbers 250329 and 250330 will move to have the Bills referred back to the Committee;
- Should the Committee choose to have a hearing in the future on the Bills, the Defendants shall comply fully with the Sunshine Act as well as the Charter; and
- No party admits any fault or the violation of any law;

This stipulation is being made by agreement of the parties in lieu of the hearing scheduled for this day at 4pm, such hearing being no longer necessary, and Plaintiffs will request that the hearing be canceled and this stipulation be entered on the docket.

BY: /s/____________
John S. Summers, Esq.
*Counsel for the Plaintiffs*

By: /s/ ____________
Lydia Furst, Esq.
Chief Deputy City Solicitor
*Counsel for the Defendants*

Christopher R. Hall 3/18/2026

So ORDERED ____________

STPAP-Floyd Vs City Council For The City Of Philadelphia [ECD]

26030265500012

Case ID: 260302655
Control No.: 26042509

# EXHIBIT C

April 15, 2026 Order

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SETH FLOYD and ERICA HADLEY,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**CITY COUNCIL FOR THE CITY OF PHILADELPHIA and PHILADELPHIA CITY COUNCIL COMMITTEE ON HOUSING, NEIGHBORHOOD DEVELOPMENT AND THE HOMELESS,**<br>**Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO. 26-2403** |

**<u>O R D E R</u>**

**AND NOW**, this 15th day of April, 2026, upon consideration of Plaintiffs' Motion for a Temporary Restraining Order (ECF No. 8), after a hearing in open court, **IT IS HEREBY ORDERED** that said Motion is **DENIED**, except to the extent that it requests the scheduling of a contempt hearing, for the reasons set forth on the record.

**IT IS HEREBY FURTHER ORDERED** as follows:

1. Discovery pertaining to the alleged contempt shall be completed by **Friday, May 15, 2026**;
2. Plaintiffs may file a Motion for Contempt and to Enforce Court Order **on or before Friday, May 29, 2026**;
3. Defendants shall file a Response to that Motion **on or before Friday, June 5, 2026**;
4. Plaintiffs may file a Reply to that Response **on or before Friday, June 12, 2026**;
5. A hearing regarding Plaintiffs' Motion shall take place on **Thursday, June 25, 2026, at 3:00 pm** in Courtroom 10-A of 601 Market Street, Philadelphia, PA 19106.

**BY THE COURT:**

**S/ WENDY BEETLESTONE**

**WENDY BEETLESTONE, C.J.**

# EXHIBIT D

April 14, 2026 Hearing Transcript

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| **SETH FLOYD and ERICA HADLEY,** | **CIVIL ACTION NUMBER** |
| **Plaintiffs,** | **26-cv-02403-WB** |
| **v.** | **MOTION** |
| **CITY COUNCIL FOR THE CITY OF PHILADELPHIA and PHILADELPHIA CITY COUNCIL COMMITTEE ON HOUSING, NEIGHBORHOOD DEVELOPMENT, AND THE HOMELESS,** | |
| **Defendants.** | |

---

James A. Byrne U.S. Courthouse
601 Market Street
Philadelphia, Pennsylvania 19106
April 14, 2026
Commencing at 3:24 p.m.

**B E F O R E:** **THE HONORABLE WENDY BEETLESTONE, CHIEF UNITED STATES DISTRICT JUDGE**

**A P P E A R A N C E S:**

| | |
|---|---|
| FOR THE PLAINTIFF: | GERMAN, GALLAGHER & MURTAGH<br>BY: BRIANA L. PEARSON, ESQUIRE<br>200 S. Broad Street, Suite 500<br>Philadelphia, PA 19102 |

Sharon Ricci, Official Court Reporter
Sharon_Ricci@paed.uscourts.gov

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

**A P P E A R A N C E S:** **(Continued)**

FOR THE DEFENDANT: CITY OF PHILADELPHIA LAW DEPARTMENT
BY: WILLIAM B. SHUEY, ESQUIRE
BY: MICHAEL W. PFAUTZ, ESQUIRE
1515 Arch Street, 15th Floor
Philadelphia, PA 19102

**ALSO PRESENT:**

Stephen Sonnie, Deputy Clerk

(PROCEEDINGS held in open court before The Honorable Wendy Beetlestone, Chief United States District Judge, at 3:24 p.m.)

THE DEPUTY CLERK: All rise. Court is now in session. The Honorable Chief Judge Wendy Beetlestone presiding.

THE COURT: Good afternoon. Have a seat.

This is Seth Floyd and Erica Hadley vs. City Council for the City of Philadelphia. Who's here for the plaintiff?

MS. PEARSON: Good afternoon, Briana Pearson on behalf of plaintiffs.

THE COURT: And defense?

MR. SHUEY: Good afternoon, Your Honor, William Shuey, S-H-U-E-Y, for City defendants.

MR. PFAUTZ: And Michael Pfautz, P-F-A-U-T-Z, for defendants as well.

THE COURT: Okay. So I think what we have to do, first of all, is to determine what exactly is before me. So as I understand it, plaintiff is requesting a number of orders, which the first of which concerns -- and no argument on this right now. I'm just trying to figure out what we're talking about here.

MS. PEARSON: Yes, Your Honor.

THE COURT: You want me to order that a Court of

Common Pleas order remains in full force and effect.

MS. PEARSON: Yes, Your Honor.

THE COURT: Okay. That's one.

And then two, you want me to enjoin City Council from taking any action.

MS. PEARSON: Yes, Your Honor.

THE COURT: I'm not asking for any argument, I'm just asking if that's what you want me to do.

MS. PEARSON: Yes.

THE COURT: And then you want me to schedule a contempt hearing?

MS. PEARSON: I did, but I think we're fine with this -- this hearing is fine, Your Honor.

THE COURT: This is not a contempt hearing, this is a temporary restraining order.

MS. PEARSON: I understand.

THE COURT: So I'm most confused about your request that I enjoin City Council from taking any action. Perhaps you can argue on that, and then we can hear from defense.

MS. PEARSON: Sure, Your Honor.

So it is plaintiffs' contention that there was a hearing with the housing committee on March 4th, there was no quorum, there was a violation of the Sunshine Act in how the hearing was conducted. The plaintiffs then filed the

lawsuit.

Plaintiff and defendants then entered into a stipulation that if the bills were passed forward and if there were any additional hearings related to those bills, that the defendants would follow the Sunshine Act fully, there would be transparency, there would be the ability to have public comment and testimony, and there would be a quorum throughout the committee hearings.

March 30th, the defendants scheduled a new hearing for these bills to be continued to be passed through, and on March 30th the exact same thing, the exact same actions that happened on March 4th continued to occur. There was not a quorum throughout most of the committee hearings. There was, at some point, maybe one committee member available during the hearings. At some point there were maybe one or two committee members available during public testimony or public comment.

I provided the Court with affidavits from both plaintiffs and two other non-party attendees of the hearing confirming exactly what I'm saying, that defendants agreed that they would follow the law, they would be transparent, they would have a quorum during these hearings, and that did not occur on March 30th.

So it is my position that defendants violated their order that was entered on March 19th where they

agreed that they would follow the law from end to end as it relates to these particular bills and that the hearings would be conducted in a way that was transparent and was in accordance with the Sunshine Act. That did not occur.

THE COURT: Okay. So in my view, that argument goes to you wanting a contempt hearing -- right? -- because it's in violation of the stipulation that was signed into effect by, I think, Judge Padova.

Is that right?

MS. PEARSON: That is correct.

THE COURT: So I'm not -- as I said, I'm not dealing with the contempt hearing right now. I'm just dealing with your request that you seek that I stay -- pending further order of this Court, defendants and all persons acting in concert or participation with them are enjoined from taking any action to advance, vote upon, or otherwise act on Philadelphia City Council Bills Numbers 250329 and 250330 in violation of or inconsistent with the March 19th, 2026, order.

So I want you to focus in on what you believe authority I have to enjoin Philadelphia City Council.

MS. PEARSON: Your Honor, I'm not asking you to, you know, constrict the legislators from doing their job, I'm not asking you to do that. What I'm asking

Case 2:26-cv-02403-WB Document 42-1 Filed 04/29/26 Page 7 of 23



you to do is have them adhere to what they agreed to. And if they disregard it and completely ignore the court order that was entered on March 19th, I would argue that the hearing that they had on March 30th that was not in accordance with the order that was entered on March 19th would be invalid.

THE COURT: So now I think we're talking about something else. Initially you were talking about the contempt hearing, and I said we're not talking about the contempt hearing right now.

MS. PEARSON: I understand that.

THE COURT: But now I think what you're saying is you want me to enter an order finding that the Court of Common Pleas order remains in full force and effect.

MS. PEARSON: That is correct.

THE COURT: Okay. So that's not what I'm talking about right now. We'll put that in this corner. Right?

MS. PEARSON: Even --

THE COURT: But we're not talking about that right now.

I'm just talking about the request made by you. You provided me with a proposed order in Document 8 in which you ask me to enjoin City Council from taking actions on specific bills, so that is where I'm focused.

MS. PEARSON: To put a finer point on it, Your

Honor, what I would say is that because those two bills were passed in violation of the Court's order, that either that hearing that was done in violation of the court's order has to be redone or that it's invalidated because it was done in violation of the court's order.

THE COURT: But what you're asking me to do is take no action on these bills.

So you just said -- what you've said to me here is not what your papers are saying.

MS. PEARSON: I understand.

THE COURT: You're talking about what happened -- right? -- and that's the contempt stuff, but your order says I should have a prospective injunction enjoining the City Council from taking action on a specific bill. That's the only thing I'm focusing on.

Maybe I can hear from the City first and then --

MS. PEARSON: I understand. What I'm saying is I'm trying to tailor it further and make it more narrow so that Your Honor is not in a position where she is constricting legislature outside of her power.

THE COURT: So my understanding, at least for now, is you are not pursuing your request that I enjoin City Council?

MS. PEARSON: I'm not looking to have them enjoined. And I had a conversation with defense counsel as

well, so I'm not looking for that at this point, just the order is --

THE COURT: Got it. Let me hear from City Council on that, your perspective.

MR. SHUEY: Your Honor, my understanding is that Your Honor and Ms. Pearson has been discussing paragraph 7 of the proposed order.

THE COURT: That's what I'm discussing, yes. That's what I want you to focus on, only that.

MR. SHUEY: We agree, Your Honor, that that would be inappropriate for a court to order a legislature not to take some action.

THE COURT: Do you have any case law for that?

MR. SHUEY: Not with me, Your Honor.

THE COURT: Okay. So I do.

MR. SHUEY: Yes.

THE COURT: So in *McChord vs. Cincinnati, N. O. & T. P. Railroad Company*, which is a 1902 case which remains in effect, and it's 183 U.S. 483, you can find what I'm about to say on page 496 through 97.

The Supreme Court found that: "The same exemption from judicial interference applies to all legislative bodies, so far as their legislative discretion extends...The courts cannot in the one case forbid the passage of a law nor in the other a passage of a

resolution, order, or ordinance. If by either body, the legislature or the board of supervisors, an unconstitutional act be passed, its enforcement may be arrested. The parties seeking to execute the invalid act can be reached by the courts, while the legislative body of the state or of the municipality, in the exercise of its legislative discretion, is beyond their jurisdiction. The fact that in either case the legislative action threatened may be in disregard of constitutional restraints, and impair the obligation of a contract, as alleged in this case, does not affect the question. It is legislative discretion which is exercised, and that's the discretion, whether rightfully or wrongfully exercised, is not subject to interference by the judiciary."

And in the Third Circuit case of *Perrong vs. Bradford*, which is 157 F.4th 251, at page 262, that's a 2025 case, the Third Circuit said: "To preserve these sovereign interests, the federal government may not, in most circumstances, 'dictate what a state legislature may and may not do.'"

So I think that with respect to that request, I think all agree it cannot be made and it cannot -- even in the future it cannot be made. We're done with that. Okay?

So now I think that we have to focus in on this

order of March 19th, 2026, the order of the Common Pleas Court. And you're saying that under 28 U.S.C. 1450 -- well, tell me what you think 1450 does.

MS. PEARSON: It's my understanding, Your Honor, that it allows whatever prior orders were entered into at the state court level to transfer, that the orders don't just evaporate because the case has been removed to federal court.

THE COURT: Okay. Any response to that?

MR. SHUEY: Your Honor, we don't disagree that the things don't just disappear just because something is removed to federal court. We have more substantive concerns with Ms. Pearson's approach -- or request here, but not on that issue.

THE COURT: But let's just deal with one issue at a time.

MR. SHUEY: Yes.

THE COURT: And so I look at 28 U.S.C. Section 1450, which states: "Whenever any action is removed from a state court to a district court of the United States, all injunctions, orders, and other proceedings had in such action, prior to its removal, shall remain in full force and effect until dissolved or modified by the district court."

So that means you asked me in your proposed

order to find that the March 19th, 2026, order entered by the Court of Common Pleas remains in full force and effect pursuant to 28 U.S.C. 1450. I don't have to find that because 1450 says that it is in full force and effect. So I think you've already got your request.

And City, you agree, right?

MR. SHUEY: We agree.

THE COURT: That March 19th, 2026, order, which was based on a stipulation that the City entered into where the plaintiff is in full force and effect, right?

MR. SHUEY: Correct, Your Honor.

THE COURT: And you know, quite separately, what 1450 says is that I can dissolve it or modify it, but there's nothing in 1450 that says that I should enter an order saying that's right. And in fact, that would be totally inappropriate because that would undermine the authority of state courts by saying you didn't listen hard enough to the state courts, listen to the federal court. That's not what we do. So I think with respect to that one, there's nothing I can do.

So the question then is, what do we have left to deal with in this temporary restraining order hearing?

MS. PEARSON: Your Honor, as I stated earlier, I think that, as you just stated, the March 19th order is still in force and effect and it was violated.

And no, I'm not looking for necessarily sanctions or to find defendants in contempt. I am asking for the Court that the actions that they took that disregarded the order that was in effect be considered invalid.

THE COURT: City?

MR. SHUEY: Your Honor, I don't see that request in the proposed order as filed.

MS. PEARSON: I understand that --

THE COURT: Let's say it was, what would your response be?

MR. SHUEY: Your Honor, my response would be that there's no evidence that the City of Philadelphia, that the committee in this case violated the Sunshine Act on March 30th, 2026.

And I would be happy to talk about --

THE COURT: Well, but that's the contempt issue because -- I'm not going to in a TRO hearing talk about what may or may not have happened in an earlier meeting. Right?

Because there's nothing -- in terms of equitable relief. Maybe there's a declaration that you might be looking for, but this is not the venue to have a declaration. Or at least it is the venue but it's not the proceeding in which to seek that.

So it seems to me the next thing would be, and I

don't know whether you're asking for this, is that I should issue an order saying that in the future the City should not violate the terms of the state court order. Is that what you're saying?

MS. PEARSON: Yes. And additionally, that the actions that they've taken to date that did violate that order render any decisions that they made in violation of it invalid.

THE COURT: Okay. So with respect to the request to issue a TRO with respect to actions in the future which could be in violation of the Home Rule Charter or the Sunshine Act, I think that there is a ripeness issue. The Lyons' court -- and I wish I had the cite here, but it's the Lyons' court in California involving chokeholds, would not allow me to do that.

So then what we're left with is the request that the prior council hearing in which people were allegedly in and out of the room and were making backroom deals, whether that is something that I can do now, and it is not because it has happened already. There's nothing that would be warranted in me issuing a TRO because it already happened. And I've already told you I can't stop things in the future because of the Lyons case.

So I think that is everything. Right?

MS. PEARSON: I guess, Your Honor. I mean, I

understand that you can't do anything about the issues that aren't ripe yet about, you know, a hearing that hasn't happened or occurred yet. I understand that, Your Honor.

But I do believe that the Court would be well within its right to invalidate the prior acts that were not in accordance with the --

THE COURT: Okay. That would be a different -- that would not be here.

So here's the question I have: You also filed a motion to remand. And I understand the exigency of the circumstances, but I denied it because local rule requires that you include citations to authority and you didn't. And I deliberately did it without prejudice because I understand that we are in -- you know, everybody was scrambling.

So I've done it without prejudice with the thought that perhaps if you wanted to renew it with citations to authority, you might want to do that.

MS. PEARSON: I think the case is fine here before Your Honor. It doesn't need to be remanded. I just wanted to make sure that we had a hearing already scheduled, we would be able to at least have that hearing.

There was issues surrounding, like I've been saying throughout this particular proceeding, the

defendants' actions in violation of the court order, so I wanted to make sure that that was brought forth in the most timely way that I possibly could. So I think it's fine, it doesn't need to be remanded.

THE COURT: Okay. So then the issue is I've got a complaint which is subject to answer or 12(b)(6) -- right? -- and it's got some federal courses of action and some state courses of action as well. So that would be the normal course of events we would do that.

And then we've got this contempt hearing. And the question is, it seems to me that the biggest issue that you want to deal with is the contempt hearing?

MS. PEARSON: Yes, Your Honor.

THE COURT: Okay. So then there's a couple of paths that we can take. Either pretty much we can treat this as a Rule 16 and set a scheduling order for everything moving forward, happy to do that, and assume that contempt would be something that can be addressed -- and I'm assuming the City is going to file a 12(b)(6); is that right?

MR. SHUEY: Yes, Your Honor.

THE COURT: So I'm assuming that that would be something that the City would address, although I'm not sure procedurally how that would work.

The alternative is that given that the contempt

hearing is carrying the weight of the case right now, that I would hold everything else and then provide you some discovery for your contempt hearing and then hold a contempt hearing. And then once a contempt hearing was done and an opinion was issued on that, then we would go back to the races and put it into the normal run of cases.

So two options. Why don't you talk to each other and figure out which one you think is the best. Hopefully you can agree. If not, I'll just rule.

(Sotto voce discussion.)

THE COURT: Okay. Agreement?

MS. PEARSON: Yes.

THE COURT: Excellent. Is this the first time today that's happened?

(Laughter.)

MS. PEARSON: No. We were playing nice, I promise.

THE COURT: Good, good. Okay. So what have you agreed?

MS. PEARSON: 30 days for a short amount of discovery regarding the contempt.

THE COURT: 30 days of discovery.

And then do you want a time for briefing or not?

MS. PEARSON: Yes, Your Honor.

THE COURT: So I'll give you two weeks after that for plaintiffs' briefing, one week after that for defendants' briefing.

And then just because I don't know what my schedule looks like, I will set a hearing date. And so when I say "hearing date," there's a difference between an argument and a hearing. An argument would just be you have your legal arguments and you make your legal arguments. Hearing would be you would put witnesses on the stand.

So do you think you would have witnesses?

MS. PEARSON: Yes.

THE COURT: So it would be a hearing date. And my deputy, Mike Beck, will reach out to you for what works best for everyone.

MS. PEARSON: Thank you, Your Honor.

THE COURT: Okay. Anything else?

MR. SHUEY: Thank you, Your Honor.

(Sotto voce discussion.)

THE COURT: So I'll have a Rule 16 conference immediately -- I will set a date which will be immediately following the hearing or shortly thereafter. Okay?

And then what I'll do is -- yes, we'll have that Rule 16, and then at that point everyone will have a better

understanding of where we are and you'll be able to come up with proposed dates and the various bits and pieces that you're required to provide in the Rule 16. Okay?

MS. PEARSON: Yes, Your Honor.

MR. SHUEY: One question for clarification. Your ruling today will stay our time to respond to the complaint, am I understanding that correctly?

THE COURT: It won't.

MR. SHUEY: It won't, okay.

THE COURT: But you just ask me and I'll give it to you.

MR. SHUEY: Very well. Thank you, Your Honor.

MS. PEARSON: I mean, if you need additional time --

THE COURT: I'm assuming you'll give him additional time because -- I assume you want to deal with your contempt hearing, and then he's going to file his 12(b)(6) and you want some time to do that.

So let's decide that at the Rule 16. So you can work with -- you're not only scheduling discovery, if you need expert discovery, summary judgment deadlines, but also any deadlines for the motion to dismiss as well.

MS. PEARSON: Okay.

THE COURT: Okay. Anything else?

MS. PEARSON: No. No, Your Honor.

MR. SHUEY: No, Your Honor.

THE COURT: Great. Thank you.

THE DEPUTY CLERK: All rise.

(Matter adjourned at 3:48 p.m.)

\- - - - - - - - - - - - - - -

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/S/ Sharon Ricci, RMR, CRR, FCRR
Official Court Reporter

April 14, 2026
Date

## 1

**12(b)(6** [3] - 13:18, 14:6, 16:22
**1450** [7] - 8:23, 8:24, 9:15, 9:23, 9:24, 10:8, 10:9
**14th** [1] - 1:1
**157** [1] - 8:13
**16** [5] - 14:3, 16:1, 16:4, 16:8, 16:23
**183** [1] - 7:17
**1902** [1] - 7:16
**19th** [8] - 4:4, 4:21, 5:4, 5:6, 8:22, 9:21, 10:3, 10:19

## 2

**2025** [1] - 8:13
**2026** [6] - 1:1, 4:22, 8:22, 9:21, 10:3, 11:9
**2503299** [1] - 4:20
**2503300** [1] - 4:21
**251** [1] - 8:13
**262** [1] - 8:13
**28** [3] - 8:23, 9:14, 9:23

## 3

**30** [2] - 15:4, 15:6
**30th** [5] - 3:13, 3:15, 4:2, 5:5, 11:9
**3:24** [1] - 1:11
**3:48** [1] - 17:7

## 4

**483** [1] - 7:17
**496** [1] - 7:18
**4th** [2] - 3:4, 3:17

## 7

**7** [1] - 7:4

## 8

**8** [1] - 5:21

## 9

**97** [1] - 7:18

## A

**ability** [1] - 3:11
**able** [2] - 13:11, 16:6
**accordance** [3] - 4:7, 5:5, 12:22
**Act** [5] - 3:5, 3:10, 4:8, 11:8, 12:4
**act** [3] - 4:20, 7:25, 8:1
**acting** [1] - 4:18
**action** [11] - 2:11, 2:24, 4:19, 6:6, 6:12, 7:10, 8:5, 9:15, 9:18, 13:19, 13:20
**actions** [6] - 3:16, 5:22, 10:22, 11:23, 12:2, 13:13
**acts** [1] - 12:21
**additional** [3] - 3:9, 16:18, 16:20
**additionally** [1] - 11:22
**address** [2] - 14:5, 14:9
**adhere** [1] - 5:2
**adjourned** [1] - 17:7
**advance** [1] - 4:19
**affect** [1] - 8:8
**affidavits** [1] - 3:22
**afternoon** [3] - 1:15, 1:18, 1:21
**agree** [5] - 7:8, 8:19, 10:1, 10:2, 14:19
**agreed** [4] - 3:25, 4:4, 5:2, 15:3
**agreement** [1] - 14:21
**alleged** [1] - 8:7
**allegedly** [1] - 12:9
**allow** [1] - 12:7
**allows** [1] - 9:1
**alternative** [1] - 14:10
**amount** [1] - 15:4
**answer** [1] - 13:18
**applies** [1] - 7:19
**approach** [1] - 9:9
**April** [1] - 1:1
**argue** [2] - 2:25, 5:4
**argument** [5] - 2:3, 2:13, 4:9, 15:14
**arguments** [2] - 15:15, 15:16
**arrested** [1] - 8:1
**assume** [1] - 16:20
**assuming** [4] - 14:4, 14:5, 14:8, 16:19
**attendees** [1] - 3:23
**authority** [4] - 4:23, 10:12, 13:2, 13:7
**available** [2] - 3:19, 3:21

## B

**based** [1] - 10:4
**beck** [1] - 15:20
**Beetlestone** [2] - 1:1, 1:13
**behalf** [1] - 1:19
**best** [2] - 14:19, 15:21
**better** [1] - 16:5
**between** [1] - 15:14
**beyond** [1] - 8:4
**biggest** [1] - 13:23
**bill** [1] - 6:12
**Bills** [1] - 4:20
**bills** [7] - 3:8, 3:9, 3:14, 4:5, 5:23, 5:25, 6:6
**bits** [1] - 16:7
**board** [1] - 7:24
**bodies** [1] - 7:20
**body** [2] - 7:23, 8:2
**Bradford** [1] - 8:13
**Briana** [1] - 1:4
**Brianna** [1] - 1:18
**briefing** [3] - 15:7, 15:10, 15:11
**brought** [1] - 13:15

## C

**California** [1] - 12:6
**cannot** [4] - 7:21, 8:19, 8:20
**carrying** [1] - 14:11
**case** [12] - 7:11, 7:16, 7:21, 8:5, 8:7, 8:12, 8:14, 9:3, 11:8, 12:15, 13:8, 14:12
**cases** [1] - 14:17
**charge** [1] - 12:3
**charger** [1] - 12:3
**Chief** [1] - 1:13
**chokeholds** [1] - 12:6
**Cincinnati** [1] - 7:15
**Circuit** [2] - 8:12, 8:14
**circumstances** [2] - 8:16, 13:1
**citations** [2] - 13:2, 13:7
**cite** [1] - 12:5
**City** [21] - 1:2, 1:16, 1:22, 2:11, 2:24, 4:20, 4:23, 5:22, 6:11, 6:13, 6:20, 7:1, 10:1, 10:4, 10:25, 11:7, 11:19, 14:5, 14:9
**clarification** [1] - 16:10
**CLERK** [2] - 1:12, 17:6
**code** [1] - 9:14
**comment** [2] - 3:12, 3:22
**committee** [6] - 3:4, 3:13, 3:18, 3:19, 3:21, 11:8
**Common** [4] - 2:8, 5:14, 8:22, 9:22
**company** [1] - 7:16
**complaint** [2] - 13:18, 16:12
**completely** [1] - 5:3
**concerning** [1] - 15:5
**concerns** [2] - 2:3, 9:8
**concert** [1] - 4:18
**conducted** [2] - 3:6, 4:6
**conference** [1] - 16:1
**confirming** [1] - 3:24
**confused** [1] - 2:23
**considered** [1] - 10:24
**constitutional** [1] - 8:6
**constrict** [1] - 4:25
**constricting** [1] - 6:18
**contempt** [18] - 2:17, 2:20, 4:10, 4:15, 5:9, 5:10, 6:10, 10:22, 11:10, 13:22, 13:24, 14:4, 14:11, 14:13, 14:14, 14:15, 15:5, 16:21
**contention** [1] - 3:3
**continued** [2] - 3:15, 3:17
**contract** [1] - 8:7
**conversation** [1] - 6:23
**corner** [1] - 5:17
**correct** [3] - 4:13, 5:15, 10:6
**correctly** [1] - 16:12
**council** [1] - 12:8
**Council** [10] - 1:2, 1:16, 2:11, 2:24, 4:20, 4:23, 5:22, 6:12, 6:21, 7:1
**counsel** [2] - 1:5, 6:23
**couple** [1] - 14:1
**course** [1] - 13:21
**courses** [2] - 13:19, 13:20
**Court** [8] - 2:7, 3:22, 5:13, 7:18, 8:23, 9:22, 10:22, 12:20
**court** [16] - 1:11, 1:12, 4:17, 5:3, 7:9, 9:2, 9:4, 9:8, 9:16, 9:20, 10:13, 11:20, 12:5, 12:6, 13:14
**COURT** [49] - 1:15, 1:20, 1:25, 2:7, 2:10, 2:13, 2:16, 2:20, 2:23, 4:9, 4:14, 5:7, 5:12, 5:16, 5:19, 6:5, 6:9, 6:19, 7:1, 7:6, 7:11, 7:13, 7:15, 9:5, 9:11, 9:14, 10:3, 10:7, 10:25, 11:4, 11:10, 12:1, 12:23, 13:17, 14:1, 14:8, 14:21, 14:23, 15:2, 15:6, 15:9, 15:19, 15:23, 16:1, 16:13, 16:15, 16:19, 17:3, 17:5
**Court's** [3] - 6:1, 6:2, 6:4
**courts** [4] - 7:21, 8:2, 10:12, 10:13

## D

**date** [5] - 11:23, 15:12, 15:13, 15:19, 16:2
**dates** [1] - 16:7
**days** [2] - 15:4, 15:6
**deadlines** [2] - 16:25
**deal** [4] - 9:11, 10:16, 13:23, 16:20
**dealing** [2] - 4:15, 4:16
**deals** [1] - 12:10
**decide** [1] - 16:22
**decisions** [1] - 11:24
**declaration** [2] - 11:14, 11:15
**defendant's** [2] - 13:13, 15:11
**defendants** [9] - 1:22, 1:24, 3:7, 3:10, 3:14, 3:24, 4:3, 4:17, 10:21
**defense** [3] - 1:20, 3:1, 6:23
**deliberately** [1] - 13:3
**denied** [1] - 13:1
**deputy** [1] - 15:20
**DEPUTY** [2] - 1:12, 17:6
**determine** [1] - 2:1
**dictate** [1] - 8:16
**difference** [1] - 15:13
**different** [1] - 12:23
**disagree** [1] - 9:6
**disappear** [1] - 9:7
**discovery** [5] - 14:13, 15:5, 15:6, 16:24
**discretion** [4] - 7:21, 8:4, 8:8, 8:9
**discussing** [2] - 7:4, 7:6
**discussion** [2] - 14:20, 15:25
**dismiss** [1] - 17:1
**disregard** [2] - 5:3, 8:6
**disregarded** [1] - 10:23
**dissolve** [1] - 10:8
**dissolved** [1] - 9:19

**district** [2] - 9:16, 9:20
**Document** [1] - 5:21
**done** [5] - 6:2, 6:4, 8:20, 13:5, 14:15
**dove** [1] - 4:12
**during** [3] - 3:19, 3:21, 4:1

**E**

**effect** [10] - 2:8, 4:11, 5:14, 7:17, 9:19, 9:23, 9:25, 10:5, 10:20, 10:23
**either** [4] - 6:1, 7:23, 8:5, 14:2
**end** [2] - 4:5
**enforcement** [1] - 7:25
**enjoin** [5] - 2:11, 2:24, 4:23, 5:22, 6:20
**enjoined** [2] - 4:18, 6:23
**enjoining** [1] - 6:11
**enter** [2] - 5:13, 10:9
**entered** [7] - 3:7, 4:3, 5:4, 5:6, 9:1, 9:22, 10:4
**equitable** [1] - 11:13
**Erica** [2] - 1:2, 1:16
**evaporate** [1] - 9:3
**events** [1] - 13:21
**evidence** [1] - 11:7
**exact** [2] - 3:15, 3:16
**exactly** [2] - 2:1, 3:24
**excellent** [1] - 14:23
**execute** [1] - 8:1
**exemption** [1] - 7:19
**exercise** [1] - 8:3
**exercised** [2] - 8:9, 8:10
**exigency** [1] - 13:1
**expert** [1] - 16:24
**extends** [1] - 7:21

**F**

**F4th** [1] - 8:13
**fact** [2] - 8:5, 10:10
**far** [1] - 7:20
**federal** [5] - 8:15, 9:3, 9:8, 10:13, 13:19
**figure** [2] - 2:4, 14:18
**file** [2] - 14:6, 16:21
**filed** [3] - 3:6, 11:2, 12:25
**fine** [4] - 2:18, 2:19, 13:8, 13:16
**finer** [1] - 5:24
**first** [4] - 1:25, 2:3, 6:14, 14:23
**Floyd** [2] - 1:2, 1:16
**focus** [3] - 4:22, 7:7, 8:21
**focused** [1] - 5:23
**focusing** [1] - 6:13
**follow** [3] - 3:10, 3:25, 4:4
**following** [1] - 16:3
**forbid** [1] - 7:22
**force** [7] - 2:8, 5:14, 9:19, 9:22, 9:24, 10:5, 10:20
**forth** [1] - 13:15
**forward** [2] - 3:8, 14:4
**full** [6] - 2:8, 5:14, 9:19, 9:22, 9:24, 10:5
**fully** [1] - 3:10
**future** [4] - 8:20, 11:19, 12:2, 12:14

**G**

**given** [1] - 14:11
**government** [1] - 8:15
**great** [1] - 17:5
**guess** [1] - 12:16

**H**

**Hadley** [2] - 1:2, 1:16
**happy** [2] - 11:9, 14:4
**hard** [1] - 10:12
**hear** [3] - 2:25, 6:13, 7:1
**hearing** [32] - 2:17, 2:19, 2:20, 3:3, 3:5, 3:14, 3:24, 4:10, 4:15, 5:4, 5:9, 5:10, 6:2, 10:17, 11:11, 12:8, 12:18, 13:10, 13:11, 13:22, 13:24, 14:11, 14:14, 14:15, 15:12, 15:13, 15:14, 15:16, 15:19, 16:3, 16:21
**hearings** [6] - 3:9, 3:13, 3:18, 3:20, 4:1, 4:6
**hold** [2] - 14:12, 14:14
**home** [1] - 12:3
**Honor** [30] - 1:21, 2:6, 2:9, 2:12, 2:19, 3:2, 4:24, 5:25, 6:17, 7:3, 7:4, 7:8, 7:12, 8:25, 9:6, 10:6, 10:18, 11:1, 11:6, 12:16, 12:19, 13:9, 13:25, 14:7, 15:8, 15:22, 15:24, 16:9, 16:17, 17:4
**Honorable** [1] - 1:13
**hopefully** [1] - 14:19
**housing** [1] - 3:4

**I**

**ignore** [1] - 5:3
**immediately** [2] - 16:2
**impair** [1] - 8:6
**important** [1] - 4:7
**inappropriate** [2] - 7:9, 10:11
**include** [1] - 13:2
**inconsistent** [1] - 4:21
**injunction** [1] - 6:11
**injunctions** [1] - 9:17
**interest** [1] - 8:15
**interference** [2] - 7:19, 8:10
**invalid** [4] - 5:6, 8:1, 10:24, 11:25
**invalidate** [1] - 12:21
**invalidated** [1] - 6:3
**involving** [1] - 12:6
**issue** [9] - 1:22, 9:10, 9:11, 11:10, 11:19, 12:2, 12:4, 13:17, 13:23
**issued** [1] - 14:15
**issues** [2] - 12:17, 13:11
**issuing** [1] - 12:13

**J**

**job** [1] - 4:25
**Judge** [3] - 1:1, 1:13, 4:12
**judgment** [1] - 16:25
**judicial** [1] - 7:19
**judiciary** [1] - 8:11
**jurisdiction** [1] - 8:4

**K**

**Kung** [1] - 1:4

**L**

**Laughter** [1] - 14:25
**law** [4] - 3:25, 4:4, 7:11, 7:22
**lawsuit** [1] - 3:6
**least** [3] - 6:19, 11:16, 13:11
**left** [2] - 10:16, 12:7
**legal** [2] - 15:15
**legislative** [6] - 7:20, 8:2, 8:4, 8:5, 8:8
**legislature** [4] - 6:18, 7:9, 7:24, 8:16
**legislatures** [1] - 4:25
**level** [1] - 9:2
**lion's** [3] - 12:5, 12:6, 12:15
**listen** [2] - 10:12, 10:13
**local** [1] - 13:1
**look** [1] - 9:14
**looking** [4] - 6:22, 6:24, 10:21, 11:14
**looks** [1] - 15:12

**M**

**Macord** [1] - 7:15
**March** [15] - 3:4, 3:13, 3:15, 3:17, 4:2, 4:4, 4:21, 5:4, 5:5, 5:6, 8:22, 9:21, 10:3, 10:19, 11:9
**Matter** [1] - 17:7
**mean** [2] - 12:16, 16:18
**means** [1] - 9:20
**meeting** [1] - 11:12
**member** [1] - 3:19
**members** [1] - 3:21
**Michael** [2] - 1:4, 1:23
**might** [2] - 11:14, 13:7
**Mike** [1] - 15:20
**mine** [1] - 10:11
**modified** [1] - 9:19
**modify** [1] - 10:8
**most** [4] - 2:23, 3:18, 8:15, 13:15
**motion** [2] - 12:25, 16:25
**moved** [1] - 9:7
**moving** [1] - 14:3
**MR** [17] - 1:21, 1:23, 7:3, 7:8, 7:12, 7:14, 9:6, 9:13, 10:2, 10:6, 11:1, 11:6, 14:7, 15:24, 16:10, 16:14, 16:17
**MS** [33] - 1:18, 2:6, 2:9, 2:12, 2:15, 2:18, 2:22, 3:2, 4:13, 4:24, 5:11, 5:15, 5:18, 5:24, 6:8, 6:15, 6:22, 8:25, 10:18, 11:3, 11:22, 12:16, 13:8, 13:25, 14:22, 15:1, 15:4, 15:8, 15:18, 15:22, 16:18, 17:2, 17:4
**municipality** [1] - 8:3

**N**

**narrow** [1] - 6:16
**necessarily** [1] - 10:21
**need** [3] - 13:16, 16:18, 16:24
**new** [1] - 3:14
**next** [1] - 11:17
**nice** [1] - 15:1
**non** [1] - 3:23
**non-party** [1] - 3:23
**normal** [2] - 13:20, 14:17
**nothing** [4] - 10:9, 10:15, 11:13, 12:12
**NOTP** [1] - 7:15
**number** [1] - 2:2
**Number** [1] - 4:20

**O**

**obligation** [1] - 8:7
**occur** [3] - 3:17, 4:2, 4:8
**occurred** [1] - 12:19
**once** [1] - 14:14
**one** [8] - 2:10, 3:19, 3:20, 7:21, 9:11, 10:15, 15:10, 16:10
**open** [1] - 1:11
**opinion** [1] - 14:15
**options** [1] - 14:17
**order** [34] - 2:7, 2:8, 2:21, 4:3, 4:17, 4:22, 5:3, 5:6, 5:13, 5:14, 5:21, 6:1, 6:2, 6:4, 6:10, 6:25, 7:5, 7:9, 7:23, 8:22, 9:21, 10:3, 10:10, 10:17, 10:19, 10:23, 11:2, 11:19, 11:20, 11:24, 13:14, 14:3
**orders** [4] - 2:2, 9:1, 9:2, 9:17
**ordinance** [1] - 7:23
**otherwise** [1] - 4:19
**outside** [1] - 6:18

**P**

**p.m** [2] - 1:11, 17:7
**page** [2] - 7:18, 8:13
**papers** [1] - 6:7
**paragraph** [1] - 7:4
**participation** [1] - 4:18
**particular** [2] - 4:5, 13:13
**parties** [1] - 8:1
**party** [1] - 3:23
**passage** [2] - 7:22
**passed** [4] - 3:8, 3:15, 6:1, 7:25
**paths** [1] - 14:2
**Pearson** [2] - 1:5, 7:4
**PEARSON** [33] - 1:18,

2:6, 2:9, 2:12, 2:15, 2:18, 2:22, 3:2, 4:13, 4:24, 5:11, 5:15, 5:18, 5:24, 6:8, 6:15, 6:22, 8:25, 10:18, 11:3, 11:22, 12:16, 13:8, 13:25, 14:22, 15:1, 15:4, 15:8, 15:18, 15:22, 16:18, 17:2, 17:4
**Pearson's** [1] - 9:9
**pending** [1] - 4:16
**people** [1] - 12:8
**perhaps** [2] - 2:25, 13:6
**Perrone** [1] - 8:12
**persons** [1] - 4:17
**perspective** [1] - 7:2
**Pfautz** [2] - 1:4, 1:23
**PFAUTZ** [2] - 1:23
**Philadelphia** [5] - 1:3, 1:17, 4:20, 4:23, 11:7
**pieces** [1] - 16:7
**Pierce** [1] - 1:18
**plaintiff** [4] - 1:17, 2:2, 3:7, 10:5
**plaintiff's** [3] - 1:5, 3:3, 15:10
**plaintiffs** [3] - 1:19, 3:6, 3:23
**playing** [1] - 15:1
**Pleas** [4] - 2:8, 5:14, 8:22, 9:22
**point** [5] - 3:19, 3:20, 5:24, 6:24, 16:5
**position** [2] - 4:2, 6:17
**possibly** [1] - 13:15
**power** [1] - 6:18
**prejudice** [2] - 13:3, 13:5
**preserve** [1] - 8:14
**presiding** [1] - 1:14
**pretty** [1] - 14:2
**procedurally** [1] - 14:10
**proceeding** [2] - 11:16, 13:13
**proceedings** [1] - 9:17
**promise** [1] - 15:1
**proposed** [5] - 5:21, 7:5, 9:21, 11:2, 16:7
**prospective** [1] - 6:11
**provide** [2] - 14:13, 16:8
**provided** [2] - 3:22, 5:21
**public** [3] - 3:12, 3:21, 3:22
**pursuant** [1] - 9:23
**pursuing** [1] - 6:20
**put** [4] - 5:17, 5:24, 14:16, 15:16

**Q**

**quite** [1] - 10:7
**quorum** [4] - 3:4, 3:12, 3:17, 4:1

**R**

**races** [1] - 14:16
**railroad** [1] - 7:16
**reach** [1] - 15:20
**reached** [1] - 8:2
**recondone** [1] - 6:3
**related** [1] - 3:9
**relates** [1] - 4:5
**relief** [1] - 11:13
**remain** [1] - 9:18
**remains** [4] - 2:8, 5:14, 7:16, 9:22
**remand** [1] - 12:25
**remanded** [2] - 13:9, 13:16
**removal** [1] - 9:18
**removed** [2] - 9:3, 9:16
**render** [1] - 11:24
**renew** [1] - 13:6
**request** [10] - 2:24, 4:16, 5:20, 6:20, 8:18, 9:9, 9:25, 11:1, 12:1, 12:8
**requesting** [1] - 2:2
**required** [1] - 16:8
**requires** [1] - 13:2
**resolution** [1] - 7:23
**respect** [4] - 8:18, 10:14, 12:1, 12:2
**respond** [1] - 16:11
**response** [3] - 9:5, 11:5, 11:6
**restraining** [2] - 2:21, 10:17
**restraints** [1] - 8:6
**rightfully** [1] - 8:9
**ripe** [2] - 12:4, 12:18
**rise** [2] - 1:12, 17:6
**room** [2] - 12:9, 12:10
**Rule** [5] - 14:3, 16:1, 16:4, 16:8, 16:23
**rule** [3] - 12:3, 13:2, 14:19
**ruling** [1] - 16:11
**run** [1] - 14:17

**S**

**sanctions** [1] - 10:21
**schedule** [1] - 2:16
**scheduled** [2] - 3:14, 13:10
**scheduling** [3] - 14:3, 15:12, 16:24
**scrambling** [1] - 13:5
**seat** [1] - 1:15
**Section** [1] - 9:15
**see** [1] - 11:1
**seek** [2] - 4:16, 11:17
**seeking** [1] - 8:1
**separately** [1] - 10:7
**session** [1] - 1:13
**set** [3] - 14:3, 15:12, 16:2
**Seth** [2] - 1:1, 1:16
**shall** [1] - 9:18
**shine** [5] - 3:5, 3:10, 4:7, 11:8, 12:4
**short** [1] - 15:4
**shortly** [1] - 16:3
**Shuey** [1] - 1:4
**SHUEY** [17] - 1:21, 1:22, 7:3, 7:8, 7:12, 7:14, 9:6, 9:13, 10:2, 10:6, 11:1, 11:6, 14:7, 15:24, 16:10, 16:14, 16:17
**signed** [1] - 4:11
**Sotto** [2] - 14:20, 15:25
**sovereign** [1] - 8:14
**specific** [2] - 5:23, 6:12
**stand** [1] - 15:17
**state** [8] - 8:3, 8:16, 9:2, 9:16, 10:12, 10:13, 11:20, 13:19
**states** [1] - 9:15
**States** [1] - 9:17
**stay** [2] - 4:16, 16:11
**still** [1] - 10:19
**stipulation** [3] - 3:7, 4:11, 10:4
**stop** [1] - 12:14
**stuff** [1] - 6:10
**subject** [2] - 8:10, 13:18
**substantive** [1] - 9:8
**summary** [1] - 16:24
**sun** [5] - 3:5, 3:10, 4:7, 11:8, 12:4
**supervisors** [1] - 7:24
**Supreme** [1] - 7:18
**surrounding** [1] - 13:12

**T**

**tailor** [1] - 6:16
**temporary** [2] - 2:21, 10:16
**terms** [2] - 11:13, 11:20
**testimony** [2] - 3:12, 3:21
**THE** [51] - 1:12, 1:15, 1:20, 1:25, 2:7, 2:10, 2:13, 2:16, 2:20, 2:23, 4:9, 4:14, 5:7, 5:12, 5:16, 5:19, 6:5, 6:9, 6:19, 7:1, 7:6, 7:11, 7:13, 7:15, 9:5, 9:11, 9:14, 10:3, 10:7, 10:25, 11:4, 11:10, 12:1, 12:23, 13:17, 14:1, 14:8, 14:21, 14:23, 15:2, 15:6, 15:9, 15:19, 15:23, 16:1, 16:13, 16:15, 16:19, 17:3, 17:5, 17:6
**thereafter** [1] - 16:3
**they've** [1] - 11:23
**Third** [2] - 8:12, 8:14
**threatened** [1] - 8:5
**throughout** [3] - 3:13, 3:18, 13:12
**timely** [1] - 13:15
**today** [2] - 14:24, 16:11
**took** [1] - 10:23
**totally** [1] - 10:11
**trance** [1] - 4:7
**transfer** [1] - 9:2
**transparency** [1] - 3:11
**transparent** [1] - 4:1
**treat** [1] - 14:2
**TRO** [3] - 11:11, 12:2, 12:13
**trying** [2] - 2:4, 6:16
**two** [6] - 2:10, 3:20, 3:23, 5:25, 14:17, 15:9

**U**

**U.S** [1] - 7:17
**U.S.C** [3] - 8:23, 9:14, 9:23
**unconstitutional** [1] - 7:25
**under** [2] - 8:23, 10:11
**United** [1] - 9:17
**up** [1] - 16:6

**V**

**various** [1] - 16:7
**venue** [2] - 11:15, 11:16
**versus** [2] - 7:15, 8:12
**view** [1] - 4:9
**violate** [2] - 11:20, 11:23
**violated** [3] - 4:3, 10:20, 11:8
**violation** [9] - 3:5, 4:11, 4:21, 6:1, 6:2, 6:4, 11:24, 12:3, 13:13
**voce** [2] - 14:20, 15:25
**vote** [1] - 4:19
**vs** [2] - 1:2, 1:16

**W**

**warranted** [1] - 12:12
**week** [1] - 15:10
**weeks** [1] - 15:9
**weight** [1] - 14:11
**Wendy** [2] - 1:1, 1:13
**William** [2] - 1:4, 1:21
**wish** [1] - 12:5
**witnesses** [2] - 15:16, 15:17
**works** [1] - 15:20
**wrongfully** [1] - 8:10
**Wu** [1] - 1:4
**Wu-Kung** [1] - 1:4

# EXHIBIT E

Enacted Bills Nos. 250329-AA and 250330-AA
ECF No. 21, pages 61–71 and 73–85

# City of Philadelphia

(Bill No. 250329-AA)

AN ORDINANCE

Amending Chapter 9-3900 of The Philadelphia Code, entitled "Property Licenses and Owner Accountability," to clarify licensing requirements, authorize the Department to create a Proactive Inspection program, require public reporting related to Code compliance, and establish remedies, damages, and protections for tenants, all under certain terms and conditions.

*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*

SECTION 1. Legislative Findings. Council finds that:

(1) A safe, habitable, and well-maintained home is a fundamental necessity for health, stability, and economic mobility. Yet, too many rental properties in Philadelphia fail to meet basic standards of habitability. Approximately 40% of Philadelphia rental homes need repairs and 30-45% of rental units operate without proper licensing, exposing tenants to unsafe, unfit, and imminently dangerous conditions.

(2) Philadelphia is trending toward a majority-renter city, with approximately half of all households currently renting their homes. More than half of these renters are cost-burdened, paying more than 30% of their income toward rent, limiting their ability to absorb additional housing instability or pursue legal remedies when conditions deteriorate.

(3) Existing enforcement mechanisms rely heavily on tenant complaints, placing the burden on tenants to identify, report, and pursue remedies for violations, often at personal risk. This reactive system allows serious code violations to persist undetected and unaddressed for extended periods. Furthermore, tenants consistently face retaliation for speaking out about unsafe conditions.

(4) A majority of tenants lack access to legal representation or the financial means to enforce their rights, resulting in widespread under-enforcement of existing housing standards and allowing non-compliant landlords to continue collecting rent despite failing to maintain habitable properties. In eviction court, 80-85% of landlords have legal representation while only 5-8% of tenants do.

(5) The current rental licensing system does not adequately ensure ongoing compliance with housing standards, nor does it provide sufficient transparency to tenants regarding the condition and legal status of their housing.

(6) Strengthening licensing requirements, establishing proactive inspections, improving transparency, and creating meaningful enforcement mechanisms, including a private right of

# City of Philadelphia



action, are necessary to ensure that all rental housing meets basic standards of safety and habitability.

(7) Tenant advocates report a myriad of eviction filings in Philadelphia Municipal Court, and in many cases, eviction judgments entered against tenants, for properties where there are open code violations and deficiencies in rental licenses and certificates of rental suitability.

(8) It is the intent of Council to shift from a reactive, complaint-driven system to a proactive and accountable framework that ensures compliance before harm occurs, empowers tenants to enforce their rights, and aligns economic incentives so that bad actor landlords cannot continue to profit from unsafe or unlawful conditions.

(9) These reforms are necessary to protect public health, reduce displacement, and promote housing stability in Philadelphia's housing system.

SECTION 2. Title 9 of The Philadelphia Code is hereby amended to read as follows:

TITLE 9. REGULATION OF BUSINESSES, TRADES AND PROFESSIONS

* * *

CHAPTER 9-3900. PROPERTY LICENSES AND OWNER ACCOUNTABILITY

* * *

§ 9-3901. General Provisions.

* * *

(2) Application and Issuance. In addition to the provisions set forth in Subcode A of Title 4, the following provisions shall also apply to licenses required by this Chapter:

(a) An applicant for a new license or the renewal of a license shall complete an application provided by the Department. *The license shall be considered effective from the date specified on the license.* The application shall contain the following information, and such other information as the Department may require:

* * *

(b) *An applicant shall not be eligible for a new rental license or renewal, nor shall* [T]*t*he Department [shall] issue or renew a license [if] *unless* it finds:

* * *

*(d) If a license is issued while an appeal of a violation is pending, the relevant violation is affirmed on appeal, and all relevant appeals have been exhausted, the Department may suspend the license.*

*(e) The owner shall, within 7 days of receipt, either post the results of any appeal covered by this Section in a conspicuous place clearly visible to all impacted tenants or deliver it to all impacted tenants either personally or by first class mail.*

* * *

(4) Non-compliance, Private Right of Action and Suspension. In addition to the provisions for license suspension set forth in Subcode A of Title 4, the following provisions shall also apply to licenses required by this Chapter:

(a) The Department is authorized to immediately suspend a license if a property is deemed unfit or unsafe or imminently dangerous.

*(b) Any owner who is required to obtain or renew a rental license shall, within 7 days of receipt, provide a copy of that rental license, together with a restatement of subsection 9-3901(4)(h), to all tenants in the following manner. The owner shall either (i) post the rental license and restatement of subsection 9-3901(4)(h) in a conspicuous place clearly visible to all tenants or (ii) deliver a copy of the rental license, together with a restatement of subsection 9-3901(4)(h), to each tenant either personally or by certified mail. For properties containing one (1) or two (2) dwelling units, the owner may also provide the rental license and restatement of subsection 9-3901(4)(h) by e-mail, provided that the tenant has affirmatively consented in writing to receive such notices by e-mail, has provided an e-mail address for that purpose, and has not revoked such consent. A tenant may revoke consent to receive notices by e-mail at any time by written notice to the owner, and upon such revocation, the owner shall provide notice by another method authorized under this Section.*

*(c) Any owner who receives a notice of violation from the Department stating that (i) a property or unit is unsafe, unfit, or imminently dangerous as defined in Sections PM-108, PM-109, or PM-110, or (ii) a property or unit violates the Philadelphia Fire Code, shall provide notice to all impacted tenants by posting a copy of the notice of violation, and any subsequent inspection reports or appeals, in a conspicuous location on the premises clearly visible to impacted tenants, or by delivering such notice personally or by first class mail.*

*Such notice shall be provided no later than twenty-four (24) hours prior to the deadline for correction stated in the notice of violation. If the violation is fully corrected within the time permitted by the Department, no tenant notice shall be required under this subsection.*

# City of Philadelphia



*(d) Any owner who receives a notice of license suspension shall, within 7 days of receipt, either post a copy of that notice in a conspicuous place clearly visible to all impacted tenants or deliver it to all impacted tenants either personally or by first class mail.*

[(b)] *(e)* The Department is authorized to suspend a license at the request of the District Attorney with respect to any property subject to forfeiture to the Commonwealth under the provisions of 42 Pa. C.S. § 6801 or other applicable law.

[(c)] *(f)* A license issued may be suspended by the Department for failure to comply with the requirements of this Code after a re-inspection has been made to determine compliance pursuant to Section A-503.1 of Subcode A, *provided an appeal is not in the process of being reviewed,* or for failure to pay any fine and/or cost imposed under this Chapter or Subcode A, and such suspension shall continue until there has been compliance and until any unpaid fines and costs have been paid.

[(d)] *(g)* The Department shall provide written notice and an opportunity for a hearing prior to any suspension of a license under this Section.

[(e)] *(h)* Non-compliance. Any owner who fails to obtain a *valid* rental license as required by Section 9-3902, *who fails to obtain a valid* [to comply with Section 9-3903 regarding a] Certificate of Rental Suitability *as required by Section 9-3903*, *who fails to correct code violations as described in Section 9-3903(2)(d)*, or whose rental license has been suspended shall be denied the right to recover possession of the premises or to collect rent during or for the period of noncompliance or during or for the period of license suspension. In any action for eviction or collection of rent, the owner shall attach a copy of the license*, copies of all Certificates of Rental Suitability required by Section 9-3903 and copies of all code violations issued with respect to the rental unit and/or property during the relevant tenancy.*

[(f)] *(i)* Private Right of Action. Any [tenant of any property] *person* subject to the provisions of this Chapter shall have the right to bring an action against the owner of such property to compel compliance with this Chapter *and to seek relief as provided in this Section*. [Such private right of action neither limits nor expands the rights of private parties to pursue any legal rights and claims they may possess under a written agreement or at Common Law.] *A prevailing tenant shall be entitled to the following remedies:*

*(.1) Compensatory damages for any harm caused by any non-compliance or liquidated damages in the amount of $1,000 per violation, whichever is greater. Liquidated damages under this subsection are intended to make the tenant whole and to compensate the tenant for collateral harms suffered as a result of the violation and for the tenant's time and effort enforcing the rights afforded to the tenant under this Chapter. Each separate occurrence or instance of a prohibited action shall constitute a separate violation; A continuing violation arising from the same underlying condition shall constitute a single violation and shall not be deemed a separate violation for each day it continues.*

# City of Philadelphia



*(.2) For violations of Section 9-3901(4)(h), abatement and refund of rent for any period during which rent was collected and the owner was noncompliant as defined in that Section;*

*(.3) Such other relief, including injunctive relief, as the court may deem appropriate; and*

*(.4) Reasonable attorney's fees and costs.*

*(j) Safe Harbor. In a private action pursuant to this Section, an owner shall not be deemed non-compliant for any period in which the owner can demonstrate, by a preponderance of the evidence, that the safe harbor provisions set below apply.*

*(.1) Delayed re-inspection of premises. An owner shall not be deemed non-compliant for purposes of this Section for any period during which the owner's inability to obtain or maintain a rental license or Certificate of Rental Suitability results primarily from a delayed re-inspection by the Department. An owner shall be deemed compliant as of the date the owner completed the required corrective action and took all reasonable steps to obtain or maintain the required license or Certificate of Rental Suitability, provided that the owner demonstrates by a preponderance of the evidence that:*

*(.a) The owner timely corrected the underlying condition or deficiency;*

*(.b) The owner timely applied for, renewed, or sought reinstatement of the rental license or Certificate of Rental Suitability and requested in writing any required inspections;*

*(.c) Any failure to obtain or maintain the license or Certificate during the relevant period was due primarily to the delayed re-inspection by the City;*

*(.d) The owner provided notice of the completed repair to the tenant(s); and*

*(.e) A subsequent inspection confirms the condition was corrected.*

*(.2) Pending appeal of certain taxes, liens, fines, and fees resulting in outstanding balances. An owner shall not be deemed non-compliant for purposes of this Section for any period during which a timely appeal is pending and not yet adjudicated regarding taxes, liens, fines, and fees unrelated to a Title 4 violation that form an outstanding balance on the owner's business tax account that would otherwise prevent license issuance, provided that the owner demonstrates by a preponderance of the evidence that:*

Case 2:26-cv-02403-WB Document 4-1 Filed 10/29/26 Page 6 of 39

# City of Philadelphia



*(.a) In the case of a violation that leads to a tax, lien, fine or fee, the underlying violation was not issued under Title 4 and does not involve conditions classified as Unsafe, Unfit, or Imminently Dangerous;*

*(.b) The outstanding balance is the sole reason preventing the license from being issued or renewed;*

*(.c) The owner filed a timely administrative or judicial appeal of the violation or tax clearance determination, as applicable, in accordance with governing procedures;*

*(.d) The owner has not failed to take any required interim corrective actions within the owner's control; and*

*(.e) The underlying violation or condition is subsequently dismissed or withdrawn upon adjudication, such that the outstanding balance would not have prevented license issuance; and*

*(.f) Within five (5) days of filing such appeal, the owner provides written notice to all impacted tenants stating that an appeal has been filed, identifying the nature of any outstanding balance, and explaining that the basis for any alleged non-compliance is subject to adjudication; such notice shall be provided in accordance with this Section's notice requirements.*

*(.g) In any action for eviction, recovery of possession, or collection of rent or other charges relating to a property subject to this Section, the owner shall attach to the initial filing a copy of any pending appeal described in this subsection and shall affirmatively disclose the existence and status of such appeal. Failure to attach and disclose as required by this paragraph shall render the filing defective for purposes of this Section until cured.*

*For purposes of this subsection, if the appeal is denied in full, the period of non-compliance shall be deemed to run from the original cure date.*

*(.3) Renewal of Rental License. An owner shall not be deemed noncompliant for purposes of this Section solely for failure to timely renew a rental license during the fifteen (15) days immediately following the expiration of such license, provided that the owner obtains a valid renewal within such period.*

*(.4) No provision of this Section shall limit an owner's ability to bring a claim for property damage or breach of contract.*

§ 9-3902. Rental Licenses.

# City of Philadelphia



(1) Required.

(a) The owner of any dwelling unit, multiple family dwelling, rooming house, dormitory, hotel, one-family dwelling, two-family dwelling, or rooming unit let for occupancy must obtain a rental license. No person shall collect rent with respect to any property that is required to be licensed pursuant to this Section unless a valid rental license has been issued for the property *and has not expired or been suspended.*

§ 9-3903. Certificate of Rental Suitability; Required Tenant Documents.

(1) Required.

(a) The owner of any property for which a rental license is required shall, at the inception of each tenancy, provide to the tenant a Certificate of Rental Suitability that was issued by the Department no more than sixty days prior to the inception of the tenancy. The owner shall at the same time provide the tenant a copy of the owner's attestation to the suitability of the dwelling unit as received by the Department pursuant to subsection 9-3903(2)(b)(.3), and a copy of the "City of Philadelphia Partners for Good Housing Handbook" issued by the Department, or such other document as the Department shall require. The Certificate of Rental Suitability may be for either an individual dwelling unit, or for the entire building in which the unit is located.

(b) Exception. The provisions of subsection 9-3903(1)(a) shall not apply with respect to any rental to a tenant who is a member of the owner's family.

*(c) The owner of any property for which a rental license is required shall, at the time of filing an eviction action, provide a Certificate of Rental Suitability to the tenant and to the court that was issued by the Department no more than thirty days prior to the date of enrollment. Any owner who fails to comply with this subsection shall be denied the right to file for eviction or obtain possession of the property.*

*(d) At any point during a tenancy, a tenant may request a Certificate of Rental Suitability from the owner, provided that a tenant may not request more than one such Certificate within any ninety (90) day period. Within ten (10) days of receiving a tenant request, an owner shall provide to the tenant a Certificate of Rental Suitability issued by the Department no more than thirty days prior to the request. Any owner who fails to comply with this subsection shall be denied the right to collect rent until a Certificate of Rental Suitability is provided to the tenant. The Safe Harbor Provision in Section 3-901(4)(j) shall also apply to this subsection.*

(2) Application and Issuance.

# City of Philadelphia



(a) Applications for a Certificate of Rental Suitability shall be made on forms provided by the Department.

(b) The Department shall issue a Certificate of Rental Suitability only after it determines that:

(.1) The owner of the property has obtained all required licenses with respect to the property, including a rental license.

(.2) There are no outstanding violation notices under this Code with respect to the property, except with respect to violations for which there is a pending appeal of which the owner has notified the Department in a manner prescribed by the Department.

Exception: The Department of Licenses and Inspections may promulgate regulations regarding conditions under which Certificates of Rental Suitability may be issued, despite violations of Section PM-108.1.3 (Unsafe shared retaining walls).

(.3) The owner of the premises to be leased acknowledges the obligation to provide a fit and habitable property and states that (1) all fire protection and smoke detection equipment for the premises are present and in proper operating order in accordance with all applicable requirements of The Philadelphia Code and regulations and standards adopted thereunder; (2) the operating systems are working properly to provide a fit and habitable condition; and (3) *that the premises are free of unfit, unsafe, or imminently dangerous conditions, as defined by Sections PM-108, PM-109, and PM-110; and (4)* the owner will continue to maintain all fire protection and smoke detection equipment for the premises in accordance with all applicable requirements of The Philadelphia Code and regulations and standards adopted thereunder, will continue to maintain the operating systems in proper working order, *will continue to ensure that the property is free of any unfit, unsafe, and imminently dangerous conditions as defined by Sections PM-108, PM-109, and PM-110,* and will continue to maintain the property in a fit and habitable condition.

(c) The Certificate shall set forth the applicable rental license number for the property, the date of the last inspection conducted by the Department (where applicable) and the applicable zoning designation, and shall set out the process by which a tenant may request a further inspection of the property by the Department.

(d) Failure by the owner to correct *unsafe, unfit, or imminently dangerous* code violations *as defined by Sections PM-108, PM-109, and PM-110* [covered by subsection (2)(b)(.3)] within thirty (30) days of receiving a notice of violation, or sooner as indicated by the Department, shall be considered to be noncompliance with this Section*, so long as the owner has not timely appealed the notice of violation*.

# City of Philadelphia



*(.1) In an action for eviction or collection of rent, the owner shall have the burden of demonstrating compliance with the requirements for issuance of a Certificate of Rental Suitability during the relevant tenancy.*

*(.2) Where a notice of violation is timely appealed and subsequently affirmed, the owner shall be deemed in noncompliance with this Section as of the cure date specified on the notice of violation.*

*(e) Proactive Inspection Program. The Department is authorized to establish a Proactive Inspection Program in order to inspect all residential rental properties and units registered to a rental license pursuant to Section 9-3902 ("Rental Licenses"), identified as Residential Dwellings or Rooming Houses / Boarding Houses, on a regular cycle by July 2030, provided that such inspections are feasible in the interests of health and safety.*

*(f) Reporting Requirements.*

*(.1) The Department shall prepare an annual report, and shall provide Council with, and make publicly available, such reports pursuant to the schedule set forth in paragraph (.2) Such reports shall include, but are not limited to, the following:*

*(.a) The current status of the Proactive Inspection Program, an assessment of progress toward the goal of routine proactive inspections for all units registered to a rental license pursuant to Section 9-3902 ("Rental Licenses"), identified as Residential Dwellings or Rooming Houses / Boarding Houses, and a plan for developing the program over the next calendar year.*

*(.b) The total number of rental inspections performed during the past calendar year per zip code, and whether each inspection was in response to a complaint or a result of the Proactive Inspection Program.*

*(.c) An overview of inspections performed in response to complaints, including the number and type of complaints received per zip code, number and type of complaints responded to per zip code, the number and type of violations found as a result of complaints per zip code, and the average response time for each type of complaint.*

*(.d) The total number of all notices of intent to cease operations and cease operations orders for residential rental properties.*

*(.e) A list of all residential rental property owners and addresses with an open Unfit, Unsafe, or Imminently Dangerous violation or a Cease Operations order, as defined by Sections PM-108, PM-109, PM-110, and A-505.*

# City of Philadelphia



*(.2) The first report shall be provided to Council no later than December 31, 2027. Thereafter, an annual report shall be provided to Council no later than June 30 each year.*

SECTION 3. This Ordinance shall become effective November 1, 2026.

---

**Explanation:**

[Brackets] indicate matter deleted.
*Italics* indicate new matter added.

# City of Philadelphia



CERTIFICATION: This is a true and correct copy of the original Bill, Passed by the City Council on April 23, 2026. The Bill was Signed by the Mayor on May 7, 2026.

Elizabeth McCollum
Chief Clerk of the City Council

# Exhibit B

# City of Philadelphia

(Bill No. 250330-AA)

AN ORDINANCE

Amending Chapter 9-800 of The Philadelphia Code, entitled "Landlord and Tenant," to modify the requirements related to good cause for ending a tenancy, add protections against retaliation and harassment for tenants and tenant organizations, specify tenants' rights related to the implied warranty of habitability and provide a legal presumption related to breaches of the implied warranty of habitability, create a tenant right to organize, specify deadlines for asserting claims, and establish and enhance enforcement mechanisms, remedies, damages, and protections, all under certain terms and conditions.

*THE COUNCIL OF THE CITY OF PHILADELPHIA HEREBY ORDAINS:*

SECTION 1. Legislative Findings. Council finds that:

(1) A safe, habitable, and well-maintained home is a fundamental necessity for health, stability, and economic mobility. Yet, too many rental properties in Philadelphia fail to meet basic standards of habitability. Approximately 40% of Philadelphia rental homes need repairs and 30-45% of rental units operate without proper licensing, exposing tenants to unsafe, unfit, and imminently dangerous conditions.

(2) Philadelphia is trending toward a majority-renter city, with approximately half of all households currently renting their homes. More than half of these renters are cost-burdened, paying more than 30% of their income toward rent, which limits their ability to relocate when faced with unsafe or unstable housing conditions and increasing their vulnerability to exploitation.

(3) Existing enforcement mechanisms rely heavily on tenant complaints, placing the burden on tenants to identify, report, and pursue remedies for violations, often at personal risk. This reactive system allows serious code violations to persist undetected and unaddressed for extended periods. Furthermore, tenants consistently face retaliation for speaking out about unsafe conditions.

(4) Retaliation against tenants who assert their legal rights severely undermines recourse for tenants experiencing unsafe conditions. Tenants who report violations, request repairs, or organize collectively frequently face eviction, non-renewal, rent increases, or harassment, discouraging the exercise of lawful rights and undermining enforcement of housing standards.

(5) The absence of clear, enforceable standards governing retaliation, harassment, and interference with tenant rights allows harmful practices to persist and creates uncertainty for both tenants and landlords.

# City of Philadelphia



(6) Tenant organizing and collective action are critical tools for addressing unsafe conditions and power imbalances in the rental market. However, tenants and tenant organizers often face barriers to organizing, including restricted access to buildings, non-renewal of leases, eviction, and harassment.

(7) Establishing a clear right to organize, strengthening protections against retaliation and harassment, clarifying and reinforcing the implied warranty of habitability, and creating strong enforcement mechanisms are necessary to ensure that tenants can safely assert their rights without fear of reprisal.

(8) Requiring good cause for lease termination is essential to prevent arbitrary displacement, promote housing stability, and ensure that tenants are not forced from their homes without a legitimate and lawful basis.

(9) These reforms are necessary to protect public health, reduce displacement, and promote housing stability in Philadelphia's housing system.

SECTION 2. Title 9 of The Philadelphia Code is hereby amended to read as follows:

TITLE 9. REGULATION OF BUSINESSES, TRADES AND PROFESSIONS

*        *        *

CHAPTER 9-800. LANDLORD AND TENANT

*        *        *

§ 9-804. Unfair Rental Practices.

*        *        *

(2) It shall be unlawful for any owner, landlord, agent or other person operating or managing premises to *refuse to lease to any person,* terminate a lease with a tenant or make, alter, amend or modify any term or condition of any existing lease or arrangement of tenancy with a tenant*, or restrict access to common areas or amenities* in retaliation for:

(a) any violation having been found against the premises;

(b) *Initiating or participating in the investigation of or enforcement against a violation, including but not limited to* the filing of a complaint alleging a violation *and/or related to the investigation of or enforcement against a violation*;

# City of Philadelphia



(c) *any lawful communication made by a tenant in good faith with a government official or in a judicial proceeding regarding violations or other conditions of the premises, provided that any allegations concerning retaliatory conduct during a consecutive thirty (30) day period shall be treated as the subject of a single complaint.*

[(c)] *(d)* the joining of*, or participation in,* any lawful organization*, including a tenant organization, association, or union*[, or any other exercise of a legal right]. [It shall be unlawful for any owner, landlord, agent or other person operating or managing premises to refuse to lease any premises to a prospective tenant because he believes the prospective tenant has exercised any such right];

[(d)] *(e)* an incident of domestic violence or sexual assault in which a tenant was the victim, or a tenant's status as a victim of domestic violence or sexual assault. For purposes of this subsection (2)(d) the meaning of the terms "victim", "domestic violence" and "sexual assault" are as defined in Section 9-3201 of this Code[.]*;*

*(f) any other exercise of a legal right.*

In any civil proceeding involving this provision in which the notice of termination or alteration of a term or condition of the lease was given within one year after a violation was found, a right of the tenant against the landlord, agent or other person operating or managing premises was exercised, or a correction made, whichever is the latest, it shall be the burden of the owner, landlord, agent or other person operating or managing such premises to prove that the notice was not given in retaliation for the exercise by the tenant of his legal rights.

(3) [The provisions of this Section shall not apply to:

(a)] [Any bona fide] *The* transfer of title [incident to a sale] of the [premises, but] *premises shall not alter the obligation of* any subsequent owner, landlord, agent or other person operating or managing such premises *to comply with* [shall be subject to] the provisions of this Chapter.

*(a)* [(b)] *It shall not be a violation of this Section 9-804 for* [Any] *an* owner, landlord or agent or other person operating or managing any premises against which a notice of violation has been issued *to* [who desires to] terminate an existing occupancy in order that the premises may be rehabilitated and the violation cured, *provided that* [and] the Department of Licenses and Inspections issues a certification that such work requires that the premises be vacated.

* * *

(12) Good cause required.

# City of Philadelphia



(a) No owner, landlord, agent or other person operating or managing any residential premises, upon expiration of [a] *any* lease [of less than one year], shall *take any action to terminate a tenancy* [issue a notice to vacate, notice of non-renewal, or notice to terminate the lease], unless (1) the landlord has good cause to *take that action* [not renew the lease]; and (2) the landlord provides the tenant with notice pursuant to subsection (c), below. For purposes of this subsection (12)(a), good cause shall include, but is not limited to, any of the following:

* * *

*(.10) The landlord has cause for eviction under 68 Pa. Stat. § 250.501(a)(2) or (3), or successor statute.*

*(.11) The owner has entered into a bona fide agreement of sale to transfer the premises to a purchaser who will occupy the unit as their principal residence, provided that:*

*(.a) The owner provides the tenant with a copy of a fully executed, arm's-length agreement of sale identifying the purchaser.*

*(.b) The purchaser provides a signed statement that the purchaser intends to occupy the unit as their principal residence within ninety (90) days of closing and does not intend to rent the unit.*

*(.c) The owner provides at least sixty (60) days' notice of non-renewal to the tenant, attaching all documentation requested in paragraphs (.a)-(.b), above.*

* * *

(b) [Reserved] *For purposes of subsection 12(a), above, an action to terminate a tenancy shall include, but is not limited to, any of the following:*

*(.1) Issuing, serving, or otherwise providing a tenant with a notice to vacate, notice of non-renewal, notice to terminate the lease, notice of Diversion Rights pursuant to Section 9-811; or*

*(.2) Initiating, filing, commencing, or otherwise pursuing an eviction action or any other legal action seeking to obtain a judgment for possession of the premises, excepting ejectment actions.*

(c) A landlord who has good cause to *take an action to terminate a tenancy* [issue a notice to vacate or notice to terminate a lease] under subsection (a), above, shall notify the tenant in writing *with reasonable specificity* of the basis for such good cause in the same manner and on the same schedule as set forth in subsection (11)(a) ("Landlord Notice to Tenant of Rent

# City of Philadelphia



Increase"). In the event the owner, landlord, agent or other person operating or managing the premises fails to issue the notice as required by this subsection (12), the lease shall renew on a month-to-month basis, unless the tenant elects otherwise.

* * *

*(f) This section (12) shall not apply if a landlord sufficiently alleges in an eviction complaint, and a court of competent jurisdiction finds, that the tenant resides in an individual rental unit that is also occupied by the landlord as a primary residence and has been since the start of the tenancy.*

* * *

*(13)* Self-Help Eviction.

* * *

*(14)* Any person aggrieved under the provisions of this Section may file a complaint with the Fair Housing Commission or may allege any violations in an initial pleading or, where appropriate, in a responsive pleading in a court of competent jurisdiction. *Claims for violations of this Chapter shall be governed by the contractual statute of limitations applicable under the laws of the Commonwealth of Pennsylvania. Tenants shall retain the right to file claims beyond the expiration of their lease period and after vacating the premises, provided such claims are filed within the applicable contractual statute of limitations period. There is no requirement that a complaint be filed with an agency before asserting a claim in court. Each separate occurrence or instance of a prohibited action shall constitute a separate violation. A continuing violation arising from the same underlying condition shall constitute a single violation and shall not be deemed a separate violation for each day it continues.*

*(a) In an administrative proceeding before the Fair Housing Commission violations of this Section shall be punishable pursuant to Section 9-807.*

*(b) In a judicial proceeding, a court may order the following, upon a finding that a violation of this Section has occurred:*

*(.1) Injunctive relief and such other equitable relief, as appropriate.*

*(.2) Compensatory damages and restitution, including economic damages inclusive of overpaid rent and emotional distress damages, or, in the alternative, if the plaintiff elects before judgment is rendered, statutory damages of $1,000 per violation.*

*(.3) Upon a finding of a willful or wanton violation of this Section, punitive damages up to three times the value of actual damages sustained inclusive of overpaid rent or, if statutory damages are elected, three times the value of statutory damages.*

# City of Philadelphia



*(.4) Reasonable attorney's fees and costs.*

*(.5) Suspension or revocation of the owner or agent's rental license, during which period the rent for any rental unit in the housing accommodation shall not be collected or increased.*

*(c) A tenant may use the protections afforded in this Section as an affirmative defense in a court of competent jurisdiction.*

*(15)* No provision of this Section can be waived or made subject to a contract between the parties depriving a tenant of the benefits of this Section.

* * *

*§ 9-816. Rights to Safe and Healthy Homes.*

*(1) Right to Organize.*

*(a) Tenants shall have the right to:*

*(.1) Organize and advocate related to the terms and conditions of their residency;*

*(.2) Form, join, meet with, and participate in tenant organizations;*

*(.3) Meet and confer through representatives of their own choosing with owners and management; and*

*(.4) Engage in lawful concerted activities with other tenants;*

*(b) Any tenant organizer who is not a tenant shall have the same rights to visit tenants and access residential rental accommodations and shall follow the same building access and security protocols as all other non-tenants. Furthermore:*

*(.1) If a multifamily residential property has a consistently enforced, written policy against canvassing, then a non-tenant tenant organizer must be accompanied by a tenant while on the property of the multifamily housing project.*

*(.2) If a multifamily residential property has a written policy favoring canvassing, any non-tenant tenant organizer must be afforded the same privileges and rights of access as other uninvited outside parties in the normal course of operations. If the*

# City of Philadelphia



*project does not have a consistently enforced, written policy against canvassing, the project shall be treated as if it has a policy favoring canvassing;*

*(c) Any owner or agent of an owner of a residential rental accommodation has a duty to confer in good faith with tenants and tenant organizers regarding lease terms and property conditions to which those tenants are party. "Confer in good faith" means that the parties shall have the mutual obligation, personally or through their authorized representatives, to meet and confer and continue for a reasonable period of time, in order to exchange freely information, opinions, and proposals, and to endeavor to reach agreement. Examples of conferring in good faith include, but are not limited to, maintaining a designated point of contact, engaging in regular communications, responding to reasonable requests for information, allowing participation by non-resident advocates, providing adequate time for limited-English speakers to obtain translation services, providing and adhering to timelines for addressing habitability concerns, and negotiating and putting agreements into writing;*

*(d) No owner or agent of an owner of a residential rental accommodation shall interfere with the right of a tenant or tenant organizer invited by a tenant onto the premises to conduct the following activities related to the establishment or operation of a tenant organization, if performed in a lawful manner consistent with subsection § 9-816(1)(b):*

*(.1) Distributing literature in common areas, including lobby areas;*

*(.2) Knocking on tenants' doors, speaking with tenants, and placing literature at or under tenants' doors;*

*(.3) Posting information on all building bulletin boards;*

*(.4) Assisting tenants in participating in tenant organization activities; and*

*(.5) Convening tenant or tenant organization meetings at any reasonable time and in any appropriate space that would reasonably be interpreted as areas that the tenant had access to under the terms of their lease, including any tenant's unit, a community room, a common area including lobbies, or other available space.*

*(.6) Formulating responses to owner actions or building and unit conditions, including:*

*(.a) Rent increases or requests for rent increases;*

*(.b) Proposed changes in the housing accommodation's facilities and services;*

*(.c) Conversion of residential units to nonresidential use, cooperative housing, or condominiums;*

*(.7) Proposing that the owner or management modify the housing accommodation's facilities and services; and*

*(.8) Any other activity reasonably related to the establishment or operation of a tenant organization.*

*(e) This Section shall not be construed to grant any greater access to a rental residential accommodation than any other non-resident would be provided.*

*(2) Right to Habitability.*

*(a) Tenants shall have the right to facilities and services vital to their life, health, and safety and to the use of the premises for residential purposes throughout the duration of their tenancy. At a minimum, tenants have a right to safe and sanitary living conditions.*

*(b) It shall be unlawful for any owner, landlord, agent, or other person operating or managing premises to threaten to or engage in any act or omission which materially interferes with the tenant's right to habitability, including but not limited to the following:*

*(.1) Failing to perform or complete repairs and maintenance in a reasonably timely manner or failing to follow applicable industry standards, including but not limited to the Philadelphia Property Maintenance Code, Philadelphia Building Construction and Occupancy Code, Philadelphia Fire Code, and Philadelphia Health Code, to minimize exposure to mold, lead paint and dust, asbestos, or other building materials with potentially harmful health impacts. A reasonably timely manner is defined as the landlord has had reasonable time after being put on notice, taking into account the emergency nature of the repair as well as the impact or potential impact to the tenants' and occupants' health, safety, and well-being.*

*(.2) Engaging in an act or omission which results in a material breach of the implied warranty of habitability, as defined in this Section.*

*(c) Abatement under this provision*

*(.1) In a court action alleging unpaid rent, a tenant shall be entitled to an abatement of rent during and for any periods when the implied warranty of habitability has been materially breached by a landlord, including, but not limited to, where a landlord fails to rebut the presumption of a breach pursuant to this subsection. A material breach of the implied warranty of habitability occurs when (1) a defect in the property is of a nature and kind which will prevent the use of the dwelling for its intended purpose to provide premises fit for habitation by its dwellers; (2) the landlord had notice of the defect of the*

# City of Philadelphia



*condition; and (3) the landlord failed to make the necessary repairs in a reasonably timely manner.*

*(.2) In a proceeding pursuant to this Section before a court of competent jurisdiction, there shall be a rebuttable presumption that an owner, landlord, agent or other person operating or managing any residential premises breached the implied warranty of habitability if (1) the conditions or characteristics of the premises violate the requirements of the Philadelphia Property Maintenance Code or the Philadelphia Fire Code; (2) the Department has issued a notice of violation regarding the defective conditions or characteristics of the premises; (3) the date to cure, specified in an issued notice of violation, has passed; (4) no appeal of that notice of violation is pending; and (5) the defective conditions or characteristics that form the basis of that notice of violation have not all been remedied. When these conditions are met, a court may reasonably conclude that the landlord had notice of the defect from the Department of Licenses and Inspections, had a reasonable opportunity to make the necessary repairs, and failed to make the necessary repairs. (.a) A notice of violation that includes a determination by the Department that the rental property is unfit, unsafe, or imminently dangerous, which is not complied with pursuant to the timelines of section (b) shall entitle a tenant to full abatement of rent during or for the period of the violation, or until the Department determines that work to repair the violation has started and is actively progressing, and acceptable interim measures have been taken to ensure tenant safety and unit habitability during the interim.*

*(.b) The Department's notice of violation to the landlord shall relieve the tenant of separately providing the landlord written notice of a defect or condition that gives rise to the presumptive breach of the implied warranty of habitability.*

*(.c) A landlord may rebut the presumption of a breach of the implied warranty of habitability, in whole or in part, by showing by a preponderance of the evidence:*

*(.i) The landlord has been unable to correct the violation because the tenant prevented the landlord from accessing the property;*

*(.ii) To the extent the notice of violation is not related to the structure of the building, that the habitability of the tenant's residence was not fully impacted by the relevant violation, in which case rent shall be abated to the extent that habitability was adversely impacted;*

*(.iii) The tenant caused the violation that is the basis for the violation; or*

*(.iv) The defective conditions or characteristics that form the basis of the violation were corrected, in which case the breach shall be deemed to apply to the period from the issuance of the notice of violation to the date the defective condition was*

Case 2:26-cv-00403-WB Document 42-1 Filed 10/29/26 Page 82 of 199

# City of Philadelphia



*repaired, so long as notice of repair was provided, a request for reinspection by the Department has been made, and the subsequent reinspection confirms the defective condition was repaired.*

*(.d) Nothing in this Subsection shall be interpreted to preclude a finding that the implied warranty of habitability was breached prior to or despite no violation having been issued by the City.*

*(3) Protections Against Interference and Retaliation*

*(a) Tenants shall have the right to the use and quiet enjoyment of their residence and the housing services that are connected with the use or occupancy of a rental unit, including, but not limited to, utilities (including gas, water, and electricity), ordinary repairs or replacement, and maintenance, including painting.*

*(b) It shall be unlawful for any owner, landlord, agent, or other person operating or managing premises to take any action, or refuse to act in a way that would cause a reasonable tenant to vacate such residential rental unit or to surrender or waive any rights described above in relation to such tenancy. Examples include, but are not limited to, the following:*

*(.1) Reducing or eliminating, or threatening to reduce or to interfere with a tenant's quiet enjoyment of their residence, including but not limited to, by failing to provide notice of 24 hours for non-emergency repairs to the tenant, or failing to offer a reasonable justification for entry into the unit; or otherwise engaging in unreasonably disruptive behavior when entering or accessing the property or attempting to do so.*

*(.2) Threatening a tenant or their guests with physical harm.*

*(.3) Reducing or eliminating, or threatening to reduce or to eliminate, housing services required by a lease, contract or law, including but not limited to the elimination of parking if provided in the tenant's lease or contract.*

*(.4) Engaging in abusive use of government process against a tenant, for example by making a report or threatening to make a report about a tenant to a governmental entity, including immigration authorities, when done to retaliate against the tenant for engaging in activity protected under Section 9-804(2), to prevent the tenant from engaging in such activities in the future, or to cause the tenant to vacate the unit or forfeit other legal rights of occupancy.*

*(.5) Other acts or omissions of such significance as to substantially interfere with or disturb the comfort, repose, peace or quiet of a tenant and that cause, or are likely to cause, a tenant to surrender or waive any rights in relation to such tenancy.*

# City of Philadelphia



*(.6) Retaliating for engaging in activity protected under Section 9-804(2) by reducing or eliminating, or threatening to reduce or to eliminate any other benefits, privileges, or facilities of the property promised to tenants, in a lease or otherwise, or required by law.*

*(.7) Disclosing, threatening to disclose, or misusing a tenant's medical or health information, including but not limited to records or information relating to disability, medical treatment, prescriptions, or health conditions, where such disclosure or threat of disclosure is made to co-tenants, neighbors, employers, governmental entities, or any other third party.*

*(4) Remedies. Any person aggrieved under the provisions of this Section may allege any violations in an initial pleading or, where appropriate, in a responsive pleading in a court of competent jurisdiction. A claim for a violation of this Chapter must be filed in court within two (2) years of the date that an alleged violation occurred. There is no requirement that a complaint be filed with an agency before asserting a claim in court. Each separate occurrence or instance of a prohibited action shall constitute a separate violation. A continuing violation arising from the same underlying condition shall constitute a single violation and shall not be deemed a separate violation for each day it continues.*

*(a) A court may order the following, upon a finding that a violation of this Section has occurred:*

*(.1) Injunctive relief and such other equitable relief, as appropriate.*

*(.2) Compensatory damages and restitution, including overpaid rent and emotional distress damages, or, in the alternative, if the plaintiff elects before judgment is rendered, statutory damages of $1,000 per violation.*

*(.3) Upon a finding of a willful or wanton violation of this Section, punitive damages of three times the value of actual damages sustained inclusive of overpaid rent or, if statutory damages are elected, three times the value of statutory damages.*

*(.4) Reasonable attorney's fees and costs.*

*(.5) Suspension or revocation of the owner or agent's rental license, during which period the rent for any rental unit in the housing accommodation shall not be collected or increased.*

*(b) A tenant may use the protections afforded in this Section as an affirmative defense in a court of competent jurisdiction.*

SECTION 3. This Ordinance shall become effective November 1, 2026.

# City of Philadelphia



______________________________

**Explanation:**

[Brackets] indicate matter deleted.
*Italics* indicate new matter added.

# City of Philadelphia

*BILL NO.* 250330-AA *continued* Certified Copy

CERTIFICATION: This is a true and correct copy of the original Bill, Passed by the City Council on April 23, 2026. The Bill was Signed by the Mayor on May 7, 2026.

Elizabeth McCollum
Chief Clerk of the City Council

# EXHIBIT F

Declaration of Seth Floyd
October 29, 2026

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF**
**PENNSYLVANIA**

| | |
|---|---|
| FLOYD et al. | : |
| | : |
| v. | : No. 2:26-cv-02403 |
| | : |
| CITY COUNCIL FOR THE CITY OF PHILADELPHIA, et al. | : |

**OCTOBER 29, 2026, DECLARATION OF SETH FLOYD IN SUPPORT OF PLAINTIFFS' RENEWED EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER**

I, SETH FLOYD, DECLARE AS FOLLOWS:

1. I am an adult individual and a Plaintiff in this action. I have personal knowledge of the facts concerning my own property ownership, rental operations, and organizational involvement set forth below, and I am competent to testify to them. Before this lawsuit was filed, I met with Councilmember Nicolas O'Rourke and other Councilmembers on multiple occasions to discuss the proposed legislation and advocate for amendments.

2. I am a Philadelphia residential property owner, landlord, taxpayer, and constituent. I own and operate rental housing in Philadelphia and am directly affected by municipal laws governing rental properties and landlord-tenant relationships.

3. When this lawsuit was instituted in March 2026, I was a member of the Homeowners Association of Philadelphia ("HAPCO"). I have since become HAPCO's President.

4. In my capacity as President, I am familiar with HAPCO's membership and affiliated network. HAPCO has a network of approximately 14,000 Philadelphia landlords, tenants, taxpayers, and constituents, consisting of dues-paying members and other

affiliates. That figure describes the broader network and is not a representation that all 14,000 individuals are dues-paying members.

5. Most of HAPCO's dues-paying members are small landlords. A substantial number of members are minority landlords, property owners, and Philadelphia taxpayers, including people whose circumstances and interests resemble my own.

6. Through my own experience as a landlord and my work with HAPCO, I am familiar with the practical difficulties small and mid-sized housing providers face when new legal and administrative requirements affect rental licensing, leases, property management, and the ability to maintain affordable rental housing.

7. I am familiar with Philadelphia City Council Bills Nos. 250329-AA and 250330-AA, the housing legislation challenged in this lawsuit, which is scheduled to take effect on November 1, 2026. I am concerned about the effect of those enactments on my existing rental operations and future rental decisions.

8. I currently have vacant rental units. In light of the impending changes, I will have to hold off on renting those vacant units while I determine how to comply with the new requirements and manage the risks associated with entering new tenancies.

9. Delaying the rental of my vacant units means that housing I otherwise could offer to prospective Philadelphia tenants will remain unavailable during that period. It also interferes with my ability to conduct my rental business as planned.

10. I am concerned that the new requirements will restrict my ability to recover possession of a unit or evict a tenant when necessary and legally justified. That uncertainty affects the decisions I must make now about entering and renewing tenancies.

11. I anticipate having to rewrite or revise my residential leases to address the new legal requirements and to pay for legal review of those revisions. Those are additional obligations and expenses arising from the impending changes.

12. I anticipate having to hire a property manager, or obtain additional property-management assistance, to keep up with the new requirements. As a housing provider, that would materially increase the cost of operating my rental properties.

13. To absorb those additional costs and risks, I anticipate having to raise the rents I charge. I do not want to increase rents unnecessarily, but I cannot disregard the costs of operating and maintaining my properties.

14. I also anticipate having to increase the credit-score, income, and savings requirements I apply when screening prospective tenants in order to manage the increased financial and legal risks I perceive under the new requirements.

15. Higher rents and stricter screening standards would make it harder for some prospective tenants to qualify for housing that I otherwise might have offered to them. I am concerned that these consequences will reduce the availability of naturally occurring affordable housing in Philadelphia.

16. These are not merely abstract policy concerns. They are decisions I am confronting in my own rental business because the challenged legislation is scheduled to become operative on November 1, 2026.

17. In my role with HAPCO, I have heard similar concerns expressed by other landlords, particularly small and mid-sized housing providers. I describe those concerns as part of my experience leading the organization; the statements in paragraphs 8 through 16 concern the effects on my own operations and the decisions I personally anticipate making.

18. I believe that the interests of small landlords, minority property owners, tenants, and taxpayers deserve meaningful consideration in the public legislative process. As both a Plaintiff and HAPCO's President, I am particularly concerned that people affected by the legislation have a fair opportunity to communicate their views without adverse treatment because they challenged governmental action in court.

19. I submit this Declaration in support of Plaintiffs' request for temporary relief and expedited judicial consideration before the November 1, 2026 effective date. I am willing to testify concerning the matters stated herein if requested by the Court.

**VERIFICATION**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed by:
Seth Floyd
AA87BD2BA9C648B...

Seth Floyd

Date: 10/29/2026

# EXHIBIT G

March 30, 2026 Committee Hearing Transcript

Selected excerpts from 222-page official transcript

Landlord and Tenant to modify the requirements related to good cause for ending a tenancy, add protections against retaliation and harassment for tenants and tenant organizations, specified tenants' rights related to the implied warranty of habitability, and provide a legal presumption related to breaches of the implied warranty of habitability, create a tenant right to organize, specify deadlines for certain claims, and establish and enhance enforcement mechanisms, remedies, damages, and protections, all under certain terms and conditions.

CHAIR GAUTHIER: The clerk will please call the first panel of witnesses to testify on the bills. I would ask that all witnesses please summarize your testimony. We have a very packed agenda today, and we'll be setting a timer for five

minutes per witness at which time I'll ask you to wrap up.

Please call the first panel.

THE CLERK: Okay. Before I call the first panel, I just want to announce that there is a public comment list to my left over here for folks to sign up if they so choose. Yes, public comment list to my left for folks who haven't signed up yet. And our first panel will be Mo Rushdy, Lev Kravinsky, and Theresa Howell and Katie -- Katie Ashby. Excuse me.

CHAIR GAUTHIER: Good afternoon. Please state your name for the record and proceed with your testimony.

MR. RUSHDY: Thank you, Madam Chair. My name is Mo Rushdy. I am testifying today on Bill Nos. 250329 and 250330 on behalf of the Building Industry Association of

And for the most part, believe it or not, they're not members of ours, but we understand the industry and what it can cause, an -- unintended consequences. Thank you for the time.

CHAIR GAUTHIER: Thank you all for your testimony.

We are now going to move on to the public comment list. We ask that all commenters limit their testimony to two minutes. and if you have submitted written testimony, please summarize.

Ms. Jones, can you please call the names of the first three commenters?

THE CLERK: Diane Thompson, Bill Vargas, Leonard Bony.

MS. THOMPSON: Good afternoon. Thanks for having me today. I just want to say a couple --

CHAIR GAUTHIER: Please

Now, that was -- and the landlord remediated the rent without any kind of legal action necessary. So what I'm saying is sometimes you can work something out, you don't need to have legal action happen immediately. And as a landlord, I appreciated the fact that my tenant allowed me the time to work out that infestation. And I appreciated the fact that my landlord remediated rent and negotiated with us -- without us having to take legal action as well. So I just wanted to make that comment. Thank you.

CHAIR GAUTHIER: Thank you for your comment.

Please state your name for the record and proceed with your comment.

MR. VARGAS: Bill Vargas, I'm a landlord. Thank you all for being here today. When I testified against this bill back on March 4th,

I talked about how I went into a property with a -- with a lead paint guy so we could renew my license. And we were surrounded and threatened by people who came to the house for that very purpose, to keep us from getting that test done. And my testimony went viral on social media. I heard from so many landlords who have had situations where they've either been threatened or physically assaulted while trying to do what the city mandates that they should do. That's not the part that Mr. O'Rourke tells you about.

In -- under the current situation, you could be actually assaulted and prevented from doing what you need to do. And then the tenant can go into court and say, well, he didn't have his rental license, and the judge will buy it. Under his bill, it'll be even worse. Tenants won't want you to make

repairs.

They will prevent you from making repairs and then they will turn around -- thank you, thank you. They will physically present -- prevent you, and then they'll go into court, because now L&I will not revoke your license. They'll go into court and they'll sue you. They will physically assault you, then they'll be able to sue you. That's how crazy this bill is.

Now, I know -- I know a landlord who everywhere he goes, whenever he goes on one of his properties, he carries a gun because one time he was innocently collecting rent. There was six guys in the back room, they jumped him, they beat him so badly, he was in the hospital for six months and almost died. So now wherever he goes, he carries the gun.

So you pass this bill,

that's the kind of thing that's going to become commonplace. And so therefore, if you pass this bill, someone will get killed. So if you don't want someone killed, you need to kill this bill. And -- thank you. Listen, I'm not -- I'm not trying to -- I'm not trying to paint with a broad brush. I'm not saying that all tenants are bad.

Thanks. Thank you, sir. I'm not -- I'm not saying that all tenants are bad--

CHAIR GAUTHIER: Thank you for your comment. Please wrap up.

MR. VARGAS: Most tenants are good --

CHAIR GAUTHIER: Your two minutes is completed --

MR. VARGAS: -- but --

CHAIR GAUTHIER: -- thank you for your comments.

MR. VARGAS: Okay. Thank you.

THE CLERK: Okay.

CHAIR GAUTHIER: Okay. Will the clerk please call the name of the next three commenters?

THE CLERK: Gareth Evans, German Yaskava, and Reverend Greg Holson.

CHAIR GAUTHIER: If you are in the room and you heard your name called, please come up to the desk.

MR. HOLSTON: Good afternoon. My name is Reverend Gregory Holston. I'm the Executive Director of Destination. I have some remarks, but I'm confused by what I've been hearing. If the realtors cared so much about this issue, why wouldn't they have put their own legislation in years ago? Why do they want to stop something now that this council person has put in and this committee wants to move forward with when they had years to try to address this issue?

I would think the real -- the realtor association or the renters' association -- I mean, not renter association, the property owners have the legal means and the legal knowledge to be able to address this issue years ago. But also I'm concerned because yes, I hear about the small landlords and what they're going through, and we do need to do something about that kind of situation that Bill Vargas just described. But we can go forward with this piece of legislation and address that with some support and some help. But the problem is he's worried about who -- what people may get killed and not enough about the people who are already dying.

The reality is that child lead paint, which he was going to correct, and I give him credit for trying to correct it, most landlords

are not correcting. And we are seeing that poison toxin in our children for year after year after year after year. We have all done studies of those on Street Road who have been involved in gun violence and found out that many of them had the toxin of lead paint in their bodies that affected -- that caused permanent brain damage to them.

And on some of the reasons we have the violence in our community today that we have, we have never effectively addressed lead paint in our homes, in our communities. And if this bill will allow some folk to be able to say I -- without retaliation, with a sense that they are a remediation can be done, a safe -- a place where they can be able to go while it's being taken care of.

If this will give them the courage to say, landlord, get this

lead paint out of my apartment, then I'm a hundred percent for it because I'm trying to save some children and some babies that are in our schools today.

CHAIR GAUTHIER: Thank you. Please wrap up your comment. I need you to wrap up your comment. Thank you so much.

MR. HOLSTON: Thank you.

CHAIR GAUTHIER: Will the clerk please call the next three public commenters?

THE CLERK: Nate Roundtree, Federica Lightfoot, Sue Rocksandich.

CHAIR GAUTHIER: Good afternoon. Please state your name for the record and proceed with your comment.

MS. LIGHTFOOT: Hi, my name is Frederica Lightfoot. Rich rising everyone. I'd like to share a quote, maybe one or two. An empty barrel makes the most noise, and a

guilty conscience needs no accuser. The Safety Homes Act has definitely ruffled some feathers, which shows how complacent they have become. Stand in your discomfort.

Thanks to Councilman Member O'Rourke and all the other parties involved for initiating this act, it is so long overdue. And I am speaking from experience, I have shared this years ago about how the landlords are negligent and -- when it comes to repairs. It's needed for the oppressed people. Tenants, let's stand up. Let's get up. Let's stand up for our rights. Thank you.

CHAIR GAUTHIER: Thank you for your comments. Proceed. State -- please state your name and proceed.

MS. ROCKSANDICH: Hi, I'm Sue RockSandich, everybody calls me Rocky. I am a landlord. I'm a

small landlord. I'm a retired nurse after 46 years of it, and I've probably been a landlord longer than some of these people in here have ever been on the earth. Anyway, first off, I love my tenants and what I want to know from Council as a small landlord is, what have you done for me lately? I have my tenants -- my tenants are all, frankly, I -- they're under market in terms of what they're paying. And I love a clean home.

I tell the tenants when I -- when I first interview someone, I say - and when I get my places ready, I personally I am on my hands and knees cleaning it with every -- with my -- with my people, and I'm there to do a turnover. First off, there is no incentive for a small landlord or self-managing landlord.

There is no incentive to evict a patient -- tenant, I'm

sorry, patient, back to nursing -- to evict a tenant. Because I'm not -- a turnover cost a ton of money. And as a small landlord, I don't own an apartment complex with 30 units, each one being a one bedroom. I own a three-bedroom rural home, which was dilapidated; I bought, renovated, and I make nice for my -- for my tenants. I appreciate a safe, healthy home.

But years ago, you all got rid of a mediation program. And I think frankly, if you want to help out with regard to the small landlords, remove us from all these little got-you's that you're doing and aiming at the large consortiums that have people who are not vested in their neighborhood. I had a tenant years ago, I -- when -- before I knew how to screen, she let 25 feral cats into the basement of the home. And --

CHAIR GAUTHIER: Please wrap up your comment.

MS. ROCKSANDICH: Pardon me?

CHAIR GAUTHIER: Two minutes is up. Can you please wrap your comment.

MS. ROCKSANDICH: Okay. Basically, what I'm saying is what we need is something where we can call and get immediate action when we go into one of our properties and the tenant is living in there in a filthy manner, so that we can address it before it becomes an absolute, absolute disgrace.

CHAIR GAUTHIER: Thank you --

MS. ROCKSANDICH: We need that backup --

CHAIR GAUTHIER: Thank you so much for your comment --

MS. ROCKSANDICH: And as far as lead is concerned, it's a

small thing, but lead; we already need that to get our rental license. Why does it have to be --

CHAIR GAUTHIER: Thank you for your comment today.

Will the clerk please call the next few public commenters?

THE CLERK: Eileen Gray, Brenda Simons, Ethan Kalathil, Brown Colburn.

CHAIR GAUTHIER: Good afternoon. Please state your name for the record and proceed with your comment.

MS. SIMONS: Good afternoon. My name is Brenda Simons, and I am a Philadelphia resident, a block captain, and a small business landlord. Thank you for the opportunity to speak today.

First, let -- give me one moment because I did want to say something specific. First, I need to thank the staff of Councilman

Curtis Jones' office for their valuable assistance whenever called upon. Josh Cohen and Gail Young have been very responsive to me as a small business landlord.

I want to begin by saying clearly that safe and healthy housing is important to all of us. Good landlords want safe homes just as much as good tenants do. We all share the same goals; stable housing, safe communities, and strong neighborhoods.

However, I respectfully want to share the perspective of small landlords, many of whom are not large corporations. Many of us are seniors, retirees, or working families who own one or two properties and rely on that income simply to maintain those homes and support ourselves. And even before the new legislation, navigating the system is already very challenging.

For example, I have been a small business landlord for more than 25 years.

However, this year, it took me months to renew my business license. I was bounced between 311, eCLIPSE, L&I, and the Revenue Department and back to the same departments repeatedly. I have the dates, names, and emails and the departments to prove it. Only when I called Councilman Curtis Jones' office and spoke with Josh Cohen were these things, these problems finally addressed. That experience demonstrates how time consuming and difficult compliance can be, especially for small landlords --

CHAIR GAUTHIER: I'm sorry. Thank you for your comment. If you could please wrap, your two minutes is up. I can give you like 10 seconds, but please wrap up.

MS. SIMONS: Okay. Let me

just --

CHAIR GAUTHIER: We also do have your full written testimony --

MS. SIMONS: I know --

CHAIR GAUTHIER: -- here.

MS. SIMONS: I know, but there's something that I did want to say, okay? Unfortunately, those landlords that have -- whose tenants have good things to say are not adequately represented here and in this legislation. Okay? I want the just share, for the record, okay? One of my -- I just want to share something because we can't --

CHAIR GAUTHIER: Very briefly please so that everyone can have a chance to comment.

MS. SIMONS: One of my tenants said my landlord was the best landlord and we were blessed to have her as a landlord. My other tenant who was the current tenant said small --

CHAIR GAUTHIER: Thank you. Everyone was eligible to come here and comment. Tenants could have come and said good things about their landlords, too. Thank you so much.

Please state your name for the record and proceed with your comment.

MS. GRAY: My name is Eileen Gray, and I thank you for letting me testify today. I've been a landlord for 37 years. I've lived in - so I'm also a realtor for 25 years, and I've lived in Philadelphia and voted in Philadelphia my entire life.

I just wanted to let you know that over 37 years of being a landlord, I finally have gotten a team of people that can repair things in a pretty timely manner. That's our -- one of our -- one of the main -- one of the problems with

you.

Will the clerk please call the next few public commenters?

THE CLERK: Brian Bachman, Greg Workman, Seth Floyd, Brian Jackson.

CHAIR GAUTHIER: Good afternoon. Please state your name for the record and proceed with your comment.

MR. FLOYD: Good afternoon, everyone. For the record, my name is Seth Floyd. I'm here to testify in regards to the Safe, Healthy Homes Bill. I'm a homeowner, a constituent of Councilman Jones' district. I'm an experienced landlord, 25 years, licensed real estate broker for 21 years. I mostly represent tenants transitioning from home -- from rental into home ownership. I also represent tenants who want to move into rental properties.

I also have the pleasure of representing landlords. My question; what are we doing here? With the intention of the bill being safe, healthy homes and there being no opposition to actually having safe, healthy homes, passing this type of legislation seem like it would be a layup. Hit the easy button.

There is not one person in this room, I mean, no one that doesn't want safe homes for Philadelphia. Nobody. Yet somehow this committee was able to motivate all the subject matter experts and stakeholders out from their busy days to come here today at City Hall for almost the last year. How is that? I'm going to tell you very briefly.

First, the title of this bill is great, but the language needs work. We've been here three

times for a reason, is that we spend a lot of time with the bill sponsor and the committee members about trying to get these amendments in, every time to not have them amended.

Every time come here with the same thing that we got with response from Councilman Curtis's request. Every time, the response is, we are going to work on that, hey, we're going to implement that. Hey, give us a little time. Hey, those are great talking points, let's talk about it.

I'm going to tell you this, I've met with O'Rourke more times than I can count. I've met with Kate more times than I can count. I've walked in City Hall the last few months, more times than I can count. You know how many amendments came from all the attorneys and GPCA and the Association of Realtors and HAPCO and the PP -- and the PAA?

How very little, almost nothing of substance. The reason that we're here is not because we want to, it's because we have to. There is a risk to our business. And --

CHAIR GAUTHIER: Thank you --

MR. FLOYD: -- what I'm saying to you is --

CHAIR GAUTHIER: Please take a few seconds and wrap up, but the two minutes is up.

MR. FLOYD: We are -- we are here to keep the balance of the ecosystem. That is our job. We have licenses; we have a career. We work in this space for a living. We protect the tenant, we make this process work. And if you don't listen to us, I don't know who you will listen to.

CHAIR GAUTHIER: Thank you for your comment.

Please state your name for

business. It is difficult to do business in the City of Philadelphia.

CHAIR GAUTHIER: Thank you for your comment. Thank you so much.

Please state your name for the record and proceed with your comment.

MS. HADLEY: Good afternoon, Councilmembers. My name is Erica Hadley. I am a small landlord here in Philadelphia. I'm a Black woman and a mother trying to raise -- to build a suitable future for my children. I didn't come into this with a big company behind me.

I started with my family, one property at a time, to create something suitable, not just for me, but for my children. I'm not a big multimillion dollar business. I'm not a small, corrupt, deep pocket billionaire. I am what 73 percent

of landlords in the City of Philadelphia actually look like. I care about my tenants. I try to work with people. I try to get second chances when I can. But I'm here today because I need you to understand what this really looks like for someone like me.

I've had tenants who cost me thousands of dollars, not because I neglected my responsibility, but because the system allowed situations to spiral out of control. And in one case, I had accepted a tenant through a program to help her and her children transition out of a shelter. I wanted -- I wanted to help. I believe in giving a chance -- someone a chance.

At first, things were fine, then the problem started. There were constant complaints from my other tenants. There were unoccupied -- unauthorized

occupants, and repeated disturbances. I addressed every issue the tenants raised. Every maintenance concern was handled promptly when she complained of were pets -- pests in the property, I had professional help come immediately. Despite that, she stopped paying rent.

Then the real problems began. She filed repeated complaints with License and Inspection and Fair Housing, often right before court dates and before inspections. Access to the property was blocked. New claims were -- came up to the property listing like glass leak -- gas leak that turned out to be minor or unfounded, but still delayed everything. This went on for over a year.

Even after I went in court, she appealed, and delays continued. During that time, I still -- I was

still paying my mortgage, utilities, repairs, and legal fees across multiple attorneys. I lost a year of rent and ultimately had to pay her to leave my property just to get it back.

In another situation, I had a tenant who caused repeated disruptions, made complaints of the building and other residents. At one point --

CHAIR GAUTHIER: And I'm going to have to ask you briefly wrap up.

MS. HADLEY: Okay. I tried to be patient, I tried to be understanding. And this is -- this is what happens for people like me. Good people, I try to be someone --

CHAIR GAUTHIER: Thank you so much for coming today and for your comment.

Please state your name for the record and proceed with your

they, you know, replace it? Because
now I got asthma because of that.
Now, I got to wear this retarded
mask and can't breathe half of the
time. So now what, landlord? What
do I do as a tenant? Talk to me.
What do I do?

CHAIR GAUTHIER: Thank you
so much for your comment. I would
like to -- thank you. I would like
to recognize the presence of
Councilmember Cindy Bass.

Will the clerk please call
the names of the next few public
commenters?

THE CLERK: Katie Glick,
Eli Gobe, Levi Toback, Vanessa
Raymond-Garcia, Dawn Sanders, Tyrick
Murray.

MS. GLICK: Hello. My name
is Katie Glick. I want to thank all
the tenants who have commented
today. I'm a Philadelphia nurse,
and I'm now a medical student at

Drexel. I decided to pursue medicine because I want to help keep Philadelphians healthy. I'm here today because I want to talk about the public health issues that come with living in substandard housing.

The medical community recognizes poor housing as a significant social determinant of health, even after controlling for other determinants such as income and smoking. Poor housing conditions are associated with a variety of chronic health issues, including asthma, respiratory infections, cardiovascular disease, lead poisoning, injuries, and worsened mental health.

One landlord earlier talked about how her heat was up for two weeks this winter. I wonder how she would have felt about that timeline knowing that she was in an increased risk of heart attacks due to that

cold.

Here in Philly, we know the violations associated with negative health outcomes are more likely to affect low-income Black communities with North, Southwest and West Philly being hit hardest. Seventy-three percent of hazardous living conditions affecting health and safety were clustered in areas of higher-than-average poverty in the city.

And 66 percent were clustered in predominantly Black neighborhoods. Rental advocates have stated that renters are hesitant to report code violations for fear of retaliation or fear that their home may be deemed unsafe and that they'd need to relocate. This leads to renters in substandard housing only reporting once their landlords have already filed their evictions.

We heard someone say earlier that renters should protect themselves, but landlords have the power in this relationship. Housing is a basic physiological need, and more than that, it is a basic human right. Philadelphians deserve to be healthy.

Being safely housed is instrumental in that goal. I urge everyone on this Committee today to vote to move the Safe and Healthy Homes Act forward to a full vote in Council. Renters should not have to wait one more day for these protections. Thank you for your time.

VICE CHAIR LANDAU: Thank you very much. Can the next person please state your name? State your name for the record. Thank you.

MS. SANDERS: Hi. My name is Sonya Sanders. I wanted to thank Nicolas O'Rourke, Jamie Gauthier and

Rue Landau for your help. I am a -- I have -- I'm a president of Philly Thrive, and I'm also a tenant that has been abused. I'm recognizing today that I've been abused by landlords.

Now, I have been -- had the blessing of having plenty of landlords, but I have one good landlord that I have today. And I'm not -- I'm not opposing against the good landlord. We're not here for that. If you're doing your job, we -- kudos to you. We applaud that. We applaud that. But for the landlord here or anywhere else in Philadelphia that's not doing that job, shame on you, because you're causing bad health. You are taking our health and you are abusing our health. You are leaving people.

Anybody would say you're killing us in these homes. And it's not fair. It is not fair. I will

not stand for it. My people will not stand for it. My community will not stand for it. They will -- my organization will not stand for it. It has to stop. I commend Nicolas O'Rourke. He gives a savior to us. He gave us a voice. You understand? We will not be abused any longer.

We still have to go home in our homes and still see roaches crawling. When we call our landlords, they do nothing. They do nothing. You call after the call, you go down and you go down and you try to fight. You tell them what you need. They say you ain't doing enough. How much more can we do? That's why we're here today to say we will not stand for it any longer. Any longer. Bad landlords you are going to stop abusing us. We have a right. We have rights.

VICE CHAIR LANDAU: Thank you. Can the next person please

state your name for the record and proceed with your testimony?

MR. MURRAY: Yeah, I've been told I can go next. My name is Tyrick Murray. I'm a resident of the Fern Rock and Olney area. Kind of like right on the median. And I kind of want to talk about this from a public safety standpoint. I hear a lot of people on both sides talking about issues within the home. I did a quick Google today before getting here. I looked up to see how many apartment fires happened last year. And it didn't actually have a number. I actually looked at the totality of Philadelphia. It couldn't give me a number until I zoomed in and that number was over 100,000.

So a lot of people who should be here to talk cannot talk because they probably are not alive anymore, right? So there's a lot of

issues I have. I'm a marketing and management person.

I heard a lot of people here talk about business and how it's not profitable to have this, I'm going to say be a better business person. All right? Right. If you can't operate a business without keeping your tenants alive, healthy without getting illnesses, you should not have that business.

I don't care if you are a millionaire or I have a hundred thousand dollars salary, you should not have that business at the cost of another person's life. I apologize. I'm just going to be blunt with you. I'm trying to think if there was anything else to say. Oh, yeah, the bill. You-all got to read the bill. I've heard so many people gaslight this bill, bring up things that are not in it. They talking about how it allowed tenants

to abuse them. It does not allow that. Retaliation is talking about retaliation in the form of a retaliation against protection of themselves.

As the last person stated, she was talking about abuse. Retaliation -- let me collect my words. Let me collect my words. If I'm being abused and I retaliate against that abuse as a tenant, for you to retaliate against that is further abuse. You are the oppressor in that situation and you are continuing your oppression when I'm trying to end that. That should be something criminal. But we're not even saying that. All right?

So just to end it, I believe this bill should be passed and it should have been passed a while ago. If you have complaints, bring up something specific. If you're going to talk about L&I,

bring up something specific from L&I. Otherwise, why are we here?

VICE CHAIR LANDAU: Please state your name and proceed with your testimony.

MR. GABAY: Good afternoon to everyone. My name is Eli Gabay. I'm an attorney in the city and county of Philadelphia for 43 years. I'm also the recipient of the Pro Bono Award on behalf of tenants in the Philadelphia Housing Authority in 2010.

I'm here on behalf of responsible landlords and responsible tenants. I believe that we've -- one of the greatest assets the city has are landlords who are trying their best and doing their best. And if the lives of tenants are extremely important, obviously their living conditions, et cetera.

However, I feel that this bill is premature. It's premature