**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SETH FLOYD and ERICA HADLEY,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**CITY COUNCIL FOR THE CITY OF PHILADELPHIA and PHILADELPHIA CITY COUNCIL COMMITTEE ON HOUSING, NEIGHBORHOOD DEVELOPMENT AND THE HOMELESS,**<br>**Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO. 26-2403** |

# MEMORANDUM OPINION

Plaintiffs Seth Floyd and Erica Hadley have sued the City Council for the City of Philadelphia ("City Council") and the Philadelphia City Council Committee on Housing, Neighborhood Development and the Homeless ("Committee"),[1] seeking to permanently enjoin City Council from enforcing two ordinances Plaintiffs claim violate their constitutional rights, as well as state and municipal law. Plaintiffs bring their claims under: the Takings Clause of the Fifth Amendment, U.S. Const. amend. V; the Contracts Clause of Article I, U.S. Const. art. I, § 10, cl. 1; the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1; Article I, Sections 1 and 26 of the Pennsylvania Constitution, Pa. Const. art. I §§ 1, 26; the Pennsylvania Sunshine Act, 5 Pa. C.S. §§ 701-716; and, the Philadelphia Home Rule Charter, Phila. Charter § 2-201.[2] Defendants move to dismiss all

---

[1] Because the Committee is a part of City Council, Defendants will be collectively referred to as "City Council."

[2] In their Response in Opposition to Defendants' Motion to Dismiss (ECF No. 29), Plaintiffs fail to cite any case law to support their claims that Defendants violated the Pennsylvania Sunshine Act and the Philadelphia Home Rule Charter. Under Rule 7.1(c) of the Local Rules of Civil Procedure for the Eastern District of Pennsylvania, "[e]very motion not certified as uncontested . . . shall be accompanied by a brief containing a concise statement of the legal contentions and authorities relied upon in support of the motion." Loc. R. Civ. Pro. 7.1(c). Given their failure to comply with this rule with respect to these two claims, Plaintiffs' arguments on these claims are forfeited. *See DLJ Mortg. Cap., Inc. v. Stevens*, 167 F.4th 632, 635 (3d Cir. 2026) ("Under our precedents, when a litigant raises an argument in passing . . . but fails to squarely argue it, we consider it a forfeiture.") (citing *Kalu v. Spaulding*, 113

counts in the Amended Complaint[3] pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the Motion will be granted.

## I. FACTUAL BACKGROUND

The following facts are drawn from Plaintiffs' Amended Complaint and are accepted as true for the purpose of the Motion to Dismiss. *See Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902 (3d Cir. 1997). Seth Floyd and Erica Hadley are African American independent housing providers who own, manage, and lease residential rental housing within the City of Philadelphia. Their properties are considered naturally occurring affordable housing ("NOAH"),[4] which constitutes one of the largest sources of affordable rental housing in the city. As small landlords, Plaintiffs have invested their own capital into their properties and they personally oversee every aspect of ownership and management, including performing or supervising maintenance, repairs, contractor coordination, tenant communications, licensing, leasing, inspections, regulatory compliance, and financial management. Plaintiffs rely on rental income to maintain sufficient operating revenue to satisfy costs such as mortgages, real estate taxes, insurance premiums, utilities, maintenance expenses, licensing fees, repairs, and capital improvements. Additionally, as African Americans, Plaintiffs belong to a group of housing providers that has historically

---

F.4th 311, 344 n.21 (3d Cir. 2024)). *See also United States v. Heatherly*, 985 F.3d 254, 270 (3d Cir. 2021) (treating failure to "develop[ ] . . . arguments properly" as forfeiture).

[3] Plaintiffs have amended their complaint once as a matter of course under Federal Rule of Civil Procedure 15(a). Both parties have labeled the operative complaint a Second Amended Complaint based on Plaintiffs' initial Complaint and Amended Complaint filed in the Court of Common Pleas of Philadelphia County, where Plaintiffs initiated this proceeding. When this action was removed to this Court pursuant to 28 U.S.C. § 1441, Plaintiffs' Amended Complaint in the Court of Common Pleas became the operative complaint in this matter. Because Plaintiffs then amended, the Court refers to the operative complaint as the Amended Complaint.

[4] NOAH are rental units that are currently affordable to residents of the neighborhood, are not regulated to remain affordable by a housing agency or fund (and generally not subsidized), and may be found across a broad swath of neighborhoods. Urban Land Institute, *Preserving Philadelphia's Naturally Occurring Affordable Housing*, Feb. 2021, https://www.phila.gov/media/20210519214156/Preserving-Philadelphia-NOAH.pdf.

faced significant disparities in accumulated wealth, operating margins, access to investment capital, commercial credit, and rates of property ownership. Collectively, these factors make Plaintiffs more economically vulnerable than institutional housing providers.

On April 23, 2026, City Council voted to approve two ordinances, Bills No. 250329-AA and No. 250330-AA (the "Bills"), which Plaintiffs allege fundamentally alter the ownership and management of their properties by: expanding compliance requirements; increasing licensing consequences, litigation exposure, and operational costs; adding administrative obligations and procedural barriers to recovering possession of their property; and, causing prolonged interruptions in rental income. Plaintiffs allege the cumulative effect of these Bills would fall disproportionately on small landlords, consuming a greater percentage of their operating revenue than institutional housing providers and directly impairing their ability to continue owning, maintaining, and operating affordable residential rental housing.

Bill No. 250329-AA amends Chapter 9-3900 of the Philadelphia Code, entitled "Property Licenses and Owner Accountability," to clarify licensing requirements, require public reporting related to Code compliance, establish remedies, damages, and protections for tenants, and authorize the creation of a Proactive Inspection program. Among other provisions, Bill No. 250329-AA requires an owner who receives a notice of violation stating that a property is unsafe, unfit, imminently dangerous, or violative of the Philadelphia Fire Code to provide notice of that violation to all tenants. The owner then has thirty days to correct it. An owner who fails to correct Code violations, obtain a valid rental license or Certificate of Rental Suitability, or whose rental license has been suspended is denied the right to recover possession of the premises or collect rent during or for the period of noncompliance. When an owner initiates an eviction action, they are required to provide a Certificate of Rental Suitability to the tenant and to the

court. They also carry the burden of demonstrating compliance. Bill No. 250329-AA also creates a Proactive Inspection program, enabling the Department of Licenses and Inspections to inspect on a regular cycle all residential properties and units registered to a rental license, and requiring the Department to create an annual report on the program.

Bill No. 250330-AA amends Chapter 9-800 of the Philadelphia Code, entitled "Landlord and Tenant," to modify the requirements related to good cause termination of a tenancy, add protections against retaliation for tenants, and specify tenants' rights regarding the implied warrant of habitability, the right to organize, and available remedies. As relevant here, it prohibits any owner, landlord, agent, or other person operating or managing premises from refusing to lease to anyone, terminating a lease with a tenant, modifying conditions of existing leases, or restricting a tenant's access to common areas or amenities in retaliation for activities concerning, *inter alia*, reporting or participating in investigations of violations, joining tenant organizations, or otherwise exercising any legal right. In addition, good cause is required to terminate any tenancy, and a landlord must notify the tenant in writing with reasonable specificity as to the basis for such good cause. Lastly, tenants have the right to organize and advocate about the terms and conditions of their residency, as well as the right of habitability. In a court action alleging unpaid rent, tenants are entitled to an abatement of rent during and for any periods when the implied warranty of habitability has been materially breached by a landlord.

Prior to passage, City Council and the Committee conducted multiple public hearings on the Bills.[5] Plaintiffs attended those hearings. They provided testimony on the anticipated legal,

[5] The legislative history of the Bills, a matter of public record, identifies City Council's hearings and other proceedings throughout the legislative process, beginning with the Bills' introduction on April 10, 2025. B. 250329-AA, 2026 Council of the City of Phila., Legislation Details (With Text), https://phila.legistar.com/ViewReport.ashx?M=R&N=Master&GID=30&ID=7300048&GUID=5FA005B6-47E9-4FED-8F94-4661BD604D22&Extra=WithText&Title=Legislation+Details+(With+Text); B. 250330-AA, 2026 Council of the City of Phila., Legislation Details (With Text), https://phila.legistar.com/ViewReport.ashx?M=R&N=Master&GID=30&ID=7300049&GUID=52D840F2-9545-

economic, and practical effects of the proposed legislation upon small housing providers and affordable housing across the city. Plaintiffs testified the Bills would substantially increase cumulative regulatory burdens on landlords, falling disproportionately on small independent landlords who were less able to absorb the increased operative costs. They also testified that African American and other minority-owned rental businesses would be especially affected. Plaintiffs presented evidence that harming these providers would discourage continued investment in naturally occurring affordable housing, disrupting the broader housing ecosystem and harming tenants and landlords alike. Other small landlords, including other African American landlords and landlords of color, expressed similar concerns. During their testimony, City Councilmembers interrupted several speakers and prevented them from finishing their prepared remarks,[6] affording them less opportunity to present their concerns than other participants. Their testimony received little meaningful consideration. The mayor signed both Bills into law on May 7, 2026. They have an effective date of November 1, 2026.

## II. LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

44B8-9C3F-6A985532E5FC&Extra=WithText&Title=Legislation+Details+(With+Text). *See Buck v. Hampton Tp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) ("In evaluating a motion to dismiss, we may consider . . . matters of public record . . . .") (internal citation omitted).

[6] Plaintiffs do not identify who interrupted these speakers in the Amended Complaint.

suffice." *Id.* Rather, a plaintiff must allege some facts to raise the allegation above the level of mere speculation. *Great W. Mining & Min. Co. v. Fox Rothschild, LLP*, 615 F.3d 159, 176 (3d Cir. 2010) (citing *Twombly*, 550 U.S. at 555).

When analyzing a motion to dismiss, a complaint must be construed "in the light most favorable to the plaintiff," with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). Legal conclusions are disregarded, well-pleaded facts are taken as true, and a determination is made as to whether those facts state a "plausible claim for relief." *Id.* at 210-11. In so doing, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III. DISCUSSION

Plaintiffs' Amended Complaint presents four claims of municipal liability against City Council under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), and 42 U.S.C. § 1983. Plaintiffs allege the Bills, as official policy, violate their constitutional rights under the Takings Clause of the Fifth Amendment, the Contract Clause of Article I, and the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment. Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Under a *Monell* theory of liability, municipalities may be held directly liable

under section 1983 "if they adopt a custom or policy that is unconstitutional or that is the 'moving force' behind any constitutional violation." *Barna v. Bd. of Sch. Dir. of Panther Valley Sch. Dist.*, 877 F.3d 136, 145 n. 6 (3d Cir. 2017) (citing *Monell*, 436 U.S. at 658).

**A. Takings Clause**

Beginning with Plaintiffs' Takings Clause claim, Plaintiffs allege the "cumulative operation" of the Bills, particularly their expansion of regulatory compliance obligations and restrictions on lease terminations and renewals, amounts to a regulatory taking without just compensation under the Fifth and Fourteenth Amendments.

The Takings Clause of the Fifth Amendment prohibits the taking of private property "for public use, without just compensation," U.S. Const. amend. V, and "applies to state and local governments through the Fourteenth Amendment." *Newark Cab Ass'n v. City of Newark*, 901 F.3d 146, 151 (3d Cir. 2018) (citing *Am. Exp. v. Sidamon-Eristoff*, 669 F.3d 359, 370 (3d Cir. 2012)). Its purpose is to "bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). "[G]overnment regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster . . . such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle v. Chevron, U.S.A. Inc.*, 544 U.S. 528, 537 (2005). That said, "government regulation—by definition—involves the adjustment of rights for the public good," *Andrus v. Allard*, 444 U.S. 51, 65 (1979), and "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922).

Plaintiffs allege the Bills comprise an unconstitutional regulatory taking that is

compensable under the Takings Clause. There are two types of regulatory takings: takings *per se*, where the regulation precludes all economically beneficial use of the property, *see Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992), and partial takings, where it sufficiently impacts use as to require compensation. *See Nekrilov v. City of Jersey City*, 45 F.4th 662, 669 (3d Cir. 2022). Plaintiffs have not alleged the Bills eliminate every economically beneficial use of their properties, so their claim is evaluated as a partial taking. This is assessed under the framework set forth in *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978), which weighs three factors: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Murr v. Wisconsin*, 582 U.S. 383, 393 (2017). This analysis involves "essentially ad hoc, factual inquiries." *Penn Central*, 438 U.S. at 124.

The Third Circuit's decision in *Nekrilov v. City of Jersey City* is especially informative as to how to conduct that ad hoc, factual inquiry in this context. 45 F.4th at 662. As a threshold matter, to succeed on a takings claim, "the plaintiff[s] must first show that a legally cognizable property interest is affected by the Government's action in question." *Prometheus Radio Project v. FCC*, 373 F.3d 372, 428 (3d Cir. 2004). In *Nekrilov*, the Third Circuit identified three cognizable property interests: "(1) use and enjoyment of [plaintiff's] purchased properties; (2) long-term leases . . . ; and (3) short-term rental contracts." 45 F.4th at 670 (citing *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n.16 (1977)) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."). The Court in *Nekrilov* determined a forward-looking right to pursue one's short-term rental businesses is not a cognizable property interest. *Nekrilov*, 45 F.4th at 670. Plaintiffs do not address *Nekrilov* in

their Response, but the Women's Council of Philadelphia, Inc. ("Women's Council"), in their Brief of *Amicus Curiae* in Support of Plaintiffs, attempt to distinguish it from this case. The Women's Council argues Plaintiffs' property ownership and contractual interests are distinct from the forward-looking property interest rejected in *Nekrilov*. The Court agrees. Plaintiffs allege the Bills affect the use and management of their residential properties, as well as their existing written lease agreements, and so have demonstrated cognizable property interests under *Nekrilov*. Accordingly, one moves to an analysis of the *Penn Central* factors.

***i. Economic Impact***

Starting with the first factor of that analysis—economic impact—Plaintiffs allege the Bills impose "substantial economic burdens" and cause "diminished property value." They provide a list of these anticipated economic burdens: increased compliance costs, expanded administrative requirements, greater litigation exposure, increased licensing risks, prolonged delays affecting the recovery of possession, interruptions in rental income, increased legal expenses, and additional operational uncertainty. Unlike institutional housing providers who can absorb such regulatory burdens within their ordinary operating expenses, Plaintiffs allege their ability to continue owning, maintaining, and operating affordable residential rental housing is directly impaired by the Bills.

In response, City Council argues that Plaintiffs have not adequately pled economic impact because they have failed to allege a significant reduction in the value of their properties via appraisal, market analysis, or any other relevant facts. As stated in *Nekrilov,* "the economic impact of a regulation is usually measured in terms of its effect on the value of the property." 45 F.4th at 673. Moreover, "the [Supreme] Court has required compensation only in cases in which the value of the property was reduced drastically." *Rogin v. Bensalem Twp.*, 616 F.2d

680, 692 (3d Cir. 1980). *See*, *e.g.*, *Andrus*, 444 U.S. at 65-66 (approximately 100% diminution in value); *Village of Euclid v. Ambler Realty Co*., 272 U.S. 365, 384 (1926) (75% diminution in value); *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (87.5% diminution in value). The Third Circuit has also declined compensation even in cases with substantial harm. *See Nekrilov*, 45 F.4th at 672-73 (50-60% loss of potential rental revenue was not sufficient economic impact); *Pace Res., Inc. v. Shrewsbury Twp.*, 808 F.2d 1023, 1031 (3d Cir. 1987) (90% loss of property value was not sufficient). Plaintiffs state only that they have suffered "diminished property value," without providing any information to identify, or quantify, that diminution. This conclusory statement does not sufficiently plead that the Bills had an "effect on the value of [Plaintiffs'] property," *Nekrilov*, 45 F.4th at 673, let alone caused the value to be "reduced drastically." *Rogin*, 616 F.2d at 692.

Rather, Plaintiffs' allegations largely concern the potential interruptions in their rental revenue and the increased costs associated with compliance, neither of which support a finding of sufficient economic impact. "[L]oss of future profits—unaccompanied by any physical property restriction—provides a slender reed upon which to rest a takings claim." *Andrus*, 444 U.S. at 66. Specifically, when it comes to purchased properties that may be rented out, *Nekrilov* affirmed that "lost profits are not an appropriate [] measure of economic impact." 45 F.4th at 673.[7] Plaintiffs' allegations that the Bills increase financial pressure to dispose of rental

[7] In their Brief of *Amicus Curiae*, the Women's Council of Philadelphia, Inc. admits the Court in *Nekrilov* forecloses the consideration of lost profits as economic impact, but they argue the Court's rejection "rested in substantial part on the allegations actually made concerning revenue, property value, retained uses, and the ability to sell." As discussed above, the Court in *Nekrilov* is neither the first nor the only to determine that economic impact is generally assessed by the reduction in value of a property, not potential lost profits. Further, in seeking to distinguish the case, the Women's Council points to a deficiency in Plaintiffs' Amended Complaint that appears to not have been as present in *Nekrilov*—unlike in that case, Plaintiffs here have failed to include concrete allegations "concerning revenue, property value, retained uses, and the ability to sell." Less detailed allegations on economic impact are not stronger ones. If anything, the fact that the quantifiable economic impact alleged in *Nekrilov* was not sufficient makes Plaintiffs' allegations less likely to survive.

properties or withdraw from Philadelphia's rental housing market altogether do not save them. Loss-of-profits claims that "fail to account for other potentially profitable uses of the properties, the most obvious of which is to sell the properties," *id.*, cannot survive.

Plaintiffs argue that Defendants' demand for "completed valuation evidence" and "final economic quantification" exceeds pleading requirements under Federal Rule of Civil Procedure 8, especially before the Bills have even been implemented. But they do not include any allegations remotely close to valuation evidence. Indeed, they don't include factual allegations of value diminution at all. As stated in *Nekrilov*, in that Plaintiffs' "complaint does not quantify th[e] estimated loss, and . . . bases [its Takings Clause] claim at least in part on a prediction," it cannot survive a motion to dismiss. *Id.* (citing *Fowler*, 578 F.3d at 210) ("[C]onclusory or 'bare-bones' allegations will [not] survive a motion to dismiss."). Plaintiffs have thereby failed to allege economic impact.

***ii. Interference with Distinct, Investment-Backed Expectations***

Turning to whether the Bills interfere with Plaintiffs' distinct, investment-backed expectations, Plaintiffs allege they acquired, rehabilitated, and operate their properties in reliance upon the legal framework governing residential housing at the time of acquisition. City Council argues Plaintiffs could not have any reasonable expectations the City would not continue to regulate the landlord-tenant relationship, especially since many of the Bills' provisions depend on existing legal rules and regulations.

*Nekrilov* is again instructive. One "do[es] not suffer a taking requiring compensation merely because 'they have been denied the ability to exploit a property interest that they heretofore had believed was available for development.'" *Nekrilov*, 45 F.4th at 675 (quoting *Penn Central*, 438 U.S. at 130). "Nor does the Takings Clause mean that 'once a property has

been devoted to a particular use, the owner has a reasonable expectation of being able to continue with that use absent the payment of compensation.'" *Id.* (quoting *Pace Res., Inc.,* 808 F.2d at 1032). Additionally, "distinct, investment-backed expectations are reasonable only if they take into account the power of the state to regulate in the public interest." *Pace Res., Inc.*, 808 F.2d at 1033.

Plaintiffs allege that they reasonably relied on Pennsylvania law recognizing traditional incidents of private property, including the ability to negotiate lease agreements, recover possession, and maintain economically viable rental operations, when they made substantial financial commitments to purchase and improve their properties. The Bills will, in other words, "affect[] an already-existing use of purchased properties and long-term leases," as was the case in *Nekrilov*. 45 F.4th at 675. However, the Third Circuit "has made clear that disruption of a present use [of a property] is not enough" to sufficiently allege distinct, investment-backed expectations, *id.* (citing *Pace Res., Inc.*, 808 F.2d at 1032-34), and reliance on current laws to continue to dictate future use of properties is not a reasonable expectation.

Further, Plaintiffs' expectations fail to consider City Council's strong interest in regulating residential housing and ensuring tenants live in safe, habitable, and well-maintained housing without fear of retaliation or unwarranted eviction. The power of the government to regulate tenancy laws is longstanding and well-established. *See HAPCO v. City of Philadelphia*, 482 F. Supp.3d 337, 351-52 (E.D. Pa. 2020) (detailing historical and substantial regulation of residential leases and the landlord-tenant relationship under federal, state, and municipal laws). Plaintiffs have thus also failed to allege distinct, investment-backed expectations.

***iii. Character of the Governmental Action***

Lastly, Plaintiffs acknowledge the City possesses broad authority to regulate residential

housing in furtherance of legitimate public health, safety, and welfare objectives, but argue that the Bills exceed constitutional limits because they impose cumulative burdens upon a discrete class of small housing providers that should be borne by the public as a whole.

When considering the character of the governmental action for a regulatory takings claim, unlike "a physical invasion of land . . . 'a public program adjusting the benefits and burdens of economic life to promote the common good' . . . ordinarily will not be compensable." *New Jersey v. U.S.*, 91 F.3d 463, 468 (3d Cir. 1996) (quoting *Penn Central*, 438 U.S. at 124). "The State has considerable authority to enact legislation, including the power to affect contractual commitments between private parties," *Am. Exp.*, 669 F.3d at 371, and the Supreme Court has "consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Yee v. City of Escondido*, 503 U.S. 518, 528-29 (1992). On the whole, the Court in *Nekrilov* observed, "courts are more likely to 'uphold a regulation that applies generally to a broad class of properties.'" 45 F.4th at 677 (quoting *Rogin*, 616 F.2d at 690).

As acknowledged by Plaintiffs, City Council has the authority to regulate housing and the landlord-tenant relationship to "adjust[] the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124. It is an authority that has been "consistently affirmed" by the courts. *Yee*, 503 U.S. at 528-29. *See also Troy Ltd. v. Renna*, 727 F.2d 287, 302 n. 16 (3d Cir. 1984) ("Most decisions sustaining governmental action . . . have involved a common exercise of regulatory power."); *Rogin*, 616 F.2d at 690 (local zoning ordinance); *Nekrilov*, 45 F.4th at 677-78 (limiting short-term rentals); *Am. Exp.*, 669 F.3d at 371 (retroactively reducing presumptive abandonment period for travelers checks). Plaintiffs' claim

that they as a discrete class of small independent housing providers are disproportionately burdened by the regulation does not mean the Bills do not "appl[y] generally to a broad class of properties." *Rogin*, 616 F.2d at 690. They do. And even if they indeed have "a more severe impact on some [housing providers] than on others, [] that in itself does not mean that the law effects a 'taking.'" *Penn Central*, 438 U.S. at 133. "Legislation designed to promote the general welfare commonly burdens some more than others." *Id.*

Plaintiffs have failed to sufficiently plead a regulatory taking under the standards of all factors set out in the *Penn Central* framework, and this claim against City Council must be dismissed.

**B. Contract Clause**

Turning next to Plaintiffs' Contract Clause claim, they allege the Bills substantially impair their existing contractual relationships and materially alter the legal and economic expectations upon which they acquired, financed, maintained, and leased their properties. The Contract Clause of Article I of the U.S. Constitution provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. It "applies equally to municipal ordinances as it does to state legislation." *Nekrilov*, 45 F.4th at 678-79 (citing *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 822 (7th Cir. 2019)). "Despite its broad language," however, "the Contract Clause does not disrupt a state's ability to exercise its police powers in service of the public interest, even if it affects existing contracts." *Id.* at 178 (citing *Watters v. Bd. of Sch. Dirs. of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)).

In determining a violation of the Contract Clause, "[t]he threshold issue is whether the [municipal] law has operated as a substantial impairment of a contractual relationship." *Sveen v. Melin*, 584 U.S. 811, 819 (2018). If so, "the court must further inquire whether the law at issue

has a legitimate and important public purpose and whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in light of that purpose." *Transp. Workers Union v. SEPTA*, 145 F.3d 619, 621 (3d Cir. 1998). If the impaired contractual relationship is between private parties, "the court will defer to the legislative judgment concerning the importance of the public purpose and the manner in which that purpose is being pursued." *Id.*

As a preliminary matter, a contractual relationship exists here. *See id.* Plaintiffs allege they own residential rental properties that are subject to written lease agreements executed prior to the enactment of the Bills. City Council does not contest the existence of these contractual relationships. Furthermore, by definition, a lease is "[a] contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration." Lease, Black's Law Dictionary (12th ed. 2024); *see also Omnipoint Comm'ns Enters., L.P. v. Twp of Nether Providence*, 232 F. Supp.2d 430, 434 (E.D. Pa. 2002) ("[A] lease requires a mutually acceptable agreement between parties entering a contract.").

Starting with the question of substantial impairment, the relevant considerations are "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 584 U.S. at 819 (citations omitted). An important factor is whether the parties are operating in a regulated industry. *Am. Exp.*, 669 F.3d at 369. "When a party enters an industry that is regulated in a particular manner, it is entering subject to further legislation in the area, and changes in the regulation that may affect its contractual relationships are foreseeable." *Id.* (citing *Energy Rsrvs Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400 (1983)).

City Council argues Plaintiffs could not reasonably expect the statutory framework

governing residential landlord-tenant relationships would remain unchanged, as residential leasing has long been the subject of extensive state and local regulation, and several of the Bills' provisions stem from existing law. Under the Philadelphia Code, it is currently illegal to terminate or alter a lease after notice of a Code violation, Phila. Code § 9-804(1), or in a retaliatory manner, *id.* § 9-804(2). Additionally, good cause protections from lease termination already exist for leases under one year. *Id.* § 9-804(12)(a). In Pennsylvania more broadly, the Landlord and Tenant Act of 1951 details, *inter alia*, notice and process requirements for an eviction, 68 Pa. Stat. §§ 250.501, 250.503, tenant rights and duties in multiple unit buildings, *id.* §§ 250.503-A, 250.504(a), and protections for participation in a tenants' organization, *id.* § 250.205. The state's "Rent Withholding Act" further absolves a tenant of the duty to pay rent if "any Public Health Department . . . certifies a dwelling as unfit for human habitation." 35 Pa. Stat. § 1700-1.

Plaintiffs assert the Bills materially impair their existing contractual relationships by rendering negotiated lease provisions governing termination and nonrenewal unenforceable, compelling continuation of landlord-tenant relationships beyond the terms agreed upon by the parties, and substituting mandatory statutory provisions for privately negotiated contractual rights. The statement that the Bills materially impair Plaintiffs' contractual relationships is a legal conclusion and thus may be disregarded. *Fowler*, 578 F.3d at 210-11. To boot, it is not supported by well-pleaded facts that raise the allegation above the level of mere speculation. *Great W. Mining & Min. Co.*, 615 F.3d at 176 (citing *Twombly*, 550 U.S. at 555). Plaintiffs fail to state with any specificity how particular provisions of the Bills will impact any provisions of their lease agreements. What's more, the highly regulated nature of residential leases and the landlord-tenant relationship negates the reasonableness of Plaintiffs' expectations that City Code

would not "interfere" with their leases. *See Sveen*, 584 U.S. at 819. Even if the Bills expand Plaintiffs' obligations as landlords under the law, the "enlargement of an already-regulated statutory tenancy is probably not an impairment at all." *Troy*, 727 F.2d at 297. Because Plaintiffs have failed to allege a plausible substantial impairment to their contractual relationships, no further analysis is required, and their Contract Clause claim must be dismissed.

**C. Due Process Clause**

Plaintiffs' allegations in support of their Fourteenth Amendment claims are strikingly similar to those they make in support of their Takings Clause claim. They maintain that the Bills deprive them of their constitutionally protected property interests without substantive due process of law by substantially increasing compliance costs, expanding administrative obligations, increasing litigation exposure, delaying the recovery of possession, restricting Plaintiffs' ability to determine whether and under what conditions their properties may continue to be leased, and materially increasing the cost of operating residential rental housing. Plaintiffs allege these burdens disproportionately harm small landlords operating with limited reserves, increasing pressure on them to reduce investment or exit the market. This decreases long-term availability of naturally occurring affordable housing, one of Philadelphia's largest sources of affordable rental housing. As a result, Plaintiffs argue, the Bills undermine City Council's stated objective of promoting housing stability.

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Legislative acts are subject to rational basis review, which means City Council "must demonstrate (1) the existence of a legitimate state interest that (2) could be rationally furthered by the [Bills]." *Am. Exp.*, 669 F.3d at 366. In other words, Plaintiffs must plausibly allege "there is no rational

connection between the regulation and the interest which the regulation promotes." *Empire Kosher Poultry, Inc. v. Hallowell*, 816 F.2d 907, 912 (3d Cir. 1987) (citations omitted). "[U]nder rational basis scrutiny, a court's inquiry is limited to whether the law 'rationally furthers *any* legitimate state objective.'" *Am. Exp.*, 669 F.3d at 367 (alteration in original) (quoting *Malmed v. Thornburgh*, 621 F.2d 565, 569 (3d Cir. 1980)). *See also Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487-88 (1955) ("[T]he law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."). This test "requires significant deference to the legislature's decision-making and assumptions." *Am. Exp.*, 669 F.3d at 366 (citing *Sammon v. N.J. Bd. of Med. Exam'rs*, 66 F.3d 639, 645 (3d Cir. 1995)).

Plaintiffs allege an attenuated chain of events in an effort to argue the Bills violated their substantive due process rights. They state that the cumulative financial and administrative burdens caused by the Bills could result in more small independent landlords like them leaving the market. They suggest this could then accelerate market consolidation among institutional owners, resulting in less available affordable housing, which would be contrary to City Council's stated purpose of preserving affordable housing. That sequence of conceivable negative consequences does not amount to alleging a plausible lack of rational connection between City Council's legitimate interest and the means by which it has chosen to further that interest. *See Romer v. Evans*, 517 U.S. 620, 632 (1996) (under rational basis review, "a law will be sustained . . . even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous.").

The stated purpose of the Bills is to shift from a reactive, complaint-driven housing

system that leaves tenants vulnerable to retaliation and eviction to a proactive and accountable framework that ensures compliance before harm occurs and empowers tenants to enforce their rights. The Bills broadly aim to protect public health, reduce displacement, and promote housing stability. Plaintiffs acknowledge, and explicitly do not challenge, City Council's declared objectives. By introducing stronger licensing requirements, protecting tenants from retaliation for reporting housing code violations or participating in tenant organizing, and requiring evictions only for good cause, the Bills rationally serve such legitimate state interests. Rather than alleging facts sufficient to demonstrate that there is "no rational connection," *Empire Kosher Poultry*, 816 F.2d at 912, between the Bills and the interests they promote, Plaintiffs merely chose a potential alternative interest City Council had—preserving affordable housing—and then argue the tenuous means by which the Bills' ultimate impact could work against that interest. That is not a plausibly stated claim and Plaintiffs' substantive due process claim must be dismissed.

**D. Equal Protection Clause**

The Fourteenth Amendment also provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It "prohibits states from discriminating between individuals on the basis of race." *Antonelli v. New Jersey*, 419 F.3d 267, 274 (3d Cir. 2005) (citing *Shaw v. Reno*, 509 U.S. 630, 642 (1993)). A claim of intentional race discrimination under a facially neutral law or policy that is applied evenhandedly, as Plaintiffs allege here, requires Plaintiffs to demonstrate that the Bills: (1) are motivated by a discriminatory intent or purpose; and, (2) have a racially discriminatory impact. *Id.* (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)). If Plaintiffs state a plausible claim, strict scrutiny review applies to the Bills. *Arlington Heights*,

429 U.S. at 266-67. Absent a racially discriminatory purpose and impact, the Bills are subject to rational basis review. *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 544 (3d Cir. 2011).

Plaintiffs allege that although the Bills are facially neutral, the legislative process to enact them denied Plaintiffs the equal protection of the laws. Plaintiffs assert that, prior to enactment, they and other African American landlords and landlords of color personally advised the City Council in multiple public hearings of the disproportionate burden the Bills place on minority owned rental businesses. During those hearings, several such speakers were interrupted before completing their testimony, prevented from presenting all of their prepared remarks, or afforded materially less opportunity to address the legislative body than other participants. Despite these warnings and alternative approaches presented during the legislative process, City Council passed the Bills. City Council argues Plaintiffs have failed to allege facts demonstrating discrimination on the basis of race, and the Bills should be upheld under rational basis review.

Plaintiffs' allegations primarily relate to discriminatory impact. To establish discriminatory impact, Plaintiffs "must show that similarly situated individuals of a different race were treated differently." *Doe*, 665 F.3d at 550. Plaintiffs state publicly available research demonstrates both that naturally occurring affordable housing is supplied primarily by small local landlords, like Plaintiffs, operating with limited capital, and that African American landlords disproportionately face barriers to commercial lending, wealth accumulation, and financial reserves. Both of these patterns render Plaintiffs—and African American small landlords more broadly—materially less able than institutional housing providers to absorb significant fixed regulatory costs and cumulative compliance burdens. But these statements only compare small landlords to institutional housing providers, with no allegations as to how the

latter group constitutes "similarly situated individuals of a different race." *Id.*

Plaintiffs' allegations regarding the treatment of landlords of color at the Bills' hearings are more germane, but offer only that they were treated differently "than other participants." That does not sufficiently allege the existence of similarly situated individuals of a different race who received different treatment. *See Danihel v. Office of President of U.S.*, 616 F. App'x 467, 470-71 (3d Cir. 2015) ("While [the plaintiff] states, without elaboration, that other individuals were treated better than him, these conclusory allegations are altogether insufficient to state a claim.") (citing *Cnty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 171 (3d Cir. 2006)).

Plaintiffs fare no better alleging a racially discriminatory purpose. "Racially discriminatory purpose means that the decisionmaker adopted the challenged action at least partially because the action would benefit or burden an identifiable group." *Doe*, 665 F.3d at 552; *see also U.S. v. Frazier*, 981 F.2d 92, 95 (3d Cir. 1992) ("Even conscious awareness on the part of the [decisionmaker] that the [policy] will have a racially disparate impact does not invalidate an otherwise valid law, so long as that awareness played no causal role . . . ."). It "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Admin'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Plaintiffs allege that City Council was advised, via the repeated testimony of Plaintiffs and other small independent landlords, written submissions, publicly available research, and the legislative record, of the disproportionate burden the Bills would have on minority owned rental businesses and the potential resultant pressure on minority landlords to exit the rental market. They allege that, despite this actual notice, City Council declined to adopt alternative approaches and enacted the Bills. Plaintiffs have not alleged any facts indicating City Council plausibly

enacted the Bills in their current form because of the disproportionate impact on African American small landlords or other landlords of color.[8] "[C]onscious awareness" of a potential racially disparate impact "does not invalidate an otherwise valid law." *U.S. v. Frazier*, 981 F.2d at 95. Plaintiffs have failed to allege an intentional race discrimination claim under the Equal Protection Clause, so rational basis review applies. As determined above, Plaintiffs have not pled the lack of a rational relation between the Bills and their stated purpose, and so Plaintiffs' Equal Protection Clause claim must also be dismissed.

**E. *Monell* Liability**

Because Plaintiffs alleged constitutional violations stem from City Council's official policy, they allege Defendants are liable as a municipality under the *Monell* theory of liability. *See Monell*, 436 U.S. at 658. As the Supreme Court has held, however, a municipality cannot be found liable on a *Monell* claim where there has been no underlying violation of rights under § 1983. *See City of Los Angeles v. Heller*, 475 U.S. 796 (1986); *see also Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 124 (3d Cir. 2003) ("[M]unicipal liability will only lie where municipal action actually caused an injury.") (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). Because all underlying constitutional claims have been dismissed, this claim must also be dismissed.

---

[8] As *Amicus*, the Women's Council argues Plaintiffs sufficiently allege a discriminatory purpose when one considers the overall context in which the Bills were passed, as required by *Village of Arlington Heights v. Metropolitan Housing Development Corporation*. 429 U.S. 252, 266-68 (1977) (determining the presence of a discriminatory purpose "demands a sensitive inquiry into such circumstantial and direct evidence" as, *inter alia*, disproportionate impact, historical background of the decision, the sequence of events leading up to the decision, departures from normal procedures, and legislative history). The Women's Council argues Plaintiffs' allegations of historical disparities affecting access to property ownership, identified disproportionate burdens on minority owners, Plaintiffs' direct warnings to City Council, procedural irregularities, and unequal treatment of public speakers suffice to allege discriminatory purpose. As discussed above, a claim under the Equal Protection Clause cannot survive without alleging both racially discriminatory impact and discriminatory intent. *See id.* at 265. In that Plaintiffs have failed to allege racially discriminatory impact, the Court need not consider the Women's Council's arguments as to discriminatory purpose.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss will be granted, and all of Plaintiffs' claims will be dismissed without prejudice.[9]

An appropriate order follows.

**BY THE COURT:**

S/ **WENDY BEETLESTONE**

**WENDY BEETLESTONE, C. J.**

[9] Pursuant to Federal Rule of Civil Procedure 15(a), leave to amend shall be freely given when justice so requires. *See also U.S. v. Thomas*, 221 F.3d 430, 435 (3d Cir. 2000) ("The purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities") (internal quotation marks omitted). "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." *Alston v. Parker*, 363 F.3d 229, 235-36 (3d Cir. 2004), *overruled on other grounds*. Defendants argue amendment would be futile. "Futility" means that the complaint, as amended, would fail to state a claim upon which relief could be granted. *Id.* Plaintiffs' Amended Complaint would not, as amended, necessarily fail to state a claim upon which relief could be granted. Leave to amend will be granted.